## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re:<br><br>SPECIALTY HOSPITAL OF<br>WASHINGTON, LLC, *et al.*,<br><br>Debtors.[1] | Case No. 14-00279<br><br>Chapter 11<br><br>(Joint Administration Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507
(I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING,
(II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) GRANTING
PRIMING LIENS AND PROVIDING SUPERPRIORITY CLAIMS, (IV)
GRANTING ADEQUATE PROTECTION, (V) SCHEDULING A FINAL
HEARING, AND (VI) GRANTING RELATED RELIEF**

Specialty Hospitals of America, LLC ("**SHA**") and certain of its subsidiaries and

affiliates, as debtors and debtors-in-possession (collectively, the "**Debtors**") hereby file this

Motion (the "**Motion**") pursuant to sections 105(a), 361, 362, 363, 364 and 507 of title 11 of the

United States Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**") and Rules 2002, 4001,

6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for

entry of an interim order on an expedited basis, substantially in the form attached hereto as

Exhibit A (the "**Interim Order**"), and  a final order (the "**Final Order**" and together with the

Interim Order, the "**DIP Orders**"), (i) authorizing the Debtor to (a) enter into a financing

arrangement on an interim basis on the terms as set forth in the debtor-in-possession financing

term sheet attached hereto as Exhibit B (the "**DIP Term Sheet**") and on a final basis under a

debtor-in-possession financing agreement containing terms and conditions substantially similar

---

[1]     The debtors in these chapter 11 cases and the last four digits of each debtor's federal
identification number are:  Specialty Hospital of America, LLC (1347), SHA Holdings, Inc.
(1943), SHA Management, LLC (1350), Specialty Hospital of Washington, LLC (1352),
Specialty Hospital of Washington Nursing Center, LLC (1348), Specialty Hospital of
Washington Hadley, LLC (2586), and SHA Hadley SNF, LLC (1976).

to those set forth in the DIP Term Sheet (the "**DIP Credit Agreement**") and (b) use Cash

Collateral (as defined herein), (ii) granting priming liens, priority liens, and superpriority claims

to the DIP Lender (as defined below), (iii) granting adequate protection to the Existing

Lienholders (as defined below) with respect to the use of the Cash Collateral and any diminution

in the value of the Existing Lienholders' interests in the prepetition collateral, including Cash

Collateral, (iv) scheduling a final hearing pursuant to Bankruptcy Rule 4001, and (v) granting

related relief.  In support of this Motion, the Debtors rely on the *Declaration of Edwin Clark,*

*Chief Financial Officer of the Debtors, in Support of First Day Motions* filed contemporaneously

with this Motion and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Debtors own and operate the only two long term acute care facilities within

the District of Columbia as well as two nursing homes whose patients often require more acute

health care than those at many other nursing homes.  Although the quality of care provided to

their patients or residents is high, the Debtors lack the resources to continue to operate, and

efforts to obtain debt or equity financing to sustain their operations has been unsuccessful,

particularly given the amount of debt they owe.  Thus, to avoid having to close their doors and

transfer patients abruptly, the Debtors have been required to seek protection under chapter 11

and to turn to this Court to oversee an accelerated process for selling their businesses free and

clear of liens, claims, encumbrances and interests.

2.      Fortunately, the Debtors have not been forced to enter chapter 11 without an

option for being able to sell their assets and provide continuing high-quality care to their patients

and residents.  The Debtors have been able to secure a stalking horse bid for their assets from a

financially sound buyer whom the Debtors believe will be able to obtain, in short order, the

necessary non-bankruptcy regulatory and other approvals to permit a sale without any

interruption in service.

3.      This stalking horse bidder also is providing, subject to Court approval, post-petition financing to fund the Debtors' operations while this process proceeds, which funding will be a credit against its purchase price for these assets.  This financing ensures that the Debtors remain current on their post-petition obligations, and without it the Debtors will be unable to execute on their plan to conduct a prompt and orderly sale process aimed at continuing the operations and providing seamless high-quality care to their patients, while maximizing the value for their assets.

4.      For these reasons as expanded on below, the Debtors request that the Court enter interim and final orders approving the post-petition financing arrangement reached by the Debtors.

## CONCISE STATEMENTS PURSUANT TO BANKRUPTCY RULE 4001

5.      **Obtaining Credit**.  As required by Bankruptcy Rule 4001(c), the following is a summary of the material terms of the DIP Term Sheet, forthcoming DIP Credit Agreement, and DIP Orders:[2]

| MATERIAL TERMS | SUMMARY OF DIP CREDIT AGREEMENT |
| --- | --- |
| **Borrowers**: | All Debtors.  *See* p. 1 of the DIP Term Sheet. |

---

[2]      Unless otherwise indicated, capitalized terms used and not defined in the below chart shall have the meanings set forth elsewhere in this Motion or in the DIP Term Sheet. The summaries and descriptions of the terms and conditions of the DIP Term Sheet and the Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of their significant terms and should only be relied upon as such. The summaries and descriptions are and will be qualified in their entirety by the DIP Term Sheet, the DIP Credit Agreement and the Interim Order or Final Order, as applicable. In the event that there is a conflict between this Motion and the DIP Term Sheet, or, as applicable, the Interim Order or Final Order, the DIP Term Sheet or the Interim Order or Final Order, as applicable, shall control in all respects.

| | |
|---|---|
| **DIP Lender:** | DCA Acquisitions, LLC or its assigns.  *See* p. 1 of the DIP Term Sheet. |
| **DIP Loan Amount:** | A superpriority, priming, term loan facility (the "**DIP Loan**") in an aggregate principal amount of $15,000,000 ("**Commitment**").  *See* p. 1 of the DIP Term Sheet. |
| **Use of Proceeds:** | Proceeds of the DIP Loan shall be utilized to pay, inter alia, working capital and operational expenses, and case administration costs reflected on the "**Approved Budget**," together with costs, expenses, and closing payments. |
| **Interim Availability:** | After entry of the Interim Order, up to $6.6 million of the Commitment shall be funded subject to the terms of the DIP Loan Documents and in accordance with the Approved Budget (the "**Interim Disbursement**").  *See* p. 1 of the DIP Term Sheet. |
| **Final Availability:** | Upon entry of the Final Order approving the DIP Loan, the balance of the Commitment shall be made available, subject to compliance with the terms, conditions and covenants described in the DIP Loan Documents and in accordance with the Approved Budget (the "**Final Disbursement**").  *See* p.1 of the DIP Term Sheet. |
| **Approved Budget:** | The Approved Budget consists of a 13-week statement of sources and uses, broken down by week, including the anticipated uses of the DIP Loan for such period.  The Approved Budget as of the execution of the execution of the DIP Term sheet is attached to this Motion as <u>Exhibit C</u>. |
| **Priority and Liens/ Ranking/Security /Collateral:** | **DIP Collateral:**  Pursuant to Bankruptcy Code § 364(c)(2), (3), and 364(d), the DIP Loan shall be secured by: (i) a perfected first priority lien on any and all current and future assets of the Borrowers of any nature or type whatsoever (excluding causes of action and recoveries pursuant to Chapter 5 of the Bankruptcy Code), and all proceeds thereof; and (ii) constructive control over the Borrowers' bank accounts in similar form and substance of lockbox and/or control accounts customary for transactions of this nature, except that duly perfected real property tax liens, if any, shall not be primed (collectively the **"DIP Collateral"**).

**Priority:** Section 364(c)(1) "**Superpriority Administrative Expense Claim**". The security interests against the DIP Collateral, pursuant to Code § 364(c)(2), (3), and 364(d), constitute a lien ranking prior to all other claims and liens of the Borrowers, except for the Carveout (the **"Priming Lien"**). The Priming Lien will be senior in priority to security interests and liens securing the indebtedness and other obligations owing under any of the Borrowers' prepetition loan and security agreements and other liens, except duly perfected real property tax liens, if any.  The Priming Lien shall not be subject to challenge, but instead shall attach and become valid and perfected without the requirement of any further action by the Agent or the Lender.

**Government Recoupment:**  Governmental units shall have no recoupment rights except for overpayments that arise under the same provider agreement or comparable applicable statutes, regulations, or arrangements, in accordance with applicable law.

**Carvout:**  Carveout from DIP Lender's security interests and claims for (i) U.S. Trustee fees; (ii) prior to an Event of Default, unpaid fees and expenses of Debtor's and Committee's professionals, and any patient care ombudsman in accordance with the Approved Budget, in an amount not to exceed the aggregate amount set forth in the Approved Budget; and (iii) up to $250,000 for the payment of Professional Fees incurred from and after the occurrence of an Event of Default. Other than the Carveout, the DIP Loan shall not otherwise be subject to any carveout for Professional Fees.  *See* pp. 2-3 of the DIP Term Sheet. |

| | |
|---|---|
| **Funding Date:** | Interim funding:  no later than two (2) business days after entry of the Interim Order. *See* p. 2 of the DIP Term Sheet.<br><br>Final funding:  no later than two (2) business days after entry of Final Order.  *See* p. 2 of the DIP Term Sheet. |
| **Term:** | In the absence of, inter alia, the occurrence or nonoccurrence of several specified events, all sums due under the DIP Loan shall become due and payable in full in cash on the thirty-fifth (35th) day after the Petition Date.  However, if the Court has entered an order approving the Lender Sponsored Transaction and all conditions to the closing of that Transaction have been satisfied except for the requirement that all regulatory approvals have been received, then the Due Date shall be extended for up to sixty (60) days pursuant to the Approved Budget.  *See* pp. 3-4 of the DIP Term Sheet. |
| **Interest Rate:** | LIBOR + 1200 per annum with a 2% floor (the **"Interest**").  Interest shall be due and payable monthly in cash in arrears.  *See* p.3 of the DIP Term Sheet. |
| **Default Interest Rate:** | Upon the occurrence of an Event of Default (as defined below) and during the continuation of such default, interest shall accrue on the outstanding amounts at 3% in excess of the applicable interest rate (the "**Default Interest**").  *See* p.3 of the DIP Term Sheet. |
| **Fees:** | 1  DIP Fee in an amount equal to 2% of the Commitment, earned in full at the commencement of the DIP Loan and payable on the earliest of the Due Date, an Event of Default and the consummation of a Sale.  *See* p. 3 of DIP Term Sheet.<br><br>2.  One percent (1%) of the Commitment, earned in full at the commencement of the DIP Loan and payable on the earliest of the Due Date, an Event of Default and the consummation of a Sale.  *See* p. 3 of the DIP Term Sheet.<br><br>3.  A call premium of 3% (at 103) of the Commitment, payable in full upon the Due Date, provided that the call premium shall be waived by Lender upon a closing of the Lender-Sponsored Transaction.  *See* p. 3 of the DIP Term Sheet.<br><br>4.  $40,000 per annum, which amount shall be payable in cash to the Agent no later than two (2) business days after entry of the Interim Order and shall be non-refundable. *See* p. 3 of the DIP Term Sheet. |
| **Event of Default:** | The list of events, acts and omissions that constitute and **"Event of Default"** is lengthy, and summarizing them would result in this Concise Statement exceeding the five page limit.  Events of Default are located at pages 7-9 of the DIP Term Sheet. Debtors submit the Events of Default are customary for a buyer-sponsored transaction under the present circumstances. |
| **DIP Loan Closing Conditions:** | The DIP Term Sheet is subject to, among other items, the following:<br><br>1. Orders for relief for all Borrowers in the DC Court;<br><br>2. Entry of the Interim Order and Final Order; and<br><br>3. Execution of all definitive legal documentation with respect to the DIP Loan and Lender-Sponsored Transaction acceptable to the Agent and Lender in their sole discretion, all prior to the final hearing on the DIP Loan. |
| **Lender Sponsored Transaction:** | The Borrowers and the Lender will cooperate to develop and implement a restructuring (the "**Lender Sponsored Transaction**") through a sale of substantially all of the |

|  | Borrowers' assets free and clear of all liens, claims, encumbrances and interests pursuant to Bankruptcy Code § 363 (the "**Sale**"). The Lender (or its designee) shall be designated as the "stalking horse" purchaser for the Sale pursuant to the terms and conditions set forth in the APA Term Sheet (the "**Stalking Horse Bid**"). The agreements, instruments and other documents necessary to implement and consummate the Lender Sponsored Transaction shall be on terms and conditions acceptable to the Agent and the Lender. |
|---|---|
| **Milestones:** | 1.  On the Petition Date, the Borrowers shall have filed a motion (the "**Sale Motion**") to establish bidding procedures for the Sale and identified the Lender (or its designee) as the "stalking horse" purchaser, and to approve the Sale.<br><br>2.  Within nine (9) days of the Petition Date, the Bankruptcy Court shall have entered an order approving bidding procedures for the Sale.<br><br>3.  Within thirty-five (35) days of the Petition Date, the Bankruptcy Court shall have entered an order approving a Sale.<br><br>4.  If Lender is the successful bidder and all other conditions to closing the Sale have been met except for the required regulatory approvals, and the Court has approved the appointment of management that is acceptable to Lender, Lender will continue to fund the DIP in accordance with an approved budget (approved by Lender in its sole discretion) for an additional sixty (60) days in order to consummate the Sale. |

6.    **Use of Cash Collateral**.  As required by Bankruptcy Rule 4001(b), the following is a summary of the material terms regarding the Debtors' use of Cash Collateral:

| MATERIAL TERMS | SUMMARY OF CASH COLLATERAL USEAGE |
|---|---|
| **Names of Each Entity with and Interest in Cash Collateral:** | 1.   Debtors<br>2.   DIP Lender (assuming the DIP Loan is approved)<br>3.   Branch Banking and Trust Company<br>4.   National Capitol Bank of Washington<br>5.   Internal Revenue Service<br>6.   U.S. Department of Health and Human Services<br>7.   Centers for Medicare and Medicaid Services<br>8.   District of Columbia Department of Health Care Finance |
| **Purpose for the Use of Cash Collateral:** | Cash Collateral be utilized to pay, inter alia, working capital and operational expenses, and case administration costs reflected on the Approved Budget, together with costs, expenses, and closing payments. |
| **Duration for Use of Cash Collateral:** | Concurrent with the term of the DIP Loan. |
| **Adequate Protection for Existing Lienholders:** | 1.   Continuing valid, binding, enforceable, and perfected postpetition security interests in and liens on the DIP Collateral junior only to the DIP Liens and the Carveout.<br><br>2.   Bankruptcy Code section 507(b) allowed superpriority administrative expense claim in each of the Cases and any successor cases in connection therewith, junior only to the DIP Liens and the Carveout (the "**Senior Superpriority Claims**"). |

## JURISDICTION

7.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

8.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.     The statutory bases for the relief requested herein are sections 105(a), 361, 362, 363, 364 and 507 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## BACKGROUND

*The Debtors*

10.     SHA is a holding company that operates two healthcare facilities in Washington, D.C. under the "Specialty Hospitals of Washington" brand, and is the parent company of the Specialty Hospital of Washington, LLC, Specialty Hospital of Washington Nursing, LLC, SHA Management, LLC, Specialty Hospital of Washington Hadley, LLC, SHA Holdings, Inc., and SHA Hadley SNF, LLC.

*The Facilities*

11.     The Debtors collectively own and operate two Long Term Acute Care Hospital ("**LTAC**")[3] facilities, each of which has an accompanying Skilled Nursing Facility ("**SNF**").[4] As described below, the patients and residents at these facilities are among the sickest in the

---

[3]     LTACs are specialized hospitals that treat patients with multiple conditions, but who may improve and be able to return home.   They treat people requiring comprehensive rehabilitation, head trauma treatment, respiratory therapy and pain management.   LTACH patients are often resident at a facility for more than 25 days, and often are transferred from intensive or critical care units.   These patients receive care coordination, dialysis, wound care, pharmacy and physician services, radiation, and physical therapy, among other services.

[4]     A SNF is commonly referred to as a nursing home.   It provides twenty-four hour care to residents who are sick, disabled or injured.

country.

12.     One such facility is located at 700 Constitution Avenue, NE, Washington, DC (the "**Capitol Hill Facility**").[5]  The Capitol Hill Facility houses a 60-bed LTAC and a 117-bed SNF.  The facility is leased pursuant to a *Lease Agreement* dated December 23, 2004 (as may have been amended and restated from time to time, the "**Lease**") with Capitol Hill Group, one of SHDC's petitioning creditor, as landlord.

13.     The other facility is located at 4601 MLK Jr. Avenue S.W., Washington, D.C. (the "**Hadley Facility**" and, together with the Capitol Hill Facility, the "**SHA Facilities**"). The Hadley Facility houses an 82-bed LTAC, a 62-bed SNF,[6] and a surgical suite primarily for the benefit of the Hadley Facility's patients or residents.

14.     Collectively, the SNF beds currently have an occupancy rate of approximately 98 percent, filled mostly by Medicaid patients.  The LTAC beds currently have an occupancy rate of approximately 46 percent, filled by a combination of primarily Medicare and Medicaid patients.

15.     The SHA Facilities contain the only licensed freestanding LTACs between Philadelphia and Richmond, and have the only certificates of need issued in Washington D.C. for LTAC services. The Debtors provide a wide variety of programs and services at the SHA Facilities, including cardio-pulmonary treatment, wound care, infectious disease therapy, and other forms of patient care services.

16.     The Debtors' patients typically are critically ill and/or have multiple system

---

[5]     The LTAC and SNF at the Capitol Facility are owned and operated by Debtors Specialty Hospital of Washington, LLC and Specialty Hospital of Washington Nursing Center, LLC, respectively.

[6]     The LTAC and SNF at the Hadley Facility are owned and operated by Debtors Specialty Hospital of Washington Hadley, LLC and SHA Hadley SNF, LLC, respectively.   Debtor Specialty Hospital of Washington Hadley, LLC owns the real estate and improvements thereon at the Hadley Facility.

failures that require extended acute care treatment after discharge from a traditional acute care hospital. Patients often come to the hospitals directly from an intensive care unit. Indeed, the "case mix" at these facilities is 1.329, the fifth highest in the United States. The "cae mix" index is the relative value assigned to a diagnosis related group of patients developed by Medicare to identify the average acuity level for that group of patients which in this case is the group of patients in the LTAC.

17.    To provide high quality care to their patients and residents, the Debtors currently employee approximately 790 people. Historically, when occupancy levels at the SHA Facilities were at their peak, the Debtors employed approximately 850 people.

18.    A description of the Debtors and their businesses, and the facts and circumstances giving rise to these Cases and supporting the relief sought in this Motion, is set forth in the contemporaneously-filed *Declaration of Edwin Clark in Support of Chapter 11 Petitions and First Day Motions*, which is incorporated herein by reference.

## PREPETITION CAPITAL STRUCTURE

19.    As described more fully below, the Debtors' prepetition secured debt consists mainly of: (i) secured facilities with Branch Banking and Trust Company ("**BB&T**") in the approximate amount of $40.1 million; (ii) a secured facility with National Capitol Bank of Washington ("**NCB**") in the approximate amount of $6 million, (iii) tax liens in favor of the Internal Revenue Service and/or other governmental agencies (the "**IRS**") in the approximate amount of $7 million, and (iv) more than $5 million owed (on a senior subordinated secured basis) to JWR Realty, LLC ("**JWR**") by Specialty Hospitals of America, LLC. BB&T, NCB, IRS and JWR are referred to herein as the "**Existing Lienholders**".

*The BB&T Facilities*

20.      The Debtors have outstanding obligations under a secured financing facility with BB&T in the principal amount of approximately $34 million.  Approximately $28 million of these obligations relate to a term facility (the "**BB&T Term Facility**") and the remaining $6 million of these obligations relate to a revolving facility (the "**BB&T Revolving Facility**" and, together with the BB&T Term Facility, the "**BB&T Facilities**").

21.      The BB&T Facilities are evidenced by a *Business Loan and Security Agreement* dated March of 2008 and three secured promissory notes, each dated March 24, 2008: (i) a *Term A Promissory Note* in the amount of $35 million; (ii) a *Term B Promissory Note* in the amount of $6 million, and; (iii) a *Revolving Promissory Note* in the amount of $10.5 million.[7]  The BB&T Term Facility matures on April 1, 2015, and the BB&T Revolving Facility matured on April 1, 2011. The BB&T Facilities appear to be secured by substantially all of the Debtors' assets (the "**BB&T Collateral**").  The Debtors are in monetary default under the BB&T Facilities.  As of the Petition Date, the total amount outstanding on the BB&T Facilities was approximately $40.1 million.

*NCB Facility*

22.      SHA also has outstanding obligations under a short-term secured financing arrangement with NCB (the "**NCB Facility**").  The NCB Facility is evidenced by a *Promissory Note* in the amount of $6 million, a *Commercial Security Agreement*, and a *Security Agreement-Pledge*, each dated March 12, 2013, by and between SHA and NCB. The NCB Facility appears to be secured by all of SHA's personal property and business assets (the "**NCB Collateral**"); albeit subordinate to the Debtors' obligations under the BB&T Facilities and the IRS Tax Liens

---

[7]      The original borrowing limit under the BB&T Revolving Facility was $7.5 million, but was increased to $10.5 million through execution of an *Allonge and First Modification to Revolving Promissory Note* dated December of 2009.

(as defined below).  SHA is currently in monetary default under the NCB Facility. As of the Petition Date, the total amount outstanding on the NCB Facility was approximately $6 million.

*IRS Tax Liens*

23.     The Debtors are obligated to the federal government for payment of certain unpaid withholdings and other related tax obligations (the "**Tax Obligations**"), including those arising under the Federal Insurance Contributions Act (FICA). In order to secure repayment of the Tax Obligations, the IRS has filed liens (the "**IRS Tax Liens**") on the Debtors' accounts receivable and inventory (the "**IRS Collateral**" and together with the BB&T Collateral and the NCB Collateral, the "**Prepetition Collateral**") totaling approximately $7 million.  The IRS Tax Liens appear to be senior to the security interests of both BB&T and NCB with regard to the IRS Collateral.

*JWR Realty Facility*

24.     Specialty Hospitals of America, LLC has outstanding obligations to JWR in the amount of at least $5 million (the "**JWRR Debt**") pursuant to, among other instruments, a certain Senior Subordinated Note Agreement dated as of November 28, 2005 (as may have been amended from time to time).  The  collateral for the JWRR Debt is described in, among other instruments, the November 28, 2005 Security Agreement (All Personal Property Assets) entered into by Specialty Hospitals of America, LLC and JWR.

## **NEED FOR DIP FINANCING AND USE OF CASH COLLATERAL**

*Current Financial Challenges; Critical Need for Financing*

25.     The Debtors are operating under severe financial and operational distress that threatens their ability to maintain operations. Several factors have contributed to the Debtors' difficulties. They have been (and are) parties to numerous legal actions, including actions

brought by the IRS, the Department of Justice, the Center for Medicaid and Medicare Services ("**CMS**"), the D.C. Department of Healthcare Finance and the D.C. Department of Health. Defending these and several other lawsuits consumes substantial financial, personnel, and other resources of the Debtors. Moreover, the outcome of such lawsuits has resulted in substantial liabilities to the IRS, CMS and others, totaling over $40 million.

26.     Occupancy levels at the SHA Facilities (particularly the LTAC facilities) have also declined. Since 2012, total occupancy at the Hadley and Capitol Hill Facilities has decreased approximately 31% and 74% respectively.

27.     As a result of these and a confluence of related factors, the Debtors are currently in a state of financial crisis. They are in monetary default under lease and secured debt obligations and have fallen behind in payment to trade creditors. Without the infusion of new operating capital, the SHA Facilities will be unable to meet upcoming payroll and operational obligations.

28.     The SHA Facilities serve a vital need to the community and their closure would result in a healthcare crisis in the Washington DC area. As mentioned above, both the SHA Facilities provide acute medical care and services to a population suffering from serious and life-threatening conditions. Because the LTACs at the SHA Facilities are the only licensed, freestanding LTACs in the region, and because short-term acute care hospitals are not equipped to care for long-term patients from a financial standpoint, the continued operation of both the SHA Facilities is critical to the well-being of its current and future patients, and particularly those patients utilizing Medicaid and Medicare. The SHA Facilities are both located in areas of high concentration of Medicaid and Medicare patients, many of whom do not have the financial or physical capability to move. This potential hardship is particularly true for the SNF residents.

There are few other nursing home options for people in these neighborhoods, and there is a shortage of nursing home beds in the District of Columbia.  Moreover, as freestanding LTACs and SNFs, the SHA Facilities are serving very fragile patients with life-threatening illnesses.  For these people, closure of the SHA Facilities could lead to particularly catastrophic consequences.

29.     In addition, because there are not any other freestanding LTACs in DC, and there already exists a shortage of SNF beds in the District of Columbia, the closure of the SHA Facilities would have a devastating and potentially long-lasting impact on the approximately 750 people who work there.  There are no comparable facilities with capacity within the District, making it unlikely that the Debtors' employees would find new jobs quickly within the District.

*The Proposed Financing and Sale Transactions*

30.     Confronted with increasing financial difficulties, on one hand, and existing and future patients in critical need (most of whom have no place else to turn), on the other hand, the Debtors analyzed and pursued initiatives other than closing and shutting the doors.  To this end, in August 2013 the Debtors retained Alvarez & Marsal ("**Alvarez**"). [8]

31.     Alvarez initially began to assist the Debtors explore operational restructuring

---

[8]     Alvarez specializes in interim management, crisis management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operational restructuring. Alvarez's debtor advisory services have included a wide range of activities targeted at stabilizing and improving a company's financial position, including developing or validating forecasts, business plans and related assessments of a business's strategic position; monitoring and managing cash, cash flow and supplier relationships; assessing and recommending cost reduction strategies; and designing and negotiating financial restructuring packages.  Among the cases in which Alvarez was retained to provide advisory services include In re Peninsula Hospital Center, Case No. 11-47056 (ESS) (Bankr, E.D.N.Y. August 16, 2012); In re Our Lady of Mercy Medical Center et. al., Case No 07-1059 (REG) (Bankr. S.D.N.Y, 2007).   Alvarez members have also served as chief restructuring officers in other high profile chapter 11 cases.  See, e.g. In re Saint Vincents Catholic Medical Centers, et. al., Case No 0514945 (CGM).  Alvarez was additionally special healthcare strategy and restructuring advisor to North General Hospital and its affiliates prior to its 2010 bankruptcy filing.

(including a likely bankruptcy proceeding) that was to be funded in part with the proceeds or settlement from a lawsuit with DHCF (the "**DHCF Lawsuit**") that was hoped to be received in late 2013.    During this time, Alvarez assisted the Debtors in development of financial projections, weekly cash flow forecasts, benchmarking analyses, and in discussions with the Debtors' primary creditor and regulatory constituencies.    In December 2013, the administrative law judge in the DHCF Lawsuit ruled against the Debtors on several of the issues and the Debtors determined the best course of action was to pursue a sale.    At that time Alvarez focused its efforts to those items deemed necessary to complete a sale transaction, including cash flow forecasts, assistance with due diligence efforts, assistance in discussions with creditors, regulators, and potential bidders, and bankruptcy preparation.

32.    Having concluded that a sale of their assets was the only viable alternative to liquidation, the Debtors engaged Michael Zarriello of Cain Brothers ("**Cain**") on January 22, 2014. [9]

33.    Thereafter, the Debtors, with the assistance of Alvarez and Cain, contacted a select group of parties whom they believed (either based on their own knowledge or on the recommendation of others) possessed the ability and financial means to negotiate and close a transaction under all of the circumstances promptly.    One candidate, it turned out, lacked the

---

[9]    Mr. Zarriello is both a seasoned financial executive and investment banker with health care and multi-industry experience. He heads Cain's distressed situation practice representing major money center lending institutions, municipal bond funds and borrowers (hospitals, senior housing, post-acute care and managed care sectors) both in the for-profit and tax exempt markets.  Prior to joining Cain Brothers he was Executive Director-Co-Head Healthcare of Capstone Advisory Group, where he represented lenders, companies, and investors in complex debt restructurings, turnarounds, and transaction advisory services. Previously Mr. Zarriello has worked in both investment banking positions with MTS Health Partners, Jesup & Lamont and Bear Stearns and in operating positions as CFO of Rural/Metro Corporation, a large ambulance service company. He was the CFO of Avon products, Inc. healthcare Division, which had investments in nursing homes, alcohol and substance centers, assisted living centers and a distributor of durable medical equipment.

financial resources to fund a transaction.  Others were unwilling to commence due diligence efforts and begin investing in the substantial up-front legal costs necessary to expeditiously advance a transaction without a requirement that the Debtors execute an onerous exclusivity agreement.

34.     However, one exception, Silver Point Capital, LLC ("**Silver Point**"), emerged. Silver Point is a Greenwich, Connecticut-based private investment fund that specializes in investing in distressed companies.  Silver Point is reported to have in excess of $8 billion in assets under management. Its current investments include an equity interest in LifeCare Family of Hospitals an owner/operator of 17 LTAC'S, and previously it owned Vista Healthcare, an operator of 3 hospitals in California.  The Debtors understand (and continue to understand) that Silver Point possesses the resources and ability to consummate a transaction quickly. Significantly, Silver Point indicated that it would commence due diligence and engage its legal counsel to advance the transaction immediately, without execution by the Debtors of an onerous exclusivity agreement.   Consequently, the Debtors directed their limited resources into negotiating a transaction with Silver Point.  In response, Silver Point put the proverbial "money where its mouth is," allocating resources and starting the due diligence and legal process right away.

35.     During the process of negotiating with Silver Point, the Debtors concluded that the most effective transaction would be one where the proposed asset purchaser serves as the Debtors' post-petition lender, effectively underwriting the portion of the costs necessary to reach closing that the Debtors could not, themselves, fund from existing operations.  Unlike a stand-alone debtor-in-possession loan without more, this type of transaction allows for an expeditious auction of the Debtors' assets, and thus, a definitive strategy for exiting bankruptcy, affording

the Debtors' operations the opportunity to survive.

36.     In fact, through a newly-created entity, DCA Acquisitions, LLC ("**Acquisitions**"),

Silver Point ultimately submitted to the Debtors a term sheet for a proposed transaction to

acquire substantially all of the Debtors' assets, pursuant to which Acquisitions would serve as a

DIP lender and a stalking horse bidder in connection with a section 363 sale of substantially all

of the Debtors' assets, subject to higher or otherwise better offers.   In response, the Debtors,

together with their financial, transactional and legal advisors, engaged in extensive negotiations

with the Stalking Horse Purchaser.   Ultimately, the Debtors reached an agreement with the

Stalking Horse Purchaser on the principal terms of a stalking horse asset purchase agreement.

37.     Simultaneously, the Debtors reached an agreement with the Stalking Horse

Purchaser on the principal terms of the post-petition financing facility that is the subject of this

Motion.   The agreement is the product of lengthy arms'-length negotiations, and provided for

financing of the Debtors in order to pursue and fund a sale pursuant to § 363 of the Bankruptcy

Code, with the DIP Lender to serve as the stalking horse bidder.

38.     The Debtors, together with their advisors, have carefully considered the few

realistic options that are currently available.   The Debtors do not possess sufficient liquidity to

continue operating outside of bankruptcy, and the pursuit of a sale transaction funded by the

proposed DIP financing presents the only real option to (a) continue operations and provide

uninterrupted patient care at the SHA Facilities, and (b) to preserve, and possibly enhance, value

for the Debtors' estates.

39.     Importantly, because the Debtors' collective obligations to the Existing

Lienholders are secured by substantially all of the Debtors' assets, the Debtors had only two

potential options with respect to the prospect of obtaining postpetition financing: (a) find a lender

willing to extend postpetition financing with priority junior to that of the Existing Lienholders or

(b) obtain postpetition financing that primed the liens of the Existing Lienholders (if necessary,

without the Existing Lienholders' consent).   Ultimately, the Debtors and their advisors

concluded, given the critical financial condition and revenue problems facing the Debtors, that

any DIP lender would require a priming lien on substantially all of the Debtors' assets and a

limitation on the recoupment and setoff rights of other governmental regulatory agencies as a

condition to funding any postpetition loans.   Indeed, this is the only basis on which the DIP

Lender is willing to advance postpetition financing to the Debtors, and there are no alternative

sources of adequate funding available to the Debtors.   Accordingly, in the sound exercise of their

business judgment, the Debtors and their advisors determined that the DIP Loan would provide

the best bridge to a section 363 sale.

40.     The Debtors, the DIP Lender, and the Agent engaged in extensive, good faith,

arm's length negotiations with respect to the terms and conditions of the postpetition financing.

The result of these negotiations is the proposed DIP Loan, including the DIP Term Sheet and

ultimately the DIP Credit Agreement.

## **RELIEF REQUESTED**

41.     By this Motion, the Debtors are seeking, without limitation:

    (a)     authorization to execute, enter into, deliver, and incur obligations under (i)
the DIP Term Sheet and DIP Credit Agreement (as the same may be
amended, restated, supplemented or otherwise modified from time to time)
and (ii) any related documents required to be delivered by or in connection
with the DIP Credit Agreement, and to perform such other and further acts
as may be required in connection with the DIP Loan Documents;

    (b)     authorization to use the proceeds of the DIP Loan as expressly provided in
the DIP Term Sheet and DIP Credit Agreement and consistent with the
Approved Budget to (i) pay (a) all fees due to the DIP Lender as provided
under the DIP Loan and (b) administration costs of the Cases and
prepetition claims or amounts approved by the Court, (ii) provide working

capital for the Debtors, including postpetition ordinary course operating expenses, and (iii) provide funding for other general corporate purposes of the Debtors;

(c)     authorization to grant the DIP Lender (i) pursuant to Bankruptcy Code section 364(c)(1), superpriority administrative expense claim status in the Cases, which claims in respect of the DIP Loan shall be superior to all other claims; (ii) pursuant to Bankruptcy Code section 364(c)(2), a first priority lien on all unencumbered assets of the Debtors and their estates (now or hereafter acquired and all proceeds thereof); and (iii) pursuant to Bankruptcy Code section 364(d), a first priority priming lien on all assets of the Debtors and their estates (now or hereafter acquired and all proceeds thereof);

(d)     authorization to grant adequate protection to the Existing Lienholders;

(e)     authorization to use, in accordance with the Approved Budget, any Cash Collateral (as that term is defined in Bankruptcy Code section 363(a)) in which Existing Lienholders have an interest, and grant certain protections to the Existing Lienholders with respect to, *inter alia*, use of their Cash Collateral in accordance with the Approved Budget and the use (to the extent of any diminution in value) of their other collateral;

(f)     modification of the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents;

(g)     authorization, upon entry of the Interim Order, to borrow an aggregate principal amount up to $15 million pursuant to the terms and conditions set forth in the DIP Term Sheet and the DIP Credit Agreement and in accordance with the Approved Budget;

(h)     to schedule a preliminary hearing on this Motion and obtain authorization, from the entry of the Interim Order until the Final Hearing, to obtain credit under the terms contained in the DIP Term Sheet and to utilize Cash Collateral to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates; and

(i)     to schedule a Final Hearing on this Motion to consider entry of the Final Order authorizing the Debtors to borrow the balance of the DIP Loan on a final basis on the terms and conditions set forth in the DIP Credit Agreement.

## SUPPORTING AUTHORITY

42.    Approval of the DIP Loan will afford the Debtors an opportunity to preserve the value of their estates and sell their business operations. Absent the requisite financing, the

Debtors' healthcare operations would come to an abrupt halt, resulting in immediate and irreparable harm to the Debtors and their estates. Closing the Debtors' facilities would also imperil the health, of many patients, and as a statistical matter, transferring patients, according to the District of Columbia, would result if the death of some patients. The Debtors do not possess sufficient sources of working capital or cash to fund the Cases and continue the operation of their business without accessing the DIP Loan and using Cash Collateral. Accordingly, for the reasons stated herein, the Debtors request that the Court approve the DIP Loan and use of Cash Collateral.

A.      **The Debtors Satisfy the Requirements for Obtaining Secured Postpetition Financing Pursuant to Bankruptcy Code Section 364(c).**

43.     The Debtors propose to obtain financing under the DIP Loan by providing security interests and other liens as set forth above pursuant to section 364(c) of the Bankruptcy Code. To obtain postpetition secured credit, the statute requires a court to find, among other things, that the debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c).

44.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c). Specifically, courts look to whether:

(a)     the debtor is unable to obtain unsecured credit under Bankruptcy Code § 364(b), *i.e.*, by allowing the postpetition lender only an unsecured administrative claim;

(b)     the credit transaction is necessary to preserve the assets of the estate; and

(c)     the terms of the transaction are fair an, reasonable, given the circumstances of the debtor/borrower and the proposed lender.

See e.g. In re L.A. Dodgers LLC, 457 B.R. at 3126. The DIP Loan satisfies each of these three requirements.

*The Debtors Cannot Obtain Unsecured Financing*

- 19 -

45.     First, the Debtors are unable to obtain, on an unsecured general administrative-priority basis, a loan of the magnitude needed cover their negative cash flow and other costs necessarily to be incurred through the closing on a section 363 sale.  They require more than $6.5 million in the first four weeks alone, and no one would lend such sums on an unsecured basis.

46.      By way of example, in a May 7, 2014 letter to Specialty Hospital of America, LLC, Midcap Financial, LLC made a proposal for "a $15 million senior secured debtor-in-possession revolving credit facility," secured by a priming lien "pursuant to Section 364(d) of the Bankruptcy Code."  See Exhibit D attached hereto.

47.     Similarly, in an April 30, 2014 letter, NexBank, SSB proposed a 60-day "senior secured" DIP facility of up to $8 million secured by "a first priority perfected security interest in all existing and after-acquired real and personal property of the Borrowers."  See Exhibit D attached hereto.

48.     Cain, the Debtors' investment banker, is familiar with the market for DIP loans to healthcare facilities.  In Cain's opinion DIP financing is not available to the Debtors on an unsecured general administrative-priority basis.  Cain believes that any credible DIP lender would insist upon, among other things, a priming lien on all of the Debtors' assets.

49.     At the hearing on this Motion, the Debtors will prove that obtaining credit on an unsecured basis is not an available option.  Upon doing so, the Court should find that the Debtors have satisfied their burden of proof under the first element under Section 364(c).

*The DIP Loan is Necessary to Preserve Estate Assets and is an Exercise of the Debtor's Sound Business Judgment*

50.     Second, the DIP Loan is needed by the Debtors to maintain their operations and preserve their estates pending a section 363 sale.  The Debtors suffer from substantial negative cash flow.  Absent the DIP Loan, the Debtors will be unable to satisfy their postpetition

obligations.  This will quickly force them into administrative insolvency, where they will have no choice but to cease operations, move patients, close the doors, and convert their Cases to chapter 7.  If this occurs, any value that exists in the Debtors' enterprise will plummet.   This is proof positive that the DIP Loan is necessary to preserve the Debtors' estates.

*The DIP Loan is Fair and Reasonable and was Negotiated in Good Faith*

51.     Third, the terms and conditions of the DIP Loan are fair and reasonable under the circumstances.

52.     In determining whether the terms of a debtor's proposed postpetition financing arrangement are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender.  See In re Farmland Indus., Inc., 294 B.R. 855, 885-89 (Bankr. W.D. Mo. 2003) (finding that terms of postpetition financing were reasonable when taken in context and relative circumstances of the parties were considered).

53.     In this case, the Debtors simply lack sufficient funds to operate. The DIP Loan will provide the Debtors with the liquidity they need to not only operate their businesses and maintain patient care, but also to fund the sale process.

54.     In contrast, the DIP Lender is undertaking substantial risk.  The DIP Lender is neither a pre-petition lender advancing funds post-petition to protect its pre-existing loan position nor a post-petition lender looking to originate loan and make a return.  That is not even possible given the Debtors' financial crisis, including its negative cash flow.

55.     Instead, the DIP Lender is making the DIP Loan solely to fill in the negative cash flow gap the period of time needed to close on a sale of the Debtors' assets, and to underwrite the administrative costs that will accrue during this time period.  If, after the DIP Loan is funded, the Debtors are forced to liquidate, it is very possible that there will be insufficient assets to repay

the DIP Lender in full.  Whatever the DIP Lender might recover would occur over time and at liquidation and "fire sale" prices.

56.     Considering all of the circumstances, the dire financial circumstances of the Debtors, the "lifeline" the Debtors and their estates will receive upon receiving the loan proceeds, and the substantial risk being underwritten, the DIP Lender should be compensated and protected accordingly.

57.     Furthermore, the various fees and charges associated with obtaining the DIP Loan, including the fees payable in connection therewith, are within the range of reasonableness. Courts recognize that payment of lender fees may be necessary to obtain postpetition financing and often approve payment of such fees. *See, e.g.,* Resolution Trust Corp. v. Official Creditors' Comm. (In re Defender Drug Stores, Inc.), 145 B.R. 312, 316-19 (B.A.P. 9th Cir. 1992) (approving financing facility that included a lender "enhancement fee"); see also In re Korea Chosun Daily Times, Inc., 337 B.R. 773, 783 (Bankr. E.D.N.Y. 2005) (noting that postpetition financing arrangement may provide for payment of a commitment fee even if the financing arrangement is not consummated).

58.     The terms of the DIP Loan also are fair and reasonable because they do not deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these Cases.  Instead, the proposed DIP Loan and the DIP Orders provide that (a) all administrative expenses incurred through an event of default will be funded in accordance with the Approved Budget and (b) after an event of default, the security interests and administrative expense claims granted to the DIP Lender are subject to the Carveout.

59.     Accordingly, the Debtors respectfully submit that the terms of the DIP Loan are

fair, reasonable and appropriate under the circumstances, and the Agent and the DIP Lender should be accorded the benefits of Bankruptcy Code Section 364(e) in respect of such loan.

> B.    **Senior Secured Financing Pursuant to Bankruptcy Code Section 364(d) is Appropriate**

60.    If a debtor is unable to obtain credit solely under the provisions of Bankruptcy Code Section 364(c), the debtor may obtain credit by a senior or equal lien on property of the estate that is already subject to a lien. See 11 U.S.C. § 364(d). The Bankruptcy Code authorizes a debtor in possession to grant superpriority senior secured priming liens if: (i) the debtor is unable to obtain financing without granting such liens, and (ii) the interests of the secured creditors whose liens are being primed by the postpetition financing are adequately protected. See 11 U.S.C. §§ 364(d)(1)(A) & (B).

*The Debtors Are Unable to Obtain Financing Solely Under Bankruptcy Code Section 364(c)*

61.    Under Bankruptcy Code Section 364(d)(1)(A), the adequacy of a debtors' efforts to obtain postpetition financing is a case-specific inquiry. Courts generally have found that a debtor's good-faith efforts to seek credit from other sources is sufficient to carry this burden. *See* In re Snowshoe Co., 789 F.2d at 1088 (recognizing "there is no duty to seek credit from every possible lender"); In re 425 Cent. Park Ave. Corp., 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (noting that while "[s]ection 364(d)(1) does not require the debtor to seek alternative financing from every possible lender," it "must make an effort to obtain credit without priming a senior lien").

62.    Here, the term sheet of every prospective DIP lender required the Debtors to grant the lender senior secured liens.  See e.g. Exhibit D and Exhibit E.

63.    The Debtors and their advisors engaged in rigorous, arm's length negotiations with the DIP Lender that produced the best available financing option under the circumstances.

64.     Also, none of the Existing Lienholder is willing to commit to postpetition financing *on any basis*, let alone an unsecured or junior secured basis.

65.     Accordingly, the Court should find that postpetition financing other than on a senior secured basis is unavailable to the Debtors.

*Any Objecting Existing Lienholder is Adequately Protected*[10]

66.     Though several sections of the Bankruptcy Code refer to "adequate protection," the Bankruptcy Code does not expressly define what constitutes adequate protection.  Section 361 of the Bankruptcy Code sets forth several non-exclusive examples of the concept, including: (1) making cash payments; (2) providing replacement liens; and (3) granting any other relief that will result in the secured party realizing the "indubitable equivalent" of its interest in the asset. 11 U.S.C. § 361.  Although Section 361 presents some specific illustrations, the statute is broad and flexible, not exclusive.   In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992).

67.     Section 361(3) is regarded as a "catch-all" provision, affording courts discretion, on a case-specific basis, to determine what level of protection is appropriate to provide a secured party.  See Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.), 16 F.3d 552, 564 (3d Cir. 1994); In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996).

68.     Here, the Existing Lienholders are adequately protected for a simple reason:  The DIP Loan will enable the Debtors to avoid shutting down and to pursue the sale of their assets as a going concern, bringing value to the estates and its creditors.  If the Court denies the requested

---

[10]     Given the circumstances facing the Debtors and the potentially catastrophic consequences if this financing is not obtained from the DIP Lender, the Debtors are hopeful that Existing Lienholders will consent to the relief requested in this Motion with respect to priming and use of Cash Collateral.  Requiring the Debtors to litigate priming and cash collateral, even if the Debtors prevail, will only add further uncertainty to the fate of the patients, residents and employees of the SHA Facilities.  Uncertainty could further erode the Debtors' ability to stabilize their business and jeopardize the proposed transaction.

financing, two things will be assured – the Existing Lienholders will face a significant loss on their existing claims, and the Debtors will be required to quickly cease operations to the detriment of virtually every party in interest, including patients.

69.    Furthermore, if the Debtors were forced to liquidate, it appears speculative that Existing Lienholders would net anything of value in respect of their liens.  Ultimately, the cost and expenses of any shutdown and liquidation will be charged to the collateral of the Existing Lienholders.    The Debtors believe that the value of the collateral for Existing Lienholders does not exceed the likely amount of those costs and expenses.

70.    Finally, notwithstanding the likely lack of any realizable collateral value by Existing Lienholders, ass further adequate protection for the Existing Lienholders, the Debtors propose granting Existing Lienholders replacement liens and superpriority expense claims that would each be junior to the DIP Liens, the Superpriority Administrative Expense Claim and the Carveout.

71.    Here, the DIP Loan is simply the best and only form of financing (i.e., senior secured) available.  In addition, the DIP Lender serves as the stalking horse bidder for the Debtors' assets.  Therefore, unlike a stand-alone post-petition lender, the DIP Lender will have greater incentive to see the sale process through.

72.    In accordance with Bankruptcy Code Section 364(d) and consistent with the purposes underlying the provision of adequate protection, the proposed DIP Orders provide the Existing Lienholders with adequate protection.  The proposed adequate protection is justified to protect the Existing Lienholders resulting from the priming of their liens and the imposition of the automatic stay.  Accordingly, the Court should permit the Debtors to prime the liens securing the obligations owing to Existing Lienholders in connection with the proposed DIP Loan, as the

requirements of Bankruptcy Code section 364(d) have been satisfied.

     C.     **The Debtors Should be Authorized to Use Cash Collateral**

73.     Sections 363(c)(1) authorizes a debtor in possession to use property of the estate in the ordinary course of business. 11 U.S.C. § 363(c)(1). In order to use cash collateral, however, one of two conditions must be satisfied: (1) each entity with an interest in the cash collateral consents to its use, or (2) the court, after notice and a hearing, authorizes such use. 11 U.S.C. § 363(c)(2).

74.     Absent the ability to use Cash Collateral, the Debtors would be deprived of a significant (albeit insufficient), source of liquidity, which would imperil the process and the Debtors' ability to sell their assets as a going-concern.

75.     If the Court approves the DIP Loan, then the DIP Lender will have the first-priority lien on the Debtor's Cash Collateral, and the DIP Lender consents to the Debtors' use of Cash Collateral in accordance with the Approved Budget. Under such circumstances, the Debtors are optimistic that they will receive the consent of all or some of the Existing Lienholders to use of Cash Collateral. If not, then the Debtors request that the Court make a finding of adequate protection consistent with the finding necessary to approve the DIP Loan.

76.     Even if the Court does not authorize the DIP Loan, the Debtors will need to access Cash Collateral to fund an orderly wind down

77.     Accordingly, whether it is to fund the section 363 sale process or to fund an orderly wind down, the Debtors submit that their request to use Cash Collateral should be approved; albeit to fund the Approved Budget in the case of the former scenario and to fund a wind down budget in the case of the later scenario.

D.      **The Automatic Stay Should be Modified on a Limited Basis**

78.     The relief requested herein contemplates a modification of the automatic stay

pursuant to Bankruptcy Code section 362 to (a) permit the Debtors to grant the security interests,

liens, and superpriority claims described above with respect to the Agent and the DIP Lender and

to perform such acts as may be reasonably requested to assure the perfection and priority of such

security interests and liens and (b) implement the terms of the proposed DIP Orders.   In the

Debtors' business judgment, the stay modification request is fair and reasonable under the

circumstances.   Accordingly, the Debtors request that the Court grant such relief.

E.      **Interim Approval of the DIP Loan is Necessary to Prevent Immediate and
        Irreparable Harm**

79.     Bankruptcy Rules 4001(b) and (c)(2) provide that a final hearing on a motion to

obtain credit pursuant to Bankruptcy Code section 364 may not be commenced earlier than

fourteen (14) days after the service of such motion. Upon request, however, a bankruptcy court is

empowered to conduct a preliminary expedited hearing on the motion and authorize the

obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the

Debtors' estates. *See* Fed. R. Bankr. P. 4001(c)(2).

80.     Bankruptcy Rule 6003 provides that to the extent relief is necessary to avoid

immediate and irreparable harm, a bankruptcy court may grant certain forms of relief during the

twenty-one (21) days immediately following the filing date. Fed. R. Bankr. P. 6003. Although, as

described above, the Debtors are to sell their assets expeditiously and efficiently through a

section 363 sale, immediate and irreparable harm would result if funding authority is not granted

on an interim basis.   The Debtors clearly have an immediate need to obtain access to liquidity

under the DIP Loan to, among other things, continue the to provide life-saving, high quality

medical and related services to their patients and residents, and to satisfy other working capital

- 27 -

and operational needs.  Funding each of these expenditures is necessary to the Debtors' ability to preserve and maintain their going-concern value for the benefit of all parties in interest.  The Debtors, therefore, submit that the relief requested in this motion is necessary to avoid immediate and irreparable harm to the Debtors, as described herein, and that Bankruptcy Rule 6003 has been satisfied.

81.     Accordingly, the Debtors respectfully request that the Court schedule and conduct a preliminary hearing on the Motion and (a) authorize the Debtors, from the entry of the Interim Order until the Final Hearing, to obtain credit under the terms contained in the DIP Term Sheet and to utilize Cash Collateral, all in accordance with the Approved Budget attached as Exhibit C and the DIP Term Sheet, and (b) schedule the Final Hearing.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND (h)

82.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  To the extent that this Order is subject to said rule, the Debtors further seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the effectiveness of this Order.

## NOTICE

83.     Notice of this motion has been provided to the following parties, or, in lieu thereof, their counsel: (a) the Office of the United States Trustee for the District of Columbia; (b) each of the Debtors' thirty largest unsecured creditors on a consolidated basis; (c) counsel to BB&T; (d) counsel to the DIP Lender and the Agent; (e) counsel to NCB; (f) counsel to Capitol Hill Group; (g) all applicable health regulatory agencies and taxing authorities; (h) the United States Attorney's Office for the District of Columbia; (i) the IRS; (j) JRW; and (j) all known

parties that may be asserting a lien against the Collateral.  The Debtors submit that, in light of the

nature of the relief requested, no other or further notice need be given.


Dated: May 21, 2014                    Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

/s/ *Patrick Potter*
Patrick Potter (426514)
Jerry Hall (976461)
Dania Slim (991689)
2300 N Street, NW
Washington, DC 20037-1122
Telephone:  (202) 663-8000
Facsimile:  (202) 663-8007
patrick.potter@pillsburylaw.com
jerry.hall@pillsburylaw.com
dania.slim@pillsburylaw.com


-and-

Andrew M. Troop (admitted *pro hac vice*)
1540 Broadway
New York, NY 10036-4039
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com

*Counsel for Debtors*

**<u>Exhibit A</u>**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re:<br><br>SPECIALTY HOSPITAL OF<br>WASHINGTON, LLC, *et al.*,<br><br>Debtors.[1] | Case No. 14-00279<br><br>Chapter 11<br><br>(Joint Administration Requested) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING PRIMING LIENS AND PROVIDING SUPERPRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION, (V) SCHEDULING FINAL HEARING AND (VI) GRANTING RELATED RELIEF**

Upon the emergency motion dated May 21, 2014 (the "**Motion**") of Specialty Hospital of America, LLC ("**SHA**"), Specialty Hospital of Washington, LLC, SHA Management, LLC, Specialty Hospitals of Washington Nursing Center, LLC, Specialty Hospital of Washington Hadley, LLC, SHA Holdings, Inc., and SHA Hadley SNF, LLC as debtors and debtors-in-possession (collectively, the "**Debtors**" or "**Borrowers**")[1] in the above-captioned chapter 11

---

[1]     The debtors in these chapter 11 cases and the last four digits of each debtor's federal identification number are:  Specialty Hospital of America, LLC (1347), SHA Holdings, Inc. (1943), SHA Management, LLC (1350), Specialty Hospital of Washington, LLC (1352),

cases (collectively, the "**Cases**") for interim and final orders under sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Bankruptcy Code (as amended, the "**Bankruptcy Code**") and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "**Bankruptcy Rules**"), seeking, *inter alia:*

        (a)    for Borrowers to obtain postpetition financing (the "**DIP Loan**") in the aggregate amount of up to $15 million under a term loan, and forthwith to borrow up to $6.6 million (the "**Interim Disbursement**") under terms of the DIP Term Sheet[2] attached to the Motion as Exhibit B on an interim basis under this Interim Order, with further borrowings pursuant to final documentation contained in a credit agreement (the "**DIP Credit Agreement**"),[3] between the Borrowers and DCA Acquisitions, LLC (the "**DIP Lender**"); and such DIP Loan:

        (i)    having priority, pursuant to § 364(c)(1), over all administrative expenses of the kind specified in Bankruptcy Code § 503(b) or 507(b) (the "**Senior Superpriority Administrative Expense Claim**");

        (ii)    being secured, pursuant to § 364(c)(2), by (a) a perfected first priority lien and security interest upon any and all current and future assets of the Borrowers of any nature or type whatsoever, including, without limitation, cash, accounts, accounts receivable (including, without limitation, all Medicare/Medicaid receivables/reimbursement), goods, instruments, investment property (including, without limitation, ownership interests in corporations, partnerships and limited liability companies), inventory, vehicles, customer lists, trademarks, copyrights, brands, know-how and other intellectual property, minerals, mineral rights, plant and equipment, patents, trade secrets, tax assets, real property and/or leasehold rights, personal property, any causes of action under the Bankruptcy Code or applicable non-bankruptcy law, excluding causes of action and recoveries pursuant to Chapter 5 of the Bankruptcy Code, all other tangible and intangible assets, and any and all proceeds of the foregoing; and (b) constructive control over the Borrowers' bank accounts in similar form and substance of lockbox and/or control accounts customary for transactions of this nature (including, in the case of those accounts which receive the collected proceeds of Medicare and Medicaid accounts receivable, subject to the special rules and limitations applicable thereto), except that duly perfected real property tax liens, if any, shall not be primed   (collectively, the "**DIP Collateral**");

---

Specialty Hospital of Washington Nursing Center, LLC (1348), Specialty Hospital of Washington Hadley, LLC (2586), and SHA Hadley SNF, LLC (1976).

[2] Capitalized terms not defined herein shall have the meaning ascribed to such terms in the DIP Term Sheet.

[3] The foregoing notwithstanding, the DIP Lender may in its sole discretion determine to have the DIP Term Sheet serve as the DIP Credit Agreement.

(iii)    being secured, pursuant to § 364(c)(3), by a perfected lien and security interest upon all of the Borrowers' prepetition and postpetition property (including property referred to in clause (ii) above, or in clause (iv) below);

(iv)    being secured, pursuant to § 364(d)(1), by perfected first priority senior priming liens on and in the DIP Collateral ranking prior to all other claims and liens of the Borrowers, except for the Carveout as defined below.  The Senior Priming Liens (as defined below) will be senior in priority to security interests and liens securing the indebtedness and other obligations owing under any of the Borrowers' prepetition loan and security agreements and other liens.  The Senior Priming Liens shall not be subject to challenge, but instead shall attach and become valid and perfected without the requirement of any further action by the Agent or the DIP Lender.

(b)    for the Debtor to use the Cash Collateral (as such term is defined in the Bankruptcy Code) pursuant to §§ 361, 362 and 363, and all other collateral identified in the Existing Loan Documents in which the Existing Lienholders have a lien or security interest (together with the Cash Collateral, the "**Prepetition Collateral**");

(c)    to schedule, pursuant to Rule 4001, a final hearing (the "**Final Hearing**") for this Court to consider entry of a final order authorizing the DIP Loan on a final basis, as set forth in the Motion and the DIP Term Sheet; and

(d)    the granting of certain related relief.

The Debtors having requested in the Motion that pending the Final Hearing on the Motion, a hearing be scheduled on an expedited basis to consider entry of this Interim Order; and notice of such expedited hearing having been given to: (a) the Office of the United States Trustee for the District of Columbia; (b) each of the Debtors' thirty-five largest unsecured creditors on a consolidated basis; (c) counsel to Branch Banking & Trust Company ("**BB&T**"); (d) counsel to the DIP Lender and the Agent; (e) counsel to National Capitol Bank of Washington ("**NCB**"); (f) counsel to Capitol Hill Group; (g) all applicable health regulatory agencies and taxing authorities; (h) the United States Attorney's Office for the District of Columbia; (i) the Internal Revenue Service (the "**IRS**"); (j) JWR Realty, LLC ("**JWR**") and (k) all known parties that may be asserting a lien against the DIP Collateral; and it appearing that on the record made in the Cases and after considering the Debtors' immediate need for interim financing, no other or

further notice need be given; and the DIP Lender having agreed to provide the DIP Loan in accordance with the DIP Term Sheet and this Interim Order.

NOW, THEREFORE, upon the Motion and the record of the Interim Hearing held on May 23, 2014; and after due deliberation and good and sufficient cause appearing therefore, the Court hereby makes the following findings of fact and conclusions of law:

Based upon the record presented to the Court, it appears that:

A.    *Filing*.  On May 21, 2014 (the "**Petition Date**"), each of the Debtors (other than Specialty Hospital of Washington, LLC ("**SHDC**")) filed a voluntary chapter 11 petition in this Court.  On May 21, 2014, the Court entered an order for relief in the case of SHDC.  The Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.    *Jurisdiction and Venue*.  This Court has core jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This Interim Order is entered in a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (D), (G), (K) and (M).

C.    *Notice*.  Notice of the Motion and the Interim Hearing was served by the Debtors on: (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtors' thirty-five largest unsecured creditors on a consolidated basis; (c) counsel to BB&T; (d) counsel to the DIP Lender and the Agent; (e) counsel to NCB; (f) counsel to the Debtors' landlords; (g) all applicable health regulatory agencies and taxing authorities; (h) the United States Attorney's Office for the District of Columbia; (i) the IRS; and (j) all known parties that may be asserting a lien against the Collateral. Under the circumstances, the notice provided of

the Motion and the Interim Hearing is sufficient and adequate notice and no further notice of the relief sought at the Interim Hearing is necessary or required.

D.    *Existing Lienholders*.  In the Motion the Debtors have asserted the following facts:

(a)    as of the Petition Date, BB&T, NCB, the IRS, and JWR (collectively, the "**Existing Lienholders**") asserted the following claims against the Debtors: (i) BB&T asserts a secured claim against the Debtors in an amount in excess of $34 million arising from a term loan and revolving line of credit extended to the Debtors (the "**BB&T Claim**"); (ii) NCB asserts a junior, secured claim against SHA that exceeds $6 million arising from a short term loan (the "**NCB Claim**"); (iii) the IRS asserts a secured claim against the Debtors in the approximate that exceeds $11 million arising from alleged unpaid withholding taxes (the "**IRS Claim**"); and (iv) JWR asserts a claim against Specialty Hospital of America, LLC in excess of $5 million under a senior subordinated note agreement (the "**JWR Claim**," together with the BB&T Claim, the NCB Claim, IRS Claim, the "**Prepetition Secured Obligations**"); and

(b)    the Existing Lienholders assert that the Prepetition Secured Obligations are secured by valid, enforceable and perfected liens on the Prepetition Collateral, including, in the case of BB&T, Cash Collateral; and

(c)    The Prepetition Collateral constitutes substantially all of the Debtor's assets.

E.    *Need for Postpetition Financing and Use of Prepetition Collateral (including Cash Collateral)*.  The Debtors have an immediate need to obtain the DIP Loan and to use the Prepetition Collateral including the Cash Collateral.  The Debtors do not have sufficiently available sources of working capital and financing to carry on the operation of their businesses

- 5 -

without the DIP Loan and the Debtors' use of the Prepetition Collateral (including Cash Collateral). The ability of the Debtors to pay employees, maintain business relationships with vendors and suppliers, purchase new inventory, and otherwise finance their operation is essential to the Debtors' continued viability and to the well-being of the Debtors' patients dependent on the Debtors' healthcare services. Without the DIP Loan and the Debtors' use of Prepetition Collateral (including Cash Collateral), the continued orderly operation of the Debtors' healthcare services would not be possible, and serious and irreparable harm to the Debtors and their estates as well as their patients dependent on the Debtors' healthcare services would result. The purpose of the DIP Loan and the Debtors' use of Prepetition Collateral (including Cash Collateral) will thus be to preserve, maintain and possibly enhance the going concern value of the Debtors and protect patients dependent on the Debtors' services.

F.     *No Credit Available on More Favorable Terms.*   Given the Debtors' financial condition, financing arrangements, and capital structure, as well as the uncertain timing of collections of receivables, the Debtors do not have sufficient Cash Collateral to fund their businesses and are otherwise unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.   Financing on a postpetition basis is not otherwise available without the Debtors' granting, pursuant to section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code, and securing such indebtedness and obligations with the security interests in and the liens upon the DIP Collateral pursuant to section 364(c) and (d) of the Bankruptcy Code.   The Debtors are unable to obtain the necessary postpetition financing that they need on terms more favorable than those provided by the DIP Loan.

G.     *Need to Grant Superpriority Administrative Expense Claim and Senior Priming Liens.*   The Debtors are unable to obtain an adequate unsecured credit facility allowable under section 503(b)(1) of the Bankruptcy Code and must grant to the DIP Lender and Agent a Superpriority Administrative Expense Claim as contemplated by section 364(c)(2), (c)(3) and (d) of the Bankruptcy Code.   Subject only to the Carveout (as defined below), the DIP Lender has conditioned all loans and advances to be made under the DIP Term Sheet upon the grant to the DIP Lender and Agent of: (a) a Superpriority Administrative Expense Claim pursuant to section 364(c)(1) of the Bankruptcy Code with priority over any and all expenses of any kind or nature whatsoever specified in sections 503(b) and 507(b) of the Bankruptcy Code, including, without limitation, the Junior Superpriority Administrative Expense Claims; and (b) in accordance with

section 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, the Senior Priming Liens on and security interests in the DIP Collateral.

H.     *DIP Loan.*   Pursuant to the DIP Loan, the DIP Lender has agreed to provide a term loan to the Debtors in amounts not to exceed the maximum outstanding principal amount of: (i) following entry of the Interim Order and prior to entry of the Final Order, $6.6 million in accordance with the DIP Term Sheet, the Approved Budget (as defined below) and this Interim Order; and (ii) upon entry of the Final Order, the balance of the DIP Loan, in accordance with the DIP Loan Agreement, the DIP Loan Documents, the Approved Budget and the Final Order, for an aggregate commitment not to exceed $15 million (the "**Commitment**").  The DIP Lender and Agent shall have the discretion to establish a reserve in the Commitment in accordance with the DIP Term Sheet and the DIP Credit Agreement, including on account of the Carveout.

I.     *Business Judgment and Good Faith.*   The terms of the DIP Loan including the interest rates and fees applicable thereto, are at least as favorable to the Debtors as those available from alternative sources.   The terms of the DIP Loan have been negotiated in good faith and at arms' length between the Debtors and the DIP Lender, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are fair and reasonable under the circumstances, and are enforceable in accordance with applicable law.   The credit extended to the Debtors by the DIP Lender under the DIP Loan and this Interim Order shall be deemed to have been extended in "good faith" as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full protection of sections 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

J.      *Need for Immediate Approval.*   The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).   Absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.   The Debtors have no alternative source of financing to meet their immediate and projected obligations, including payroll and other operating expenses, and consequently, it is essential that the Court approve the interim financing contemplated hereby on an immediate basis.   Consummation of the DIP Loan and authorization of the use of the Prepetition Collateral (including Cash Collateral) in accordance with the terms of this Interim Order are therefore in the best interests of the Debtors' estates, and are consistent with the Debtors' exercise of their fiduciary duties.

K.      *Record.*   The record adequately demonstrates the need for the Court to have conducted the Interim Hearing on the notice provided because of the potential for immediate and irreparable harm to the Debtors, their assets, businesses and estates.   Based on the record, pursuant to sections 105, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(c), notice of the Interim Hearing was adequate as set forth herein and on the record.

Based upon the foregoing, **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** as follows:

<u>**Approval and Authorization.**</u>

1.      *Motion Granted.*   The Motion is granted on an interim basis and on the terms set forth herein.   Any objections to the Motion with respect to the entry of this Interim Order that have not previously been withdrawn or resolved are hereby denied and overruled.

2.      *Approval of Documents*.   The DIP Loan and the DIP Term Sheet are hereby approved subject to the terms of this Interim Order including the Interim Disbursement. The

failure to reference or discuss any particular provision of the DIP Term Sheet shall not affect the validity or enforceability of any such provision.

3.      *Authorization to Execute and Deliver Documents*.   The Debtors are expressly authorized, empowered and directed to do and perform all acts to make, execute, deliver and implement the DIP Term Sheet and any other document required to be executed and delivered in connection therewith. Upon execution and delivery of the DIP Term Sheet, the DIP Loan Obligations shall constitute valid, binding and nonavoidable obligations of the Debtors, enforceable against the Debtors in accordance with the terms of this Interim Order and the DIP Term Sheet.  No obligation, payment, transfer or grant of security under the DIP Term Sheet or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim. The Debtors are authorized and directed to pay all principal, interest, fees, costs and other expenses that may be required or necessary for the Debtors to perform all of their obligations under the DIP Term Sheet and this Interim Order without any further order or approval of the Court.

4.      *Authorization to Borrow; the Approved Budget*. Good and sufficient cause has been shown for the entry of this Interim Order. The Debtors are authorized and empowered to borrow funds pursuant to the DIP Term Sheet up to the Interim Disbursement pending the Final Hearing for the purposes permitted under the DIP Term Sheet and this Interim Order, all in accordance with the budget attached to this Interim Order as Exhibit B (the "**Approved Budget**").

5.      *Amendments*. The DIP Lender or Agent and the Debtors may amend, modify, supplement or waive any provision of the DIP Term Sheet if such amendment, modification, supplement or waiver is not material (in the good faith judgment of the DIP Lender or Agent and the Debtors), without any need to apply to, or receive further approval from, the Court.  Any material amendment, modification, supplement or waiver shall be in writing, signed by the parties and subject to approval by the Court on appropriate notice.

### Use of Prepetition Collateral (Including Cash Collateral).

6.      *Use of Prepetition Collateral (Including Cash Collateral)*. The Debtors are authorized to use the Prepetition Collateral (including the Cash Collateral) during the period from the Filing Date until the occurrence and continuation of an Event of Default for the same purposes as set forth in and in accordance with this Interim Order, the Motion and the Approved Budget.

### Payment of DIP Loan Obligations.

7.      *Payment of Principal, Interest, Fees, Etc*. The Debtors shall pay to the DIP Lender principal and interest as provided in this Interim Order and the DIP Term Sheet in accordance with the procedures herein and therein set forth (and the DIP Lender shall be permitted to charge such amounts to the DIP Loan Obligations).  In consideration of the financial and other accommodations to be made by the DIP Lender under this Interim Order and the DIP Term Sheet, the Debtors are hereby authorized and directed, without further order of the Court, to pay to the DIP Lender and Agent all fees and charges as set forth herein and in the DIP Term Sheet and to reimburse the DIP Lender and Agent for all reasonable out-of-pocket expenses and professional fees as set forth herein and in the DIP Term Sheet.

### Senior Superpriority Administrative Claim; Collateral.

8.      *Superpriority Administrative Expense Claim; Waiver under Section 506(c)*.
Subject only to the Carveout, all of the DIP Loan Obligations shall have the status of an allowed
Superpriority Administrative Expense Claim in the Case pursuant to section 364(c)(1) of the
Bankruptcy Code, having priority over any and all administrative expenses, adequate protection
claims and all other claims against the Debtors, whether heretofore or hereafter incurred, of any
kind or nature whatsoever, including without limitation, all administrative expenses of the kind
specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all
administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b),
506(c) (subject to entry of the Final Order), 507(a), 507(b), 546, 726, 1113 or 1114 of the
Bankruptcy Code, including, without limitation, the Junior Superpriority Administrative Expense
Claims and Adequate Protection Liens, whether or not such expenses or claims may become
secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed
claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered
administrative expenses allowed under section 503(b) of the Bankruptcy Code (collectively, the
"**Senior Superpriority Administrative Expense Claims**"). No claim or expense having a
priority senior or *pari passu* to the priority granted to the DIP Lender and Agent in this Interim
Order shall be granted or permitted in the Cases, or any superseding chapter 7 case, and, subject
to entry of the Final Order, no other costs or expenses of administration of any kind, nature or
description whatsoever shall be imposed against the DIP Collateral under sections 105, 506(c) or
552 of the Bankruptcy Code or otherwise (subject to entry of the Final Order), in each case,
while any portion of the DIP Loan Obligations remains outstanding.

9.      *Payment of Administrative Expenses*. Unless an Event of Default shall have
occurred (or would result from such payment), subject to the Approved Budget, the Debtors shall

be permitted to pay, as the same may become due or authorized and payable, administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code incurred in the ordinary course of their businesses.

10.    *Senior Priming Liens*. As security for the full and timely payment of the DIP Loan Obligations, the DIP Lender and Agent are hereby granted pursuant to section 364(c)(2), (3) and (d) of the Bankruptcy Code, senior, perfected priming liens on, and security interests in, all of the DIP Collateral, subject only to the Carveout (the "**Senior Priming Liens**").  The Senior Priming Liens shall be senior in priority to security interests and liens securing the indebtedness and other obligations owing under any of the Borrowers' prepetition loan and security agreements and other liens, including any liens of the Existing Lienholders, and to the Adequate Protection Liens, but shall not be senior to any duly perfected real property tax liens, if any.  The Senior Priming Liens shall not be subject to challenge, but instead shall attach and become valid and perfected without the requirement of any further action by the Agent or the DIP Lender.

11.    *No Subordination*. The liens on, and security interests in, the DIP Collateral granted to the DIP Lender and Agent under this Interim Order and pursuant to the DIP Loan Agreement and the DIP Loan Documents shall not be subordinated to, or made *pari passu* with, any other lien or security interest, however and whenever arising, in the Cases or any superseding chapter 7 case, other than the Carveout.

12.    *Automatic Perfection of Liens.*

(a) The liens and security interests granted to the DIP Lender and Agent hereunder and under the DIP Term Sheet are valid, binding, continuing, enforceable and fully-perfected with the priorities herein and therein set forth.

(b) The DIP Lender and Agent shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office, or to take any other action in order to validate or perfect the liens and

- 13 -

security interests granted by or pursuant to this Interim Order and/or the DIP Term Sheet.

(c) Should the DIP Lender or Agent, in their sole discretion, from time to time, choose to file such financing statements, mortgages, notices of lien or similar instruments, take possession of any DIP Collateral securing the DIP Loan Obligations for perfection purposes, or take any other action to protect from infringement or otherwise validate or perfect any such security interest or lien, the Debtors and their officers are hereby directed to execute any such documents or instruments as the DIP Lender or Agent shall reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.

(d) In the discretion of the DIP Lender or Agent, a certified copy of this Interim Order may be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby directed to accept such certified copy of this Interim Order for filing and recording, and such certified copy shall be deemed filed and recorded at the time and on the date of entry of this Interim Order.

**Carveout.**

13.   *Carveout*.   The liens, security interests, and Superpriority Administrative Expense Claims (as defined below) granted in favor of the Lender and the Agent in connection with the DIP Loan shall be subject to a carveout (the "**Carveout**") for (i) the payment of U.S. Trustee fees, (ii) the payment of all court-approved fees and expenses of professionals retained by the Borrowers, professionals retained by the official committee of unsecured creditors, once appointed (the "**Committee**"), and any patient care ombudsman appointed in the Cases (collectively, the "**Professional Fees**") incurred during the Cases in accordance with the Approved Budget prior to the occurrence of an Event of Default (as defined below) under the DIP Loan, but that remain unpaid as of such date, in an amount not to exceed the aggregate amount set forth in the Approved Budget (without regard to any permitted variance under the Approved Budget) for the time period up to the date of an Event of Default and (iii) an amount up to $250,000 for the payment of Professional Fees incurred from and after

the occurrence of an Event of Default under the DIP Loan following entry of the Final Order. Other than the Carveout, the DIP Loan shall not otherwise be subject to any carveout for Professional Fees.

## Termination.

14.    *Termination.* Notwithstanding the provisions of section 362 of the Bankruptcy Code and without order of or application or motion to the Court, subject to any applicable grace or cure period expressly set forth in the DIP Term Sheet, in the event of: (a) the failure of the Debtors to perform any of their material obligations under this Interim Order, or (b) the occurrence and continuance of an Event of Default (as defined in the DIP Term Sheet), then and upon the occurrence of either of the foregoing (each an "**Event of Default**"), and at all times during the continuance thereof, the DIP Lender or Agent may upon not less than five (5) days prior written notice to the Debtors and their counsel, the Office of the United States Trustee, and counsel for the Committee(s) (and prior to its appointment, the Debtors' thirty-five largest unsecured creditors on a consolidated basis) exercise any and all rights and remedies allowed under this Interim Order, the DIP Term Sheet and/or applicable law; *provided, however,* that notwithstanding the foregoing and section 362 of the Bankruptcy Code, and without order of or application or motion to the Court, if an Event of Default exists which is not subsequently cured or waived during the notice period: (i) The DIP Loan shall mature and any and all DIP Loan Obligations shall become due and payable in full in cash, (ii) The Agent and the DIP Lender shall have standing to move for an order to cause the Borrowers to engage in a process to liquidate their assets pursuant to Bankruptcy Code § 363, and (iii) The Agent and the DIP Lender shall have the right to an emergency hearing requesting relief from the automatic stay otherwise imposed pursuant to Bankruptcy Code Section 362 that permits the Agent and the DIP Lender to

realize upon, or to exercise any right or remedy with respect to, any portion of the DIP Collateral. The DIP Lender's failure to exercise rights under this paragraph shall not constitute a waiver of any of their rights. At any hearing following an Event of Default, the Debtors shall be permitted to contest whether an Event of Default has occurred and is then continuing but may not seek any relief that would in any way restrict or impair the rights and remedies of the DIP Lender set forth in this Interim Order, the DIP Term Sheet and/or applicable law.

15.     *Due Date*. In addition to any rights and remedies of the DIP Lender and Agent under the terms of this Interim Order, the DIP Loan shall immediately and automatically terminate and the DIP Loan Obligations shall be immediately due and payable upon the Due Date (as defined in the DIP Term Sheet).

## Adequate Protection for the Existing Lienholders.

16.     *Adequate Protection Liens*. As adequate protection for the granting of the Senior Priming Liens to secure the DIP Loan and the Debtors' use of the Prepetition Collateral including the Cash Collateral, to the extent of any diminution in value (if any) of the Existing Lienholders' liens (if any) in the Prepetition Collateral following the Petition Date, the Existing Lienholders are granted replacement liens (the "**Adequate Protection Liens**"), in the same priorities that exist prior to the entry of this Order, with respect to the same Debtors, and in the same collateral type that currently secures their respective claims, whether such collateral arose before or after the entry of the orders for relief with respect to each of the Debtors.   The Adequate Protection Liens shall be subject to the Carveout and shall be junior in priority to the Senior Priming Liens granted to the DIP Lender and Agent securing the DIP Loan Obligations and senior to all other liens.

17.   *No Filing Required*. The Existing Lienholders shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office, or to take any other action in order to validate or perfect the Adequate Protection Liens granted by or pursuant to this Interim Order. The Existing Lienholders shall have no right to seek or exercise any rights or remedies in respect of the Adequate Protection Liens unless the DIP Lender has consented thereto or the DIP Loan Obligations has been indefeasibly paid and satisfied in full accordance with the DIP Term Sheet and this Interim Order.

18.   *Superpriority Administrative Expense Claim; Waiver under Section 506(c)*. In accordance with section 507(b) of the Bankruptcy Code, the amount of any diminution in value (if any) of the Existing Lienholders liens in the Prepetition Collateral following the Petition Date shall have the status of an allowed Superpriority Administrative Expense Claim in the Cases pursuant to section 364(c)(1) of the Bankruptcy Code, having priority over any and all administrative expenses, adequate protection claims and all other claims against the Debtors, whether heretofore or hereafter incurred, of any kind or nature whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c)(subject to entry of the Final Order), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, subject and junior only to the DIP Lender's and Agent's Senior Superpriority Administrative Expense Claim and the Carveout (the "**Junior Superpriority Administrative Expense Claim**").

- 17 -

## Miscellaneous Provisions.

19.     *Reporting Requirements*. The Debtors are obligated to comply with the reporting

and disclosure undertakings and agreements set forth in this Interim Order and the DIP Term

Sheet and such obligations shall continue until the indefeasible payment in full of all DIP Loan

Obligations and the DIP Lender's commitment to loan money to the Debtors under the DIP Loan

Agreement is terminated.

20.     *Binding Effect of Order; Successors and Assigns*. The DIP Term Sheet and this

Interim Order shall be binding upon all parties-in-interests in the Cases, including without

limitation, the DIP Lender, the Existing Lienholders, the Committee and the Debtors and their

respective successors and assigns, including, without limitation, any chapter 11 trustee or chapter

7 trustee or similar responsible person hereafter appointed as a representative of the Debtors'

estates and any such successors or assigns, without further order of this Court and shall inure to

the benefit of the DIP Lender, the Existing Lienholders, the Committee and the Debtors and their

respective successors and assigns. The Debtors and their successors and assigns shall be deemed

authorized and directed to comply with the provisions of this Interim Order and the DIP Term

Sheet. The DIP Lender shall not have any obligation to extend any financing to any chapter 11

trustee or chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

21.     *No Impairment of Liens and Order*. The liens, security interests, Senior

Superpriority Administrative Expense Claims, DIP Loan Obligations and other rights and

remedies granted to the DIP Lender and Agent under this Interim Order and the DIP Term Sheet,

and any actions taken pursuant hereto or thereto shall survive, and shall not be modified, altered

or impaired in any manner by: (a) any other financing or extension of credit or incurrence of debt

by the Debtors (under section 364 of the Bankruptcy Code or otherwise); (b) the entry of an

order confirming any plan of reorganization; (c) the entry of an order converting the Case to

chapter 7 or dismissing the Cases; or (d) the maturity of the DIP Loan Obligations. The liens, security interests, claims and any other rights granted to the DIP Lender and Agent pursuant to this Interim Order and the DIP Term Sheet shall continue in effect until the DIP Loan Obligations are indefeasibly satisfied and paid, and the DIP Lender's commitment to make loans under the DIP Loan has terminated.

22.     *Good Faith*. Having been found to be extending the DIP Loan to the Debtors in good faith, the DIP Lender and the Agent are entitled to the full protection of section 364(e) of the Bankruptcy Code with respect to the DIP Loan Obligations and the Senior Superpriority Administrative Expense Claims and liens created or authorized by this Interim Order in the event that this Interim Order or any authorization contained herein is stayed, vacated, reversed or modified on appeal. If any provision of this Interim Order is hereafter modified, vacated, reversed or stayed by subsequent order of this or any other court for any reason, such modification, vacation, reversal or stay shall not affect the validity, enforceability and priority of any of the DIP Loan Obligations or the claims, liens and security interests granted to the DIP Lender and the Agent under this Interim Order and/or the DIP Term Sheet, and the validity, enforceability or priority of the DIP Loan Obligations and the claims, liens and security interests of the DIP Lender and the Agent shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender and the Agent shall be entitled to all of the rights, privileges and benefits granted herein, including, without limitation, the liens, security interests and priorities granted to the DIP Lender and the Agent in this Interim Order with respect to all DIP Loan Obligations.

23.     *Challenges in Respect of DIP Loan Obligations*. None of the advances under the DIP Loan or the Carveout may be used to prosecute actions, claims, demands or causes of action

against the DIP Lender or the Agent or to object to or contest in any manner, or to raise any defense in any pleading to the validity, perfection, priority or enforceability of the DIP Loan Obligations, the Senior Superpriority Administrative Claims or the Senior Priming Liens.

24.     *No Third Party Beneficiaries*. Other than as expressly set forth herein, no rights are created hereunder for the benefit of any third party, or any direct, indirect or incidental beneficiary.

25.     *No Marshaling*. In no event shall the DIP Lender or Agent be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.

26.     *Limitations under Section 552(b) of the Bankruptcy Code*. Subject to entry of the Final Order, the DIP Lender and the Agent shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the DIP Collateral under section 552(b) of the Bankruptcy Code.

27.     *No Waiver*. Any delay or failure to exercise rights and remedies under the DIP Term Sheet or this Interim Order of the DIP Lender or Agent shall not constitute a waiver of such party's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the DIP Term Sheet and this Interim Order.

28.     *Payments Free and Clear*. Any and all payments or proceeds remitted to the DIP Lender, the Agent or Existing Lienholders pursuant to the provisions of this Interim Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based

on, directly or indirectly, sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtors) or 552(b) of the Bankruptcy Code (subject to entry of the Final Order).

29.    *Insurance*. The DIP Lender and the Agent are deemed to be the loss payee under the Debtors' insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies to the payment in full of the DIP Loan Obligations.

30.    *Automatic Stay*. The automatic stay imposed by virtue of section 362 of the Bankruptcy Code is hereby vacated and modified insofar as necessary to permit the DIP Lender and the Agent to take any action authorized or contemplated by this Interim Order or the DIP Term Sheet and to carry out the terms thereof, subject, however, to the satisfaction of any notice, procedural and other conditions contained in this Interim Order, and/or the DIP Term Sheet.

31.    *No Control*. Subject to entry of the Final Order, by consenting to this Interim Order, by making advances, loans or extending financial accommodations of any type, kind or nature under this Interim Order or by administering the loans made hereunder, none of the DIP Lender or the Agent shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person," "managing agent" or "owner or operator" (as such terms or any similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar Federal or state statute) with respect to the operation or management of the Debtors.

32.    *Indemnification*. Subject to the entry of the Final Order, nothing in this Interim Order or the DIP Term Sheet shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender or the Agent, any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in

connection with their restructuring efforts. So long as the DIP Lender and the Agent comply with their respective obligations under this Interim Order and the DIP Term Sheet and their obligations under applicable law (including the Bankruptcy Code): (a) the DIP Lender and the Agent shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person; and (b) all risk of loss, damage or destruction of the Collateral shall be borne by the Debtors.

33.    *Inconsistency*. In the event of any inconsistency between this Interim Order and the DIP Term Sheet, any document or any other agreement heretofore or hereafter entered into by and between the Debtors and the DIP Lender Parties and/or the Existing Lienholders, the terms of this Interim Order shall govern and control.

34.    *Retention of Jurisdiction*. The Bankruptcy Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

35.    *Immediate Docketing of Order*. The Clerk of the Court is hereby directed to forthwith enter this Interim Order on the docket of this Court maintained in regard to the Cases.

36.    *Effectiveness*. In accordance with Rule 7052, this Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the

Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

37.     *Headings*. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

38.     *Notice of Final Hearing; Objections*. The Debtors shall, on or before [May 28, 2014] transmit copies of a notice of the entry of this Interim Order, together with a copy of this Interim Order and a copy of the Motion, to the parties having been given notice of the Interim Hearing, to any party which has filed prior to such date a request for notices with this Court and to counsel for the Committee, once appointed. The notice of entry of this Interim Order shall state that any party in interest objecting to the DIP Loan on a final basis and the entry of the Final Order shall file written objections with the Clerk of the United States Bankruptcy Court for the District of Columbia no later than 4:00 p.m. (prevailing Eastern Time) on [_____], 2014 and shall serve such objections so that the same are received on or before such date by: (a) counsel to the Debtors, Pillsbury Winthrop Shaw Pittman, LLP, 2300 N Street, NW, Washington, DC 20037-1122 (Attn: Patrick Potter, patrick.potter@pillsburylaw.com) and Pillsbury Winthrop Shaw Pittman, LLP, 1540 Broadway, New York, NY (Attn: Andrew Troop, andrew.troop@pillsburylaw.com); (b) (ii) counsel for the DIP Lender for noticing purposes, Squire Sanders (US) LLP, One East Washington Street, Suite 2700, Phoenix, AZ 85004 (Attn: Craig D. Hansen, Esq., craig.hansen@squiresanders.com); (c) counsel to the Committee; and (d) the Office of the United States Trustee for the District of Columbia, 115 S. Union Street, Room 210, Alexandria, VA 22314 (Attn: Bradley Jones; Bradley.D.Jones@usdoj.gov).

39.     *Final Hearing*. The Final Hearing will be held on [          ], 2014 at [      ]

(prevailing Eastern Time).

SIGNED AND DATED ABOVE

cc:

All attorneys who have entered an appearance and who are registered e-filers.

**Exhibit B**

**Debtor-in-Possession Term Loan/ Lender Sponsored Transaction**

**Term Sheet**

**May 18, 2014**

| | |
|---|---|
| **Borrowers:** | Specialty Hospitals of America, LLC, SHA Management, LLC, Specialty Hospitals of Washington, LLC (*"SHW"*), Specialty Hospitals of Washington-Nursing Center, LLC, Specialty Hospital of Washington-Hadley, LLC, SHA Holdings, Inc. and SHA Hadley SNF, LLC (collectively, the *"Borrowers"*). |
| **Guarantors:** | None |
| **Lender:** | DCA Acquisitions, LLC or its assigns (the *"Lender"*). |
| **Agent:** | DCA Finance, LLC (the *"Agent"*). |
| *DIP LOAN* | |
| **Type:** | Debtor-in-Possession Term Loan (the *"DIP Loan"*) and potential emergence transaction as part of the Borrowers' voluntary chapter 11 bankruptcy cases filed in the District of Columbia (the *"Cases"*). |
| **Bankruptcy Status:** | A precondition to the funding of the DIP Loan is filing of voluntary chapter 11 cases by each of the Borrowers in the United States Bankruptcy Court for the District of Columbia (the *"DC Court"*) and, as to SHW, consent to entry of an order for relief in the DC Court. The date on which the Cases are filed in the DC Court is the *"Petition Date"*. |
| **Commitment:** | Up to $15 million (the *"Commitment"*), with $10 million available to fund the Approved Budget (as defined below), to be funded on a weekly basis, commencing after entry of the Interim Order (as defined below), and $5 million set aside as a cash reserve. |
| **Interim Disbursement:** | Upon entry of an interim financing order (the *"Interim Order"*) by the Court under Bankruptcy Code § 364(c) and (d) (in form and substance agreeable to the Borrowers, the Lender and the Agent), up to $6.6 million of the Commitment shall be funded by the Lender, on a weekly basis and pursuant to the terms of the Approved Budget (as defined below) (the *"Interim Disbursement"*).<br><br>The Interim Disbursement shall also include the funding of (i) a $450,000 retainer for Pillsbury Winthrop Shaw Pittman, LLP, bankruptcy counsel for the Borrowers and (ii) a $100,000 retainer for Alvarez & Marsal, financial advisor for the Borrower, as part of the Interim Disbursement, which amount shall be reduced dollar for dollar against any amounts that the Court authorizes Pillsbury and Alvarez to roll up from any pre-petition retainer received by such counsel (and satisfy unpaid pre-petition fees and expenses approved by the Court). |
| **Final Disbursement:** | Upon entry of a final financing order (the *"Final Order"*) by the Court under Bankruptcy Code § 364(c) and (d) (in form and substance agreeable to the Borrowers, the Lender and the Agent), the balance of the Commitment shall be made available by the Lender on a weekly basis pursuant to the |

- 1 -

| | terms of the Approved Budget (the *"Final Disbursement"*). |
|---|---|
| **Funding Date:** | Funding under the DIP Loan in accordance with the Approved Budget with respect to the Interim Disbursement shall begin as soon as practicable after the entry of the Interim Order, but no later than two (2) business days after entry of such order (the *"Interim Closing Date"*). |
| | Funding of the DIP Loan in accordance with the Approved Budget with respect to the Final Disbursement shall begin as soon as practicable after the entry of the Final Order, but no later than two (2) business days after entry of such order (the *"Final Closing Date"*). |
| | The DIP Loan shall be governed by the Interim Order and the Final Order (the *"DIP Orders"*), this Term Sheet (which is binding until superseded by the DIP Credit Agreement, as defined herein), a loan agreement between the Lender, the Agent and the Borrowers (with all related documentation, the *"DIP Credit Agreement"*), and such other documents and agreements required by the Lender and the Agent (collectively, the *"Loan Documents"*). |
| **Use of Proceeds:** | Proceeds of the DIP Loan shall be utilized as follows: (i) general working capital and operational expenses; (ii) administration of the Cases (in each case of (i) and (ii), in accordance with a weekly cash flow budget prepared by the Borrowers and approved by the Lender, in form and substance acceptable to the Lender and the Agent on a line-by-line basis (the *"Approved Budget");* and (iii) costs, expenses, closing payments, and all other payment amounts contemplated herein. |
| | The Approved Budget shall include forecasts of revenues and receipts, expenses (including restructuring expenses and expenses arising on account of the Cases including Professional Fees), statements of cash flows, and applicable assumptions, prepared by the management and/or financial advisors of the Borrowers; such Approved Budget may be updated and revised by the Borrowers from time to time in form and substance satisfactory to the Lender and the Agent, and upon approval of such revised budget, it shall become the Approved Budget. |
| | On the second business day of each week, the Borrowers shall update the Approved Budget on a weekly, rolling basis and shall deliver a variance analysis with respect to the Borrowers' actual revenue, collections and expenses during the prior week measured on a line item basis against the Approved Budget and indicate whether it is in substantial compliance with the Approved Budget and the terms of the DIP Loan, in each case in form and substance satisfactory to the Lender and the Agent. In connection with delivery of the weekly updated Approved Budget, the Borrowers shall clearly identify to the Lender and the Agent any changes made from the prior Approved Budget. |
| **Carveout:** | The liens, security interests, and Superpriority Administrative Expense Claims (as defined below) granted in favor of the Lender and the Agent in connection with the DIP Loan shall be subject to a carveout (the *"Carveout"*) for (i) the payment of U.S. Trustee fees, (ii) the payment of all court-approved fees and expenses of professionals retained by the Borrowers, professionals retained by the official committee of unsecured creditors, once appointed (the *"Committee"*), and any patient care ombudsman appointed in the Cases (collectively, the *"Professional Fees"*) incurred during the Cases in accordance with the Approved Budget prior to the occurrence of an Event of Default (as defined below) under the DIP Loan, but that remain unpaid as of such date, in an amount not to exceed the aggregate amount set forth in the Approved Budget (without regard to any permitted variance under the Approved Budget) for the time period up to the date of an Event of Default and (iii) an amount up to $250,000 for the payment of Professional Fees incurred from and after the occurrence of an Event of Default under the DIP Loan following entry of the |

| | |
|---|---|
| | Final Order. Other than the Carveout, the DIP Loan shall not otherwise be subject to any carveout for Professional Fees. |
| Interest: | LIBOR + 1200 per annum with a 2% floor (the *"Interest"*). Interest shall be due and payable monthly in cash in arrears. |
| Default Interest: | Upon the occurrence of an Event of Default (as defined below) and during the continuation of such default, interest shall accrue on the outstanding amounts at 3% in excess of applicable interest rate (the *"Default Interest)*. |
| DIP Fee: | Two percent (2%) of the Commitment, earned in full at the commencement of the DIP Loan and payable on the earliest of the Due Date (as defined below and without regard to any agreed extension thereof), an Event of Default (as defined below) and the consummation of a Sale. |
| Collateral Monitoring Fee: | One percent (1%) of the Commitment, earned in full at the commencement of the DIP Loan and payable on the earliest of the Due Date (as defined below) (without regard to any agreed extension thereof), an Event of Default (as defined below), and the consummation of a Sale. |
| Call Premium: | A call premium of 3% (at 103) of the Commitment, payable in full upon the Due Date, provided that the call premium shall be waived by Lender upon a closing of the Lender-Sponsored Transaction. |
| Agent Fee: | $40,000, which amount shall be payable in cash to the Agent no later than two (2) business days after entry of the Interim Order and shall be non-refundable. |
| Costs/ Expenses: | The Borrowers shall reimburse the Agent and the Lender for all reasonable costs and expenses incurred in connection with (i) the DIP Loan, (ii) the DIP Loan Obligations (as defined below) and (iii) any expense reimbursement the Borrowers are obligated to pay pursuant to the terms of the APA as part of the Lender Sponsored Transaction (as defined below), including, without limitation, legal fees, advisor fees, consultant fees, costs and expenses, collateral valuations, appraisals, surveys, field examinations, third party diligence, lien searches, filing fees, and all other out-of-pocket costs and expenses in any way related to the DIP Loan, the DIP Loan Obligations and the enforcement and collection thereof (collectively, the *"Costs and Expenses"*). In the event that the DIP Loan is not consummated, the Lender and the Agent shall have the right to seek reimbursement of all reasonable Costs and Expenses incurred with respect thereto as an administrative expense of the Borrowers' bankruptcy estates pursuant to Bankruptcy Code § 503(b), and the Borrowers hereby acknowledge and agree that such amount shall constitute an administrative expense of the Borrowers' bankruptcy estates. |
| Term: | Any and all then current outstanding principal amount of the DIP Loan (the *"DIP Loan Principal")* plus any unpaid accrued Interest or Default Interest (as the case may be) plus any Costs and Expenses and other amounts due under the DIP Loan, this Term Sheet, the DIP Credit Agreement, the Interim Order and the Final Order (each, a *"DIP Loan Obligation"* and collectively, the *"DIP Loan Obligations")* shall become due and payable in full in cash upon the earlier of the following (the *"Due Date"):* (i) thirty-five (35) days after the Petition Date; (ii) the substantial consummation (as defined in Bankruptcy Code § 1101 and which for purposes hereof shall be no later than the effective date) of a confirmed plan of reorganization; (iii) conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code; (iv) appointment of a trustee for the Borrowers; (v) dismissal of any of the Cases; (vi) twenty (20) days after the entry of the Interim Order if the Final Order has not been entered prior to the expiration of such twenty (20) day period; (vii) the date on which the Court enters a final order approving a post-petition financing between the Borrowers and another |

| | |
|---|---|
| | lender(s) or investor(s) (as the case may be) (other than the Lender); (viii) consummation of a sale of substantially all of the Borrowers' assets under Bankruptcy Code § 363; (ix) the date on which the Court enters an order approving a sale of any of the Borrowers' assets under Bankruptcy Code § 363 to any party other than the Lender; and (x) five (5) business days after the Agent or the Lender notifies the Borrowers and their counsel in writing of an Event of Default which is not subsequently cured or waived by the end of such notice period; provided, however, that if the Court has entered an order approving the Lender Sponsored Transaction and all conditions to the closing of that Transaction have been satisfied except for the requirement that all regulatory approvals have been received, then the Due Date shall be extended for up to sixty (60) days pursuant to the Approved Budget. The Lender may further extend the Due Date in its sole discretion. In the event the parties consummate a Lender Sponsored Transaction, as referred to below, the DIP Loan Obligations will be treated in accordance with the terms of such Lender Sponsored Transaction. |
| **DIP Collateral:** | The DIP Loan shall be secured by: (i) a perfected first priority lien on any and all current and future assets of the Borrowers of any nature or type whatsoever, including, without limitation, cash, accounts, accounts receivable (including, without limitation, all cash proceeds from Medicare/Medicaid receivables/reimbursement), goods, instruments, investment property (including, without limitation, ownership interests in corporations, partnerships and limited liability companies), inventory, vehicles, customer lists, trademarks, copyrights, brands, know-how and other intellectual property, minerals, mineral rights, plant and equipment, patents, trade secrets, real property and/or leasehold rights, personal property, any causes of action under the Bankruptcy Code or applicable non-bankruptcy law, excluding causes of action and recoveries pursuant to Chapter 5 of the Bankruptcy Code, all other tangible and intangible assets, and any and all proceeds of the foregoing; and (ii) constructive control over the Borrowers' bank accounts in similar form and substance of lockbox and/or control accounts customary for transactions of this nature (including, in the case of those accounts which receive the collected proceeds of Medicare and Medicaid accounts receivable, subject to the special rules and limitations applicable thereto) exercisable upon an Event of Default and stay relief from the Court, or as may be provided in the Interim Order and Final Order, except that duly perfected real property tax liens, if any, shall not be primed (collectively the **"DIP Collateral"**). |
| **Superpriority Administrative Expense Claim and Priming Lien:** | The DIP Loan shall be authorized and approved by the Court pursuant to Bankruptcy Code § 364(c)(1) to be incurred as, and shall constitute, claims with a priority over all administrative expenses of the kind specified in Bankruptcy Code § 503(b) or 507(b) (the **"Superpriority Administrative Expense Claim"**). The security interests and liens in the DIP Collateral securing the DIP Loan shall be authorized and approved by the Court pursuant to Bankruptcy Code § 364(c)(2), (3), and 364(d) to constitute a lien on and in the DIP Collateral ranking prior to all other claims and liens of the Borrowers, except for the Carveout as defined below (the **"Priming Lien"**). The Priming Lien will be senior in priority to security interests and liens securing the indebtedness and other obligations owing under any of the Borrowers' prepetition loan and security agreements and other liens, except duly perfected real property tax liens, if any. The Priming Lien shall not be subject to challenge, but instead shall attach and become valid and perfected without the requirement of any further action by the Agent or the Lender.

A governmental unit (as defined in the Bankruptcy Code), including without limitation the U.S. Department of Health and Human Services, CMS, all applicable State Medicaid and health agencies, and the departments, divisions and agencies thereof (a **"Governmental Entity"**) to collect pre-petition overpayments from the Borrowers shall be governed by the DIP Orders and shall have no right to recoup provider reimbursement |

| | |
|---|---|
| | overpayments that were made to a Borrower from any amounts due to such Borrower other than to recoup such overpayments that arise under the same provider agreement or comparable applicable statutes, regulations, or arrangements, only in accordance with applicable law.<br><br>All of the liens described herein, including the Priming Lien, shall be effective and perfected on the date of entry of the Interim Order. |
| **Release:** | The Borrowers shall release and waive any and all claims, causes of action, counterclaims, set-offs and defenses of any kind or nature whatsoever against the Agent and the Lender relating to any acts, omissions or conduct of the Agent and the Lender arising on or before the Interim Closing Date and the Final Closing Date, as applicable, pursuant to a release set forth in the Interim Order and the Final Order, as applicable, in form and substance acceptable to the Agent and the Lender. |
| **Indemnification:** | The Borrowers will indemnify and hold harmless the Lender and the Agent and their respective members, officers, directors, employees, affiliates, successors, assigns, agents, counsel and other advisors (collectively, the *"Indemnified Parties"*) from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of, or in connection with the preparation for a defense of, any investigation, litigation or proceeding arising out of, related to or in connection with (a) the DIP Loan, the transactions contemplated thereby, and any use made or proposed to be made with the proceeds thereof or (b) the Cases, whether or not such investigation, litigation or proceeding is brought by the Borrowers, their shareholders or creditors or an Indemnified Party, or an Indemnified Party is otherwise a party thereto, except to the extent such claim, damage, loss, liability or expense is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. |
| **Receivable Collection and Billing Procedures:** | The Borrowers shall (i) maintain and retain adequate management, staffing and third party consultants, and shall have developed a satisfactory plan to oversee and implement the billing and collection of receivables in a manner reasonably acceptable to the Agent, including obtaining approval by the Agent of any significant "bulk" compromises on receivables; and (ii) consult with the Agent regarding any significant changes to the personnel engaged in the billing, collection and reporting of receivables, outside consultants and advisers and outsource firms.<br><br>The Borrowers shall have engaged financial consultants, restructuring advisors and/or other advisors, reasonably acceptable to the Agent, for a scope of services reasonably acceptable to the Agent. |
| **Representations and Warranties:** | The Borrowers shall make usual and customary representations and warranties for transactions of this nature, including, without limitation, good standing of each of the Borrowers; no consent or approval is required other than the Interim Order and the Final Order; due authorization, execution and delivery of loan documents; no violation of material agreements entered into after the commencement of the Cases; no violation of law as a result of the execution of the DIP Loan Documents; no liens on the assets of the Borrowers except for valid, perfected and non-avoidable liens and security interests in existence as of the commencement of the Cases and certain other liens permitted by the Agent and the Lender; compliance with applicable laws and regulations; no material change in business; no unstayed litigation that is reasonably likely to have a material adverse effect on the operations of the Borrowers taken as a whole; no |

| | |
|---|---|
| | information furnished by Borrowers to the Agent or Lender or the Court contains any material misstatement of fact or omitted to state a material fact necessary to make the statements therein not materially misleading; taxes paid to the extent required by law; and material returns filed. |
| **Reporting Requirements:** | Customary reporting requirements for debtor-in-possession financing facilities and as otherwise determined by the Agent, in consultation with the Borrowers. Among other things, (i) Borrowers shall promptly and in no event later than two (2) business days following actual knowledge or receipt thereof provide a complete description, with copies of all relevant documentation, of any material communication to or from any governmental entity; and (ii) Borrowers shall promptly inform the Lender and the Agent of any professional engagements and outsourcing of services. |
| **Covenants:** | The Borrowers shall comply with all of the following covenants: |
| | 1.  The Borrowers shall promptly provide the Agent with updates of any material developments in connection with the Borrowers' reorganization efforts under the Cases; |
| | 2.  The Borrowers shall deliver the Approved Budget as updated on a weekly basis to the Agent (in form and substance reasonably acceptable to the Agent), including, without limitation, forecasts, sales pipeline, accounts receivable and cash flow; |
| | 3.  The Borrowers shall deliver a semi-monthly payroll report to the Agent (in form and substance reasonably acceptable to the Agent). |
| | 4.  The Borrowers shall operate their businesses in accordance with the Approved Budget (subject to a permitted variance of: (i) 25% per category in week one; and (ii) 10% per category thereafter as measured on a cumulative basis), and the requirements of the Bankruptcy Code and orders of the Court; |
| | 5.  Without the prior written consent of the Agent or the Lender, the Borrowers shall not seek or consent to occur any of the following: |
| | a.  Any order which authorizes the assumption or rejection of any leases or contracts of any of the Borrowers without the Agent's prior written consent; |
| | b.  Any modification, stay, vacation or amendment to the Final Order to which the Agent has not consented in writing; |
| | c.  A priority claim or administrative expense or unsecured claim against any of the Borrowers (now existing or hereafter arising of any kind or nature whatsoever, including without limitation, any administrative expense of the kind specified in Bankruptcy Code § 105, 326, 328, 330, 331, 364(c) 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114) equal or superior to the priority claim of the Agent and the Lender in respect of the obligations hereunder, except with respect to the Carveout; |
| | d.  Any lien on any DIP Collateral having a priority equal or superior to the lien securing the obligations hereunder, other than with respect to the Carveout; |
| | e.  Any order which authorizes the payment of any indebtedness incurred prior to the Petition Date other than to employees or vendors, the services or goods of which are essential to continued operations and such payments are in accordance with the Approved Budget and approved by an order of the Court; |
| | f.  Any order seeking authority to take any action that is |

|  | prohibited by the terms of this Term Sheet, the DIP Credit Agreement, the Interim Order or the Final Order or refrain from taking any action that is required to be taken by the terms of this Term Sheet, the Interim Order or the Final Order; or<br><br>g   Any other action that would materially adversely affect the Agent or the Lender in any way without the prior written consent of the Agent or the Lender;<br><br>6.  The Borrowers shall take, in consultation with the Agent and the Lender, all reasonable actions necessary to pursue and consummate the Lender Sponsored Transaction. |
|---|---|
| **Asset Sales:** | The Borrowers shall not sell any material assets outside the ordinary course of business, except in connection with a sale under § 363 of the Bankruptcy Code, in each case without the consent of the Lender and the Agent. All proceeds of DIP Collateral shall be immediately applied to the DIP Loan, subject to a hold-back reserve in an amount consistent with the Approved Budget and to be agreed upon by the Borrower and the Lender for funding the wind-down of the Borrowers. |
| **Closing Conditions:** | This Term Sheet is subject to, amongst other items, the following:<br><br>1.  The filing of all the Cases before the DC Court and, as to SHW, consent to entry of an order for relief in the DC Court;<br><br>2.  Entry of the Interim Order and Final Order by the Court, authorizing borrowing pursuant to this Term Sheet and the DIP Credit Agreement;<br><br>3.  Prior to the date of the final hearing on the DIP Loan, execution of the DIP Credit Agreement and any other definitive legal documentation with respect to the DIP Loan acceptable to the Agent and Lender in their sole discretion; and<br><br>4.  Prior to the date of the final hearing on the DIP Loan, execution of the APA and any related documentation with respect to the Lender-Sponsored Transaction acceptable to the Agent and Lender in their sole discretion. |
| **Event(s) of Default:** | Each of the following shall constitute an **"Event of Default"**, unless otherwise waived by the Agent in its sole discretion:<br><br>1.  The Final Order is not entered within 20 days following the entry of the Interim Order;<br><br>2.  Borrowers shall fail to pay any DIP Loan Obligation in cash after such payment has become due;<br><br>3.  Any governmental unit, including any departments, agencies or fiscal intermediaries thereof, shall seek to recoup or setoff provider reimbursement overpayments that were made to the Borrowers from any amounts due to the Borrowers or to obtain a lien through any means which is equal or senior to the liens of the DIP Lender on the DIP Collateral, to the extent such recoupment or setoff exceeds, as to any Borrower entity, $125,000 in the aggregate, since the Petition Date, or $25,000, as to any single recoupment;<br><br>4.  Any report, certificate or other document delivered to the Agent or the Lender pursuant to this Term Sheet, the DIP Credit Agreement, the Interim Order or the Final Order shall have been incorrect in any material respect when made or deemed made;<br><br>5.  The failure of Borrowers to comply in all material respects with any covenant, agreement or terms and conditions of the Interim Order, the Final Order, this Term Sheet, and the DIP Credit Agreement; |

6. Any of the Borrowers is enjoined, restrained or in any way prevented by the order of any court or any governmental authority from conducting all or any material part of its business for more than three (3) consecutive days;

7. Any material adverse change in the Borrowers' operations, in the sole discretion of the Lender (including, without limitation, CMS or D.C. Medicaid transferring patients, terminating provider relationships, or withholding or offsetting payments);

8. Any material damage to, or loss, theft or destruction of, any DIP Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty (whether or not insured) which causes, for more than three (3) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Borrowers, if any such event or circumstance could reasonably be expected to have a material adverse effect;

9. The entry of an order in the Cases which stays, modifies (in any manner adverse to the Agent or the Lender), or reverses the Interim Order or Final Order or which otherwise materially adversely affects, as determined by the Agent in its reasonable discretion, the effectiveness of the Interim Order or Final Order without the express written consent of the Agent;

10. The conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code;

11. The appointment of a trustee for any of the Borrowers;

12. The dismissal of any of the Cases; provided that the Agent and the Lender have not consented in writing to such dismissal;

13. The entry of any order which provides relief from the automatic stay otherwise imposed pursuant to Bankruptcy Code § 362 that permits any creditor to (i) realize upon, or to exercise any right or remedy with respect to, any material portion of the DIP Collateral, or (ii) to terminate any license, franchise or similar agreement, wherein either case the exercise of such right or remedy or such realization or termination would be reasonably likely to have a material adverse effect;

14. Subject to the allowance and payment of any amounts due under the Carveout, the filing of any application by Borrowers without the express written consent of the Agent for the approval of a super-priority claim in the Cases which is pari passu with or senior to the priority of the claims of the Agent or the Lender, or there shall arise any such super-priority claim under the Bankruptcy Code;

15. The payment by Borrowers of any prepetition indebtedness without the written consent of the Agent or Lender, other than payment to employees or vendors, the services or goods of which are essential to continued operations, and such payments are in accordance with the Approved Budget and approved by an order of the Court;

16. The filing of any motion by Borrowers seeking, or the entry of any order in the Cases: (a) permitting working capital or other financing (other than ordinary course trade debt, unsecured debt and insurance premium financing) for any of the Borrowers from any person other than the Lender or Agent (unless the proceeds of such financing are to be used to pay in full in cash all obligations arising under this Term Sheet, the DIP Credit Agreement, the Interim Order and the Final Order); (b) granting a lien on, or security interest in, any of the DIP Collateral, other than with respect to this Term Sheet (unless such liens are granted in connection with a financing, the

proceeds of which are to be applied to the payment in full in cash of all obligations arising under this Term Sheet, the DIP Credit Agreement, the Interim Order and the Final Order, and other than liens granted as adequate protection for pre-petition liens on the Borrowers' assets, which adequate protection liens are junior in priority to the Lender's super priority priming liens); (c) except as permitted by this Term Sheet, the DIP Credit Agreement, the Interim Order or the Final Order, permitting the use of any of the DIP Collateral pursuant to Bankruptcy Code § 363(c) without the prior written consent of the Agent, or permitting recovery from any portion of the DIP Collateral any costs or expenses of preserving or disposing of such DIP Collateral under Bankruptcy Code § 506(c); or (d) dismissing the Cases, unless the Agent has sought or consented in writing to such relief by the Court;

17. The filing of a motion or other pleading by the Borrowers seeking the entry of an order confirming a plan of reorganization (and/or approving a disclosure statement related thereto) that does not require payment in full in cash of all obligations under this Term Sheet, the DIP Credit Agreement, the Interim Order and the Final Order on the consummation date of such plan of reorganization, and as to which Lender has not consented in writing;

18. On or before 95 days after the Petition Date, the Lender has not (x) reached agreement with D.C. Medicaid and CMS Medicare for the issuance or transfer of, respectively, the Medicaid and the Medicare operating numbers, (y) reached agreement with CMS, DOJ and DC Medicaid as to the level of assumed liability of the Lender and related caps on recoupment rights, all as acceptable to the Lender, (z) reached agreement with any other governmental entity with regard to the liability of the Lender, all at levels acceptable to the Lender or its assignee;

19. The Lender or the Agent determine in good faith that any of the Regulatory Approvals required as a condition to closing the Sale pursuant to the terms of the APA are not reasonably likely to be obtained;

20. The filing of any pleading by any of the Borrowers challenging the validity, priority, perfection or enforceability of this Term Sheet, the DIP Credit Agreement or the DIP Orders or the obligations hereunder, or any lien granted pursuant to this Term Sheet, the DIP Credit Agreement, the Interim Order or the Final Order is determined to be null and void, invalid or unenforceable by the Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Cases;

21. The Court enters an order approving a sale of any of the Borrowers' assets to any party other than the Lender;

22. Borrowers shall have breached the terms of the APA or any related documentation, including the bid procedures, for the Lender-Sponsored Transaction; or

23. Borrowers shall have failed to satisfy any of the Milestones (set forth below) without prior consent of the Lender.

| | |
|---|---|
| **Default Remedies:** | Upon five (5) business days' written notice to the Borrowers and their counsel of an Event of Default which is not subsequently cured or waived during such notice period:<br><br>1. The DIP Loan shall mature and any and all DIP Loan Obligations shall become due and payable in full in cash;<br><br>2. The Agent and the Lender shall have standing to move for an order to cause the Borrowers to engage in a process to liquidate |

| | |
|---|---|
| | their assets pursuant to Bankruptcy Code § 363; and<br><br>3. The Agent and the Lender shall have the right to an emergency hearing requesting relief from the automatic stay otherwise imposed pursuant to Bankruptcy Code § 362 that permits the Agent and the Lender to realize upon, or to exercise any right or remedy with respect to, any portion of the DIP Collateral. |
| **Prepayment(s):** | The Borrowers shall have the right (but not the obligation) to prepay the DIP Loan Obligations (in cash) in whole or in part. There shall be no prepayment penalty or premium, except as provided herein. |
| **Reservation of Rights:** | Nothing in this Term Sheet is intended or shall be construed to waive any of the Agent's or the Lender's rights to object to or otherwise contest the reasonableness of the fees and expenses of the Professionals. Such rights are hereby reserved in their entirety.<br><br>The Agent and the Lender shall, as a condition of the DIP Loan, have the right under Bankruptcy Code § 363(k) to credit bid up to the full amount of the DIP Loan Obligations in connection with any sale of the Borrowers' assets whether or not under a plan of reorganization or otherwise (the *"Credit Bid Right"*). The Credit Bid Right shall be approved by the Court pursuant to the Interim Order and the Final Order, and shall be a condition to consummating the DIP Loan. |
| *LENDER SPONSORED TRANSACTION* | |
| **Lender Sponsored Transaction:** | The Borrowers and the Lender will cooperate to develop and implement a restructuring (the *"Lender Sponsored Transaction"*) through a sale of substantially all of the Borrowers' assets free and clear of all liens, claims, encumbrances and interests pursuant to Bankruptcy Code § 363 (the *"Sale"*). The Lender (or its designee) shall be designated as the "stalking horse" purchaser for the Sale pursuant to the terms and conditions set forth in the APA Term Sheet attached hereto as <u>Exhibit A</u> (the *"Stalking Horse Bid"*). The agreements, instruments and other documents necessary to implement and consummate the Lender Sponsored Transaction (collectively, the *"APA"*) shall be on terms and conditions acceptable to the Agent or the Lender. |
| **Milestones:** | The Borrowers shall satisfy certain deadlines in the Case as follows (each of which may be extended by an agreement in writing between the Borrower, and the Lender or the Agent):<br><br>1. On the Petition Date, the Borrowers shall have filed a motion (the *"Sale Motion"*) to establish bidding procedures for the Sale and identified the Lender (or its designee) as the "stalking horse" purchaser, and to approve the Sale, which motion shall be in form and substance reasonably acceptable to the Lender and the Agent.<br><br>2. Within nine (9) days of the Petition Date, the Bankruptcy Court shall have entered an order approving bidding procedures for the Sale, which order shall be in form and substance reasonably acceptable to the Lender and the Agent.<br><br>3. Within thirty-five (35) days of the Petition Date, the Bankruptcy Court shall have entered an order approving a Sale, which order shall be in form and substance reasonably acceptable to the Lender and the Agent. |

- 10 -

| | 4. In the event that the Lender is the successful bidder and all other conditions to closing the Sale have been met except for the required regulatory approvals, and the Court has approved the appointment of management to run Borrowers' operations that is acceptable to Lender, Lender will continue to fund the DIP in accordance with an approved budget (approved by Lender in its sole discretion) for an additional sixty (60) days in order to consummate the Sale. |
|---|---|

This Term Sheet is not, and shall not be deemed to be, a binding agreement by the Agent or the Lender to provide the DIP Loan or the Lender Sponsored Transaction described herein. Such agreement will arise only upon the fulfillment, to the satisfaction of the Agent and the Lender, of the conditions precedent required by the Agent and the Lender as set forth herein.

This Term Sheet and the terms set forth herein are confidential until authorized by the Lender to be filed with the Court, and the Borrowers shall not disclose the terms of this Term Sheet, or the fact that negotiations between the Agent, the Lender and the Borrowers are ongoing, to any third party, including, without limitation, any other source of potential financing for the Borrowers.

*Acknowledged, Accepted and Agreed to as of the Date Set Forth Above:*

Debtors:

SPECIALTY HOSPITALS OF AMERICA, LLC, a
Delaware limited liability company

By: _____
Name: _____EDWIN D. CIANL____
Title: _____SVP  CFO____

SPECIALTY HOSPITAL OF WASHINGTON-
HADLEY, LLC, a Delaware limited liability
company

By: _____
Name: _____EDWIN D CIANL____
Title: _____SVP  CFO____

SPECIALTY HOSPITAL OF WASHINGTON-
NURSING CENTER, LLC, a Delaware limited
liability company

By: _____
Name: _____EDWIN D. CIANL____
Title: _____SVP  CFO____

- 11 -

SHA HOLDINGS, INC., a Delaware corporation

By: _____
Name: _EDWIN D CLARK_____
Title: _SVP CFO_____

SHA MANAGEMENT, LLC, a Delaware limited
liability company

By: _____
Name: _EDWIN D CLARK_____
Title: _SVP CFO_____

SPECIALTY HOSPITAL OF WASHINGTON, LLC, a
Delaware limited liability company

By: _____
Name: _EDWIN D CLARK_____
Title: _SVP CFO_____

SHA HADLEY SNF, LLC, a Delaware limited
liability company

By: _____
Name: _EDWIN D CLARK_____
Title: _SVP CFO_____

Lender:

DCA ACQUISITIONS, LLC, a Delaware limited
liability company

By:
Name:   Michael A. Gatto
Title:   Authorized Signatory

Agent:

DCA FINANCE, LLC, a Delaware limited liability
company

By:
Name:   Michael A. Gatto
Title:   Authorized Signatory

**Exhibit C**

**Specialty Hospitals of America**
Weekly Cash Flow Forecast
($000's)

| Week Number: | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Contingent on | 13 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual/Projected: | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Contingent on | Forecast |
| Week ending: | | 23-May | 30-May | 6-Jun | 13-Jun | 20-Jun | 27-Jun | 4-Jul | 11-Jul | 18-Jul | 25-Jul | 1-Aug | 8-Aug | 15-Aug | Success | Total |
| **Cash Flow Model** | | | | | | | | | | | | | | | | |
| Total Receipts | (1) | 448 | 796 | 279 | 2,555 | 436 | 782 | 265 | 2,451 | 387 | 742 | 237 | 2,498 | 389 | - | 12,264 |
| *Operating Disbursements* | | | | | | | | | | | | | | | | |
| Payroll, Payroll Taxes & Benefits | | 50 | 1,476 | 50 | 1,476 | 50 | 1,476 | 50 | 1,476 | 50 | 1,476 | 50 | 1,476 | 50 | - | 9,206 |
| Medical supplies | | 150 | - | 100 | - | 150 | - | 100 | - | 150 | - | 100 | - | 150 | - | 900 |
| Outside Services | (2) | 450 | - | 498 | - | 450 | - | 498 | - | 450 | - | 498 | - | 450 | - | 3,234 |
| Physician Services | | 200 | - | 180 | - | 200 | - | 180 | - | 200 | - | 180 | - | 200 | - | 1,340 |
| Rent | | 77 | - | 230 | - | - | - | 230 | - | - | - | 230 | - | - | - | 767 |
| Miscellaneous | (3) | 100 | - | 276 | 100 | - | 100 | 276 | 100 | - | 100 | 276 | - | 100 | - | 1,428 |
| Other | (4) | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | - | 2,340 |
| Total Operating Disbursements | | 1,207 | 1,656 | 1,514 | 1,756 | 1,030 | 1,756 | 1,514 | 1,756 | 1,030 | 1,756 | 1,514 | 1,656 | 1,130 | - | 19,275 |
| Net Operating Cash Flow | | (759) | (860) | (1,235) | 799 | (594) | (974) | (1,249) | 695 | (643) | (1,014) | (1,277) | 842 | (741) | - | (7,010) |
| *Non-Operating Disbursements* | | | | | | | | | | | | | | | | |
| Prof Fees – UCC | (5) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 745 |
| Prof Fees – Debtor | | 550 | 275 | 275 | 275 | 240 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | - | 2,335 |
| Debtor IB | | - | - | 20 | 20 | - | - | 25 | 25 | - | - | - | - | 150 | 705 | 900 |
| Prof Fees – Misc. | | 15 | 45 | 35 | 590 | - | - | 300 | - | - | - | - | - | 100 | - | 1,085 |
| Prof Fees – Lender & Other | (6) | 20 | 20 | 20 | 120 | 20 | 20 | 220 | - | 20 | 20 | 20 | 20 | 70 | - | 610 |
| Other | (7) | 138 | - | - | - | - | 22 | - | - | - | - | - | - | 32 | - | 192 |
| 503(b)(9) Claims | (8) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 481 |
| Careout Reserve | (9) | - | 161 | 161 | 161 | - | - | - | - | - | - | - | - | - | - | 250 |
| | (10) | | | | | | | | | | | | | | | |
| Total Non-Operating Disbursements | | 723 | 526 | 516 | 1,441 | 260 | 132 | 110 | 635 | 110 | 110 | 110 | 110 | 442 | 705 | 5,930 |
| *Taxes* | | | | | | | | | | | | | | | | |
| DC Taxes (provider, sales & use, property) | | 83 | - | - | - | 83 | - | - | - | 83 | - | - | - | 83 | - | 330 |
| *Interest* | | | | | | | | | | | | | | | | |
| BB&T Facilities | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| NCB | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Mezzanine Loan | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Interest, Fees & Expenses | (11) | 340 | - | 14 | 750 | - | - | 74 | - | - | - | 114 | - | 108 | - | 1,396 |
| Total Cash Flow | | (1,904) | (1,386) | (1,765) | (1,392) | (937) | (1,106) | (1,433) | 60 | (836) | (1,124) | (1,501) | 732 | (1,373) | (705) | (14,670) |
| Beginning Cash | | $ (0) | $ (1,904) | $ (1,765) | $ (1,392) | $ (937) | $ (1,106) | $ (1,433) | $ 60 | $ (836) | $ (1,124) | $ (1,501) | $ 732 | $ 732 | $ (0) | |
| Change in Cash | | (1,904) | (1,386) | (1,765) | (1,392) | (937) | (1,106) | (1,433) | 60 | (836) | (1,124) | (1,501) | 732 | (1,373) | (705) | (14,670) |
| Borrowings (Repayment) of Debt | | 1,904 | 1,386 | 1,765 | 1,392 | 937 | 1,106 | 1,433 | - | 776 | 1,124 | 1,501 | - | 641 | 705 | 14,670 |
| Ending Cash | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 60 | $ - | $ - | $ - | $ 732 | $ - | $ - | $ - |
| Ending DIP Balance | | $ 1,904 | $ 3,290 | $ 5,056 | $ 6,448 | $ 7,385 | $ 8,491 | $ 9,924 | $ 9,924 | $ 10,699 | $ 11,823 | $ 13,324 | $ 13,324 | $ 13,965 | $ 14,670 | $ 14,670 |

(1)  Reflects Capital Hill 2014 bi-weekly DIP reduction from $646K to $175K. Receipts net of any recoupments
(2)  Includes food, lab, pharmacy and rehabilitation services
(3)  Includes utilities and insurance
(4)  Includes employee travel and expense, equipment rental, IT services, etc.
(5)  Includes legal and financial advisory services
(6)  Includes lender professionals, claims agent and patient care ombudsman
(7)  Includes ordinary course professionals, D&O insurance tail, etc.
(8)  Includes utility deposits and US Trustee fees
(9)  Preliminary estimates
(10) Amount carved out for payment of professional fees after a DIP default per the DIP agreement
(11) Interest and fees on DIP facility per the DIP agreement. Includes estimate of DIP lender legal fees and expenses for APA expense reimbursement in accordance with the DIP agreement and estimates for DIP drafting and estimates for APA drafting

**Exhibit D**



Garrett Fletcher
  Managing Director
  Asset Based Lending

**MidCap Financial LLC**
7255 Woodmont Avenue.
Suite 200
Bethesda, MD 20814
301.841.6439

May 7, 2014

Specialty Hospitals of America, LLC
700 Constitution, NE
Washington, DC 20002

To Whom it May Concern:

We are pleased to advise you that MidCap Financial, LLC ("MidCap Financial") will consider establishing a $15 million senior secured debtor-in-possession revolving credit facility (the "Senior DIP Credit Facility") under the terms and conditions set forth below with Specialty Hospitals of America, LLC ("Borrower") as debtor-in-possession under Chapter 11 of the federal Bankruptcy Code, 11 U.S.C. § 101, et. seq. (the "Bankruptcy Code"), to provide for Borrower's working capital requirements.  Please note that any funding under this proposal is subject to due diligence, legal documentation and credit committee approval.

**General**

| | |
|---|---|
| Borrower: | Specialty Hospitals of America, LLC ., as debtor-in-possession under a bankruptcy case to be filed in the United States Bankruptcy Court (the "Bankruptcy Court"; and such case being the "Chapter 11 Case") |
| Administrative Agent: | MidCap Financial, LLC ("MidCap Financial") |
| Lenders: | MidCap Financial and such other banks and financial institutions as may be arranged by MidCap Financial |

**Terms and Conditions – Revolving Line of Credit**

| | |
|---|---|
| Facility: | Revolving Line of Credit |
| Commitment Amount: | The maximum loan amount under the Revolver (the "Revolver Commitment Amount") shall be $15 million.   The amount available to Borrower under the Revolver at any one time shall be based upon the Availability (as described below). |
| Availability: | Availability under the Revolver shall be an amount up to eighty five percent (85%) of the Net Collectable Value (defined below) of Borrower's accounts receivable due from eligible direct and third-party payors. The Net Collectable Value of Borrower's accounts receivable is the amount Borrower bills such payors less bad debt, contractual allowances, settlement or other liabilities due to or offset by or capable of being recouped by Medicare or Medicaid, and other standard ineligibles, which shall be determined by Agent based on its due diligence.  Availability under the Senior DIP Credit Facility shall be reduced for such availability reserves and/or adjustments as |

Please initial upon approval _____

| | may be established and maintained from time to time by Agent in its sole discretion including, without limitation, the "Carve-Out," which shall be a reserve against borrowing availability in the full amount of any carve-out or other priming lien or obligation authorized by the Bankruptcy Court order(s) approving the Senior DIP Credit Facility (the "DIP Order"), and, to the extent allowed by the Bankruptcy Court, certain professional fees and expenses which had not been paid to or held by certain professionals prior to the first business day following certain defaults. |
|---|---|
| Minimum Balance: | Borrower shall maintain a minimum drawn balance under the Revolver of no less than 30% of Availability (as defined above). |
| Term: | The earlier of (a) twelve (18) months from the date of closing or (b) the occurrence of a DIP Credit Facility Termination Event (as defined below) (in either case, the "DIP Credit Facility Maturity Date"). The term "DIP Credit Facility Termination Event" means the termination of the Senior DIP Credit Facility by Agent, in its sole discretion, based upon any one of the following events: (i) the occurrence of an event of default under the DIP Loan Documentation (defined below) or any Bankruptcy Court order approving the Senior DIP Credit Facility, (ii) the indefeasible payment in full of the indebtedness and obligations under the Senior DIP Credit Facility, (iii) a sale of all or substantially all or any material portion of the assets of Borrower, (iv) the conversion of the Chapter 11 Case to a case under Chapter 7, (v) appointment of a trustee or examiner, (vi) the effective date of a Plan (as defined below) confirmed by a final order in the Chapter 11 Case, and (vii) such other events as designated by Agent in the DIP Loan Documentation or set forth in the Bankruptcy Court order(s) approving the Senior DIP Credit Facility. |
| Principal Repayment: | All obligations under the Senior DIP Credit Facility shall be due and payable in full by Borrower to Agent at the DIP Credit Facility Maturity Date. |
| Interest and Fees: | Interest on the outstanding balance of the Revolver shall be payable monthly in arrears at an annual rate of reserve-adjusted, 30-day LIBOR (subject to a 1.5% floor) plus 525 basis points, reset monthly. Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year. Collections of cash by Lenders under the Revolver shall be credited to Borrower's obligations thereunder on a daily basis, subject to seven business clearance days. |
| | Borrower shall pay Administrative Agent a collateral management fee of 0.10% per month on the outstanding balance of the Revolver. |
| | Borrower shall pay Lenders an unused line fee equal to .042% per month of the average unused portion of the Revolver. |
| | Borrower shall pay Lenders a fully earned, non-refundable origination fee of 1%of the Revolver Commitment Amount, due and payable in full upon the |



| | funding of the initial loans under the Facility. |
|---|---|
| Prepayment: | If the Facility is prepaid prior to the end of the Term, Borrower shall pay to Lenders a fee as compensation for the costs of being prepared to make funds available to Borrower throughout the Term equal to an amount determined by multiplying the Revolver Commitment Amount by 3.0%. In addition, Lenders shall have a right of first refusal to provide any financing the proceeds of which are used to refinance this Facility. The Revolver may not be repaid prior to the full repayment of the Term Loan. |
| Security: | All obligations of Borrower under the Senior DIP Credit Facility (collectively, the "Obligations") shall be secured by (a) valid Bankruptcy Court-authorized first priority perfected and priming security interests and liens in and pledges of all now existing and hereafter acquired assets of the Borrower, (b) 100% of the now existing and hereafter acquired stock or other equity interests of the Borrower and its existing and future domestic subsidiaries, and (c) all proceeds and products of the foregoing (such assets, stock, equity interests and products and proceeds, collectively referred to herein as the "Collateral"). All liens and security interests in and to the Collateral shall be secured: (i) pursuant to Section 364(d) of the Bankruptcy Code, by a first priority, senior priming perfected lien on, and security interest in, the Collateral that is subject to any valid, duly perfected lien of any party; (ii) pursuant to Section 364(c) of the Bankruptcy Code, by a first priority, perfected lien on, and security interest in, all Collateral that is not subject to any valid, duly perfected lien of any party (such security interests, liens and pledges collectively referred to herein as the "DIP Liens"), and the DIP Liens shall be accorded super-priority under Section 364(c) of the Bankruptcy Code, including over any and all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code. |
| Use of Proceeds: | The proceeds of the Senior DIP Credit Facility will be used (i) to pay in full all Interest and Fees (as described below) as and when due throughout the Chapter 11 Case with respect to the Senior DIP Credit Facility, and (ii) except as set forth in (i), exclusively for working capital of the Borrower in the Chapter 11 Case in accordance with a budget to be prepared by the Borrower and its financial advisors in form and substance acceptable to Agent in its sole discretion and approved by the Bankruptcy Court, setting forth the expenditures, revenues, receipts and disbursements of the Borrower on a weekly basis during the Chapter 11 Case (the "Budget"). |
| Financial Covenants: | Financial covenants shall include, without limitation, minimum monthly revenue and minimum monthly cash receipts. Additional financial covenants and covenant levels shall be determined subsequent to completion of due diligence. In addition, Borrower shall furnish a borrowing base certificate to the Agent at least once each week, and on a monthly basis, a 13-week budget setting forth on a weekly basis cash revenue, receipts, expenses, disbursements, variances to the prior budget and other information. |

Please initial upon approval _____

midcap
FINANCIAL LLC

| | |
|---|---|
| Reorganization Milestones: | Any of the following events shall further constitute a DIP Credit Facility Termination Event:<br><br>• Failure of the Borrower to have the Bankruptcy Court enter an order within twenty-one (21) days of the filing of the Sale Motion in form and substance acceptable to the Agent (a) approving the Stalking Horse APA and bidding procedures proposed in the Sale Motion, and (b) scheduling an auction for the sale of the assets in accordance with those bidding procedures (the "Auction") and a sale hearing (the "Sale Hearing") with respect thereto.<br><br>• Failure of the Borrower to conduct the Auction on or before [December 31, 2014].<br><br>• Failure of the Borrower to have the Bankruptcy Court enter an order not more than ten (10) days prior to the date established for the closing of the 363 Sale approving the 363 Sale.<br><br>• Failure of the Borrower to close the 363 Sale on or before [December 31st, 2014] |
| Other Terms: | Borrower shall maintain and pay for a depository account (the "Lock Box Account") subject to a control agreement satisfactory to Administrative Agent, into which Borrower's cash collections shall be remitted.<br><br>Administrative Agent shall perform periodic field audits on Borrower's books and records and collateral-related information. |
| Loan Documents: | Borrower shall execute and deliver to Administrative Agent such loan and security agreements, instruments, documents, certificates, and assurances as are reasonable and customary for similar loans, and as Administrative Agent may reasonably require in connection with the closing of the Facility. Such loan document shall provide, among other things, that Lender shall have the right to assign the Facility in whole or in part, at its discretion.<br><br>Administrative Agent shall receive an opinion from Borrower's counsel satisfactory to Administrative Agent. |
| Conditions Precedent: | Customary conditions for financings of this type, including but not limited to:<br><br>• Satisfactory review by the Lenders of due diligence items, including but not limited to: (a) receipt and satisfaction with financial information, (b) legal diligence, (c) monthly financial projections for the |



next twelve (12) months, and (d) payment history and assurances of payment for accounts receivable due from Medicare and Medicaid.

- No material change in Borrower's business or general financial condition.

- No material default in any of Borrower's obligations under any contract.

- Borrower shall be in compliance with all applicable laws.

- Execution of all necessary credit documentation, including a credit and security agreement incorporating the terms and conditions set forth in this Term Sheet, together with customary closing documentation, instruments, documents, certificates, resolutions, opinions and assurances as are reasonable and customary for similar loans, and other items reasonably requested by the Agent, in each case in form and substance satisfactory to the Agent in its sole discretion (collectively, the "DIP Loan Documentation").

- Perfection on a first priority basis of all security interests and liens in the Collateral.

- Payment of all fees and expenses.

- Execution by a stalking horse bidder of an asset purchase agreement (the "Stalking Horse APA") for the purchase of all or substantially all of the Borrower's assets in the Chapter 11 Case pursuant to Section 363 of the Bankruptcy Code (the "363 Sale") which is subject to no conditions other than Bankruptcy Court approval.

- All of the orders entered in the Chapter 11 Case shall be in form and substance satisfactory to the Agent and its counsel.

- The Bankruptcy Court shall have entered an interim financing order authorizing the secured financing under the Senior DIP Credit Facility on the terms and conditions contemplated by this Term Sheet and the DIP Loan Documentation, granting to Agent the security interests and liens and super-priority administrative expense claim

status described above, modifying the automatic stay and other provisions required by Agent and its counsel (the "Interim Order"). The Interim Financing Order shall limit the debtor's right to surcharge any of the Collateral.

• Entry of a final financing order authorizing the Senior DIP Credit Facility and approving all other terms provided in this Term Sheet, the DIP Loan Documentation and the Interim Order, unless otherwise agreed by Agent, within thirty (30) days of the Interim Order.

• The Agent shall have received the Budget and the Budget shall have been satisfactory to the Agent in its sole discretion.

• [Filing of a motion (the "Sale Motion") within ten (10) days of entry of the Interim Order seeking entry of an order approving the 363 Sale, procedures for the 363 Sale and the Stalking Horse APA.]

Such other conditions that Agent may determine after its review of the diligence to be provided by Borrower.

| | |
|---|---|
| Facility Costs: | All reasonable costs associated with the Facility, including, but not limited to Agent's out-of-pocket expenses associated with the transaction, professional fees, recording fees, search fees, and filing fees will be paid by Borrower regardless of whether the transaction closes. Upon acceptance of the general terms of this letter, Borrower shall remit a non-refundable $75,000 deposit (the "Good Faith Deposit"), which amount shall be applied against the Facility costs. |
| Exclusivity: | Borrower understands that Lenders will invest significant resources into making financial, legal and collateral investigations and determinations, and that Lenders will incur opportunity costs in pursuing such investigations and determinations for this Facility. Accordingly, Borrower agrees that, during the "Feasibility Period" defined below, Borrower and its principals and affiliates will (a) not close any loan or extend or refinance any existing financing for any entity listed herein as Borrower, or sign a term sheet with or otherwise engage another lender for such purpose, (b) negotiate exclusively with Lenders regarding any financing, the purpose of which is substantially the same as that of the proposed Facility, and (c) act in good faith and with reasonable diligence and dispatch to provide all requested access, information, and documentation to allow Lenders to pursue approval of the proposed Facility and closing if the Facility is approved by Lenders' credit committee. If Borrower fails to comply with the requirements of the preceding sentence, then Borrower shall pay to |



| | Lenders, on demand, liquidated damages equal to 1.0% of the Commitment Amount, such payment to be in addition to any deposit(s) paid to Lenders and any other reimbursement obligations of the Borrower hereunder. The "Feasibility Period" means the period commencing as of the date hereof and continuing until the earlier of (a) the closing of the Facility, (b) a determination by Lenders not to pursue such transaction, or (c) 45 days from the date hereof (which 45-day period will automatically be extended by 120 days if Lenders obtain, within 45 days, credit committee approval for the Facility substantially in accordance with the terms described herein). Borrower agrees that such liquidated damages are a reasonable approximation of the damages Lenders will sustain by reason of Borrower's breach of its agreements in this paragraph. |
|---|---|
| Expiration: | The closing of the Senior DIP Credit Facility will occur on a date that is mutually satisfactory to Borrower and Agent; however if the Senior DIP Credit Facility does not close on or before December 30, 2013, this proposal shall expire and (except for such provisions which survive) have no further effect, unless extended by Agent. |

The terms of the Facility as set forth herein are for discussion purposes only and this term sheet does not imply in any way a commitment by Administrative Agent to enter into the Facility or to submit the Facility to Administrative Agent's credit committee for approval. Administrative Agent may terminate its review of the Facility at any time in its sole discretion. Administrative Agent will make the loans summarized above only upon further due diligence and underwriting of the transaction, approval through Administrative Agent's credit approval process, Administrative Agent's continuing satisfaction with the financial and business conditions of the Borrower and its principals, and receipt of documentation and assurances satisfactory to Administrative Agent and its legal counsel. This term sheet does not purport to specify all of the terms, conditions, representations and warranties, covenants and other provisions that will be contained in the final Financing Documents for the Facility, if approved by Administrative Agent. The Facility shall be subject to such other terms, covenants and conditions as Administrative Agent deems appropriate in its sole discretion.

This term sheet is being delivered in reliance that all information provided to Administrative Agent is and will be accurate and complete. The contents of this term sheet may not be shared with any third party without Administrative Agent's prior written consent, except for management and regulatory bodies on a need-to-know basis. All persons who are informed of the contents of this term sheet also need to be informed that such contents are confidential and cannot be disclosed without Administrative Agent's prior written consent.

Notwithstanding anything else contained herein, Borrower hereby expressly agrees to be bound by the provisions of this term sheet relating to confidentiality, exclusivity and expense reimbursement.

This term sheet supersedes all previous discussions, communications and proposals relating in any way to the Facility and shall expire if not executed by Borrower and returned to Administrative Agent by 5:00pm EST on May 13th, 2014.

MidCap Financial hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "Act") and MidCap Financial's policies and

Please initial upon approval _____



practices, MidCap Financial is required to obtain, verify and record certain information and documentation that identifies each Borrower, which information includes the name and address of each Borrower and such other information that will allow MidCap Financial to identify each Borrower in accordance with the Act.

If you would like Administrative Agent to continue reviewing your loan request, please evidence your agreement with the forgoing by accepting this proposal on the space set forth below, and returning it, to my attention.  Please also wire the good faith deposit to the following:

|  |  |
|---|---|
| Bank Name and Address: | SunTrust Bank |
|  | 25 Park Place |
|  | Atlanta, GA 30303 |
| ABA/Routing Number: | 061000104 |
| Swift Code: | SNTRUS3A |
| Account Name and Address: | MC SERVICECO LLC |
|  | 7255 Woodmont Ave. |
|  | Suite 200 |
|  | Bethesda, MD  20814 |
| ACCT: | 1000113400443 |
| ATTN: | Specialty Hospitals of America, LLC |

Upon receipt, we will immediately begin due diligence, Administrative Agent's credit process, and legal documentation. We appreciate the opportunity to furnish this proposal to you.  If you have any questions, please do not hesitate to call.

Very Truly Yours,


_____
Name: Garrett Fletcher
Title: Managing Director


Agreed and accepted this ___ day of _____, 20__.


Please initial upon approval _____

midcap

**Specialty Hospitals of America, LLC**
By:

Name:

Title:

midcap
FINANCIAL LLC

**Exhibit E**

[K&S Draft – 4/30/14]

**Specialty Hospitals of America, LLC**
**Summary of Indicative Terms and Conditions ("Term Sheet") for**
**Debtor-In-Possession Credit Facility**
**April 30, 2014**

THIS TERM SHEET IS FOR DISCUSSION PURPOSES ONLY, AND DOES NOT CONSTITUTE AN OFFER, AGREEMENT OR COMMITMENT TO LEND BY HIGHLAND CAPITAL MANAGEMENT, L.P. OR ANY OF ITS AFFILIATES. ANY COMMITMENT TO DO SO WOULD BE SUBJECT TO RECEIPT OF INTERNAL CREDIT APPROVALS, SATISFACTORY RESULTS OF DILIGENCE AND SATISFACTORY DOCUMENTATION, AND SUCH OTHER TERMS AND CONDITIONS AS MAY BE REQUIRED BY HIGHLAND CAPITAL MANAGEMENT, L.P. NO PARTY IS AUTHORIZED TO DISCLOSE THIS TERM SHEET TO ANY PERSON OTHER THAN ITS AFFILIATES AND THEIR RESPECTIVE PROFESSIONAL ADVISORS, WHO SHALL AGREE TO MAINTAIN ITS CONFIDENTIALITY. THIS IS A SUMMARY AND INDICATIVE TERM SHEET WHICH DOES NOT CONTAIN ALL OF THE TERMS OR PROVISIONS WHICH WOULD BE CONTAINED IN THE DIP FACILITY REFERRED TO BELOW.

| | |
|---|---|
| BORROWERS: | Specialty Hospitals of America, LLC ("**SHA**") and its subsidiaries, as borrowers (the "**Borrowers**"). |
| ADMINISTRATIVE AGENT AND COLLATERAL AGENT: | NexBank, SSB or one of its affiliates ("**Agent**"). |
| LENDERS: | With respect to the DIP Facility (as defined below), one or more funds managed by Highland Capital Management, L.P. and its affiliates ("**Lenders**"). |
| DIP FACILITY: | A senior secured revolving credit facility of up to $8,000,000 (the "**DIP Facility**"), on terms and conditions satisfactory to Agent. |
| AVAILABILITY: | Availability under the DIP Facility ("**DIP Availability**") will be limited to amounts permitted under the Budget (as defined below). |
| MATURITY: | The earlier of (a) sixty (60) days after the Petition Date (as defined below) or (b) the date that the sale of all or substantially all of the Borrowers' assets is consummated under Section 363 of the Bankruptcy Code. |
| SECURITY: | A first priority perfected security interest in all existing and after-acquired real and personal property of the Borrowers, including, without limitation, currently unencumbered assets (the "**Security**"), subject to the Carve-Out. The Borrowers will waive any right to seek use of, or surcharge, cash collateral or any collateral pledged to |

Agent for the benefit of the Lenders to secure all obligations under the DIP Facility.

CARVE-OUT:

A **"Carve-Out"** shall be established from the Security for the payment of (a) allowed professional fees and disbursements incurred by the Borrowers and any statutory committees appointed in cases filed under Chapter 11 of the Bankruptcy Code (but solely to the extent that such fees and disbursements are set forth in the Budget), and (b) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717. The amount and uses of the Carve-Out shall be satisfactory to Agent.

INTEREST AND FEES:

(a) A fixed rate equal to **8.00%** per annum.
(b) A commitment fee of 2.0% of the amount of the DIP Facility, payable upon entry of the interim financing order approving the DIP Facility (the **"Interim Order"**).
(c) An unused line fee of 0.75% on the average daily balance of the unused portion of the DIP Facility to be paid monthly in arrears.

FINANCIAL REPORTING:

Usual and customary for transactions of this type, giving due regard to the nature of the facility as a DIP Facility.

Borrowers shall also provide a weekly cash flow budget for a period from the date of entry of orders for relief with respect to the Borrowers (**"Petition Date"**) until thirteen (13) weeks thereafter setting forth, on a line-item basis, (a) projected cash receipts, (b) projected disbursements, (c) inventory and receivable levels and (d) total available liquidity (consisting of unused availability under the DIP Facility and unrestricted cash on hand). The Budget shall be updated by the Borrowers from time to time, subject to the approval of Agent (the **"Budget"**).

Borrowers shall also provide a weekly Budget variance report/reconciliation showing by line item actual cash receipts, disbursements, inventory and receivable levels and total available liquidity for the immediately preceding week, the immediately preceding rolling four week cumulative period and on a cumulative basis on and after the closing date, noting therein all variances, on a line-item basis, from amounts set forth for such period in the Budget most recently approved by Agent, and shall include explanations for all material variances.

BUDGET COVENANTS:

Budget covenants shall include, without limitation, weekly and cumulative testing of maximum Budget variance on an aggregate and line item basis. The maximum weekly and cumulative maximum Budget variance shall be ten percent (10%) for each line item in the Budget and five percent (5%) for the aggregate amount set forth in the Budget.

2

FINANCIAL COVENANTS:     Usual and customary for transactions of this type, giving due regard to the nature of the facility as a DIP Facility.

CONDITIONS PRECEDENT:     The definitive documentation for the DIP Facility will include such conditions precedent as are usual and customary for financings of this kind, including, but not limited to, completion of confirmatory due diligence regarding the Borrowers, their facilities, assets, and liabilities, the entry of orders for relief with respect to each Borrower under Chapter 11 of the Bankruptcy Code, and the entry of the Interim Order in form and substance satisfactory to Agent.

REPRESENTATIONS AND
WARRANTIES:     The definitive documentation for the DIP Facility will include such representations and warranties as are usual and customary for financings of this kind.

AFFIRMATIVE
COVENANTS:     The definitive documentation for the DIP Facility will include such affirmative covenants as are usual and customary for financings of this kind.

NEGATIVE
COVENANTS:     The definitive documentation for the DIP Facility will include such negative covenants as are usual and customary for financings of this kind.

EVENTS OF DEFAULT:     The definitive documentation for the DIP Facility will include such events of default as are usual and customary for financings of this kind. In addition, an event of default shall occur if the Borrowers fail to achieve certain "milestones" towards consummation of one or more sales of the Borrowers' assets and operations to be determined under Section 363 of the Bankruptcy Code (a "**363 Sale**"), in each case acceptable to Agent by dates to be agreed as more completely set forth on Schedule 1 attached hereto, unless otherwise extended by Agent in its sole discretion.

DOCUMENTATION:     Implementation of the terms and conditions for the DIP Facility shall be subject to execution of definitive documentation. In the event of any inconsistencies between this term sheet and the definitive documentation, the definitive documentation shall control.

GOVERNING LAW:     New York.

COUNSEL TO
ADMINISTRATIVE AGENT:     King & Spalding LLP.

3

<u>Schedule I</u>

**Milestones**

Unless otherwise waived by Agent in its sole discretion, Borrowers shall achieve the following milestones by the dates set forth below (or such later date as may be agreed to by Agent in its sole discretion):

1.  Not later than one (1) day after the Petition Date, filing of a motion, in form and substance satisfactory to Agent seeking approval of agreed bidding procedures (the "**Bidding Procedures**") and authority to sell the Borrowers' assets pursuant to Section 363 of the Bankruptcy Code on or before May ___, 2014;

2.  Within ten (10) days after the Petition Date, entry of a Bankruptcy Court order in form and substance satisfactory to Agent approving the Bidding Procedures;

3.  Within forty-five (45) days after the Petition Date, an auction for the sale of the Borrowers' assets pursuant to Section 363 of the Bankruptcy Code shall have occurred;

4.  Within fifty (50) days after the Petition Date, entry of a Bankruptcy Court order or orders, as the case may be, in form and substance satisfactory to Agent authorizing the sale of the Borrowers' assets, either in whole or in parts, pursuant to Section 363 of the Bankruptcy Code; and

5.  Within fifty-five (55) days after the Petition Date, the closing of the sale(s) which shall provide, unless otherwise agreed to by Agent and the Lenders, sufficient cash proceeds to repay in full in cash all outstanding obligations under the DIP Facility.

4