## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re:<br><br>SPECIALTY HOSPITAL OF<br>WASHINGTON, LLC, *et al.*,<br><br>Debtors.[1] | Case No. 14-00279<br><br>Chapter 11<br><br>(Joint Administration Requested) |

**MOTION OF DEBTORS FOR ENTRY OF ORDERS (I) (A) APPROVING
AUCTION AND BIDDING PROCEDURES IN CONNECTION WITH THE
SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS,
(B) AUTHORIZING ENTRY INTO A STALKING HORSE AGREEMENT,
SUBJECT TO HIGHER OR OTHERWISE BETTER OFFERS,
(C) APPROVING PROCEDURES RELATED TO THE ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
(D) SCHEDULING AUCTION AND SALE HEARING, (E) APPROVING THE FORM
AND MANNER OF SALE NOTICE, AND (F) GRANTING RELATED RELIEF, AND (II)
(A) AUTHORIZING AND APPROVING THE SALE OF SUBSTANTIALLY ALL OF
THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES, AND OTHER INTERESTS, (B) AUTHORIZING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
<u>AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF</u>**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), by

and through their proposed undersigned attorneys, hereby file this motion (the "**Motion**")

pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code,

11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**") and Rules 2002, 6004, 6006, and 9006 of

the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of (i) an order,

substantially in the form annexed hereto as <u>Exhibit A</u> (the "**Bidding Procedures Order**"), (a)

approving certain auction and bidding procedures in connection with the sale of substantially all

---

[1]     The debtors in these chapter 11 cases and the last four digits of each debtor's federal
identification number are:  Specialty Hospitals of America, LLC (1347), SHA Holdings, Inc.
(1943), SHA Management, LLC (1350), Specialty Hospital of Washington, LLC (1352),
Specialty Hospital of Washington Nursing Center, LLC (1348), Specialty Hospital of
Washington Hadley, LLC (2586), and SHA Hadley SNF, LLC (1976).

of the Debtors' assets, substantially in the form annexed hereto as Exhibit B (the "**Bidding Procedures**"), (b) authorizing the Debtors to enter into a stalking horse purchase agreement, subject to higher and better offers, (c) approving procedures relating to the assumption and assignment of executory contracts and unexpired leases, (d) scheduling an auction and Sale Hearing (as defined below), (e) approving the form and manner of sale notice, and (f) granting related relief, and (ii) an order, substantially in the form annexed hereto as Exhibit C (the "**Sale Order**"), (a) authorizing and approving the sale of substantially all of the Debtors' assets free and clear of all liens, claims, encumbrances, and other interests, (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases, and (c) granting related relief.  In support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Debtors own and operate the only two long-term, acute-care facilities within the District of Columbia as well as two nursing homes whose patients often require more acute health care than those at many other nursing homes.  Although the quality of care provided to their patients or residents is high, the Debtors lack the resources to continue to operate, and efforts to obtain debt or equity financing to sustain their operations have been unsuccessful, particularly given the amount of debt they owe.  Thus, to avoid having to close their doors and transfer patients abruptly, the Debtors have been required to seek protection under chapter 11 and to turn to this Court to oversee an accelerated process for selling their businesses free and clear of liens, claims, encumbrances and interests.

2.      Fortunately, the Debtors have not been forced to enter chapter 11 without an option for being able to sell their assets and provide continuing high-quality care to their patients and residents.  The Debtors have been able to secure a stalking horse bid for their assets from a

financially sound buyer whom the Debtors believe will be able to obtain, in short order, the

necessary non-bankruptcy regulatory and other approvals to permit a sale without any

interruption in service.  This stalking horse bidder also is providing, subject to Court approval,

post-petition financing to fund the Debtors' operations while this process proceeds, which

funding will be a credit against its purchase price for these assets.

3.    Notwithstanding its dire financial position, the Debtors' agreement with the

stalking horse bidder subjects its offer for the Debtors' assets to a competitive, but quick, auction

process.  Understandably, the stalking horse bidder has asked for bidder protections as a result.

The Debtors believe that the stalking horse bidder should receive the requested protections on the

facts of this case for a number of reasons, including the increased risk and expense that attends

this transaction for the stalking horse bidder as the result of the numerous approvals and

concessions that will be required from governmental agencies other than this Court; approvals

and concessions that, in some cases, this Court cannot compel.  The Debtors also believe that the

timeline for this auction is appropriate on the circumstances of this case and the limited funding

available to it.

## JURISDICTION

4.    The Court has jurisdiction over the Debtors, their estates, and this matter pursuant

to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory

bases for the relief requested in this Motion are sections 105(a), 363, 365, 503, and 507 of the

Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9006.

## BACKGROUND

**A.     Procedural Posture**

5.      On April 23, 2014 (the "**Involuntary Petition Date**"), certain creditors (the "**Petitioning Creditors**") filed an involuntary petition (the "**Involuntary Case**") under chapter 11 of the Bankruptcy Code against SHDC in the  United States Bankruptcy Court for the District of Delaware (the "**Delaware Court**").

6.      On April 28, 2014, the Petitioning Creditors filed an emergency motion in the Involuntary Case to appoint a chapter 11 trustee (the "**Trustee Motion**").  In the Trustee Motion, the Petitioning Creditors argued that, due to operational challenges and alleged mismanagement of the Capitol Hill Facility (defined below), appointment of a chapter 11 trustee was necessary to preserve the Capitol Hill Facility's viability as a going concern.[2]

7.      On May 2, 2014, the District of Columbia filed its *Motion to Change Venue of Bankruptcy Proceedings and Transfer This Case to the United States Bankruptcy Court for the District of Columbia* (the "**District's Transfer Motion**"), and on May 7, 2014, SHDC filed its Joinder in the District's Transfer Motion. On May 9, 2014, the Delaware Court entered an order granting the District's Transfer Motion.  On or about May 14, 2014, the Involuntary Case was opened by this Court and assigned case number 14-00279.  On May 21, 2014, SHDC filed its Consent to Entry of an Order for Relief.

8.      On May 21, 2014 (the "**Voluntary Petition Date**"), the Debtors, other than SHDC, filed voluntary petitions (the "**Voluntary Cases**" and, together with the Involuntary Case, the "**Cases**") with this Court under chapter 11 of the Bankruptcy Code.  The Debtors are

---

[2]      SHDC disputes the allegations in the Trustee Motion.  By agreement approved by this Court on May 16, 2014, SHDC's deadline to respond to the Trustee Motion has been set for May 28, 2014.

operating their businesses and managing their properties as debtors-in-possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.

9.      No request for the appointment of a trustee or examiner has been made in

Voluntary Cases, and no committees have been appointed or designated in any of the Cases.

**B.    The Debtors' Operations**

10.     The Debtors collectively own and operate two Long Term Acute Care Hospital

("**LTAC**")[3] facilities, each of which has an accompanying Skilled Nursing Facility ("**SNF**").[4]

As described below, the patients and residents at these facilities are among the sickest in the

country.

11.     One such facility is located at 700 Constitution Avenue, NE, Washington, DC

(the "**Capitol Hill Facility**").[5]  The Capitol Hill Facility houses a 60-bed LTAC and a 117-bed

SNF.  The facility is leased pursuant to a *Lease Agreement* dated December 23, 2004 (as may

have been amended and restated from time to time, the "**Lease**") with Capitol Hill Group, one of

SHDC's petitioning creditor, as landlord.

12.     The other facility is located at 4601 Martin Luther King Jr. Avenue, S.W.,

Washington, D.C. (the "**Hadley Facility**" and, together with the Capitol Hill Facility, the "**SHA

---

[3]      LTACs are specialized hospitals that treat patients with multiple conditions, but who
may improve and be able to return home.  They treat people requiring comprehensive
rehabilitation, head trauma treatment, respiratory therapy and pain management.  LTACH
patients are often resident at a facility for more than 25 days, and often are transferred from
intensive or critical care units.  These patients receive care coordination, dialysis, wound care,
pharmacy and physician services, radiation, and physical therapy, among other services.

[4]      A SNF is commonly referred to as a nursing home.  It provides twenty-four hour care to
residents who are sick, disabled or injured.

[5]      The LTAC and SNF at the Capitol Facility are owned and operated by Debtors Specialty
Hospital of Washington, LLC and Specialty Hospital of Washington Nursing Center, LLC,
respectively.

**Facilities**"). The Hadley Facility houses an 82-bed LTAC, a 62-bed SNF,[6] and a surgical suite

primarily for the benefit of the Hadley Facility's patients or residents.

13.     Collectively, the SNF beds currently have an occupancy rate of approximately 98

percent, filled mostly by Medicaid patients.  The LTAC beds currently have an occupancy rate of

approximately 46 percent, filled by a combination of primarily Medicare and Medicaid patients.

14.     The SHA Facilities contain the only licensed freestanding LTACs between

Philadelphia and Richmond, and have the only certificates of need issued in Washington D.C. for

LTAC services.  The Debtors provide a wide variety of programs and services at the SHA

Facilities, including cardio-pulmonary treatment, wound care, infectious disease therapy, and

other forms of patient care services.

15.     The Debtors' patients typically are critically ill and/or have multiple system

failures that require extended acute care treatment after discharge from a traditional acute care

hospital. Patients often come to the hospitals directly from an intensive care unit.  Indeed, the

"case mix" at these facilities is 1.329, the fifth highest in the United States.  The "case mix"

index is the relative value assigned to a diagnosis related group of patients developed by

Medicare to identify the average acuity level for that group of patients which in this case is the

group of patients in the LTAC.

16.     To provide high quality care to their patients and residents, the Debtors currently

employ approximately 790 people.  Historically, when occupancy levels at the SHA Facilities

were at their peak, the Debtors employed approximately 850 people.

---

[6]     The LTAC and SNF at the Hadley Facility are owned and operated by Debtors Specialty
Hospital of Washington Hadley, LLC and SHA Hadley SNF, LLC, respectively.  Debtor
Specialty Hospital of Washington Hadley, LLC owns the real estate and improvements thereon
at the Hadley Facility.

17.     A description of the Debtors and their businesses, and the facts and circumstances giving rise to these Cases and supporting the relief sought in this Motion, is set forth in the contemporaneously-filed *Declaration of Edwin Clark in Support of Chapter 11 Petitions and First Day Motions*, which is incorporated herein by reference.

### C.     The Prepetition Secured Indebtedness

18.     As described more fully below, the Debtors' prepetition secured debt consists mainly of: (i) secured facilities with Branch Banking and Trust Company ("**BB&T**") in the approximate amount of $40.1 million; (ii) a secured facility with National Capitol Bank of Washington ("**NCB**") in the approximate amount of $6 million, (iii) tax liens in favor of the Internal Revenue Service and/or other governmental agencies (the "**IRS**") in the approximate amount of $7 million, and (iv) more than $5 million owed (on a senior subordinated secured basis) to JWR Realty, LLC ("**JWR**") by Specialty Hospitals of America, LLC.  BB&T, NCB, IRS and JWR are referred to herein as the "**Existing Lienholders**".

#### *The BB&T Facilities*

19.     The Debtors have outstanding obligations under a secured financing facility with BB&T in the principal amount of approximately $34 million.  Approximately $28 million of these obligations relate to a term facility (the "**BB&T Term Facility**") and the remaining $6 million of these obligations relate to a revolving facility (the "**BB&T Revolving Facility**" and, together with the BB&T Term Facility, the "**BB&T Facilities**").

20.     The BB&T Facilities are evidenced by a *Business Loan and Security Agreement* dated March of 2008 and three secured promissory notes, each dated March 24, 2008: (i) a *Term A Promissory Note* in the amount of $35 million; (ii) a *Term B Promissory Note* in the amount of

$6 million, and; (iii) a *Revolving Promissory Note* in the amount of $10.5 million.[7]   The BB&T

Term Facility matures on April 1, 2015, and the BB&T Revolving Facility matured on April 1,

2011. The BB&T Facilities appear to be secured by substantially all of the Debtors' assets (the

"**BB&T Collateral**").   The Debtors are in monetary default under the BB&T Facilities.   As of

the Petition Date, the total amount outstanding on the BB&T Facilities was approximately $40.1

million.

### *NCB Facility*

21.     SHA also has outstanding obligations under a short-term secured financing

arrangement with NCB (the "**NCB Facility**").   The NCB Facility is evidenced by a *Promissory

Note* in the amount of $6 million, a *Commercial Security Agreement*, and a *Security Agreement-

Pledge*, each dated March 12, 2013, by and between SHA and NCB. The NCB Facility appears

to be secured by all of SHA's personal property and business assets (the "**NCB Collateral**"),

albeit subordinate to the Debtors' obligations under the BB&T Facilities and the IRS Tax Liens

(as defined below).   SHA is currently in monetary default under the NCB Facility. As of the

Petition Date, the total amount outstanding on the NCB Facility was approximately $6 million.

### *IRS Tax Liens*

22.     The Debtors are obligated to the federal government for payment of certain

unpaid withholdings and other related tax obligations (the "**Tax Obligations**"), including those

arising under the Federal Insurance Contributions Act (FICA). In order to secure repayment of

the Tax Obligations, the IRS has filed liens (the "**IRS Tax Liens**") on the Debtors' accounts

receivable and inventory (the "**IRS Collateral**" and together with the BB&T Collateral and the

NCB Collateral, the "**Prepetition Collateral**") totaling approximately $7 million.   The IRS Tax

---

[7]     The original borrowing limit under the BB&T Revolving Facility was $7.5 million, but
was increased to $10.5 million through execution of an *Allonge and First Modification to
Revolving Promissory Note* dated December of 2009.

Liens appear to be senior to the security interests of both BB&T and NCB with regard to the IRS Collateral.

*JWR Realty Facility*

23.     Specialty Hospitals of America, LLC has outstanding obligations to JWR Realty, LLC ("**JWR**") in the amount of at least $5 million (the "**JWRR Debt**") pursuant to, among other instruments, a certain Senior Subordinated Note Agreement dated as of November 28, 2005 (as may have been amended from time to time).  The  collateral for the JWRR Debt is described in, among other instruments, the November 28, 2005 Security Agreement (All Personal Property Assets) entered into by Specialty Hospitals of America, LLC and JWR.

**B.     Events Leading up to the Chapter 11 Filings**

24.     The Debtors are operating under severe financial and operational distress that threatens their ability to maintain operations. Several factors have contributed to the Debtors' difficulties. They have been (and are) parties to numerous legal actions, including actions brought by the IRS, the Department of Justice ("**DOJ**"), the Center for Medicaid and Medicare Services ("**CMS**"), the D.C. Department of Healthcare Finance and the D.C. Department of Health.  Defending these and several other lawsuits consumes substantial financial, personnel, and other resources of the Debtors.  Moreover, the outcome of such lawsuits has resulted in substantial liabilities to the IRS, CMS and others, totaling over $40 million.

25.     Occupancy levels at the SHA Facilities (particularly the LTAC facilities) have also declined.   Since 2012, total occupancy at the Hadley and Capitol Hill Facilities has decreased approximately 31% and 74% respectively.

26.     As a result of these and a confluence of related factors, the Debtors are currently in a state of financial crisis. They are in monetary default under lease and secured debt obligations and have fallen behind in payment to trade creditors. Without the infusion of new

operating capital, the SHA Facilities will be unable to meet upcoming payroll and operational

obligations.[8]

27.    The SHA Facilities serve a vital need to the community and their closure would

result in a healthcare crisis in the Washington DC area.  As mentioned above, both the SHA

Facilities provide acute medical care and services to a population suffering from serious and life-

threatening conditions.  Because the LTACs at the SHA Facilities are the only licensed,

freestanding LTACs in the region, and because short-term acute care hospitals are not equipped

to care for long-term patients from a financial standpoint the continued operation of both the

SHA Facilities is critical to the well-being of its current and future patients, and particularly

those patients utilizing Medicaid and Medicare. The SHA Facilities are both located in areas of

high concentration of Medicaid and Medicare patients, many of whom do not have the financial

or physical capability to move.  This potential hardship is particularly true for the SNF residents.

There are few other nursing home options for people in these neighborhoods, and there is a

shortage of nursing home beds in the District of Columbia.  Moreover, as freestanding LTACs

and SNFs, the SHA Facilities are serving very fragile patients with life-threatening illnesses.  For

these people, closure of the SHA Facilities could lead to particularly catastrophic consequences.

28.    In addition, because there are not any other freestanding LTACs in DC, and there

already exists a shortage of SNF beds in the District of Columbia, the closure of the SHA

---

[8]    In light of Debtors' immediate need for operating capital to fund operations from the
Voluntary Petition Date to the date of closing the proposed sale (as outlined below), the Debtors
have filed, contemporaneous with this Motion, their Emergency Motion for Entry of Interim and
Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507  (I) Authorizing the
Debtors to Obtain Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III)
Granting Priming Liens and Providing Superpriority Claims, (IV) Granting Adequate Protection,
(V) Scheduling a Final Hearing, and (VI) Granting Related Relief (the "**DIP Financing
Motion**").  As detailed in the DIP Financing Motion, the Debtors are seeking debtor-in-
possession financing (the "**DIP Loan**") from Acquisitions (as defined below).

Facilities would have a devastating and potentially long-lasting impact on the approximately 750 people who work there. There are no comparable facilities with capacity within the District, making it unlikely that the Debtors' employees would find new jobs quickly within the District.

29.     Confronted with increasing financial difficulties, on one hand, and existing and future patients in critical need (most of whom have no place else to turn), on the other hand, the Debtors analyzed and pursued initiatives other than closing and shutting the doors. To this end, in August 2013 the Debtors retained Alvarez & Marsal ("**Alvarez**"). [9]

30.     Alvarez initially began to assist the Debtors explore an operational restructuring (including a likely bankruptcy proceeding) that was to be funded in part with the proceeds or settlement from a lawsuit with DHCF (the "**DHCF Lawsuit**") that was hoped to be received in late 2013. During this time, Alvarez assisted the Debtors in development of financial projections, weekly cash flow forecasts, benchmarking analyses, and in discussions with the Debtors' primary creditor and regulatory constituencies. In December 2013, the administrative law judge in the DHCF Lawsuit ruled against the Debtors on several of the issues and the Debtors determined the best course of action was to pursue a sale. At that time Alvarez focused

---

[9]     Alvarez specializes in interim management, crisis management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operational restructuring. Alvarez's debtor advisory services have included a wide range of activities targeted at stabilizing and improving a company's financial position, including developing or validating forecasts, business plans and related assessments of a business's strategic position; monitoring and managing cash, cash flow and supplier relationships; assessing and recommending cost reduction strategies; and designing and negotiating financial restructuring packages. Among the cases in which Alvarez was retained to provide advisory services include In re Peninsula Hospital Center, Case No. 11-47056 (ESS) (Bankr, E.D.N.Y. August 16, 2012); In re Our Lady of Mercy Medical Center et. al., Case No 07-1059 (REG) (Bankr, S.D.N.Y, 2007). Alvarez members have also served as chief restructuring officers in other high profile chapter 11 cases. See, e.g. In re Saint Vincents Catholic Medical Centers, et. al., Case No. 0514945 (CGM). Alvarez was additionally special healthcare strategy and restructuring advisor to North General Hospital and its affiliates prior to its 2010 bankruptcy filing.

its efforts to those items deemed necessary to complete a sale transaction, including cash flow forecasts, assistance with due diligence efforts, assistance in discussions with creditors, regulators, and potential bidders, and bankruptcy preparation.

31.    Having concluded that a sale of their assets was the only viable alternative to liquidation, the Debtors engaged Michael Zarriello of Cain Brothers ("**Cain**") on January 22, 2014. [10]

32.    Thereafter, the Debtors, with the assistance of Alvarez and Cain, contacted a select group of parties whom they believed (either based on their own knowledge or on the recommendation of others) possessed the ability and financial means to negotiate and close a transaction under all of the circumstances promptly.  One candidate, it turned out, lacked the financial resources to fund a transaction.  Others were unwilling to commence due diligence efforts and begin investing in the substantial up-front legal costs necessary to expeditiously advance a transaction without a requirement that the Debtors execute an onerous exclusivity agreement.

33.    However, one exception, Silver Point Capital, LLC ("**Silver Point**"), emerged. Silver Point is a Greenwich, Connecticut-based private investment firm that specializes in investing in distressed companies.  Silver Point is reported to have in excess of $8 billion in

---

[10]    Mr. Zarriello is both a seasoned financial executive and investment banker with health care and multi-industry experience. He heads Cain's distressed situation practice representing major money center lending institutions, municipal bond funds and borrowers (hospitals, senior housing, post-acute care and managed care sectors) both in the for-profit and tax exempt markets.  Prior to joining Cain Brothers he was Executive Director-Co-Head Healthcare of Capstone Advisory Group, where he represented lenders, companies, and investors in complex debt restructurings, turnarounds, and transaction advisory services. Previously Mr Zarriello has worked in both investment banking positions with MTS Health Partners, Jesup & Lamont and Bear Stearns and in operating positions as CFO of Rural/Metro Corporation, a large ambulance service company. He was the CFO of Avon products, Inc. healthcare Division, which had investments in nursing homes, alcohol and substance centers, assisted living centers and a distributor of durable medical equipment.

assets under management.  Its current investments include an equity interest in LifeCare, an

owner/operator of 26 LTAC'S, and previously it owned Vista Healthcare, an operator of 5

hospitals in California.  The Debtors understand (and continue to understand) that Silver Point

possesses the resources and ability to consummate a transaction quickly.  Significantly, Silver

Point indicated that it would commence due diligence and engage its legal counsel to advance

the transaction immediately, without execution by the Debtors of an onerous exclusivity

agreement.  Consequently, the Debtors directed their limited resources into negotiating a

transaction with Silver Point.  In response, Silver Point put the proverbial "money where its

mouth is," allocating resources and starting the due diligence and legal process right away.

34.    During the process of negotiating with Silver Point, the Debtors concluded that

the most effective transaction would be one where the proposed asset purchaser serves as the

Debtors' post-petition lender, effectively underwriting the portion of the costs necessary to reach

closing that the Debtors could not themselves fund from existing operations.  Unlike a stand-

alone debtor-in-possession loan without more, this type of transaction allows for an expeditious

auction of the Debtors' assets, and thus, a definitive strategy for exiting bankruptcy, affording

the Debtors' operations the opportunity to survive.

35.    In fact, through a newly-created entity, DCA Acquisitions, LLC ("**Acquisitions**"),

Silver Point ultimately submitted to the Debtors a term sheet for a proposed transaction to

acquire substantially all of the Debtors' assets, pursuant to which Acquisitions would serve as a

DIP lender and a stalking horse bidder (the "**Stalking Horse Purchaser**" or "**SHP**") in

connection with a section 363 sale of substantially all of the Debtors' assets, subject to higher or

otherwise better offers.  In response, the Debtors, together with their financial, transactional and

legal advisors, engaged in extensive negotiations with the Stalking Horse Purchaser.

36.     Ultimately, the Debtors reached an agreement with the Stalking Horse Purchaser

on the principal terms (the "**Stalking Horse Term Sheet**") of a stalking horse asset purchase

agreement (the "**Stalking Horse Agreement**").  A fully executed copy of Stalking Horse Term

Sheet is attached to this Motion as <u>Exhibit D</u>.  The completed Stalking Horse Agreement will be

filed with the Court prior to the hearing on approval of the Bidding Procedures.  The

consideration being provided under the Stalking Horse Agreement consists of (a) $15,000,000, in

the form of a term DIP Facility provided by the Stalking Horse Purchaser; <u>plus</u> (b) the value of

either a new lease at the Capitol Hill Facility (which, for the avoidance of doubt, includes the net

present value of the lease payments to be assumed by the Stalking Horse Purchaser) to be entered

into between the Stalking Horse Purchaser and Capitol Hill Group or an amended and restated

lease, which will constitute a "Designated Contract" (<u>i.e.</u>, contracts to be assumed and assigned

to the purchaser)  which will be conditioned, in part, on a waiver from Capitol Hill Group of

certain cure amounts, rent arrearage, HVAC and capital expenditure requirements and otherwise

on the terms and conditions set forth in <u>Exhibit C</u> hereto; [11] <u>plus</u> (c) the assumption by the

Stalking Horse Purchaser of certain liabilities set forth in the Stalking Horse Agreement,

including the "Regulatory Agreements" (<u>i.e.</u>, contracts with the regulatory authorities to be

assumed and assigned to the purchaser) and the payment of the Cure Costs (as defined below)

relating to the Designated Contracts; <u>plus</u> (d) $200,000 (unless otherwise increased by the

Stalking Horse Purchaser in its sole discretion), to conduct the orderly wind-down or dismissal

of the bankruptcy case(s) following the sale contemplated by the Transaction (the value reflected

in items (a) through (d) is referred to herein at the "**Total Transaction Value**") .

---

[11]     The Debtors understand that the present value of the pre and post-closing indebtedness
under the Capitol Hill Group lease assumed by the Stalking Horse Purchaser is estimated to be
$44 million.

37.     The Stalking Horse Term Sheet and Stalking Horse Agreement were negotiated in good faith and at arm's length, and the Debtors believe the terms of the proposed transaction are fair and reasonable under all of the circumstances. In addition, the Debtors believe that the proposed post-petition marketing process described herein will provide sufficient time and opportunity for any other interested party to submit a higher or otherwise better offer for the Debtors' assets.

38.     The Debtors, together with their advisors, carefully considered the few realistic options that are currently available.  The Debtors do not possess sufficient liquidity to continue operating outside of bankruptcy, and the pursuit of a sale transaction during these Cases presents the only real option to (a) continue operations and provide uninterrupted patient care at the SHA Facilities, and (b) to enhance value for the Debtors' estates.

## **RELIEF REQUESTED**

39.     By this Motion, the Debtors request entry of the Bidding Procedures Order:

(i)     approving Bidding Procedures, the form of which are attached hereto as Exhibit B, for (a) submitting bids for the purchase of the Acquired Assets (as defined below), and (b) conducting an auction for the Acquired Assets (the "**Auction**"), in the event that the Debtors receive a Qualified Bid (as defined below) for the Acquired Assets other than that of the Stalking Horse Purchaser;

(ii)    approving payment of the Breakup Fee and reimbursement of Expenses (as defined in the Stalking Horse Term Sheet) as reasonable and beneficial to the Debtors' estates;

(iii)   authorizing the Debtors to enter into the Stalking Horse Agreement with the Stalking Horse Purchaser, subject to higher or otherwise better bids, for the purpose of establishing a minimum acceptable bid for the Acquired Assets (the "**Stalking Horse Bid**");

(iv)    approving procedures (the "**Assumption and Assignment Procedures**") for the assumption and assignment of the Designated Contracts (as defined below) in connection with the sale of the Acquired Assets and resolution of any objections thereto;

(v)     scheduling (a) a deadline to submit bids for the Acquired Assets of June 20, 2014 at 5:00 p.m. (prevailing Eastern Time), (b) the date of the Auction for June 23, 2014 at 10:00 a.m. (prevailing Eastern Time), and (c) the date of the hearing to consider approval of the proposed sale of the Acquired Assets (the "**Sale Hearing**") for June 25, 2014 at 10:00 a.m. (prevailing Eastern Time), subject to this Court's availability;

(vi)    approving the form and manner of notice of the deadline to submit bids for the Acquired Assets, the date and time of the Auction and the date and time of the Sale Hearing; and

(vii)   granting certain related relief.

40.     In addition, at the Sale Hearing, the Debtors will request entry of the Sale Order:

(i)     approving the sale of the Acquired Assets in accordance with the terms of the asset purchase agreement executed by the Successful Bidder, which shall be free and clear of all liens, claims, encumbrances, and other interests, including those of or asserted by the Existing Lienholders;

(ii)    approving the assumption and assignment of certain executory contracts and unexpired leases related to the Acquired Assets; establishing the cure amount, if any; and approving the Successful Bidder's provision of adequate assurance of future performance; and

(iii)   granting certain related relief.

### Stalking Horse Bid

41.     The Stalking Horse Term Sheet was negotiated in good faith and at arm's length, with all parties represented by separate counsel.

42.     For the reasons set forth in this Motion, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these Cases and should be approved.

43.     Unless a sale is promptly consummated, the Debtors will have no choice but to convert these Cases to chapter 7, with the likely result that the SHA Facilities will be closed, patients and residents displaced, and the SHA Facilities liquidated.  In contrast, a prompt sale will provide the opportunity to continue operations, maintain patient care and services, and

preserve jobs for and business relationships with hundreds of employees, contract and lease counterparties, and vendors.

## The Bidding and Auction Procedures

44.     To obtain the highest or otherwise best bid for the Acquired Assets, the Debtors intend to implement the Bidding Procedures attached as Exhibit B.  The Bidding Procedures set forth, among other things, the availability of due diligence for potential bidders, the deadline and requirements for submitting a Qualified Bid (as defined below), the procedures for conducting the Auction, and the criteria for determining the highest or otherwise best Qualified Bid for the Acquired Assets (the "**Successful Bid**").

45.     The following summary highlights the material terms of the Bidding Procedures. All parties in interest are referred to the text of the attached Bidding Procedures for additional information regarding the proposed procedures.[12]

### A.     Bid Deadline

46.     A potential bidder that desires to make a bid shall deliver copies of its bid package by email to: (i) counsel to the Debtors, Pillsbury Winthrop Shaw Pittman, LLP, 2300 N Street, NW, Washington, DC 20037-1122 (Attn: Patrick Potter, patrick.potter@pillsburylaw.com) and Pillsbury Winthrop Shaw Pittman, LLP, 1540 Broadway, New York, NY (Attn: Andrew Troop, andrew.troop@pillsburylaw.com); (ii) the Debtors' financial advisor, Alvarez & Marsal Healthcare Industry Group, LLC, 600 Madison Avenue, 8th Floor, New York, NY 10022 (Attn: Ronald Winters, rwinterws@alvarezandmarsal.com); (iii) the Debtors' investment banker, Cain Brothers & Company, LLC, 360 Madison Avenue, New York,

---

[12]     Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the Bidding Procedures. To the extent that there are any inconsistencies between the summary of the Bidding Procedures set forth above and the Bidding Procedures attached as Exhibit B, the terms of the actual Bidding Procedures attached as Exhibit B shall control.

NY 10017 (Attn: Gregory J. Hychko, ghychko@cainbrothers.com); and (iv) counsel to any

official committee of unsecured creditors appointed in these Cases (the "**Committee**"), so as to

be actually received on or before the date set by the Court as the deadline to submit Qualified

Bids (the "**Bid Deadline**").  The Debtors propose **June 20, 2014 at 5:00 p.m. (prevailing**

**Eastern Time)** as the Bid Deadline and seek authority in their business judgment to extend the

Bid Deadline without further order of the Court.  No bids submitted after the original or any

extended Bid Deadline shall be considered by the Debtors.

### B.    Due Diligence

47.    Subject to a potential bidder entering into a confidentiality agreement satisfactory

to the Debtors in their business judgment, the Debtors may afford any potential bidder, whom the

Debtors, in consultation with their advisors, believe has the wherewithal to close a sale

transaction and operate the SHA Facilities, the opportunity to conduct a reasonable due diligence

review in the manner determined by the Debtors in their discretion.  The Debtors shall not be

obligated to furnish access to any due diligence information of any kind after the Bid Deadline.

The Debtors intend to use reasonable efforts to provide to all potential qualified bidders certain

information in connection with the proposed sale and assumption and assignment of Designated

Contracts, including, among other things, the proposed Bidding Procedures and the Stalking

Horse Agreement, but the failure to deliver any such information to any potential bidders shall

not affect the validity, effectiveness or finality of the Auction (as defined below) or the sale

process.  All diligence inquiries must be directed to Alvarez or Cain.

### C.    Bid Requirements

48.    A bid submitted will be considered a qualified bid and the potential bidder will be

considered a qualified bidder (a "**Qualified Bid**" and "**Qualified Bidder**," respectively) only if,

18

in the Debtors' business judgment, in consultation with their advisors and the Committee if one

is appointed, the bid or bidder (as applicable) satisfies all of the following requirements:

a)     The bid states that the potential qualified bidder offers to purchase, in cash, the Acquired Assets and to assume liabilities and/or contracts (or offers to purchase less than all of the Acquired Assets, including the exclusion of the Debtors' accounts receivable) upon the terms and conditions that the Debtors in their business judgment, in consultation with their advisors, reasonably determine are no less favorable to the Debtors than those set forth in the Stalking Horse Agreement;

b)     The bid includes a signed writing that the potential qualified bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such potential qualified bidder is selected as (A) the Successful Bidder, its offer shall remain irrevocable until the earlier of (i) the outside date by which all regulatory approvals and other conditions to closing shall have been satisfied or waived, (ii) the date the Sale Order is entered if the sale transaction with such potential qualified bidder is denied, or (iii) the date that is sixty (60) days after the Sale Hearing, or (B) the Next Best Bidder (as defined below), its offer shall remain irrevocable until the earlier of (i) the closing of the sale to the Successful Bidder, (ii) the date that is thirty (30) days after the earlier of (I) the outside date by which all regulatory approvals or other conditions to closing under the Successful Bidder's asset purchase agreement shall have been satisfied or waived, or (II) the date that is sixty (60) days after the Sale Hearing;

c)     There are no conditions precedent to the potential qualified bidder's ability to enter into a definitive enforceable agreement and that all necessary internal and shareholder approvals have been obtained prior to the Bid Deadline; and there are no conditions precedent (due diligence, financing, or otherwise) to the closing of the Transaction, other than conditions precedent consistent with those set forth in the Stalking Horse Agreement;

d)     The bid includes a duly authorized and executed copy of an asset purchase agreement (an "**Asset Purchase Agreement**"), including the purchase price for the Assets (the "**Proposed Purchase Price**"), together with all exhibits and schedules thereto, together with copies marked to show any amendments and modifications to the Stalking Horse Agreement and the proposed order to approve the sale by the Bankruptcy Court;

e)     The bid includes written evidence of a firm, irrevocable commitment for debt or equity financing, or other evidence of ability to consummate the proposed sale transaction, that will allow the Debtors in their business judgment, in consultation with their advisors, to make a determination as to the bidder's financial, regulatory, and other capabilities to consummate the sale transaction contemplated by the Asset Purchase Agreement;

19

f)    The bid has value to the Debtors that is greater than or equal to (i) the Total Transaction Value, plus (ii) 5% of the Total Transaction Value, estimated to be approximately $3 million (the "**Breakup Fee**"), plus (iii) the Expense Reimbursement, as defined in the Stalking Horse Agreement, plus (iv) $100,000 (the "**Initial Overbid**");

g)    The bid identifies with particularity which executory contracts and unexpired leases the potential qualified bidder designates to assume, and provides details of the potential qualified bidder's proposal for the payment (or treatment) of related cure costs with respect to the Designated Contracts;

h)    The bid includes an acknowledgement and representation that the potential qualified bidder:  (i) has had an opportunity to conduct any and all required due diligence regarding the Acquired Assets and Designated Contracts prior to making its bid; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets and Designated Contracts in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Acquired Assets and Designated Contracts or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in the Asset Purchase Agreement; and (iv) is not entitled to and waives any right to assert a claim for any expense reimbursement, breakup fee, or similar type of payment in connection with its due diligence and bid;

i)    The bid includes evidence, in form and substance reasonably satisfactory to the Debtors, of authorization and approval from the potential qualified bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Asset Purchase Agreement, and any amendments thereto negotiated or occasioned by its participation in the Auction;

j)    The bid is accompanied by a good faith deposit in the form of a wire transfer (to an escrow agent specified by the Debtors (the "**Escrow Agent**")), certified check or such other form acceptable to the Debtors, payable to the order of the Escrow Agent in an amount equal to ten percent (10%) of the Proposed Purchase Price (the "**Good Faith Deposit**");

k)    The bid contains sufficient information, in the Debtors' business judgment in consultation with its advisors, concerning the potential qualified bidder's ability to provide adequate assurance of performance with respect to executory contracts and unexpired leases;

l)    The bidder commits to supplement the bid with other information reasonably requested by the Debtors before or after the Bid Deadline; and

m)    The bid is received by the relevant parties set forth in the Bidding Procedures prior to the Bid Deadline.

20

49.     The Debtors, the Committee and their professionals will review each potential qualified bid received from a potential qualified bidder to ensure that both the bid and the bidder meet the requirements set forth above.  A potential qualified bid received from a potential qualified bidder that the Debtors, in consultation with the Committee, determine meets the above requirements, will be considered a Qualified Bid and each potential bidder that submits a Qualified Bid will be considered a Qualified Bidder.  The Debtors, in their business judgment and in consultation with the Committee, reserve the right to reject any bid, without limitation. Notwithstanding the foregoing, the Stalking Horse Agreement shall be a Qualified Bid for all purposes and at all times, and the Stalking Horse Purchaser is a Qualified Bidder for all purposes and at all times, as otherwise is required by the Bidding Procedures.

**D.      Evaluation of Competing Bids**

50.     The Debtors may value a Qualified Bid based upon any and all factors that the Debtors deem pertinent, including, among others, the following:  (a) the Proposed Purchase Price of the Qualified Bid and the assumption of cure obligations respecting the assumption and assignment of executory contracts and unexpired leases; (b) the risks and timing associated with consummating a transaction with the Qualified Bidder, including, without limitation, risks and timing associated with obtaining all necessary regulatory approvals; (c) the risks associated with and extent of any non-cash consideration in any Qualified Bid; (d) any excluded assets or executory contracts or unexpired leases; (e) the Qualified Bidder's experience and ability in managing healthcare systems, including long-term, acute-care hospitals; and (f) any other factors that the Debtors may deem relevant to the proposed transaction.

E.    **No Qualified Bids**

51.    If the Debtors do not receive any Qualified Bids other than from the Stalking

Horse Purchaser, they will not hold an Auction and the Stalking Horse Purchaser will be named

the Successful Bidder.

F.    **The Auction**

52.    Only Qualified Bidders may participate in the Auction.  Each Qualified Bidder

may be required to confirm at the commencement of and from time to time during the Auction

that it has not engaged in any collusive behavior with respect to the bidding or the Auction.

Bidding at the Auction will be videotaped and/or transcribed.  Representatives of the following

parties-in-interest shall be entitled to attend and observe the Auction:  Debtors, Committee,

Qualified Bidders, Existing Lienholders, and federal and local regulators.  The Debtors, in their

discretion, may deny access to the Auction to any other entity or person, including the media.

53.    If more than one Qualified Bid has been received, the Debtors will conduct an

auction (the "**Auction**") for the sale of the Acquired Assets.  Prior to the Auction, the Debtors

shall send a copy of the Qualified Bid that it has determined is the highest or otherwise best bid

received to all Qualified Bidders.  The Debtors propose that the Auction take place on **June 23,**

**2014 at 10:00 a.m. (prevailing Eastern Time)** at the offices of Pillsbury Winthrop Shaw

Pittman, LLP, 2300 N Street, NW, Washington, DC 20037-1122, or such later time or such other

place as the Debtors shall designate in a subsequent notice to all Qualified Bidders.  The Auction

may be adjourned or rescheduled without further notice by an announcement of the adjourned

date at the Auction.  The Debtors reserve the right to cancel the Auction in their reasonable

discretion.

54.    The bidding at the Auction shall start at the amount offered in the highest or

otherwise best Qualified Bid, as determined and announced by the Debtors, in consultation with

their advisors, and will continue in increments of at least $100,000 (the "**Overbid Increments**")

until the bidding ceases. The Stalking Horse Purchaser will have the right to credit bid all

indebtedness that is owed under the DIP Loan as of the Closing Date.

55.     Prior to the conclusion of the Auction, in consultation with their advisors and the

Committee, the Debtors will (a) review the last bid by each Qualified Bidder made at the

Auction on the basis of financial and contractual terms and such factors relevant to the sale

process, including those factors affecting the speed and certainty of consummating the sale, (b)

determine the Successful Bid for the Acquired Assets at the Auction, and (c) notify all Qualified

Bidders at the Auction of the name of the Successful Bidder. The Debtors will present the bid of

the Successful Bidder to the Court for approval at the Sale Hearing.

56.     After determining the Successful Bid, the Debtors may, in consultation with their

advisors, determine which Qualified Bid is the next best bid (the "**Next Best Bid**"). The Debtors

will present the Next Best Bid to the Court for approval at the Sale Hearing. If the Successful

Bidder does not close the sale by the date set forth in the Successful Bid or otherwise agreed to

by the Debtors and the Successful Bidder, then the Debtors shall be authorized to close with the

party that submitted the Next Best Bid (the "**Next Best Bidder**"), without a further court order.

The party that submits the Next Best Bid shall be required to close the sale by the date set forth

in the Next Best Bid (excusing the time between the Auction and the date the Next Best Bidder is

advised that the Debtors will seek to close under the Next Best Bid) or otherwise agreed to by the

Debtors and the Next Best Bidder.

## G.     Return of Deposits

57.     The Good Faith Deposits of Qualified Bidders shall be held by the Escrow Agent.

The Good Faith Deposits of all potential qualified bidders who are determined not to be

Qualified Bidders shall be returned promptly by the Escrow Agent. The Good Faith Deposits of

all Qualified Bidders, other than the Successful Bidder and the Next Best Bidder, shall be returned within two (2) business days after the conclusion of the Sale Hearing.

58.     The Good Faith Deposit of the Next Best Bidder shall be returned within two (2) business days after the consummation of the sale transaction with the Successful Bidder, but in no event later than sixty (60) days after the Sale Hearing.

**H.     Credit Bid**

59.     On or before the Bid Deadline, parties holding a valid lien on some or all of the Acquired Assets that secures an allowed secured claim may submit a credit bid for some or all of such Acquired Assets to the fullest extent permitted under section 363(k) of the Bankruptcy Code.

**I.     As Is, Where Is**

60.     The sale shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their estates, or their agents or representatives.  Except as otherwise expressly provided in the Bidding Procedures, the Stalking Horse Agreement, or any applicable Asset Purchase Agreement, each Potential Bidder that submits a bid shall be deemed to acknowledge and represent that it (a) has had an opportunity to conduct any and all reasonable due diligence regarding the Acquired Assets prior to making its bid, (b) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid, and (c) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith.

### J.    Sale Hearing

61.    The sale of the Acquired Assets and applicable Asset Purchase Agreement shall be presented for authorization and approval by the Court at the Sale Hearing, which the Debtors propose be held on or before **June 25, 2014 at 10:00 a.m. (prevailing Eastern Time)**, subject to the availability of the Court.  The Sale Hearing may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.

### Notice Procedures

62.    The Debtors also request approval of the proposed form and manner of notice of the Bid Deadline, the Auction and the Sale Hearing.  Within two (2) business days after entry of the Bidding Procedures Order, the Debtors will serve notice of the Bid Deadline, the Auction and the Sale Hearing, substantially in the form attached hereto as Exhibit E (the "**Sale Notice**"), by first class mail on:

(i)      counsel to the Stalking Horse Purchaser;

(ii)     counsel to the Existing Lienholders;

(iii)    all applicable health regulatory agencies and taxing authorities;

(iv)     the Office of the United States Trustee for the District of Columbia;

(v)      the United States Attorney's Office for the District of Columbia;

(vi)     any entity known or reasonably believed to have asserted a security interest in or lien against any of the Acquired Assets;

(vii)    the Debtors' twenty (20) largest creditors on a consolidated basis, or counsel for the Committee if one has been appointed;

(viii)   any party that has filed a notice of appearance in these Cases;

(ix)     any party who, within the last twelve months, has expressed an interest to the Debtors in purchasing the Acquired Assets, and who the Debtors reasonably believe could consummate such a transaction; and

(x)      any party who the Debtors or their professionals believe would have an interest in purchasing the Acquired Assets.

## Assumption and Assignment Procedures

63.     To facilitate and consummate the sale of the Acquired Assets, the Debtors seek

authority to assume and assign certain Designated Contracts to the Successful Bidder.  Due to the

nature of the bidding process, it is impossible for the Debtors currently to identify which

Designated Contracts will be designated for assumption and assignment to the Successful

Bidder. As such, the Debtors further seek authority to establish the Assumption and Assignment

Procedures described below.

64.     Cure Notice.  Within five (5) business days after entry of the Bidding Procedures

Order, the Debtors will file the Cure Notice, substantially in the form attached as Exhibit F (the

"**Cure Notice**"), with the Court and serve such Cure Notice on the non-Debtor counterparties to

such Designated Contracts.   The Cure Notice will include (a) the titles of the Designated

Contracts to be assumed, (b) the names of the counterparties to such Designated Contract, (c) the

amount, if any, determined by the Debtors to be necessary to be paid to cure any existing default

under such Designated Contracts in accordance with sections 365(b) and (f)(2) of the Bankruptcy

Code (the "**Cure Amount**"), (d) the proposed effective date of the assignment, and (e) the

deadline by which any counterparties to such Designated Contracts must object.  The Debtors

reserve the right to supplement and modify the Cure Notice at any time, provided that to the

extent that the Debtors add a Designated Contract to the Cure Notice or modifies the Cure

Amount, the affected party shall receive a separate notice and an opportunity to object to such

addition or modification.

65.     Objection to Assumption and Assignment of Designated Contracts.  Any

objection to the assumption and assignment of any Designated Contract identified on the Cure

Notice, including, without limitation, any objection to the Cure Amount set forth on the Cure

Notice or to the ability of the Successful Bidder to provide adequate assurance of future

performance under such Designated Contract, must (a) be in writing, (b) set forth the basis for the objection as well as any cure amount that the objector asserts to be due (in all cases with appropriate documentation in support thereof), and (c) be filed with the Clerk of the Court, United States Bankruptcy Court for the District of Columbia, 333 Constitution Avenue, NW, Room 1225, Washington, DC 20001, and served on the following: (i) counsel to the Debtors, Pillsbury Winthrop Shaw Pittman, LLP, 2300 N Street, NW, Washington, DC 20037-1122 (Attn: Patrick Potter, patrick.potter@pillsburylaw.com) and Pillsbury Winthrop Shaw Pittman, LLP, 1540 Broadway, New York, NY (Attn: Andrew Troop, andrew.troop@pillsburylaw.com); (ii) counsel for the Stalking Horse Purchaser for noticing purposes, Squire Sanders (US) LLP, One East Washington Street, Suite 2700, Phoenix, AZ 85004 (Attn: Craig D. Hansen, craig.hansen@ squiresanders.com); (iii) counsel to the Committee; (iv) counsel to the Successful Bidder, if not the Stalking Horse Purchaser; and (v) the Office of the United States Trustee for the District of Columbia, 115 S. Union Street, Room 210, Alexandria, VA 22314 (Attn: Bradley Jones; Bradley.D.Jones@usdoj.gov), **so as to be <u>actually received</u> no later than 5:00 p.m. (prevailing Eastern Time) on the date that is fifteen (15) days after the filing of the Cure Notice** (the "**Assignment and Cure Objection Deadline**").

66.    <u>Requests for Adequate Assurance</u>.    Any request for adequate assurance information regarding the Successful Bidder (a "**Request for Adequate Assurance**") must include an email address, postal address and/or facsimile number to which a response to such request will be sent.    Upon receiving a Request for Adequate Assurance, the Debtors shall promptly provide such party with any non-confidential information reasonably related to adequate assurance by email, facsimile or overnight delivery.

67.    <u>Resolution of Objections</u>.   If no objection to the proposed assumption and assignment of a Designated Contract is timely received by the Assignment and Cure Objection Deadline, then the assumption and assignment is authorized and the respective Cure Amount set forth in the Cure Notice shall be binding upon the counterparty to the Designated Contract for all purposes and will constitute a final determination of total Cure Amount required to be paid by the Debtors or the Successful Bidder, as applicable, in connection with such assumption and assignment to the Successful Bidder.

68.    To the extent that any entity does not timely object as set forth above, such entity shall be (a) forever barred from objecting to the assumption and assignment of its respective Designated Contracts identified on the Cure Notice, including, without limitation, asserting any additional cure payments or requesting additional adequate assurance of future performance, (b) deemed to have consented to the applicable Cure Amount, if any, and to the assumption and assignment of the applicable Designated Contract, (c) bound to such corresponding Cure Amount, if any, (d) deemed to have agreed that the Successful Bidder has provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code, (e) deemed to have agreed that all defaults under the applicable Designated Contract arising or continuing prior to the effective date of the assignment have been cured as a result or precondition of the assignment, such that the Successful Bidder or the Debtors shall have no liability or obligation with respect to any default occurring or continuing prior to the assignment, and from and after the date of the assignment the applicable Designated Contract shall remain in full force and effect for the benefit of the Successful Bidder and such entity in accordance with its terms, (f) deemed to have waived any right to terminate the applicable Designated Contract or designate an early termination date under the applicable Designated Contract as a result of any

28

default that occurred and/or was continuing prior to the assignment date, (g) deemed to have agreed that the Debtors are not obligated under the Designated Contracts following the effective date of the assumption and assignment, and (h) deemed to have agreed that the terms of the Sale Order shall apply to the assumption and assignment of the applicable Designated Contract.

69.     If an objection is timely received and such objection cannot otherwise be resolved by the parties, the Court may hear such objection at the Sale Hearing, or at a later date set by the Court.  The pendency of a dispute relating to the Cure Amount will not prevent or delay the assumption and assignment of any Designated Contract or the sale of the Acquired Assets to the Successful Bidder. If an objection is filed only with respect to the cure amount listed on the Cure Notice, the Debtors may file a Certificate of No Objection as to assumption and assignment only and the dispute with respect to the cure amount will be resolved consensually, if possible, or, if the parties are unable to resolve their dispute, before the Court.  The Debtors intend to cooperate with the counterparties to the Designated Contracts to be assumed and assigned by the Debtors to attempt to reconcile any difference in a particular Cure Amount.

70.     <u>Anti-Assignment Provisions in Contracts or Leases</u>.  The Debtors further request that the Court find that any anti-assignment provisions within the purview of Bankruptcy Code 365(f) included in, or otherwise purporting to affect, any Designated Contracts to be assumed and assigned by the Debtors are unenforceable under section 365(f) of the Bankruptcy Code.

**BASIS FOR RELIEF REQUESTED**

**I.      A Sale of the Acquired Assets Under Section 363 of the Bankruptcy Code is Warranted**.

71.     Ample justification exists for approval of the proposed sale of the Acquired Assets. Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing,

may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

72.     The decision to sell assets outside of the ordinary course of business is based upon the sound business judgment of the debtor.  See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 289, 295 (3d Cir. 1996); In re Titusville Country Club, 128 BR. 396 (W.D. Pa. 1991); In re Delaware & Hudson Ry. Co., 124 BR. 169, 176 (D. Del. 1991); see also Official Committee of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983).

73.     An important objective in any proposed sale of property of the estate is to benefit the estate.  See, e.g., In re Integrated Res., Inc., 147 B.R. 650, 659 (Bankr. S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the. . . [trustee's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 BR. 124, 130 (Bankr. N.D. Ga. 1988)).  As long as the sale appears to enhance a debtor's estate, court approval of a debtor in possession's or trustee's decision to sell should only be withheld if the debtor in possession's or trustee's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.  See GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd., 331 B.R. 251, 255 (N.D. Tex. 2005); In re Lajijani, 325 B.R. 282, 289 (9th Cir. B.A.P. 2005); In re WPRV-TV, Inc., 143 B.R. 315, 319 (D. P.R. 1991) ("The trustee has ample discretion to administer the estate, including authority to conduct public or private sales of estate property.  Courts have much discretion on whether to approve proposed sales, but the trustee's business judgment is subject to great judicial deference.").

30

74.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business and not under a plan may be found where a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders.  See, e.g., In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986).  Once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  In re Integrated Res., 147 B.R. at 656 (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1).  Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions.  See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.), Case No. 89-C-593, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

75.     The Debtors submit that the proposed sale of the Acquired Assets and assumption and assignment of the Designated Contracts reflects the exercise of their sound business judgment.  After considering their alternatives, the Debtors, with the assistance of their advisors, determined that the sale of the Acquired Assets through a consensual 363 sale process governed by the Bidding Procedures will preserve and possibly enhance the value of the Debtors' estates

31

and is in the best interests of their estates, creditors, and patients.   Under the circumstances

confronting the Debtors, the terms and conditions of the Stalking Horse Agreement, including

the proposed purchase price, are fair and reasonable and were negotiated between the parties in

good faith and at arm's length.   The Debtors have limited funds, making it imperative that they

move forward expeditiously with a bidding process and consummation of a sale or risk

conversion to chapter 7 and closure of the SHA Facilities.

76.     The proposed sale process provides the best alternative under the circumstances

and is a valid exercise of the Debtors' business judgment.   The Debtors' highest priority in these

Cases is to continue providing the highest levels of care to its patients while also preserving

value.   A prompt sales process will further these goals by allowing the ultimate purchaser and

new operator of the Debtors' LTACs and SNFs to focus immediately on caring for and treating

patients without the worries and distractions inherent in any liquidity crunch or bankruptcy case.

Accordingly, the Debtors respectfully request that the Bid Procedures, which have been crafted

to further these goals, be approved.

## II.   The Sale of the Acquired Assets Should Be Free and Clear of Liens, Claims, and Encumbrances.

77.     In the interest of attracting the best bids for the Acquired Assets, the Debtors

submit that the sale of the Acquired Assets should be free and clear of any and all liens, claims,

and encumbrances in accordance with section 363(f) of the Bankruptcy Code.

78.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property of

the estate "free and clear of any interest in such property of an entity other than the estate" if any

one of the following conditions is satisfied:

> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;

32

> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5).

79.     Because section 363(f) of the Bankruptcy Code is written in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the assets "free and clear" of liens and interests.  See e.g., In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions is met, the debtor has the authority to conduct the sale free and clear of all liens.") (citing Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988)); see also Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

80.     The Debtors submit that at the time of the Sale Hearing one or more of the conditions set forth in section 363(f) of the Bankruptcy Code will be satisfied with respect to the sale of the Acquired Assets.  Specifically, section 363(f)(2) will be met because each of the Existing Lienholders will consent, or absent any objection to this Motion, will be deemed to have consented, to the sale.

81.     The Debtors also submit that it is appropriate to sell the Acquired Assets free and clear of successor liability relating to the Debtors' businesses as requested by the Stalking Horse Bidder.  Protecting the Successful Bidder from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to one or more of the Debtors will enhance

the value of the Debtors.  Courts have consistently held that a buyer of a debtor's assets pursuant to a Bankruptcy Code section 363 sale takes free and clear from successor liability relating to the debtor's business.  See, e.g., In re Trans World Airlines, Inc., 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); In re Insilco Techs., Inc., 351 B.R. 313, 322 (Bankr. D. Del. 2006) (363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory); see also In re General Motors Corp., 407 B.R. 463, 505-06 (Bankr. S.D.N.Y. 2009) ("[T]he law in this Circuit and District is clear: the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction."); In re Chrysler LLC, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009).

82.    Accordingly, the Debtors request that the Acquired Assets be sold and transferred to the Successful Bidder free and clear of all liens, claims and encumbrances, including successor liability, pursuant to section 363(f) of the Bankruptcy Code.

## III.   The Breakup Fee and Expense Reimbursement Are Reasonable Under the Circumstances and Should Be Approved.

83.    The Stalking Horse Term Sheet provides:

In consideration of the significant costs and efforts to be expended and risks assumed by SHP in negotiating the Transaction described in this Term Sheet, the Stalking Horse Agreement will provide for a break-up fee payable by SHA [Debtors] to SHP in the amount of 5% of the total transaction value (the "**Breakup Fee**"), plus reimbursement of all reasonable expenses incurred in connection with SHP's efforts to negotiate and consummate the Transaction ("**Expense Reimbursement**") in the event the Stalking Horse Agreement is terminated as a result of either (i) an Event of Default by a Debtor under the DIP Loan, or (ii) a breach by a Debtor of a material term of, or failure to timely satisfy a condition to closing that is a Debtor's obligation under, the Stalking Horse Agreement; provided that, if SHP, in its sole discretion, elects to seek specific performance of the Stalking Horse Agreement, then SHP shall not be entitled to the Breakup Fee or Expense Reimbursement.

If the Stalking Horse Agreement is terminated because of a superior bid, then the Breakup Fee and Expense Reimbursement shall be payable from the proceeds of a replacement DIP financing or from the proceeds of an alternative transaction whereby the assets contemplated to be sold to SHP are, instead, sold to a third party.

84.     Based upon the Total Transaction Value, the Break-Up Fee for which the Debtors seek approval is at least $3 million.

85.     By entering into the Stalking Horse Agreement, the Stalking Horse Purchaser has subjected its bid to higher and better offers, and has therefore required the Breakup Fee and Expense Reimbursement.

86.     The use of a stalking horse in a public auction process for sales pursuant to section 363 of the Bankruptcy Code is a customary and beneficial practice in chapter 11 cases. Often, a stalking horse bid is the best way to maximize value by locking in a purchase price "floor" and helping to garner interest in the assets to be auctioned.  As a result, stalking horse bidders virtually always require breakup fees and other forms of bidding protections as an inducement for holding their purchase offer open while it is exposed to overbids in an auction process.

87.     In this case, the Debtors are confronted with the option of immediately liquidating their operations or engaging in sale process with the Stalking Horse Purchaser, who has insisted on the Break-Up Fee and Expense Reimbursement as detailed in the Stalking Horse Term Sheet. While the Stalking Horse Bidder would be repaid the entire amount of the DIP loan in the event that it is outbid at an Auction, the Stalking Horse Bidder's purpose in engaging in months of due diligence and legal negotiations, and in incurring substantial fees and costs, is to purchase the Acquired Assets.  It has undertaken substantial risk and effort that only benefits a competing successful purchaser, and therefore the Stalking Horse Bidder should be duly compensated if it is so outbid.

88.     An auction that includes a break-up fee and expense reimbursement for a stalking horse bidder could be anticompetitive.  As noted above, however, the Break-Up Fee and Expense Reimbursement are being provided in recognition of (a) the substantial risk and expense being undertaken by the Stalking Horse Bidder, and (b) the reality that without this process, there is an increased risk that the SHA Facilities will be forced to close abruptly, literally threatening people's lives and wellbeing, ending the opportunity for creditors to have the opportunity to continue doing business with the Debtors' successor, disrupting the communities these facilities serve.

89.     Any potential negative side impact of the Break-Up Fee and Expense Reimbursement on the sales process is greatly outweighed by the virtually certain negative side effects of not approving the Break-Up Fee and Expense Reimbursement.  Thus, the Court should find that the proposed Breakup Fee and Expense reimbursement are reasonable under all of the circumstances, and approve them.

**IV.     The Successful Bidder Should Be Afforded All Protections Under Section 363(m) of the Bankruptcy Code as a Good Faith Purchaser**.

90.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

91.     Section 363(m) fosters the "policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon

which third parties rely." In re Abbotts Dairies of Penn., Inc., 788 F.2d at 147; see also Allstate

Ins. Co. v. Hughes, 174 BR. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good

faith transfers of property will not be affected by the reversal or modification on appeal of an

unstayed order, whether or not the transferee knew of the pendency of the appeal.").

92.    The Debtors submit, and will present evidence at the Sale Hearing, if necessary,

that the selection of the Successful Bidder shall be the product of arm's length, good faith

negotiations in an anticipated competitive sale process.  Accordingly, the Debtors request that

the Court make a finding at the Sale Hearing and in the Sale Order that the Successful Bidder has

purchased the Acquired Assets in good faith and is entitled to the full protections of section

363(m) of the Bankruptcy Code.

**V.    The Bidding Procedures are Reasonable and Appropriate**.

93.    Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary

course of business may be by private sale or public auction.  The Debtors have determined that

the sale of the Acquired Assets by public auction, pursuant to the Bidding Procedures, will

ensure that the bidding process with respect to the Acquired Assets is fair, transparent, and

reasonable and will yield greater value for the Debtors' estates and their creditors, when

compared to the prospect of liquidation.

94.    Courts uniformly recognize that procedures intended to enhance competitive

bidding are consistent with the goal of maximizing the value received by the estate and,

therefore, are appropriate in the context of bankruptcy sales.  See In re Montgomery Ward

Holding Corp., Case No. 97-1409 (PJW) (Bankr. D. Del. Aug. 6, 1997) (D.I. 377); In re

Fruehauf Trailer Corp., Case No. 96-01563 (PJW) (Bankr. D. Del. Jan. 31, 1997) (D.I. 439); In

re Financial News Network, Inc., 126 B.R. 152, 156 (S.D.N.Y. 1991) ("court-imposed rules for

the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates.").

95.     The Bidding Procedures set forth the schedule for conducting the Auction and the Sale Hearing. A section 363 sale process that provides adequate time for marketing and solicitation of bids is the best mechanism to maximize value under the circumstances.  The Bidding Procedures promote transparency and are fair and appropriate under the circumstances and are designed to facilitate orderly yet competitive bidding to maximize the net value realized from the sale of assets by the estates.

96.     The Bidding Procedures contemplate an open-auction process that provides potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid and compete for the right to be selected the Successful Bidder during the Auction.  At the same time, the Bidding Procedures provide the Debtors with an adequate opportunity to consider competing bids and select the highest or otherwise best offer.  Accordingly, the Debtors request that the Court approve the Bidding Procedures.

**VI.     The Notice Procedures are Reasonable and Appropriate**.

97.     Pursuant to Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Acquired Assets, including a disclosure of the time and place of the Auction, the terms and conditions of the proposed sale, and the deadline for filing objections.  The Debtors submit that the notice procedures described above fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the proposed sale of the Acquired Assets, the Bidding Procedures, the Auction, the Cure Amount, and the Sale Hearing to the Debtors' creditors and all other parties in interest that are entitled to notice, as well all those parties that have expressed a bona fide interest in acquiring the Acquired

Assets.  Based upon the foregoing, the Debtors respectfully request that the Court approve the

notice procedures proposed herein, including the form and manner of service of the Sale Notice.

**VII.    Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Approved**.

       **K.    Assumption and Assignment Based on Debtors' Business Judgment**.

98.    To facilitate and effectuate the sale of their assets, the Debtors also seek authority

to assume and assign certain Designated Contracts to the Successful Bidder.  Section 365(a) and

(b) of the Bankruptcy Code authorizes debtors in possession to assume executory contracts or

unexpired leases subject to the Court's approval, and requires such debtors in possession to

satisfy certain requirements at the time of assumption.  Under section 365(a) of the Bankruptcy

Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or

unexpired lease of the debtor."  11 U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code,

in turn, codifies the requirements for assuming an unexpired lease or executory contract of a

debtor, providing in relevant part that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> > (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
> >
> > (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

99.    The standard that is applied in determining whether an executory contract or

unexpired lease should be assumed is the debtor's "business judgment" that the assumption is in

its economic best interests.  See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d

36, 40 (3d Cir. 1989); see also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984)

(describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113); In

re III Enters., Inc. V, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) (citations omitted), aff'd, 169

B.R. 551 (E.D. Pa. 1994).

    100.    It is well established that courts should approve a debtor's motion to assume or

reject an executory contract if the debtor's decision is based on its business judgment.  See In re

Decora Indus., Inc., Case No. 00-4459, 2002 WL 32332749, at *8 (D. Del. May 20, 2002);

Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.), 330

B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory

contract is the business judgment rule."); In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del.

2006) ("The propriety of a decision to reject an executory contract is governed by the business

judgment standard."); see also Phar Mor, Inc. v. Strouss Bldg. Assocs., 204 B.R. 948, 952 (N.D.

Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory

contract.") (citation omitted).

    101.    To determine if the business judgment test is met, the court "is required to

examine whether a reasonable business person would make a similar decision under similar

circumstances."  In re Exide Techs., 340 B.R. at 239 ("This is not a difficult standard to satisfy

and requires only a showing that rejection will benefit the estate.").  Specifically, a court should

find that the assumption or rejection is elected on "an informed basis, in good faith, and with the

honest belief that the assumption . . . [is] in the best interests of [the debtor] and the estate."

Network Access Solutions, 330 B.R. at 75.  Under this standard, a court should approve a

debtor's business decision unless that decision is the product of bad faith or a gross abuse of

discretion.  See Computer Sales Int'l, Inc. v. Federal Mogul (In re Federal Mogul Global, Inc.),

293 B.R. 124, 126 (D. Del. 2003); Lubrizol Enters. v. Richmond Metal Finishers, 756 F.2d 1043,

1047 (4th Cir. 1985).

102.    The procedures set forth herein for the Debtors' assumption and assignment of

certain Designated Contracts to the Successful Bidder meet the business judgment standard and

satisfy the requirements of section 365 of the Bankruptcy Code.  The assumption and assignment

of Designated Contracts are necessary for any Successful Bidder to conduct business going

forward, and since no purchaser would take the Acquired Assets without the Designated

Contracts, the assumption and assignment of such Designated Contracts is essential to inducing

any offers for the Acquired Assets.  Further, upon consummation of the proposed sale of the

Acquired Assets, the Debtors will no longer continue to operate their businesses and will,

therefore, have no use for any of the Designated Contracts.  Lastly, the proposed Assumption and

Assignment Procedures ensure that all counterparties to Designated Contracts will receive the

Cure Notice, providing them with ample notice of the proposed assumption and assignment and

opportunity to contest any asserted Cure Amount, as well as the ability of the Successful Bidder

to provide adequate assurance of future performance.

**L.       Adequate Assurance of Future Performance**.

103.    A debtor in possession may assign an executory contract or unexpired lease of the

debtor if it assumes the agreement in accordance with section 365(a), and provides adequate

assurance of future performance by the assignee, whether or not there has been a default under

the agreement.  11 U.S.C. § 365(f)(2).

104.    The meaning of "adequate assurance of future performance" depends on the facts

and circumstances of each case, but should be given a "practical, pragmatic construction."  EBG

Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139

B.R. 585, 592 (S.D.N.Y. 1992); In re Rachels Indus., Inc., 109 B.R. 797, 803 (Bankr. W.D.

Tenn. 1990); see also In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994);

Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J.

1988) ("[a]though no single solution will satisfy every case, the required assurance will fall

considerably short of an absolute guarantee of performance.").

106.     Adequate assurance of future performance may be provided by demonstrating,

among other things, the assignee's financial health and experience in managing the type of

enterprise or property assigned.  See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr.

S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the

prospective assignee of lease from the debtor has financial resources and has expressed

willingness to devote sufficient funding to the business in order to give it a strong likelihood of

succeeding).

106.     Pursuant to the Bidding Procedures, in order to submit a Qualified Bid for the

Acquired Assets, all Qualified Bidders must provide evidence of such Qualified Bidder's ability

to provide adequate assurance of future performance under the Designated Contracts to be

assumed and assigned.  Moreover, the Assumption and Assignment Procedures permit the non-

Debtor counterparties to such Designated Contracts to request adequate assurance information

regarding the Successful Bidder, and afford such counterparties the opportunity to evaluate the

ability of the Successful Bidder to provide adequate assurance of future performance under such

Designated Contracts.  Accordingly, in this regard, the Assumption and Assignment Procedures

are reasonable and appropriate and support approval of the assumption and assignment of

Designated Contracts to the Successful Bidder.

**M.  Anti-Assignment Provisions Should be Deemed Unenforceable**.

107.  To facilitate the assumption, assignment, and sale of Designated Contracts, the

Debtors also request that the Court enter an order providing that any anti-assignment or similar

economic impairment provisions contained in, or otherwise purporting to affect, the Designated

Contracts to be assumed and assigned shall not restrict, limit or prohibit the assumption,

assignment and sale of such Designated Contracts, and that such provisions are deemed and

found to be unenforceable within the meaning of section 365(f) of the Bankruptcy Code.

108.  Section 365(f)(1), by operation of law, invalidates provisions that prohibit,

restrict, or condition assignment of or impose an economic impairment to an executory contract

or unexpired lease.  See, e.g., Coleman Oil Co., Inc. v. Circle K Corp. (In re Circle K Corp.), 127

F. 3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from

permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when

to do so will effectuate the purposes of section 365."), cert. denied, 522 U.S. 1148 (1998).

Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any

clause creating a right to modify or terminate the contract or lease upon a proposed assumption

or assignment thereof.  See, e.g., In re Jamesway Corp., 201 B.R. 73 (Bankr. S.D.N.Y. 1996)

(finding that section 365(f)(3) prohibits enforcement of any lease clause creating a right to

terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by

debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to

court's scrutiny regarding anti-assignment effect).

109.  Other courts have recognized that provisions that have the effect of restricting

assignments cannot be enforced.  See In re Rickel Home Centers, Inc., 240 B.R. 826, 831

(D. Del. 1998) ("In interpreting Section 356(f) [sic], courts and commentators alike have

construed the terms to not only render unenforceable lease provisions which prohibit assignment

outright, but also lease provisions that are so restrictive that they constitute de facto anti-

assignment provisions.").  Similarly, in In re Mr. Grocer, Inc., the court noted the following:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the
> court does retain some discretion in determining that lease provisions, which are
> not themselves ipso facto anti-assignment clauses, may still be refused
> enforcement in a bankruptcy context in which there is no substantial economic
> detriment to the landlord shown, and in which enforcement would preclude the
> bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987).

110.    Accordingly, the Debtors request that any anti-assignment and economic

impairment provisions be deemed not to restrict, limit, or prohibit the assumption, assignment,

and sale of any Designated Contracts to the Successful Bidder and be deemed and found to be

unenforceable within the meaning of section 365(f) of the Bankruptcy Code.

111.    In sum, the Assumption and Assignment Procedures are fair and reasonable and

the Debtors have or will satisfy all prerequisites to the assumption and assignment of executory

contracts or unexpired leases that are Designated Contracts.  Consequently, the Debtors

respectfully request that the Court approve the Assumption and Assignment Procedures and

authorize the Debtors to assume and assign any Designated Contracts to the Successful Bidder.

**VIII.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**.

112.    Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or

lease of property other than cash collateral is stayed until the expiration of 14 days after entry of

the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides

that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under

§ 365(f) is stayed until the expiration of fourteen (14) days after the entry of the order, unless the

court orders otherwise."  Here, an expeditious closing of a sale is necessary and appropriate to

maximize value for the estates. Accordingly, the Debtors request that the Court waive the

fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## RESERVATION OF RIGHTS

113.    The Debtors expressly reserve the right to amend, modify, and/or supplement the

relief requested in this Motion in all respects, including, but not limited to, the proposed Bidding

Procedures attached hereto, prior to or at the applicable hearing (and the Bidding Procedures

prior to or during the Auction) and reserves the right to withdraw this Motion, in whole or in

part, prior to or at the applicable hearing.

## NOTICE

114.    No trustee, examiner, or creditors' committee has been appointed in these Cases.

The Debtors have served notice of this Motion on:  (a) the Office of the United States Trustee for

the District of Columbia; (b) each of the Debtors' twenty largest unsecured creditors on a

consolidated basis; (c) counsel to the Existing Lienholders; (d) counsel to the Debtors'

postpetition lender; (e) all applicable health regulatory agencies and taxing authorities; (f) the

United States Attorney's Office for the District of Columbia; (g) the Internal Revenue Service;

(h) any entity known or reasonably believed to have asserted a security interest in or lien against

any of the Acquired Assets; and (i) any party who has expressed an interest in purchasing the

Acquired Assets within the past year (collectively, the "**Notice Parties**").  The Debtors submit

that, in light of the nature of the relief requested, no other or further notice is necessary or

required.

## NO PRIOR REQUEST

115.    No prior request for the relief sought herein has been made to this or any other

court.

45

**WHEREFORE**, the Debtors respectfully request that the Court grant the relief requested

herein and grant such other and further relief as this Court deems just and proper.


Dated: May 21, 2014                    Respectfully submitted,

                                       PILLSBURY WINTHROP SHAW PITTMAN LLP

                                       /s/ *Patrick Potter*
                                       Patrick Potter (426514)
                                       Jerry Hall (976461)
                                       Dania Slim (991689)
                                       2300 N Street, NW
                                       Washington, DC 20037-1122
                                       Telephone:  (202) 663-8000
                                       Facsimile:  (202) 663-8007
                                       patrick.potter@pillsburylaw.com
                                       jerry.hall@pillsburylaw.com
                                       dania.slim@pillsburylaw.com



                                       Andrew M. Troop (admitted *pro hac vice*)
                                       1540 Broadway
                                       New York, NY 10036-4039
                                       Telephone: (212) 858-1000
                                       Facsimile: (212) 858-1500
                                       andrew.troop@pillsburylaw.com

                                       *Counsel for Debtors*

**Exhibit A**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re: | Case No. 14-00279 |
| SPECIALTY HOSPITAL OF WASHINGTON, LLC, *et al.*, | Chapter 11 |
| Debtors.[1] | (Joint Administration Requested) |

**ORDER (I) APPROVING AUCTION AND BIDDING PROCEDURES
IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS, (II) AUTHORIZING ENTRY INTO A STALKING
HORSE AGREEMENT, SUBJECT TO HIGHER OR OTHERWISE BETTER
OFFERS, (III) APPROVING PROCEDURES RELATED TO THE ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (IV)
SCHEDULING AUCTION AND SALE HEARING, (V) APPROVING THE
FORM AND MANNER OF SALE NOTICE, AND (VI) GRANTING RELATED RELIEF**

Upon the Debtors' motion for, among other things, entry of an Order (i) Approving

Auction and Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (ii)

Authorizing Entry Into a Stalking Horse Agreement, Subject to Higher or Otherwise Better

---

[1]      The debtors in these Chapter 11 cases and the last four digits of each debtor's federal
identification number are:  Specialty Hospitals of America, LLC (1347), SHA Holdings, Inc.
(1943), SHA Management, LLC (1350), Specialty Hospital of Washington, LLC (1352),
Specialty Hospital of Washington Nursing Center, LLC (1348), Specialty Hospital of
Washington Hadley, LLC (2586), and SHA Hadley SNF, LLC (1976).

Offers, (iii) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (iv) Scheduling the Auction and Sale Hearing; (v) Approving the Form and Manner of the Sale Notice, and (vi) Granting Related Relief (the "**Motion**"),[2] all as more fully set forth in the Motion; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. §157(b)(2); and venue being proper before this Court pursuant to 28 U.S.C. §§1408 and 1409, and due and proper notice of the Motion having been provided to the necessary parties; and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion (the "**Hearing**"); and the appearances of all interested parties having been noted in the record of the Hearing; and upon the record of the Hearing; and the Court having determined that the procedural relief sought in the Motion is in the best interests of the Debtors, their creditors, and all parties in interest; and the Court having determined that the Debtors have demonstrated a compelling and sound business justification for the relief requested in the Motion, and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefore, it is hereby:

**FOUND AND DETERMINED THAT**

A.    The Debtors have demonstrated a compelling and sound business justification for this Court to grant the relief requested in the Motion, including, without limitation, (i) approval

---

[2]    The Motion also seeks entry of an order approving and authorizing the Debtors to sell the Acquired Assets free and clear of claims, liens and other interests, and related relief. Those aspects of the Motion are not addressed in this Order, and instead, will be addressed at the Sale Hearing. All capitalized terms used but not otherwise defined on this Order shall have the meanings ascribed to them in the Motion.

of the Bidding Procedures, (ii) authorization to enter into the Stalking Horse Agreement with the Stalking Horse Purchaser, subject to higher or otherwise better offers, (iii) approval of the Breakup Fee and Expense Reimbursement, as provided in the Bidding Procedures, and (iv) approval of the Assignment and Assumption Procedures, under the circumstances described herein and the Motion.

B.     The Bidding Procedures, attached to the Motion as <u>Exhibit B</u> and incorporated herein by reference as if fully set forth in this Order, are fair, reasonable and appropriate and represent the best method for preserving the Debtor's operations and auctioning its assets.

C.     Authorizing the Debtors to enter into the Stalking Horse Agreement, subject to higher or otherwise better offers, is in the best interests of the Debtors' estates and creditors and will provide a benefit to the Debtors' estates and creditors, among others, by establishing a floor for the value of the Debtors' going concern business.

D.     The Breakup Fee and Expense Reimbursement are fair, reasonable and appropriate and provide a benefit to the Debtors' estates and creditors.

E.     The Initial Overbid and the Overbid Increments are fair, reasonable and appropriate and provide a benefit to the Debtors' estates and creditors.

F.     The Sale Notice, substantially in the form attached to the Motion as <u>Exhibit E</u>, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of the Acquired Assets, the Bidding Procedures, the Auction and the Sale Hearing, and no other or further such notice is required.

G.     The Cure Notice, substantially in the form attached to the Motion as <u>Exhibit F</u>, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of the Designated Contracts in connection

with the sale of the Acquired Assets and the related Cure Amount, and no other or further such notice is required.

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED THAT**

1.      The Motion is GRANTED with respect to the relief specifically granted herein.

2.      The Bidding Procedures, attached to the Motion as Exhibit B, including those related to payment of the Breakup Fee and Expense Reimbursement, are hereby approved, are incorporated herein by reference, and shall govern all bids and bid procedures relating to the Auction and Sale of the Acquired Assets. The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

3.      The Debtors are authorized to enter into the Stalking Horse Agreement with the Stalking Horse Purchaser, subject to higher or otherwise better offers.

4.      The Breakup Fee and Expense Reimbursement are hereby approved and allowed as an administrative expense of the Debtors and the Debtors' estates under section 503 of the Bankruptcy Code. In the event that payment of the Breakup Fee and Expense Reimbursement is triggered, under the terms of the Stalking Horse Agreement or otherwise, the Breakup Fee and Expense Reimbursement shall be paid (i) in the event of the Sale of all or any part of the Acquired Assets to any party other than the Stalking Horse Purchaser, from the proceeds of such Sale, and at the earlier of the closing of such Sale, or within 10 days of entry of an order approving such Sale; or (ii) in the case of any other event triggering payment of the Breakup Fee and Expense Reimbursement, from amounts advanced to the Debtors under the DIP Loan.

5.      The Sale Notice attached to the Motion as Exhibit E is hereby approved.

6.     The deadline for submitting a Qualified Bid in accordance with the Bidding Procedures shall be [June 20], 2014 at 5:00 p.m. (prevailing Eastern Time) (the "**Bid Deadline**").

7.     Subject to the provisions of the Bidding Procedures, the Debtors are authorized to solicit, initiate, encourage, facilitate or take any other action designed to facilitate any inquiries or proposals regarding any sale of assets, assumption of liabilities or similar transactions with third parties until the Bid Deadline.

8.     Unless the Debtors receive an additional Qualified Bid, they will not hold an Auction, and the Stalking Horse Purchaser shall be named the Successful Bidder.

9.     If the Debtors receive an additional Qualified Bid (meaning at least one Qualified Bid in addition to the Stalking Horse Purchaser's existing Qualified Bid), the Debtors shall conduct the Auction on [June 23], 2014 at 10:00 a.m. (prevailing Eastern Time) at the offices of Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, DC 20037-1122, or such later time or such other place as the Debtors shall designate in a subsequent notice to all Qualified Bidders.

10.     Only Qualified Bidders may participate in the Auction. Each such Qualified Bidder participating in the Auction may be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale. The Auction will be videotaped and/or transcribed.

11.     All bidders at the Auction shall be deemed to have consented to the Bidding Procedures and to the core jurisdiction of this Court, waived any right to a jury trial in connection with any disputes relating to the Auction, the sale and the construction and enforcement of the applicable Asset Purchase Agreement, and, except as otherwise provided in

this Order and the Bidding Procedures, waived any claim for expense reimbursement or a break-up fee.

12.     Within two (2) business days after entry of this Order, the Debtors shall serve notice of the Bid Deadline and the Auction, substantially in the form attached to the Motion as Exhibit E, by first class mail on the following persons:

    i.    counsel to the Stalking Horse Purchaser;

    ii.    counsel to the Existing Lienholders;

    iii.    all applicable health regulatory agencies and taxing authorities;

    iv.    the Office of the United States Trustee for the District of Columbia;

    v.    the United States Attorney's Office for the District of Columbia;

    vi.    any entity known or reasonably believed to have asserted a security interest in or lien against any of the Acquired Assets;

    vii.    the Debtors' twenty (20) largest creditors on a consolidated basis or counsel for the Committee if one has been appointed;

    viii.    any party that has filed a notice of appearance in these cases;

    ix.    any party who has, within the last twelve months, expressed an interest to the Debtors in purchasing the Acquired Assets;

    x.    any party who the Debtors or their professionals believe would have an interest in purchasing the Acquired Assets.

13.     As soon as practicable following the determination of the Successful Bid, the Debtors shall file a notice with the Court identifying the Successful Bidder and serve such notice by telecopy, electronic mail transmission, or overnight delivery upon the following entities: (a) the Office of the United States Trustee for the District of Columbia; (b) each of the Debtors' twenty largest unsecured creditors on a consolidated basis, or counsel to the Committee if one has been appointed; (c) counsel to the Stalking Horse Purchaser; (d) all applicable health regulatory agencies and taxing authorities; (e) the United States Attorney's Office for the District

of Columbia; (f) all known parties that may be asserting a lien against the Acquired Assets; (g) all Qualified Bidders that have submitted a Qualified Bid; (h) all non-debtor counterparties to the Designated Contracts proposed to be assumed and assigned under the Successful Bid; and (i) all parties that have requested notice pursuant to Bankruptcy Rule 2002.

14.      The Assumption and Assignment Procedures are hereby approved.

15.      Within five (5) business days after entry of this Order, the Debtors will file the Cure Notice, substantially in the form attached to the Motion as <u>Exhibit F</u> (the "**Cure Notice**") with the Court and serve such Cure Notice by first-class mail on the non-debtor counterparties to the Designated Contracts.  The Cure Notice substantially in the form attached to the Motion as <u>Exhibit F</u> is hereby approved. The Debtors reserve the right to amend, modify, or supplement the Cure Notice.

16.      Any objection to the assumption and assignment of any Designated Contract identified on the Cure Notice, including, without limitation, any objection to the Cure Amount set forth on the Cure Notice or to the ability of the Successful Bidder to provide adequate assurance of future performance under such Designated Contract, must (a) be in writing, (b) set forth the basis for the objection as well as any cure amount that the objector asserts to be due (in all cases with appropriate documentation in support thereof), and (c) be filed with the Clerk of the Court, United States Bankruptcy Court for the District of Columbia, 333 Constitution Avenue, NW, Room 1225, Washington, DC 20001, and served on the following: (i) counsel to the Debtors, Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, DC 20037-1122 (Attn: Patrick Potter, patrick.potter@pillsburylaw.com) and Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, NY (Attn: Andrew Troop, andrew.troop@pillsburylaw.com); (ii) counsel for the Stalking Horse Purchaser for noticing

7

purposes, Squire Sanders (US) LLP, One East Washington Street, Suite 2700, Phoenix, AZ

85004 (Attn: Craig D. Hansen, craig.hansen@ squiresanders.com; (iii) counsel to the Committee;

(iv) counsel to the Successful Bidder, if not the Stalking Horse Purchaser; and (v) the Office of

the United States Trustee for the District of Columbia, 115 S. Union Street, Room 210,

Alexandria, VA 22314 (Attn: Bradley Jones; Bradley.D.Jones@usdoj.gov), **so as to be actually**

**received no later than 5:00 p.m. (prevailing Eastern Time) on the date that is fifteen (15)**

**days after the filing of the Cure Notice** (the "**Assignment and Cure Objection Deadline**").

       17.    To the extent that any entity does not timely object as set forth above, such

entity shall be (a) forever barred from objecting to the assumption and assignment of its

respective Designated Contracts identified on the Cure Notice, including, without limitation,

asserting any additional cure payments or requesting additional adequate assurance of future

performance, (b) deemed to have consented to the applicable Cure Amount, if any, and to the

assumption and assignment of the applicable Designated Contract, (c) bound to such

corresponding Cure Amount, if any, (d) deemed to have agreed that the Successful Bidder has

provided adequate assurance of future performance within the meaning of section 365(b)(1)(C)

of the Bankruptcy Code, (e) deemed to have agreed that all defaults under the applicable

Designated Contract arising or continuing prior to the effective date of the assignment have been

cured as a result or precondition of the assignment, such that the Successful Bidder or the

Debtors shall have no liability or obligation with respect to any default occurring or continuing

prior to the assignment, and from and after the date of the assignment the applicable Designated

Contract shall remain in full force and effect for the benefit of the Successful Bidder and such

entity in accordance with its terms, (f) deemed to have waived any right to terminate the

applicable Designated Contract or designate an early termination date under the applicable

Designated Contract as a result of any default that occurred and/or was continuing prior to the assignment date, (g) deemed to have agreed that the Debtors are not obligated under the Designated Contracts following the effective date of the assumption and assignment, and (h) deemed to have agreed that the terms of the Sale Order shall apply to the assumption and assignment of the applicable Designated Contract.

18.     If such an objection is received timely and such objection cannot otherwise be resolved by the parties, the Court may hear such objection at the Sale Hearing or at a later date set by the Court. The pendency of a dispute relating to the Cure Amount will not prevent or delay the assumption and assignment of any Designated Contract or the sale of the Acquired Assets to the Successful Bidder. If an objection is filed with respect only to the cure amount listed on the Cure Notice, the dispute with respect to the Cure Amount will be resolved consensually, if possible, or, if the parties are unable to resolve their dispute, before the Court, and subject to the entry of the Sale Order the Debtors may consummate the sale of the Acquired Assets and assumption and assignment of the Designated Contracts and reserve from the cash sale proceeds an amount sufficient to pay the asserted cure amount.

19.     The Sale Hearing shall be held on **[June 25], 2014 at [2:00 p.m.] (prevailing Eastern Time)** at the United States Bankruptcy Court for the District of Columbia, Courtroom No. 1, 333 Constitution Avenue, NW, Washington, DC 20001. The Sale Hearing may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.

20.     All other objections to approval of the sale of the Acquired Assets to the Successful Bidder shall (a) be in writing, (b) comply with the Bankruptcy Rules and any applicable Local Rules, (c) set forth the name of the objector, (d) state with particularity the legal

and factual bases for such objection, and (e) be filed with the Clerk of the Court, United States Bankruptcy Court for the District of Columbia, 333 Constitution Avenue, NW, Room 1225, Washington, DC 20001, together with proof of service thereof, and served on the following parties **so as to be _actually received_ no later than 5:00 p.m. (prevailing Eastern Time) on [June 9], 2014:** (i) counsel to the Debtors, Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, DC 20037-1122 (Attn: Patrick Potter, patrick.potter@pillsburylaw.com) and Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, NY (Attn: Andrew Troop, andrew.troop@pillsburylaw.com); (ii) counsel for the Stalking Horse Purchaser for noticing purposes, Squire Sanders (US) LLP, One East Washington Street, Suite 2700, Phoenix, AZ 85004 (Attn: Craig D. Hansen, craig.hansen@ squiresanders.com; (iii) counsel to the Committee; (iv) counsel to the Successful Bidder, if not the Stalking Horse Purchaser; and (v) the Office of the United States Trustee for the District of Columbia, 115 S. Union Street, Room 210, Alexandria, VA 22314 (Attn: Bradley Jones; Bradley.D.Jones@usdoj.gov).

21.    All objections to entry of this Order that have not been withdrawn, waived, or settled as announced to the Court at the Hearing or by stipulation filed with the Court, and all reservations of rights included in such objections, are overruled.

22.    In the event there is a conflict between this Order and the Motion or Stalking Horse Agreement, to the extent of such conflict this Order shall control and govern.

23.    This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, enforcement and/or interpretation of this Order.

24.    This Order shall be effective immediately upon entry, and any stay of orders provided for in Bankruptcy Rules 6004 or 6006 or any other provision of the Bankruptcy

Code or Bankruptcy Rules is expressly lifted. The Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and except as directed by the Court in this Order, may in their discretion and without further delay take any action and perform any act authorized under this Order.

        25.      The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

cc:

All attorneys who have entered an appearance and who are registered e-filers.

**Exhibit B**

**IN RE SPECIALTY HOSPITAL OF WASHINGTON, LLC,** *et al.*
<u>BIDDING PROCEDURES</u>

Set forth below are the bidding procedures (the "**Bidding Procedures**") to be employed in connection with the sale (the "**Transaction**") of substantially all of the assets (collectively, the "**Acquired Assets**") of Specialty Hospital of America, LLC; SHA Management, LLC; Specialty Hospital of Washington, LLC; Specialty Hospitals of Washington Nursing Center, LLC; Specialty Hospital of Washington Hadley, LLC; SHA Holdings, Inc.; and SHA Hadley SNF, LLC (collectively, the "**Debtors**"), as debtors and debtors-in-possession in these chapter 11 cases (the "**Cases**"), which are currently pending in the United States Bankruptcy Court for the District of Columbia (the "**Bankruptcy Court**"). The Acquired Assets to be sold and the terms and conditions upon which the Debtors contemplate consummating a sale are further described in a term sheet (the "**Stalking Horse Term Sheet**"), which outlines the principle terms of a stalking horse asset purchase agreement (the "**Stalking Horse Agreement**") entered into between the Debtors and SHA Acquisitions, LLC (the "**Stalking Horse Purchaser**"). An executed copy of the Stalking Horse Term Sheet is attached as <u>Exhibit D</u> to the motion (the "**Motion**") filed with Bankruptcy Court seeking approval of, among other things, these Bidding Procedures. An executed copy of the Stalking Horse Agreement was filed by the Bankruptcy Court on May [30], 2014 [DE   ].

The sale of the Acquired Assets is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court pursuant to sections 363 and 365 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure. The Transaction shall also include the assumption and assignment of certain designated executory contracts and unexpired leases (collectively, the "**Designated Contracts**") under sections 363 and 365 of the Bankruptcy Code according to the process outlined below.

From the Petition Date to the date of entry of an order approving these Bidding Procedures (the "**Interim Period**"), the Debtors were not authorized to solicit, initiate, or otherwise participate in any negotiations with any third parties regarding any transaction similar to the Transaction. But the Debtors were authorized to respond to any unsolicited third parties interested in participating in the Auction (as defined below) process in good faith. To the extent any Debtor was approached with a proposal from such an unsolicited third party during the Interim Period, the Debtors were required to immediately notify the Stalking Horse Purchaser of the terms of the proposal and the identity of the offeror. Upon entry of an order of the Bankruptcy Court approving the Bidding Procedures outlined below, such Bidding Procedures will govern any Transaction related to the Acquired Assets.

A.     **MARKETING BY THE DEBTORS**

The Debtors shall (a) coordinate the efforts of potential bidders in conducting their respective due diligence, (b) evaluate bids from potential bidders, (c) negotiate any bid made to acquire the Acquired Assets and assume Designated Contracts, (d) conduct an auction (the "**Auction**") if a Qualified Bid is received other than the Stalking Horse Agreement, and (e) make such other determinations as are provided in these Bidding Procedures. Neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Acquired Assets, or any portion thereof, to any person who is not, in the Debtors' reasonable judgment, in consultation with their advisors, a potential qualified bidder.

**B.     BID DEADLINE**

A potential bidder that desires to make a bid shall deliver copies of its bid package by email to: (i) counsel to the Debtors, Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, D.C. 20037-1122 (Attn: Patrick Potter, patrick.potter@pillsburylaw.com) and Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, NY (Attn: Andrew Troop, andrew.troop@pillsburylaw.com); (ii) the Debtors' financial advisor, Alvarez & Marsal Healthcare Industry Group, LLC, 600 Madison Avenue, 8th Floor, New York, NY 10022 (Attn: Ronald Winters, rwinterws@alvarezandmarsal.com); (iii) the Debtors' investment banker, Cain Brothers & Company, LLC, 360 Madison Avenue, New York, NY 10017 (Attn: Gregory J. Hychko, ghychko@cainbrothers.com); and (iv) counsel to any official committee of unsecured creditors appointed in these Cases (the "**Committee**"), so as to be actually received on or before **[June 20]**, **2014 at 5:00 p.m. (prevailing Eastern Time)** (the "**Bid Deadline**"), which deadline may be extended by the Debtors.  No bids submitted after the Bid Deadline shall be considered by the Debtors.

**C.     DUE DILIGENCE**

Subject to a potential bidder entering into a confidentiality agreement satisfactory to the Debtors in their business judgment, the Debtors may afford any potential bidder, whom the Debtors, in consultation with their advisors, believe has the wherewithal to close the Transaction, the opportunity to conduct a reasonable due diligence review in the manner determined by the Debtors in their discretion. The Debtors shall not be obligated to, but may, furnish access to any due diligence information of any kind after the Bid Deadline. The Debtors intend to use reasonable efforts to provide to all potential qualified bidders certain information in connection with the proposed sale and assumption and assignment of Designated Contracts, including, among other things, these proposed Bidding Procedures and the Stalking Horse Agreement.  However, the Debtors' failure to deliver any such information to any potential bidders shall not affect the validity, effectiveness or finality of the Auction or the sale process.  All diligence inquiries must be directed to Alvarez & Marsal Healthcare Industry Group, LLC, 600 Madison Avenue, 8th Floor, New York, NY 10022 (Attn: Ronald Winters, rwinterws@alvarezandmarsal.com); or Cain Brothers & Company, LLC, 360 Madison Avenue, New York, NY 10017 (Attn: Gregory J. Hychko, ghychko@cainbrothers.com).

**D.     BID REQUIREMENTS**

A bid submitted will be considered a qualified bid and the potential bidder will be considered a qualified bidder (a "**Qualified Bid**" and "**Qualified Bidder**," respectively), only if the bid is submitted by a bidder that in the Debtors' business judgment, in consultation with their advisor and the Committee if one is appointed, complies with all of the following requirements:

a.      The bid states that the potential qualified bidder offers to purchase, in cash, the Acquired Assets and to assume liabilities and/or contracts (or offers to purchase less than all of the Acquired Assets, including the exclusion of the Debtors' accounts receivable) upon the terms and conditions that the Debtors in their business judgment, in consultation with their advisors, reasonably determine are no less favorable to the Debtors than those set forth in the Stalking Horse Agreement;

b.      The bid includes a signed writing that the potential qualified bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such potential qualified bidder is selected as (A) the Successful Bidder, its offer shall remain irrevocable until the earlier of (i) the outside date by which all regulatory approvals and other conditions to closing shall have been satisfied or waived, (ii) the date the Sale Order is entered if the sale transaction with such potential qualified bidder is denied or (iii) the date that is sixty (60) days after the Sale Hearing, or (B) the Next Best Bidder (as defined below), its offer shall remain irrevocable until the earlier of (i) the closing of the sale to the Successful Bidder, (ii) the date that is thirty (30) days after the earlier of (I) the outside date by which all regulatory approvals or other conditions to closing under the Successful Bidder's asset purchase agreement shall have been satisfied or waived, or (II) the date that is sixty (60) days after the Sale Hearing;

c.      There are no conditions precedent to the potential qualified bidder's ability to enter into a definitive enforceable agreement and that all necessary internal and shareholder approvals have been obtained prior to the Bid Deadline; and there are no conditions precedent (due diligence, financing, or otherwise) to the closing of the Transaction, other than conditions precedent consistent with those set forth in the Stalking Horse Agreement;

d.      The bid includes a duly authorized and executed copy of an asset purchase agreement (an "**Asset Purchase Agreement**"), including the purchase price for the Assets (the "**Proposed Purchase Price**"), together with all exhibits and schedules thereto, together with copies marked to show any amendments and modifications to the Stalking Horse Agreement and the proposed order to approve the sale by the Bankruptcy Court;

e.      The Bid includes written evidence of a firm, irrevocable commitment for debt or equity financing, or other evidence of ability to consummate the proposed sale transaction, that will allow the Debtors in their business judgment, in consultation with their advisors, to make a determination as to the bidder's financial, regulatory, and other capabilities to consummate the sale transaction contemplated by the Asset Purchase Agreement;

f.      The bid has value to the Debtors that is greater than or equal to (i) the Total Transaction Value, plus (ii) 5% of the Total Transaction Value, estimated to be approximately $3 million (the "**Breakup Fee**"), plus (iii) the Expense Reimbursement, as defined in the Stalking Horse Agreement, plus (iv) $100,000 (the "**Initial Overbid**");

g.      The bid identifies with particularity which executory contracts and unexpired leases the potential qualified bidder designates to assume, and provides details of the potential qualified bidder's proposal for the payment (or treatment) of related cure costs with respect to the Designated Contracts;

h.      The bid includes an acknowledgement and representation that the potential qualified bidder:  (i) has had an opportunity to conduct any and all required due diligence regarding the Acquired Assets and Designated Contracts prior to making its bid; (ii) has relied solely upon its own independent review,

investigation and/or inspection of any documents and/or the Acquired Assets and Designated Contracts in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Acquired Assets and Designated Contracts or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in the Asset Purchase Agreement; and (iv) is not entitled to and waives any right to assert a claim for any expense reimbursement, breakup fee, or similar type of payment in connection with its due diligence and bid;

i.    The bid includes evidence, in form and substance reasonably satisfactory to the Debtors, of authorization and approval from the potential qualified bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Asset Purchase Agreement, and any amendments thereto negotiated or occasioned by its participation in the Auction;

j.    The bid is accompanied by a good faith deposit in the form of a wire transfer (to an escrow agent specified by the Debtors (the "**Escrow Agent**")), certified check or such other form acceptable to the Debtors, payable to the order of the Escrow Agent in an amount equal to ten percent (10%) of the Proposed Purchase Price (the "**Good Faith Deposit**");

k.    The bid contains sufficient information, in the Debtors' business judgment in consultation with its advisors, concerning the potential qualified bidder's ability to provide adequate assurance of performance with respect to executory contracts and unexpired leases;

l.    The bidder commits to supplement the bid with other information reasonably requested by the Debtors before or after the Bid Deadline; and

m.    The bid is received by the relevant parties set forth in the Bidding Procedures prior to the Bid Deadline.

The Debtors, the Committee and their professionals will review each potential qualified bid received from a potential qualified bidder to ensure that both the bid and the bidder meet the requirements set forth above. A potential qualified bid received from a potential qualified bidder that the Debtors, in consultation with the Committee, determine meets the above requirements will be considered a "Qualified Bid" and each potential bidder that submits a Qualified Bid will be considered a "Qualified Bidder." The Debtors, in their business judgment and in consultation with the Committee, reserve the right to reject any bid, without limitation.

The Stalking Horse Agreement is a Qualified Bid for all purposes and the Stalking Horse Purchaser is a Qualified Bidder for all purposes and requirements pursuant to these Bidding Procedures at all times.

The Debtors may value a Qualified Bid based upon any and all factors that the Debtors deem pertinent, including, among others: (a) the Proposed Purchase Price of the Qualified Bid and the assumption of cure obligations respecting the assumption and

assignment of Designated Contracts; (b) the risks and timing associated with consummating the Transaction with the Qualified Bidder, including, without limitation, all necessary regulatory approvals; (c) the risks associated with and extent of any non-cash consideration in any Qualified Bid; (d) any assets, contracts, or leases excluded from the Transaction; (e) the Qualified Bidder's experience and ability in managing healthcare assets, including long term acute care hospitals; and (f) any other factors that the Debtors may deem relevant to the proposed Transaction.

The Good Faith Deposits of all Qualified Bidders shall be held by the Escrow Agent in a separate account for the Debtors' benefit.  If a Successful Bidder fails to consummate an approved Transaction because of a breach or failure to perform on the part of such Successful Bidder, such Successful Bidder's Good Faith Deposit will be forfeited to the Debtors.  Any disputes with respect to the transfer of the Good Faith Deposits shall be resolved by the Bankruptcy Court.

## E.    CREDIT BID

On or before the Bid Deadline, parties holding a valid lien on some or all of the Acquired Assets that secures an allowed secured claim may submit a credit bid for some or all of such Acquired Assets to the fullest extent permitted under section 363(k) of the Bankruptcy Code.

## F.    MODIFICATIONS/RESERVATION OF RIGHTS

The Debtors may (i) determine, in their reasonable discretion, which Qualified Bid or Qualified Bids, if any, to present to the Bankruptcy Court as the highest or otherwise best offer for the Acquired Assets, (ii) reject, at any time before entry of an order of the Bankruptcy Court approving any Qualified Bid as the Successful Bid, any bid that, in the Debtors' reasonable discretion, is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code or these Bidding Procedures, or (c) contrary to the best interests of the Debtors and their bankruptcy estates and creditors; provided, that the Stalking Horse Purchaser's bid and the Stalking Horse Agreement, after approval of these Bidding Procedures, may not be rejected under (a), (b), or (c) of this provision, (iii) withdraw, in their business judgment, the Motion if pursuing approval of the Motion is determined to be contrary to the best interests of the Debtors and their bankruptcy estates and creditors, and (iv) cancel, in their business judgment, the Auction and pursue an alternative transaction if such alternative transaction is determined to be in the best interests of the Debtors and their bankruptcy estates and creditors.

The Debtors may extend or alter any deadline contained in these Bidding Procedures that will better promote their receipt of higher or otherwise better offers for the Acquired Assets and Designated Contracts.  These Bidding Procedures are solely for the benefit of the Debtors and their bankruptcy estates. The Debtors may waive or modify the provisions in these Bidding Procedures or adopt additional procedures as they see fit in their business judgment.

## G.    AUCTION

If the Debtors do not receive any Qualified Bids other than from the Stalking Horse Purchaser, they will not hold an Auction and the Stalking Horse Purchaser will be named the Successful Bidder, subject to entry of the Sale Order.

If more than one Qualified Bid has been received, the Debtors will conduct an Auction for the sale of the Acquired Assets. Prior to the Auction, the Debtors shall send a copy of all Qualified Bids to all Qualified Bidders. The Auction shall take place on [**June 23, 2014**] **at 10:00 a.m. (prevailing Eastern Time)** at the offices of Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, D.C. 20037-1122, or such later time or such other place as the Debtors shall designate in a subsequent notice to all Qualified Bidders and Notice Parties. The Auction may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Auction. The Debtors reserve the right to cancel the Auction in their reasonable discretion.

Unless otherwise ordered by the Court for cause shown, only the Stalking Horse Purchaser and Qualified Bidders will be eligible to participate at the Auction. Representatives of the following parties-in-interest shall be entitled to attend and observe the Auction: Debtors, Committee, Qualified Bidders, holders of liens encumbering the Acquired Assets, and federal and local regulators. The Debtors, in their discretion, may deny access to the Auction to any other entity or person, including the media.

Each Qualified Bidder may be required to confirm at the commencement of and from time to time during the Auction that it has not engaged in any collusive behavior with respect to the sale of the Acquired Assets, the bidding or the Auction. Bidding at the Auction will be videotaped and/or transcribed.

The bidding shall start at the amount offered in the highest or otherwise best Qualified Bid, as determined and announced by the Debtors, in consultation with their advisors, and will continue in increments of at least $100,000 until the bidding ceases. The Stalking Horse Purchaser will have the right to credit bid all indebtedness that is owed under the DIP Loan as of the Closing Date.

Prior to the conclusion of the Auction, the Debtors, in consultation with their advisors and the Committee, will (a) review the last bid by each of the Qualified Bidders made at the Auction on the basis of financial and contractual terms and such factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale, (b) determine the highest or otherwise best bid or combination of bids for the Acquired Assets and Designated Contracts at the Auction (the "**Successful Bid**"), and (c) notify all Qualified Bidders at the Auction of the name of the Successful Bidder. The Debtors will present the Successful Bid to the Court for approval at the Sale Hearing.

After determining the Successful Bid, the Debtors may, in consultation with their advisors and the Committee, determine which Qualified Bid is the next best bid (the "**Next Best Bid**"). The Debtors will present the Next Best Bid to the Court for Approval at the Sale Hearing. If the Successful Bidder does not close the Transaction by the date set forth in the Successful Bid or otherwise agreed to by the Debtors and the Successful Bidder, then the Debtors shall be authorized to close with the party that submitted the Next Best Bid (the "**Next Best Bidder**"), without a further court order. The party that submits the Next Best Bid shall be required to close the Transaction by the date set forth in the Next Best Bid (excusing the time between the Auction and the date the Next Best Bidder is advised that the Debtors will seek to close under the Next Best Bid), or otherwise agreed to by the Debtors and the Next Best Bidder.

All bidders at the Auction shall be deemed to have consented to these Bidding Procedures and to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the sale and the construction and enforcement of the applicable Asset Purchase Agreement.

**H.      NO ENTITLEMENT TO FEES FOR POTENTIAL BIDDERS OR QUALIFIED BIDDERS**

The performance of due diligence, the tendering of a bid, the determination that a bid is a Qualified Bid or the participation of a Qualified Bidder at the Auction shall not entitle a potential qualified bidder or Qualified Bidder to any breakup, termination or similar fee or reimbursement of expenses and all potential qualified bidders and Qualified Bidders waive any right to seek a claim for substantial contribution. Notwithstanding the foregoing, the Stalking Horse Purchaser shall be entitled to payment of the Breakup Fee and the Expense Reimbursement as provided in the Stalking Horse Agreement and the order approving these Bidding Procedures.

**I.      RETURN OF THE GOOD FAITH DEPOSIT**

The Good Faith Deposits of Qualified Bidders shall be held in escrow by the Escrow Agent. The Good Faith Deposits of all potential qualified bidders that are determined not to be Qualified Bidders shall be returned promptly by the Escrow Agent. The Good Faith Deposits of all Qualified Bidders, other than the Successful Bidder and the Next Best Bidder, shall be returned within two (2) business days after the conclusion of the Sale Hearing (as defined below).

The Good Faith Deposit of the Next Best Bidder shall be returned within two (2) business days after the consummation of the Transaction with the Successful Bidder, but in no event later than sixty (60) days after the Sale Hearing.

**J.      AS IS, WHERE IS**

The Transaction shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their estates, or their agents or representatives. Except as otherwise expressly provided in these Bidding Procedures, the Stalking Horse Agreement, or any applicable Asset Purchase Agreement, each Qualified Bidder shall be deemed to acknowledge and represent that it (i) has had an opportunity to conduct any and all reasonable due diligence regarding the Acquired Assets and Designated Contracts prior to making its bid, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets and Designated Contracts in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets and Designated Contracts, or the completeness of any information provided in connection therewith.

**K.      SALE HEARING**

The Debtors will seek entry of an order from the Bankruptcy Court at a hearing (the "**Sale Hearing**") to begin on [**June 25, 2014**] **at** [**2:00 p.m.**] **(prevailing Eastern Time)** to approve and authorize the Transaction with the Successful Bidder and conditionally approve the Transaction with the Next Best Bidder. The Sale Hearing may be adjourned or

rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.

**<u>Exhibit C</u>**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re:<br><br>SPECIALTY HOSPITAL OF<br>WASHINGTON, LLC, *et al.*,<br><br>Debtors.[1] | Case No. 14-00279<br><br>Chapter 11<br><br>(Joint Administration Requested) |

**ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND INTERESTS, (II) AUTHORIZING THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES, AND (III) GRANTING CERTAIN RELATED RELIEF**

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtors and

debtors-in-possession (the "**Debtors**") for, among other things, entry of an order (the "**Order**")

---

[1]      The debtors in these chapter 11 cases and the last four digits of each debtor's federal
identification number are:  Specialty Hospital of America, LLC (1347), SHA Holdings, Inc.
(1943), SHA Management, LLC (1350), Specialty Hospital of Washington, LLC (1352),
Specialty Hospital of Washington Nursing Center, LLC (1348), Specialty Hospital of
Washington Hadley, LLC (2586), and SHA Hadley SNF, LLC (1976).

[2]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to such
terms in the Motion or the Asset Purchase Agreement (as defined herein), as applicable.

pursuant to sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, et

seq. (as amended, the "**Bankruptcy Code**"), Rules 2002, 6004 and 6006 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**"), (i) authorizing and approving the sale (the

"**Sale Transaction**") of substantially all of the Debtors' assets (the "**Acquired Assets**") free and

clear of all liens, claims, encumbrances, setoff rights and others interests (the "**Encumbrances**"),

including, without limitation, all Encumbrances of or asserted by CMS, DOJ, IRS, DC Medicaid,

the Washington, D.C. Office of Tax and Revenue and any other federal, state or local regulatory

or taxing agency (each an "**Agency**," and, collectively, the "**Agencies**"), (ii) authorizing the

assumption and assignment of certain executory contracts and unexpired leases (the "**Designated

Contracts**"), identified by the Debtors and more fully described in the Asset Purchase

Agreement dated as of May [29], 2014 (attached hereto as **Exhibit A**) by and between the

Debtors and SHA Acquisition, LLC (the "**Purchaser**" or "**Stalking Horse Purchaser**") for the

purchase of the Acquired Assets and the assumption of the Designated Contracts, and (iii)

granting certain related relief, and the Court having held a hearing on June [25], 2014 (the "**Sale

Hearing**") to approve the Sale Transaction; and the Court having reviewed and considered the

Motion, the objections to the Motion, if any, and the arguments of counsel made, and the

evidence proffered or adduced at the Sale Hearing; and it appearing that the relief requested in

the Motion is in the best interests of the Debtors, their estates and creditors and other parties in

interest; and upon the record of the Sale Hearing and these chapter 11 cases (the "**Cases**"); and

after due deliberation thereon; and good cause appearing therefore, it is hereby

**FOUND AND DETERMINED THAT**[3]

---

[3]      Findings of fact shall be construed as conclusions of law and conclusions of law shall be
construed as findings of fact when appropriate.  See Bankruptcy Rule 7052.

A.      **Jurisdiction and Venue**.  The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of these Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      **Statutory Predicates**.  The statutory predicates for the relief sought in the Motion are sections 105, 363 and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, and 6006.

C.      **Petition Date**.  On May 21, 2014, the Debtors, other than Specialty Hospital of Washington LLC, LLC ("**SHDC**"), commenced these Cases by each filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  An involuntary chapter 11 petition for relief under chapter 11 of the Bankruptcy Code was filed against SHDC on April 23, 2014, and on May 21, this Court entered an Order for Relief with respect to SHDC.

D.      **Entry of Bidding Procedures Order**.  On May [30], 2014, this Court entered an order (the "**Bidding Procedures Order**") (i) approving bidding and auction procedures (the "**Bidding Procedures**"), (ii) authorizing the Debtors to enter into a Stalking Horse Agreement, (iii) authorizing and approving the Assumption and Assignment Procedures, including the notice of proposed cure amounts (the "**Cure Amount**"), (iv) approving the form and manner of notice of all procedures, schedules, and agreements, and (v) scheduling the Sale Hearing.

E.      **Compliance with Bidding Procedures Order**.  As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing, and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtors have marketed the Acquired Assets and conducted the sale process in compliance with the Bidding Procedures Order, and the Auction was duly noticed and conducted in a non-collusive, fair and good faith manner.  The Debtors and their professionals have actively marketed the Acquired Assets and

conducted the sale process in compliance with the Bidding Procedures Order, and have afforded

potential purchasers a full and fair opportunity to make higher and better offers.  The Purchaser,

the Landlord and Existing Lienholders acted in compliance with the terms of the Bidding

Procedures.  In accordance with the Bidding Procedures, the Debtors determined that the bid

submitted by the Purchaser and memorialized by the Asset Purchase Agreement is the Successful

Bid (as defined in the Bidding Procedures).

F.   **Notice**.  As evidenced by the affidavits of service and publication previously filed

with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper,

timely, adequate and sufficient notice of the Motion, the Sale Hearing, the Sale Transaction, the

Assumption and Assignment Procedures (including the objection deadline with respect to any

Cure Amount) and the assumption and assignment of the Designated Contracts and the Cure

Amount has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy

Code and Bankruptcy Rules 2002, 6004 and 6006 and in compliance with the Bidding

Procedures Order, (ii) such notice was good and sufficient, and appropriate under the particular

circumstances, and (iii) no other or further notice of the Motion, the Sale Hearing, the Sale

Transaction, or the assumption and assignment of the Designated Contracts or the Cure Amount

is or shall be required.

G.   **Corporate Authority**.  Each Debtor (i) has full corporate power and authority to

execute the Asset Purchase Agreement and all other documents contemplated thereby, and the

Sale of the Acquired Assets by the Debtors has been duly and validly authorized by all necessary

corporate action of each of the Debtors, (ii) has all of the corporate power and authority

necessary to consummate the transactions contemplated by the Asset Purchase Agreement,

(iii) has taken all corporate action and formalities necessary to authorize and approve the Asset

4

Purchase Agreement and the consummation by the Debtors of the transactions contemplated

thereby, including, without limitation, as required by their respective organizational documents

and (iv) no government, regulatory or other consents or approvals, other than those expressly

provided for in the Asset Purchase Agreement, are required for the Debtors to enter into the

Asset Purchase Agreement and consummate the Sale Transaction.

H.    **Opportunity to Object**.  A fair and reasonable opportunity to object or be heard

with respect to the Motion and the relief requested therein has been afforded to all interested

persons and entities, including the following entities:

i.    counsel to the Stalking Horse Purchaser for noticing purposes;

ii.    counsel to the Landlord;

iii.    counsel to the Existing Lienholders;

iv.    all applicable health regulatory agencies and taxing authorities;

v.    the Office of the United States Trustee for the District of Columbia;

vi.    the United States Attorney's Office for the District of Columbia;

vii.    any entity known or reasonably believed to have asserted a security
interest in or lien against any of the Acquired Assets;

viii.    the Debtors' twenty (20) largest creditors on a consolidated basis or
counsel for the Committee if one has been appointed;

ix.    any party that has filed a notice of appearance in these Cases; and

x.    any party who has expressed an interest in purchasing the Acquired Assets
and who the Debtors reasonably believe could consummate a transaction,
or who the Debtors or their professionals believe would have such an
interest.

I.    **Sale in Best Interest**.  Consummation of the sale of the Acquired Assets at this

time is in the best interests of the Debtors, their creditors, their estates and other parties in

interest.

5

J.      **Business Justification**.    Sound business reasons exist for the Sale Transaction. Entry into the Asset Purchase Agreement, and the consummation of the transactions contemplated thereby, including the Sale Transaction and the assumption and assignment of the Designated Contracts, constitutes each Debtor's exercise of sound business judgment and such acts are in the best interests of each Debtor, its estate, and all parties in interest.    The Court finds that each Debtor has articulated good and sufficient business reasons justifying the Sale Transaction.    Such business reasons include, but are not limited to, the following:  (i) the Asset Purchase Agreement constitutes the highest and best offer for the Acquired Assets; (ii) the Asset Purchase Agreement and the closing thereon will present the best opportunity to realize the value of the Acquired Assets on a going-concern basis and avoid decline and devaluation of the Acquired Assets; (iii) unless the Sale Transaction and all of the other transactions contemplated by the Asset Purchase Agreement are concluded expeditiously, as provided for in the Motion and pursuant to the Asset Purchase Agreement, recoveries to creditors may be diminished; and (iv) any plan likely would not have yielded as favorable an economic result.    The terms and conditions of the Asset Purchase Agreement, including, without limitation, the consideration to be realized by the Debtors, are fair and reasonable.    Approval of the Motion, the Asset Purchase Agreement, and the transactions contemplated thereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Designated Contracts, is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

K.      **Arm's Length Sale**.    The Asset Purchase Agreement was negotiated, proposed and entered into by the Debtors and the Purchaser without collusion, in good faith, and from arm's length bargaining positions.    Neither the Debtors nor the Purchaser has engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under 11 U.S.C.

6

§ 363(n). Specifically, the Purchaser has not acted in a collusive manner with any person and the purchase price was not controlled by any agreement among bidders. The Purchaser is not an "insider" of the Debtors as defined in Bankruptcy Code section 101(31).

L.    **Good Faith Purchaser**. The Purchaser is a good faith purchaser for value and, as such, is entitled to all of the protections afforded under 11 U.S.C. § 363(m) and any other applicable or similar bankruptcy and non-bankruptcy law. Specifically, (i) the Purchaser recognized that the Debtors were free to deal with any other party interested in purchasing the Acquired Assets, (ii) the Purchaser complied in all respects with the provisions in the Bidding Procedures Order, (iii) the Purchaser agreed to subject its bid to the competitive bid procedures set forth in the Bidding Procedures Order, (iv) all payments to be made by the Purchaser in connection with the Sale Transaction have been disclosed, (v) no common identity of directors, officers or controlling stockholders exists among the Purchaser and the Debtors, (vi) the negotiation and execution of the Asset Purchase Agreement was at arm's length and in good faith, and at all times each of the Purchaser and the Debtors were represented by competent counsel of their choosing, (vii) the Purchaser did not in any way induce or cause the chapter 11 filing of the Debtors, and (viii) the Purchaser has not acted in a collusive manner with any person. The Purchaser will be acting in good faith within the meaning of 11 U.S.C. § 363(m) in closing the transactions contemplated by the Asset Purchase Agreement.

M.    **Free and Clear**. The Debtors may sell the Acquired Assets free and clear of all obligations, liabilities and the Encumbrances because, with respect to each creditor asserting a lien, claim, encumbrance, or interest, one or more of the standards set forth in Bankruptcy Code § 363(f)(l)-(5) has been satisfied. Those holders of Encumbrances, who did not object or withdrew objections to the Sale Transaction, are deemed to have consented to the Sale

7

Transaction pursuant to section 363(f)(2) of the Bankruptcy Code.    Those holders of

Encumbrances, who did object, fall within one or more of the other subsections of section 363(f)

of the Bankruptcy Code.

N.    The Purchaser would not have entered into the Asset Purchase Agreement and

would not consummate the transactions contemplated hereby, including, without limitation, the

Sale Transaction and the assumption and assignment of the Designated Contracts, (i) if the

transfer of the Acquired Assets were not free and clear of all liens, claims, encumbrances, and

other interests of any kind or nature whatsoever, including, without limitation, rights or claims

based on any taxes or successor or transferee liability, and all liens, claims, encumbrances, setoff

rights or other interests of or asserted by any Agency or Agencies, or (ii) if the Purchaser would,

or in the future could, be liable for any such liens, claims, encumbrances, and other interests,

including, without limitation, rights or claims based on any taxes or successor or transferee

liability.    The Purchaser will not consummate the transactions contemplated by the Asset

Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and

assignment of the Designated Contracts, unless this Court expressly orders that none of the

Purchaser, its affiliates, its present or contemplated members or shareholders, or the Acquired

Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner,

whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any liens,

claims, encumbrances, and other interests, including, without limitation, rights or claims based

on any taxes, successor or transferee liability, and all liens, claims, encumbrances, setoff rights

or other interests of or asserted by any Agency or Agencies.

O.    Not transferring the Acquired Assets free and clear of all liens, claims,

encumbrances, and other interests of any kind or nature whatsoever including, without limitation,

rights or claims based on any taxes, successor or transferee liability, and all liens, claims,

encumbrances, setoff rights or other interests of or asserted by any Agency or Agencies, would

adversely impact the Debtors' efforts to maximize the value of their estates, and the transfer of

the Acquired Assets other than pursuant to a transfer that is free and clear of all liens, claims,

encumbrances, and other interests of any kind or nature whatsoever would be of substantially

less benefit to the Debtors' estates.

P.      Without limiting the generality of the foregoing, none of the Purchaser, its

respective affiliates, their respective present or contemplated members or shareholders, or the

Acquired Assets will have any liability whatsoever with respect to, or be required to satisfy in

any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly,

any liens, claims, encumbrances, and other interests relating to any U.S. federal, state or local

income tax liabilities, that the Debtors incur in connection with the consummation of the

transactions contemplated by the Asset Purchase Agreement, including, without limitation, the

Sale Transaction and the assumption and assignment of the Designated Contracts.

Q.      **Assumption of Executory Contracts and Unexpired Leases**.  The (i) transfer of

the Acquired Assets to the Purchaser and (ii) assignment to the Purchaser of the Designated

Contracts, will not subject the Purchaser to any liability whatsoever prior to the Closing or by

reason of such transfer under the laws of the United States, any state, territory, or possession

thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any

theory of law or equity, including, without limitation, any theory of equitable law, including,

without limitation, any theory of antitrust, successor or transferee liability.  The Debtors have

demonstrated that it is an exercise of their sound business judgment to assume and assign the

Designated Contracts to the Purchaser in connection with the consummation of the Sale

9

Transaction, and the assumption and assignment of the Designated Contracts is the best interests

of the Debtors, their estates, and their creditors.  The Designated Contracts being assigned to the

Purchaser are an integral part of the Acquired Assets being purchased by the Purchaser and,

accordingly, such assumption and assignment of Designated Contracts is reasonable, enhances

the value of the Debtors' estates, and does not constitute unfair discrimination.

R.    **Cure/Adequate Assurance**.    The Purchaser has (i) cured, or has provided

adequate assurance of cure, of any default existing prior to the date hereof under any of the

Designated Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, and

(ii) provided compensation or adequate assurance of compensation to any party for any actual

pecuniary loss to such party resulting from a default prior to the Closing under any of the

Designated Contracts within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.  The

Purchaser has provided or will provide adequate assurance of future performance of and under

the Designated Contracts within the meaning of section 365(b)(1)(C) of the Bankruptcy Code.

S.    **Prompt Consummation**.  The sale of the Acquired Assets must be approved and

consummated promptly to preserve the value of the Acquired Assets.  Therefore, time is of the

essence in consummating the Sale Transaction, and the Debtors and the Purchaser intend to close

the Sale Transaction as soon as reasonably practicable.

T.    **Business Judgment**. The Debtors have demonstrated compelling circumstances

and a good, sufficient, and sound business purpose and justification for the immediate approval

and consummation of the transaction contemplated by the Asset Purchase Agreement, including,

without limitation, the Sale Transaction and the assumption and assignment of the Designated

Contracts, prior to, and outside of, a chapter 11 plan of reorganization.

10

U.    **No Fraudulent Transfer**.  The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia. The Purchaser is not a mere continuation, and is not holding itself out as a mere continuation, of any of the Debtors or their respective estates and there is no continuity between the Purchaser and the Debtors.  The Sale Transaction does not amount to a consolidation, merger or de facto merger of the Purchaser and any of the Debtors.

V.    The consideration provided by the Purchaser for the Acquired Assets pursuant to the Asset Purchase Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia (including, without limitation, the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act).

W.    **Purchaser Not an Insider and No Successor Liability**.  The Purchaser is not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or stockholders existed between the Purchaser and the Debtors.  The transfer of the Acquired Assets and the assumption of the Assumed Liabilities (including any individual elements of the Sale Transaction) to the Purchaser, except as otherwise set forth in the Asset Purchase Agreement, does not, and will not, subject the Purchaser to any liability whatsoever, with respect to the Debtors' operation of their businesses prior to the closing of the Sale Transaction or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part,

11

directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee or vicarious liability.  Pursuant to the Asset Purchase Agreement, the Purchaser is not purchasing all of the Debtors' assets in that the Purchaser is not purchasing any of the Excluded Assets or assuming the Excluded Liabilities, and the Purchaser is not holding itself out to the public as a continuation of the Debtors.  The Sale does not amount to a consolidation, merger or de facto merger of the Purchaser and the Debtors and/or the Debtors' estates.  There is not substantial continuity between the Purchaser and the Debtors, and there is no continuity of enterprise between the Debtors and the Purchaser.  The Purchaser is not a mere continuation of the Debtors or the Debtors' estates, and the Purchaser does not constitute a successor to the Debtors or the Debtors' estates.

X.    **Legal, Valid Transfer**.  The transfer of the Acquired Assets to the Purchaser will be a legal, valid, and effective transfer of the Acquired Assets, and will vest the Purchaser with all right, title, and interest of the Debtors to the Acquired Assets free and clear of all Encumbrances, as set forth in the Asset Purchase Agreement.  The Acquired Assets constitute property of the Debtors' estates and good title is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  The Debtors are the sole and rightful owners of the Acquired Assets, and no other person has any ownership right, title, or interests therein.

Y.    **Asset Purchase Agreement Not Modified**.   The terms of the Asset Purchase Agreement, including any amendments, supplements, and modifications thereto, are fair and reasonable in all respects and the terms of the Order shall not modify the terms of the Asset Purchase Agreement.

Z.    **Not a Sub Rosa Plan**.  The Sale does not constitute a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.

12

The Sale neither impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates a liquidating plan of reorganization for the Debtors.

AA.    **Legal and Factual Bases**.  The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

**It is therefore ORDERED, ADJUDGED, AND DECREED THAT**

**General Provisions**

1.    The Motion is GRANTED and APPROVED in all respects.

2.    All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits and denied with prejudice.

**Approval of the Sale of the Acquired Assets**

3.    The Asset Purchase Agreement, including any amendments, supplements and modifications thereto, and all of the terms and conditions therein, is hereby approved,

4.    Pursuant to section 363(b) of the Bankruptcy Code, the sale of the Acquired Assets to the Purchaser, and the transactions contemplated thereby, are approved in all respects, and are free and clear of all obligations, liabilities and Encumbrances, including, without limitation, all obligations, liabilities, and Encumbrances of or asserted by any Agency or Agencies.

**Sale and Transfer of Acquired Assets**

5.    Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are hereby authorized and directed to sell the Acquired Assets to the Purchaser and consummate the Sale Transaction in accordance with, and subject to the terms and conditions of, the Asset Purchase Agreement, and to transfer and assign all right, title and interest (including common law rights) to all property, licenses and rights to be conveyed in accordance with and subject to the terms

13

and conditions of the Asset Purchase Agreement, and are further authorized and directed to execute and deliver, and are empowered to perform under, consummate and implement, the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement, including, without limitation, the related documents, exhibits and schedules, and to take all further actions as may be reasonably requested by the Purchaser for the purposes of assigning, transferring, granting, conveying and conferring to the Purchaser or reducing to possession, the Acquired Assets, or as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Asset Purchase Agreement.

6.      Pursuant to sections 363 (b) and (f) of the Bankruptcy Code, the Acquired Assets shall be transferred to the Purchaser upon consummation of the Asset Purchase Agreement at the Closing free and clear of all obligations, liabilities and Encumbrances of any kind or nature whatsoever, including without limitation, rights or claims (for purposes of this Order, the term "claim" shall have the meaning ascribed to such term in section 101(5) of the Bankruptcy Code) based on any taxes or successor or transferee liability, including, without limitation all claims arising in any way in connection with any agreements, acts, or failures to act, of any of the Debtors or any of the Debtors' predecessors or affiliates, whether known or unknown, contingent or otherwise, whether arising before or subsequent to the commencement of these Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including, without limitation, claims otherwise arising under federal or state tax laws or doctrines of successor or transferee liability.

7.      Following the Closing, the Debtors or the Purchaser are authorized and directed to execute and file a certified copy of this Order, which, once filed, registered or otherwise

recorded, shall constitute conclusive evidence of the release of all obligations, liabilities and Encumbrances in the Acquired Assets of any kind or nature whatsoever.  On the Closing, this Order will be construed, and constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired Assets to the Purchaser.  On the Closing, this Order also shall be construed, and constitute for any and all purposes, a complete and general assignment of all right, title and interest of the Debtors and each bankruptcy estate to the Purchaser in the Designated Contracts.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

8.     All entities which are presently, or on the Closing may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Purchaser on the Closing.

9.     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to the Purchaser in accordance with the Asset Purchase Agreement and this Order; provided, however, that the foregoing restriction shall not prevent any party from appealing this Order in accordance with applicable law or opposing any appeal of this Order.

10.     Except as expressly permitted by the Asset Purchase Agreement or this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants, and other creditors, holding liens, claims encumbrances, and other interests of any kind or nature whatsoever, including, without limitation, rights or claims

15

based on any taxes or successor or transferee liability, against or in a Debtor or the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets or the operation of the Acquired Assets before the Closing, or the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Designated Contracts, are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its respective successors and assigns, their respective property and the Acquired Assets, such persons' or entities' liens, claims, encumbrances, or other interests, including, without limitation, rights or claims based on any taxes or successor or transferee liability.

11.    On the Closing of the Sale Transaction, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Encumbrances on the Acquired Assets, if any, as such Encumbrances may have been recorded or otherwise exist.

12.    To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license or similar grant relating to the operation of the Acquired Assets on account of the filing or pendency of these Cases or the consummation of the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Designated Contracts.

13.    Subject to the terms and conditions of this Order, the transfer of the Acquired Assets to the Purchaser pursuant to the Asset Purchase Agreement constitutes a legal, valid, and effective transfer of the Acquired Assets, and shall vest the Purchaser with all right, title, and

interest of the Debtors in and to the Acquired Assets free and clear of all Encumbrances of any

kind or nature whatsoever.

**No Successor Liability**

14.     The Purchaser is not a "successor" to the Debtors or their estates by reason of any

theory of law or equity, and the Purchaser shall not assume, or be deemed to assume, or in any

way be responsible for any liability or obligation of any of the Debtors and/or their estates, other

than the Assumed Liabilities, with respect to the Acquired Assets or otherwise, including, but not

limited to, under any bulk sales law, doctrine or theory of successor liability, or similar theory or

basis of liability except for the assumption of the Asset Purchase Agreement and any documents

related thereto.  Except to the extent the Purchaser assumes Assumed Liabilities and is ultimately

permitted to assume the Designated Contracts pursuant to the Asset Purchase Agreement, neither

the purchase of the Acquired Assets by the Purchaser nor the fact that the Purchaser is using any

of the Acquired Assets previously operated by the Debtors will cause the Purchaser to be deemed

a successor in any respect to the Debtors' businesses or incur any liability derived therefrom

within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor,

employment, environmental, or other law, rule or regulation (including, without limitation, filing

requirements under any such laws, rules or regulations), or under any products liability law or

doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

15.     The Purchaser has given substantial consideration under the Asset Purchase

Agreement, which consideration shall constitute valid and valuable consideration for the releases

of any potential claims of successor liability of the Purchaser and which shall be deemed to have

been given in favor of the Purchaser by all holders of Encumbrances and liabilities in or against

the Debtors, or the Acquired Assets.  Upon consummation of the Sale Transaction, the Purchaser

shall not be deemed to (a) be the successor to the Debtors, (b) have, *de facto* or otherwise,

merged with or into the Debtors, or (c) be a mere continuation, alter ego or substantial continuation of the Debtors.

16.    Except to the extent the Purchaser or otherwise specifically agreed in the Asset Purchase Agreement or this Order, the Purchaser shall not have any liability, responsibility or obligation for any claims, liabilities or other obligations of the Debtors or their estates, including without limitation, any claims, liabilities or other obligations related to the Acquired Assets prior to Closing.  Under no circumstances shall the Purchaser be deemed a successor of or to the Debtors for any Encumbrances and liabilities against, in or to the Debtors or the Acquired Assets.  For the purposes of paragraphs 14 through 16 of this Order, all references to the Purchaser shall include the Purchaser's affiliates, subsidiaries and shareholders.

17.    Without limiting paragraph 16 immediately above, or any other provisions of this Order, and notwithstanding any agreement entered into between the Purchaser and any Agency or Agencies, in no event shall Purchaser's total liability or obligation to any Agency or Agencies exceed $[＿＿＿＿＿＿] for any reason, including, without limitation, for any liability or obligation asserted against Purchaser on account of any Encumbrances, recoupment rights or any other rights of or asserted by such Agency or Agencies.

**Good Faith**

18.    The transactions contemplated by the Asset Purchase Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein by this Order to consummate the Sale Transaction shall not affect the validity of the sale of the Acquired Assets to the Purchaser.  The Purchaser is a purchaser in good faith of the Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

19.     As a good faith purchaser of the Acquired Assets, the Purchaser has not entered into an agreement with any other potential bidders at the Auction, and has not colluded with any of the other bidders, potential bidders or any other parties interested in the Acquired Assets, and, therefore, neither the Debtors nor any successor in interest to the Debtors' estates shall be entitled to bring an action against the Purchaser, and the Sale Transaction may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

**Assumption and Assignment of Designated Contracts**

20.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Sale Transaction, the Debtors' assumption and assignment to the Purchaser, and the Purchaser's assumption on the terms set forth in the Asset Purchase Agreement, of the Designated Contracts is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

21.     The Debtors are hereby authorized and directed in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, effective upon the Closing of the Sale Transaction, the Designated Contracts free and clear of all Encumbrances of any kind or nature whatsoever and (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Designated Contracts to the Purchaser.

22.     The Designated Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to 11 U.S.C. § 365(k), the Debtors shall be relieved from any further

liability with respect to the Designated Contracts after such assignment to and assumption by the Purchaser, except as provided in the Asset Purchase Agreement.

23.     All defaults or other obligations of the Debtors under the Designated Contracts arising or accruing prior to the date of this Order (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by the Purchaser at the Closing or as soon thereafter as reasonably practicable, and the Purchaser shall have no liability or obligation arising or accruing prior to the Closing, except as otherwise expressly provided in the Asset Purchase Agreement.   The Purchaser may elect to take an assignment of certain contracts and leases previously omitted from [Schedules 4.8 and 4.19] of the Asset Purchase Agreement (the "**Previously Omitted Contracts**") after the Closing and prior to the conversion or dismissal of their chapter 11 cases. Upon designation of such Previously Omitted Contracts as "Assumed" by the Purchaser, the Debtors shall serve a notice on the counterparties to such Previously Omitted Contracts that identifies the Purchaser of the Acquired Assets and provides notice that the Debtors are assuming and assigning the Previously Omitted Contract to the Purchaser.   The counterparties will have fifteen (15) Business Days (as defined in the Asset Purchase Agreement) to object to the Cure Amount or the assumption.   If the counterparties, the Debtors and the Purchaser are unable to reach a consensual resolution with respect to an objection to the Cure Amount or assumption of a Previously Omitted Contract, the Debtors will seek an expedited hearing before Bankruptcy Court to determine the Cure Costs and approve the assumption; provided, however, that all costs, including legal fees, shall be paid for by the Purchaser.   If there is no objection, then the Debtors will obtain an order of this Court fixing the Cure Amount and approving the assumption of the Previously Omitted Contract.

24.    Each non-Debtor party to an Assigned Contract hereby is forever barred, estopped, and permanently enjoined from raising or asserting against the Debtors or the Purchaser, or the property of either of them, any assignment fee, default, breach or claim of pecuniary loss, or condition to assignment, arising under or related to the Designated Contracts, existing as of the date of the Sale Hearing, or arising by reason of the consummation of transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Designated Contracts.  Any party that may have had the right to consent to the assignment of an Assigned Contract is deemed to have consented to such assignment for purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code and otherwise if such party failed to object to the assumption and assignment of such Assigned Contract.

25.    To the extent a counterparty to an Assigned Contract failed to object timely to a Cure Amount, such Cure Amount shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to or denying the validity and finality of the Cure Amount at any time, and such Cure Amount, when paid, shall completely revive any Assigned Contract to which it relates.

**Additional Provisions**

26.    The consideration provided by the Purchaser for the Acquired Assets under the Asset Purchase Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

27.    Each and every federal, state, and local governmental agency, court or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.  On the Closing,

the Debtors and the Purchaser are authorized to take such actions as may be necessary to obtain a release of any and all obligations, liabilities and Encumbrances in the Acquired Assets, if any, and to the extent contemplated hereby and by the Asset Purchase Agreement.  This Order (a) shall be effective as a determination that, on the Closing, all Encumbrances of any kind or nature whatsoever existing as to the Acquired Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets.  Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.  The Purchaser and the Debtors shall take such further steps and execute such further documents, assignments, instruments and papers as shall be reasonably requested by the other to implement and effectuate the transactions contemplated in this paragraph.  All interests of record as of the date of this Order shall be forthwith deemed removed and stricken as against the Acquired Assets.  All entities described in this paragraph are authorized and specifically directed to strike all such recorded liens, claims, rights, interests and encumbrances against the Acquired Assets from their records, official and otherwise.

28.    If any person or entity that has filed statements or other documents or agreements evidencing claims, liens, encumbrances, or interests in any of the Acquired Assets does not deliver to the Debtors or the Purchaser prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all interests and other interests that the person or entity has or may assert with respect to any of the Acquired Assets, the Debtors and/or the Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such persons or entity with respect to any of the Acquired Assets.

29.    The Debtors will cooperate with the Purchaser and the Purchaser will cooperate with the Debtors, in each case to ensure that the transaction contemplated in the Asset Purchase Agreement is consummated, and the Debtors will make such modifications or supplements to any bill of sale or other document executed in connection with the closing to facilitate such consummation as contemplated by the Asset Purchase Agreement (including, without limitation, adding, pursuant to the terms of the Asset Purchase Agreement, such specific assets to such documents as may be reasonably requested by the Purchaser).

30.    The Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Acquired Assets other than for the Assumed Liabilities.  Without limiting the generality of the foregoing, and except as otherwise specifically provided in the Asset Purchase Agreement, the Purchaser shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character whether known or unknown as of the Closing, now existing or hereinafter arising, whether fixed or contingent, with respect to the

Debtors, the Acquired Assets or any obligations of the Debtors arising prior to the Closing, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, or in connection with, or in any way relating to the operation of the business prior to the Closing.

31.     Under no circumstances shall the Purchaser be deemed a successor of or to the Debtors for any Encumbrance against or in the Debtors or the Acquired Assets of any kind or nature whatsoever.  The sale, transfer, assignment and delivery of the Acquired Assets and the Designated Contracts shall not be subject to any Encumbrance and Encumbrances of any kind or nature whatsoever shall remain with, and continue to be obligations of, the Debtors.  All persons holding Encumbrances against, on, or in the Debtors or the Acquired Assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Encumbrances of any kind or nature whatsoever against the Purchaser, its officers, directors, shareholders and professionals, its property, its successors and assigns, or the Acquired Assets with respect to any Encumbrance of any kind or nature whatsoever such person or entity had, has, or may have against or in the Debtors, their estates, officers, directors, shareholders, or the Acquired Assets.  Following the Closing, no holder of an Encumbrance in the Debtors shall interfere with the Purchaser's title to or use and enjoyment of the Acquired Assets and the Designated Contracts based on or related to such Encumbrance, or any actions that the Debtors may take in their Cases.

32.     The terms and provisions of the Asset Purchase Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors and their respective affiliates, successors and assigns, their estates, and their creditors, the Purchaser, and its respective affiliates, successors and assigns, and any affected third parties including, but not

limited to, all persons asserting Encumbrances on the Acquired Assets to be sold to the Purchaser

pursuant to the Asset Purchase Agreement, notwithstanding any subsequent appointment of any

trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and

provisions likewise shall be binding.

33.     The failure specifically to include any particular provisions of the Asset Purchase

Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being

the intent of the Court that the Asset Purchase Agreement be authorized and approved in its

entirety.

34.     The Asset Purchase Agreement and any related agreements, documents or other

instruments may be modified, amended or supplemented by the parties thereto, in a writing

signed by both parties, and in accordance with the terms thereof, without further order of the

Court, provided that any such modification, amendment or supplement does not have a material

adverse effect on the Debtors' estates.  To the extent that any provision of the Asset Purchase

Agreement conflicts with or is, in any way, inconsistent with any provision of this Order, this

Order shall govern and control.

35.     Nothing contained in any plan of reorganization or liquidation confirmed in these

Cases or any order of this Court confirming such plans or in any other order in these Cases,

including any order entered after any conversion of these Cases to a case under chapter 7 of the

Bankruptcy Code, shall alter, conflict with, or derogate from, the provisions of the Asset

Purchase Agreement or the terms of this Order.  The provisions of this Order and the Asset

Purchase Agreement and any actions taken pursuant hereto or thereto shall survive entry of any

order which may be entered confirming or consummating any plan of reorganization of the

Debtors, or which may be entered converting these Cases from chapter 11 to chapter 7 of the

Bankruptcy Code, and the terms and provisions of the Asset Purchase Agreement as well as the rights and interests granted pursuant to this Order and the Asset Purchase Agreement shall continue in these Cases or any superseding case and shall be specifically performable and enforceable against and binding upon the Debtors, their estates and the Purchaser and their respective successors and permitted assigns, including any trustee, responsible officer or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

36.    The provisions of this Order are nonseverable and mutually dependent.

37.    To the extent applicable, the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court (a) to allow the Purchaser to give the Debtors any notice provided for in the Asset Purchase Agreement, and (b) to allow the Purchaser to take any and all actions permitted by the Asset Purchase Agreement.

38.    There are no brokers involved in consummating the Sale Transaction and no brokers' commissions are due.

39.    Compliance with the legal requirements relating to bulk sales and transfers is not necessary or appropriate under the circumstances.

40.    The Debtors and each other person having duties or responsibilities under the Asset Purchase Agreement or this Order, and their respective agents, representatives, and attorneys, are authorized and empowered to carry out all of the provisions of the Asset Purchase Agreement, to issue, execute, deliver, file and record, as appropriate, the Asset Purchase Agreement, and any related agreements, and to take any action contemplated by the Asset Purchase Agreement or this Order, and to issue, execute, deliver, file and record, as appropriate,

such other contracts, instruments, releases, deeds, bills of sale, assignments, or other agreements, and to perform such other acts as are consistent with, and necessary or appropriate to, implement, effectuate and consummate the Asset Purchase Agreement and this Order and the transactions contemplated thereby and hereby, all without further application to, or order of, the Court. Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by applicable business corporation, trust and other laws of applicable governmental units with respect to the implementation and consummation of the Asset Purchase Agreement and this Order and the transactions contemplated thereby and hereby.

41.    This Court shall retain exclusive jurisdiction to enforce and implement the terms and provisions of the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connections therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets to the Purchaser free and clear of Encumbrances, or compel the performance of other obligations owed by the Debtors, (b) compel delivery of the purchase price or performance of other obligations owed to the Debtors, (c) resolve any disputes arising under or related to the Asset Purchase Agreement, except as otherwise provided therein, (d) interpret, implement, and enforce the provisions of this Order, and (e) protect the Purchaser against (i) any claims of successor or vicarious liability related to the Acquired Assets or Designated Contracts, or (ii) any claims of Encumbrances asserted on or in the Debtors or the Acquired Assets, of any kind or nature whatsoever.

42.     To the extent that any provision of this Order conflicts with the Asset Purchase Agreement, this Order shall control.

43.     Notwithstanding anything to the contrary contained herein, the purchase by Purchaser of the Acquired Assets is subject to the Assumed Liabilities and Purchaser shall remain liable for the Assumed Liabilities, all as set forth in the Asset Purchase Agreement.

cc:

All attorneys who have entered an appearance and who are registered e-filers.

**Exhibit D**

Silver Point Capital, LLC
**Asset Purchase Agreement Stalking Horse Term Sheet**

This Asset Purchase Agreement Stalking Horse Term Sheet (the "**Term Sheet**"), is being entered into as of the 18th day of May, 2014, by and among the Debtors (defined below), and DCA Acquisitions, LLC, a Delaware limited liability company (the "**Stalking Horse Purchaser**" or "**SHP**"). This Term Sheet contains a description of certain principal terms of a Stalking Horse Agreement to be entered into among the parties for the Section 363 sale by Debtors, and purchase by SHP, of certain of the assets of the Debtors (collectively, the "**Transaction**"). To the extent that there are inconsistent terms between the Stalking Horse Agreement and this Term Sheet, the terms of the Stalking Horse Agreement shall prevail.

| *Certain Defined Terms* | "**BB&T Debt**" means the amount of debt owing to Branch Banking and Trust Company ("**BB&T**") pursuant to the Business Loan and Security Agreement between BB&T and the Debtors, dated March 2008, in the approximate amount of $40.1 million. |
|---|---|
| | "**Debtors**" means, collectively, Specialty Hospitals of America, LLC ("**SHA**"), SHA Management, LLC, Specialty Hospitals of Washington, LLC ("**SPW**"), Specialty Hospitals of Washington-Nursing Center, LLC, Specialty Hospital of Washington-Hadley, LLC, SHA Holdings, Inc., and SHA Hadley SNF, LLC. |
| | "**Designated Contracts**" means those executory contracts and unexpired leases to be assumed by and assigned to the Stalking Horse Purchaser at the closing of the Transaction, which are set forth on Exhibit A hereto. |
| | "**DIP Facility**" means that Debtor-in-Possession term loan funded by SHP to the Debtors in contemplation of the Transaction as part of the Debtors' bankruptcy cases to be filed in the District of Columbia, on substantially the terms and conditions set forth in Exhibit B hereto. |
| | "**Landlord**" means Capitol Hill Group, a California non-profit mutual benefit corporation. |
| | "**Leased Real Property**" means the Capitol Hill facility located at 700 Constitution Avenue, N.E., Washington, D.C. |
| | "**Owned Real Property**" means the Hadley Facility located at 4601 Martin Luther King Avenue, S.W., Washington, D.C. |
| | "**Regulatory Agreements**" means the approvals and agreements, in form and substance satisfactory to the Stalking Horse Purchaser in its sole discretion, with each of the Department of Justice ("**DOJ**") (and to the extent that the Stalking Horse Purchaser elects to acquire them), D.C. Medicaid ("**DCM**"), and the Centers for Medicare and Medicaid Services ("**CMS**"). |

1

| Amount and Form of Consideration | The purchase price (the "**Purchase Price**") for the purchase, sale, assignment and conveyance of the Debtors' right, title and interest in, to and under the Acquired Assets (as defined below) shall consist of: (a) $15,000,000, in the form of a term DIP Facility provided by SHP; plus (b) the value of either a new lease (which, for the avoidance of doubt, includes the net present value of the lease payments to be assumed by SHP) to be entered into between SHP and the Landlord or an amended and restated lease, which will constitute a Designated Contract, with respect to the Leased Real Property, which will be conditioned, in part, on a waiver from the Landlord of certain cure amounts, rent arrearage, HVAC and capital expenditure requirements and otherwise on terms and conditions satisfactory to SHP in its sole discretion; plus (c) the assumption by the Stalking Horse Purchaser of certain liabilities set forth in the Stalking Horse Agreement, including the Regulatory Agreements, and the payment of the Cure Costs (as defined below) relating to the Designated Contracts; and plus (d) an amount not to exceed $200,000 (or as otherwise approved by the Stalking Horse Purchaser in its sole discretion), to conduct the orderly wind-down or dismissal of the bankruptcy case(s) following the sale contemplated by the Transaction.<br><br>The parties will agree on a tax allocation of the Purchase Price which addresses the Debtors' obligations to the Internal Revenue Service ("IRS"). |
|---|---|
| Acquired Assets | The Stalking Horse Purchaser shall purchase substantially all of the operating assets of the Debtors (collectively, the "**Acquired Assets**"), other than the Excluded Assets.  The Acquired Assets include all tangible property, accounts, machinery, equipment, inventories, tenant improvements, goodwill, software and computer programs, hardware, intellectual property, prepaid expenses (other than prepaid insurance or prepaid other assets) and deposits, the Designated Contracts, books and records (including all patient charts and records, patient lists and appointment books relating to patients treated by the Debtors to the extent transferable under applicable law), any policies and procedures relating to the Debtors' business, telephone and facsimile numbers, all licenses and permits, including drug and nuclear licenses, to the extent transferable, any federal, state, or local Medicare and Medicaid provider numbers which SHP chooses in its sole discretion to assume and Certificates of Need ("**CON**"), in each case to the extent transferable or otherwise capable of being assumed, sold and assigned, in SHP's sole discretion, the Regulatory Agreements, the Owned Real Property, and all benefits, proceeds and other amounts payable under any policy of insurance relating to the Debtors' business, and proceeds of all the foregoing assets. |
| Excluded Assets | Except to the extent specifically identified above as an Acquired Asset, the following are not included in the Acquired Assets and are not being sold to the Stalking Horse Purchaser (collectively, the "**Excluded Assets**"): (i) cash, (ii) cash equivalents (excluding receivables and the proceeds thereof), (iii) |

|  | income tax receivables, (iv) deferred tax assets, (v) employee advances, (vi) prepaid insurance including prepaid professional liability insurance, (vii) contracts and leases that are not Designated Contracts, (viii) the Purchase Price and all rights of the Debtors under the Stalking Horse Agreement, (ix) any rights, claims or causes of action of any Debtor against third parties relating to assets, properties, losses, business or operations of any Debtor, including any actions under chapter 5 of the Bankruptcy Code, (x) all personnel records and other books, records, and files that the Debtors are required by law to retain in their possession, (xi) any patient records with respect to which the applicable patient(s) has objected to a transfer of such patient records to the Stalking Horse Purchaser, (xii) any claim, right or interest of any Debtor in or to any refund, rebate, abatement or other recovery for taxes, together with any interest due thereon or penalty rebate arising therefrom, (xiii) any other prepaid assets or properties expressly set forth on a Schedule to be attached to the Stalking Horse Agreement, (xiv) any Medicare and Medicaid provider numbers and CON which SHP, in its sole discretion, chooses not to assume or which are otherwise not capable of being transferred or replaced by SHP, (xv) the BB&T Debt, (xvi) applicable federal, state, and local taxes, and (xvii) any books and records relating to any of the foregoing. |
|---|---|
| *Assumed Liabilities* | The Stalking Horse Purchaser shall, effective as of the closing date, assume those liabilities and obligations (i) under the DIP Facility and (ii) arising from events occurring on or after the closing date under any Designated Contracts, including the Regulatory Agreements, subject to applicable caps on assumed liabilities, as mutually acceptable to SHP and the regulators. The Stalking Horse Purchaser also shall be responsible for payment of Cure Costs (as defined below). |
| *Excluded Liabilities* | The Stalking Horse Purchaser shall not assume or be deemed to have assumed any liabilities of the Debtors other than the Assumed Liabilities, including, without limitation, any liabilities associated with the Excluded Assets and specifically including, without limitation, the BB&T Debt, any other existing indebtedness, any federal, state, or local tax liabilities, and any obligations pursuant to Collective Bargaining Agreements and other employee-related liabilities, in each case to be assumed in SHP's sole discretion. |
| *Assumption and Assignment of Contracts and Leases; Hiring of Personnel* | At the closing, the Debtors shall assign to the Stalking Horse Purchaser each of the Designated Contracts and, to the extent not directly negotiated with the applicable regulatory entities, the Regulatory Agreements. In connection with the assumption and assignment of the Designated Contracts, the Stalking Horse Purchaser shall pay cure costs which the Bankruptcy Court, pursuant to a Final Order, orders to be paid in connection with the Debtors' assignment to Stalking Horse Purchaser of such Designated Contracts in accordance with section 365 of the Bankruptcy Code, up to a maximum aggregate amount to be agreed on by SHP in its sole discretion (the "**Cure Costs**"). SHP shall also initiate, in SHP's |

3

| | |
|---|---|
| | discretion, the process of hiring personnel appropriate for the continued operation of Debtors' health care facilities. |
| *Representations, Warranties, and Covenants* | The Stalking Horse Agreement will contain usual and customary representations, warranties, and covenants for similar bankruptcy section 363 sale transactions, including representations and warranties by the Stalking Horse Purchaser that it has the requisite authority and has obtained the necessary consents to consummate the Transaction. |
| *Regulatory Approvals* | In addition to negotiating the Regulatory Agreements on substantially the same terms, both operationally and economically as are currently in effect, the Stalking Horse Purchaser and the Debtors will have obtained all necessary regulatory approvals for the Transaction, including but not limited to, any required approvals by the DOJ, DCM, CMS, and any federal, state, or local healthcare or other agency or entity whose regulatory approval is required in order to consummate the Transaction. If any governmental approval is determined to be necessary and cannot be timely obtained, the parties agree to work in good faith to modify the terms of the Transaction as necessary to ensure compliance with all federal, state, or other governmental laws, rules, and regulations while providing the same economic result to the Stalking Horse Purchaser. |
| *Conditions to Closing* | The material conditions and contingencies for the Stalking Horse Purchaser's obligations to close include: |
| | (a)   The Debtors shall have performed, satisfied and complied in all material respects with all obligations and covenants required by the Stalking Horse Agreement to be performed or complied with by them on or prior to the closing date. |
| | (b)   The Debtors shall have executed and delivered to the Stalking Horse Purchaser the Assignment and Assumption and Bill of Sale, dated and effective as of the closing date. |
| | (c)   The Debtors shall have delivered to the Stalking Horse Purchaser all other documents required to be delivered by them under the Stalking Horse Agreement and all such documents shall have been properly executed by each of them. |
| | (d)   The Stalking Horse Purchaser shall have received any third party consents, the requirements of which have not been negated by an order of the Bankruptcy Court, and governmental approvals, including the Regulatory Agreements, in form and substance satisfactory to it in its sole and absolute discretion, effective as of the closing date (unless otherwise agreed to by the parties to the definitive Regulatory Agreements); provided, however, that if the Court has entered an order approving the Transaction and all conditions to the closing have been satisfied except for the |

requirement that all Regulatory Agreements have been received, then the period for Debtors to satisfy this closing condition shall be extended for sixty (60) days.

(e)    The Stalking Horse Purchaser shall have entered into new or modified contracts, acceptable to SHP in its sole discretion, effective as of closing, with all persons identified by SHP prior to the closing, including critical vendors and suppliers and applicable labor unions.

(f)    There shall not have occurred any Event of Default (as described in Exhibit B hereto) which has not been waived by SHP.

(g)    The Debtors shall have delivered all schedules and exhibits attached to or otherwise required by the Stalking Horse Agreement.

(h)    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become final and non-appealable.

(i)    All of the Designated Contracts shall have been validly assumed and assigned to the Stalking Horse Purchaser under section 365 of the Bankruptcy Code pursuant to the Sale Order.

(j)    The Sale Order shall provide that the sale of the Acquired Assets is (w) free and clear of all liens, claims, encumbrances and interests, including, without limitation, those of the DOJ and IRS and any state or local taxing authority, whether known or unknown, disputed, contingent, actual, or otherwise, arising prior to closing, (x) to a good faith purchaser, (y) to occur on condition that SHP has negotiated agreements with CMS and DCM satisfactory to SHP in its sole discretion, and (z) to SHP with no successor liability. The Sale Order shall also provide that SHP may credit bid under Section 363(k) of the Bankruptcy Code, at face value, the DIP Facility and any other existing secured debt that SHP may acquire prior to the closing of the Transaction.

(k)    Any and all liabilities of the Debtors to any of the CMS, DCM, IRS, the DOJ, or the District of Columbia, for either unpaid taxes owed by any Debtor, qui tam liability, overpayments arising under Medicare or Medicaid, or any other obligations or liabilities, in each case arising prior to closing on the Debtors' asset sale to SHP, shall be capped, together with any recoupment and/or setoff rights of each and any of them post-closing, at a mutually acceptable amount, agreed to in writing by SHP, as to DCM and in respect of any pre-closing taxes owed to the District of Columbia, collectively, as approved by final Order of the Bankruptcy Court, and SHP shall have negotiated acceptable caps on recoupment

689855/10/PHOENIX

with all such persons, as well as with the DOJ and IRS; provided, that, with respect to liabilities accruing prior to closing on the Transaction by any Debtor to SHP of the DOJ, IRS or to the District of Columbia (for unpaid taxes), such condition may be satisfied by a judicial or administrative finding or other agreement acceptable to SHP, final beyond appeal, that the IRS and the DOJ, and the District of Columbia, as to such taxes, each have no post-petition right of recoupment or set-off, post-sale of the Debtors' assets to SHP, arising from liabilities of any Debtor attributable to healthcare services delivered prior to closing, tax liabilities of any Debtor incurred prior to closing on the asset sale, or otherwise attributable to pre-closing operations of any Debtor.

(l)     SHP shall not have received any notice pursuant to the applicable section of the Stalking Horse Agreement that, individually or in the aggregate, could be reasonably expected to be materially adverse to the condition (financial or otherwise), properties, assets, liabilities, businesses, operations, results of operations or prospects of the business or the Acquired Assets.

(m)     No event shall have occurred that, individually or in the aggregate, could be reasonably expected to result in a material adverse change in the condition (financial or otherwise), properties, assets, liabilities, businesses, operations, results of operations or prospects of the business or the Acquired Assets (including, by way of example, CMS or D.C. Medicaid transferring patients, terminating provider relationships, or withholding or offsetting payments).

(n)     As of the closing, the Landlord shall be in full compliance with the terms of a lockup agreement to be negotiated with SHP, including having addressed any deficiencies with respect to the Leased Real Property which have resulted in, or are reasonably likely to result in, a material adverse change in the conditions, liabilities, or operations of the Leased Real Property.

(o)     As of the closing, a new or amended and restated lease satisfactory to SHP will be in effect with respect to the Leased Real Property.

(p)     SHP shall have received all consents and contract modifications which SHP may require, with all Bankruptcy Court approvals required for the same, including, without limitation, leases of key medical equipment, beds, food service contracts, and utility contracts.

If, following the entry of the Sale Order, all conditions to closing have been satisfied except for the requirement that all Regulatory Agreements have

| | |
|---|---|
| | been received, and if the period for the Debtors to satisfy this closing condition is extended for the sixty (60) day period contemplated in subsection (d) above, then SHP will agree to fund such amounts as may be called for under the DIP Term Sheet during the 60 day extension period except that, if SHP determines in good faith that either (i) the required Regulatory Approvals or (ii) the required new or amended and restated lease to be negotiated with the Landlord with respect to the Leased Real Property, are not reasonably likely to be obtained, SHP may deem the applicable closing conditions not capable of being satisfied and may declare an Event of Default under the DIP Term Sheet and any further obligation to fund additional advances shall immediately cease and be of no further force or effect. |
| *As Is, Where Is* | The Stalking Horse Purchaser is acquiring the Acquired Assets at the closing "as is, where is" and, except as otherwise expressly provided in the Stalking Horse Agreement, the Debtors are making no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Acquired Assets. Notwithstanding the foregoing, for the avoidance of doubt, SHP is buying the Acquired Assets free and clear of all CMS, DOJ, IRS (and any state or local taxing authority), and DCM liabilities, whatsoever, and also free and clear of set-off rights, except to the extent that under applicable law any of these persons retains recoupment rights, and subject, as to such persons, to mutually acceptable "caps" on recoupment rights attributable to the delivery of healthcare services by the Debtors prior to closing, as set forth in agreements between such persons and the Stalking Horse Purchaser. |
| *Break-Up Fee; Expense Reimbursement* | In consideration of the significant costs and efforts to be expended and risks assumed by SHP in negotiating the Transaction described in this Term Sheet, the Stalking Horse Agreement will provide for a break-up fee payable by SHA to SHP in the amount of 5% of the total transaction value (the "**Breakup Fee**"), plus reimbursement of all reasonable expenses incurred in connection with SHP's efforts to negotiate and consummate the Transaction ("**Expense Reimbursement**") in the event the Stalking Horse Agreement is terminated as a result of either (i) an Event of Default by a Debtor under the DIP Loan, or (ii) a breach by a Debtor of a material term of, or failure to timely satisfy a condition to closing that is a Debtor's obligation under, the Stalking Horse Agreement; provided that, if SHP, in its sole discretion, elects to seek specific performance of the Stalking Horse Agreement, then SHP shall not be entitled to the Breakup Fee or Expense Reimbursement. <br><br> If the Stalking Horse Agreement is terminated because of a superior bid, then the Breakup Fee and Expense Reimbursement shall be payable from the proceeds of a replacement DIP financing or from the proceeds of an alternative transaction whereby the assets contemplated to be sold to SHP are, instead, sold to a third party. |

7

| | |
|---|---|
| *Specific Performance* | Because the exact nature and extent of damages resulting from a breach of the Stalking Horse Agreement are uncertain at the time of entering into the Stalking Horse Agreement, and because such a breach would result in damages that would be difficult to determine with certainty, it is understood that money damages would not be a sufficient remedy and the parties shall each be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach. |
| *Release* | In connection with the closing, Debtors shall execute a release in favor of SHP (and its affiliates, agents, attorneys, and employees), releasing SHP from all causes of action and claims that the Debtors have or may have against SHP, in each case as of the closing. |
| *Non-Competition and Transition Consulting Services Agreements* | On the date the Bankruptcy Court enters the Sale Order, SHP will enter into Non-Competition and Transition Consulting Services Agreements with each of James Rappaport, Robert Rummler, and Frank Wilich, each in the amount of $200,000. |

689855/10/PHOENIX

IN WITNESS WHEREOF, this Term Sheet is executed and delivered as of the date first above-written.

**Debtors:**

SPECIALTY HOSPITALS OF AMERICA, LLC, a Delaware limited liability company

By:
Name: Edwin D Clark
Title: SVP CFO

SPECIALTY HOSPITAL OF WASHINGTON-HADLEY, LLC, a Delaware limited liability company

By:
Name: Edwin D. Clark
Title: SVP CFO

SPECIALTY HOSPITAL OF WASHINGTON-NURSING CENTER, LLC, a Delaware limited liability company

By:
Name: Edwin D. Clark
Title: SVP CFO

SHA HOLDINGS, INC., a Delaware corporation

By:
Name: Edwin D Clark
Title: SVP CFO

SHA MANAGEMENT, LLC, a Delaware limited liability company

By:
Name: Edwin D. Clark
Title: SVP CFO

SPECIALTY HOSPITAL OF WASHINGTON, LLC, a Delaware limited liability company

By:
Name: Edwin D. Clark

Title:        _Sup CFO_

SHA HADLEY SNF, LLC, a Delaware limited liability
company

By:        _____
Name:      _Edwin Chan_
Title:     _Sup CFO_

**Stalking Horse Purchaser:**

DCA ACQUISITIONS, LLC, a Delaware limited
liability company

By: _____

Name: Michael Gatto

Title: Authorized Signatory

Exhibit A[1]

Designated Contracts

1.      Agreement for Dictations and Transcription Services between MDI – Medical Dictation Services, Inc. and The Specialty Hospital of Washington/Capitol Hill entered into June 3, 2008 (with First Amendment thereto).

2.      Pharmacy Service Agreement entered into and effective November 15, 2009 by and between The Specialty Hospital of Washington, LLC.

3.      Maintenance Management Program Agreement entered into and effective October 1, 2011 by and between Cohr, Inc. d/b/a Masterplan and The Specialty Hospitals of Washington.

4.      Service Agreement by and between McGraw Communications, Inc. and Specialty Hospital of Washington-Hadley dated November 22, 2011.

5.      Agreement by and between Morrison Management Specialists, Inc. and The Specialty Hospital of Washington LLC effective April 1, 2007 (with all amendments thereto).

6.      Engagement Letter between Specialty Hospitals of America, LLC and Cherry, Bekaert & Holland, L.L.P. dated November 6, 2009.

7.      Payroll Account Acknowledgement between Aflac and Specialty Hospital of Washington effective April 17, 2009.

8.      Supplemental Staffing Agreement between The Specialty Hospital of Washington-Hadley and Favorite Healthcare Staffing, Inc. dated April 1, 2009 (with all amendments thereto).

9.      Insurance Services Agreement between Computer Programs & Systems, Inc. and The Specialty Hospital of Washington dated April 15, 2010.

10.     Contract for Hospitalist/Intensivist Services effective as of May 1, 2014 by and between Specialty Hospital of Washington and Anacostia Medical Associates, PLLC.

11.     Biomedical Services Agreement by and between Yousaf Esmaili and Specialty Hospital of Washington-Hadley effective as of (not executed).

12.     Agreement for Hospitalist and Intensivist Services entered into April 18, 2012, to be effective May 1, 2012, by and between Specialty Hospital of Washington-Hadley and Hospitalist Medicine Physicians of D.C., P.C.

---

[1] Exhibit A remains subject to SHP's continued review and revision in all respects in connection with SHP's continuing diligence review and investigation.

689855/10/PHOENIX

13.     Rehabilitative Services Agreement entered into July 1, 2012 by and between Ergo Rehab
Management Group, LLC and Specialty Hospital of Washington, LLC and Specialty Hospital of
Washington-Nursing Center, LLC.

14.     Committed Portfolio Participation Agreement between The Broadlane Group, Inc., MedAssets
Supply Chain Systems, LLC, and Specialty Hospitals of America dated July 1, 2011.

15.     Diagnostic Laboratory Services Agreement entered into by and between Washington Hospital
Center d/b/a Medstar Diagnostic Laboratories and The Specialty Hospital of Washington (not executed).

16.     Diagnostic Laboratory Services Agreement entered into by and between Washington Hospital
Center d/b/a MedStar Diagnostic Laboratories and The Specialty Hospital of Washington-Hadley (not
executed).

17.     Pharmacy Consultant Agreement dated as of December 20, 2005 between NeighborCare –
Annapolis Junction and PACIN Healthcare-Hadley Memorial Hospital Corporation.

18.     Hospitalist and Back-Up Call Coverage Agreement made and entered into on March 9, 2012
between The Specialty Hospital of Washington, LLC d/b/a The Specialty Hospital of Washington-Capital
Hill and Metropolitan Medical Group, LLC.

19.     Primary Care Hospitalist Coverage Agreement made and entered into March 9, 2012 between
The Specialty Hospital of Washington, LLC d/b/a The Specialty Hospital of Washington-Capital Hill and
Metropolitan Medical Group, LLC.

20.     Radiology Services Agreement effective as of April 1, 2012 by and between Metropolitan
Radiology Management, LLC and Specialty Hospital of Washington, LLC.

21.     Biomedical Services Agreement by and between Yousaf Esmaili and Specialty Hospital of
Washington-Capitol Hill (not executed).

22.     Service Agreement made effective as of December 15, 2008 by and between The Specialty
Hospital of Washington, LLC d/b/a the Specialty Hospital of Washington-Capitol Hill and Vascular Access
Professionals, Inc.

23.     Shredding Service Agreement by and between The Specialty Hospital of Washington, LLC and
Cintas Corporation No. 2 d/b/a Cintas Document Management dated September 9, 2011.

24.     Purchased Services Agreement entered into as of June 3, 2010 by and between FRD Services
Corporation of Virginia d/b/a FDR Services Corporation and Specialty Hospitals of Washington, LLC.

25.     Pest Management Program Agreement by and between The Specialty Hospitals of Washington
Hadley and Regional Pest Management, dated September 9, 2011.

26.     Services Agreement by and between Stericycle, Inc. and Specialty Hospital of Washington-
Capital effective August 1, 2010.

689855/10/PHOENIX

27.     Services Agreement by and between Stericycle, Inc. and Specialty Hospital of Washington-Hadley entered into June 19, 2010.

28.     Patient Transfer Agreement entered into May 2, 2014 by and between Specialty Hospital of Washington by and on behalf of its unincorporated divisions of Capitol Hill Campus and Hadley Campus and Inova Health Care Services.

29.     Agreement dated August 20, 2007 between LifeStar Response of Maryland, Inc. and The Specialty Hospital of Washington, Capitol Hill.

30.     Software License Agreement a/k/a the Software License and Services Agreement dated April 1, 2008 between 3M Company and Specialty Hospital of Washington (with all amendments thereto).

31.     Agreement between Omnicare and Specialty Hospital of Washington-Hadley dated December 1, 2009.

32.     Supply Agreement by and between Fresenius USA Marketing, Inc. and The Specialty Hospital of Washington-Capitol Hill, LLC dated October 15, 2009, with an Effective Date of October 21, 2009 (with all amendments thereto).

33.     Product Agreement by and between Pacin Healthcare – Hadley Memorial Hospital Corporation and The BOC Group, Inc. dated May 11, 1998.

34.     Supply Agreement by and between Fresenius USA Marketing, Inc. and The Specialty Hospital of Washington-Hadley, LLC dated October 15, 2009, with an Effective Date of October 21, 2009 (with all amendments thereto).

35.     Pharmacy Services Provider Agreement dated as of December 20, 2005 between NeighborCare – Annapolis Junction and PACIN Healthcare-Hadley Memorial Hospital Corporation.

36.     Primary Vendor Agreement made and entered as of March 25, 2011 by and between H. D. Smith Wholesale Drug Co. and Specialty Hospital of Washington.

37.     Corporate Program Agreement between Medline Industries Inc. and Specialty Hospitals of Washington, LLC effective September 1, 2011.

38.     Agreement between Freedom Medical and the Specialty Hospital System dated September 21, 2011.

39.     Reagent Rental Agreement by and between Instrumentation Laboratory and Specialty Hospital of Washington-Hadley effective January 20, 2009.

40.     Vendor Agreement dated February 6, 2012 between Therapy Systems, Inc. and The Specialty Hospital of Washington (Capitol Hill) and Capitol Hill Healthcare Group d/b/a Capitol Hill Nursing Center.

41.     Vendor Agreement dated February 6, 2012 between Therapy Systems, Inc. and The Specialty Hospital of Washington-Hadley, LLC.

Exhibit A

42.      Customer Service Agreement by and between UniFirst Corporation and Specialty Hospital of Washington Material Management dated January 17, 2007.

43.      Customer Service Agreement by and between UniFirst Corporation and Specialty Hospital of Washington dated March 19, 2008.

44.      Customer Service Agreement by and between UniFirst Corporation and Capitol Hill Community Hospital d/b/a Medlink Hospital dated February 24, 2005.

45.      Customer Service Agreement by and between UniFirst Corporation and Specialty Hospital of Washington dated April 3, 2006.

46.      Ancillary Services Agreement between Connecticut General Life Insurance Company and The Specialty Hospital of Washington effective July 15, 2012.

47.      Ancillary Services Agreement between Connective General Life Insurance Company and Capitol Hill Nursing Center Effective July 15, 2012.

48.      Employment Practices Liability Insurance Policy by and between AIG and Specialty Hospitals of America, LLC dated June 15, 2013.

49.      Excess Healthcare Professional Liability Policy by and between Lexington Insurance Company and Specialty Hospitals of America, LLC dated March 12, 2013.

50.      Healthcare Professional Liability Policy by and between Lexington Insurance Company and Specialty Hospitals of America, LLC dated March 12, 2013.

51.      Physicians Professional Liability Retroactive Coverage Policy by and between Specialty Hospital of Washington, L.L.C. Hadley Location Physicians dated June 6, 2013.

52.      Storage Tank Third Party Liability, Corrective Action, and Cleanup Costs Policy by and between Specialty Hospital of Washington Hadley, LLC and Commerce and Industry Insurance Company dated December 10, 2013.

53.      Workers Compensation and Employers Liability Policy by and between New Hampshire Insurance Company and Specialty Hospitals of America, LLC dated November 09, 2013.

54.      Dental Preferred Provider Insurance by and between CIGNA and Specialty Hospital of Washington effective August 1, 2012.

55.      Open Access Plus Medical Benefits Health Reimbursement Arrangement by and between CIGNA and Specialty Hospital of Washington effective August 1, 2012.

56.      Open Access Plus In-Network Medical Benefits Plan by and Between CIGNA and Specialty Hospital of Washington effective August 1, 2012.

57.      Contract for Services made as of May 1, 2014 by and between Specialty Hospital of Washington and Anacostia Medical Associates PLLC.

Exhibit A

58.     Rehabilitative Services Agreement entered into on the 1st day of July, 2012, by and between Ergo Rehab Management Group, LLC and Specialty Hospital of Washington, LLC, and Specialty Hospital of Washington-Nursing Center, LLC.

59.     Hospitalist and Back-Up Call Coverage Agreement entered into on the 9th Day of March 2012 between The Specialty Hospital of Washington, LLC (d/b/a Specialty Hospital of Washington – Capitol Hill) and Metropolitan Medical Group, LLC.

60.     Primary Care Hospitalist Coverage Agreement made as of the 9th Day of March, 2012 between Specialty Hospital of Washington (d/b/a The Specialty Hospital of Washington – Capitol Hill) and Metropolitan Medical Group, LLC.

61.     Agreement made effective as of April 1, 2008 between Specialty Hospital of Washington, LLC and Morrison Management Specialists, Inc. (with all amendments thereto).

62.     Equipment Lease Agreement dated September 24, 2012 between Med One Capital Funding, LLC and Specialty Hospital of Washington.

63.     Lease Agreement dated December 12, 2012 between Specialty Hospital of Washington-Capitol Hill, LLC and XEROX Corporation.

64.     Hospital Services Agreement dated August 1, 2006 by and between Aetna Health Inc. and The Specialty Hospital of Washington.

65.     Skilled Nursing Facility Services Agreement effective January 1, 2014 by and between AmeriHealth District of Columbia, Inc. and Capitol Hill Nursing Center.

66.     Hospital Provider Agreement effective November 1, 2013 by and between AmeriHealth District of Columbia, Inc. and Specialty Hospital of Washington.

67.     Hospital Provider Agreement effective November 1, 2013 by and between AmeriHealth District of Columbia, Inc. and Specialty Hospital of Washington Hadley.

68.     DC Chartered Healthcare Plan, Inc. Hospital Services Agreement with Capitol Community Hospital d/b/a MedLink Hospital and Capitol Hill Nursing Center effective March 15, 2007

69.     Ancillary Services Agreement between Connective General Life Insurance Company and Capitol Hill Nursing Center Effective July 15, 2012.

70.     Ancillary Services Agreement between Connecticut General Life Insurance Company and The Specialty Hospital of Washington effective July 15, 2012.

71.     Ancillary Services Agreement between Connecticut General Life Insurance Company and The Specialty Hospital of Washington effective July 15, 2012.

72.     Participating Provider Agreement between Southern Health Services, Inc. and SHA-Hadley SNF, LLC effective August 1, 2008.

Exhibit A

73.    Participating Provider Agreement between Southern Health Services, Inc. and The Specialty
Hospital of Washington-Hadley effective August 1, 2008.

74.    Participating Provider Agreement between Southern Health Services, Inc. and The Specialty
Hospital of Washington effective August 1, 2008.

75.    Participating Provider Agreement between Southern Health Services, Inc. and The Specialty
Hospital of Washington effective August 1, 2008.

76.    Participating Provider Agreement between Southern Health Services, Inc. and Capitol Hill
Healthcare Group effective August 1, 2008.

77.    Facility Provider Agreement between Health Net Federal Services and The Specialty Hospital of
Washington –Hadley effective February 1, 2007.

78.    Hospital Services Agreement between Kaiser Foundation Health Plan of the Mid-Atlantic States,
Inc. and The Specialty Hospital of Washington effective November 1, 2013.

79.    Hospital Services Agreement between Kaiser Foundation Health Plan of the Mid-Atlantic States,
Inc. and The Specialty Hospital of Washington –Hadley effective November 1, 2013.

80.    Medicaid Amendment to Hospital Services Agreement between Kaiser Foundation Health Plan
of the Mid-Atlantic States, Inc. and The Specialty Hospital of Washington –Hadley effective July
1, 2013.

81.    Ancillary Provider Participation Agreement between MedStar Family Choice, Inc. and The
Specialty Hospital of Washington effective October 10, 2013.

82.    Plan/Referral Hospital Participation Agreement between Thrive Health Plans, Inc. and Specialty
Hospital of Washington effective July 1, 2013.

83.    Plan/Referral Hospital Participation Agreement between Thrive Health Plans, Inc. and Specialty
Hospital of Washington effective July 1, 2013.

84.    Network Participation Agreement between Unison Administrative Services, LLC and Capitol Hill
Healthcare Group dba Capitol Hill Nursing Center effective July 31, 2008.

85.    Network Participation Agreement between Unison Administrative Services, LLC and The
Specialty Hospital of Washington dba The Specialty Hospital of Washington -Capitol Hill effective
July 31, 2008.

86.    Facility Participation Agreement between UnitedHealthcare of the Mid-Atlantic, Inc. and The
Specialty Hospital of Washington dba The Specialty Hospital of Washington -Capitol Hill effective
August 1, 2008.

87.    Facility Participation Agreement between UnitedHealthcare of the Mid-Atlantic, Inc. and The
Specialty Hospital of Washington-Hadley effective August 1, 2008.

Exhibit A

88.    Agreement for Consultation Services between Specialty Hospital of Washington, LLC and Charge Capture Services, Inc. dated February 24, 2010.

89.    Independent Contractor Agreement between Specialty Hospital of Washington and Jerome Perry effective February 1, 2014.

90.    Agreement for Consultation Services between Specialty Hospital of Washington, LLC and Leonard Smith dated May 10, 2009.

91.    Transcription Services Agreement by and between Perry Johnson & Associated Incorporated and Specialty Hospital of Washington Hadley effective May 1, 2014.

92.    Engagement Agreement between Reed Smith LLP and Specialty Hospitals of America, LLC dated July 14, 2010.

93.    Retainer Agreement between Rosenau & Rosenau and Specialty Hospital of Washington dated August 9, 2010.

94.    Agreement for Consultative Services between Specialty Hospital of Washington Capitol Hill, LLC and Sandra Swann dated March 25, 2011.

95.    Program Medical Director Agreement made April 4, 2007 by and between The Specialty Hospital of Washington-Hadley, LLC and Khosrow Davachi, M.D.

96.    Program Medical Director Agreement made May 13, 2008 by and between The Specialty Hospital of Washington-Hadley, LLC and Khosrow Davachi, M.D.

97.    Program Medical Director Agreement made on June 18, 2007 by and between the Specialty Hospital of Washington-Hadley, LLC and Capitol Care Medical Associates, PLLC.

98.    Medical Director Agreement made October 28, 2010 by and between The Specialty Hospital of Washington, LLC and Krishna Dass, MD.

99.    Physician Agreement effective February 2, 2013 between Jonathan Drysdale, MD and The Specialty Hospital of Washington.

100.   Professional Services Agreement effective December 1, 2005 by and between Specialty Hospitals of America, LLC and Eric F. Rieseberg.

101.   Physician Agreement effective November 1, 2007 between Mohammad Hoque, MD and The Specialty Hospital of Washington.

102.   Physician Agreement, effective April 29, 2013 between Laura Kharsa, MD and The Specialty Hospital of Washington.

103.   Pulmonary Program Medical Director Agreement dated March 14, 2014 by and between The Nursing Center of Specialty Hospital of Washington, LLC and Leslie Kingslow, MD.

Exhibit A

104.   Physician Agreement effective November 1, 2010 between Homayoon Mahjoob, MD and The Specialty Hospital of Washington d/b/a The Specialty Hospital and Nursing Center at Capitol Hill.

105.   Service Purchase Agreement entered into April/July 1, 2010 by and between Dr. Massoud Nemati and The Specialty Hospital of Washington-Hadley LLC.

106.   Program Medical Director Agreement made February 1, 2008 by and between The Specialty Hospital of Washington-Hadley. LLC and Massoud Nemati, MD.

107.   Physician Agreement effective July 23, 2012 between Shahin Oveisi, MD and The Specialty Hospital of Washington.

108.   Physician Agreement between Faullin Paletsky, MD and The Specialty Hospital of Washington d/b/a The Specialty Hospital of Washington Hospital and Nursing Center at Capitol Hill.

109.   Medical Director Agreement made January 1, 2007 by and between SHA Hadley SNF LLC and Edgar Potter, MD.

110.   Medical Director Agreement made on May 1, 2007 by and between The Specialty Hospital of Washington, LLC and Manisha Singal, MD.

111.   Medical Director Agreement by and between Capitol Hill Health Care Group d/b/a Specialty Hospital of Washington-Capitol Hill Nursing Center and Manisha Singal effective August 1, 2009.

112.   Physician Agreement effective November 6, 2009 between Kathryn Sowerine, MD and The Specialty Hospital of Washington d/b/a The Specialty Hospital of Washington Hospital and Nursing Center at Capitol Hill.

113.   Physician Agreement effective December 1, 2013 between Mestawet Teka, MD and The Specialty Hospital of Washington d/b/a The Specialty Hospital of Washington Hospital and Nursing Center at Capitol Hill.

114.   Physician Agreement effective June 11, 2009 between Heshem Vababzadeh-Monshie, MD and The Specialty Hospital of Washington d/b/a The Specialty Hospital of Washington Hospital and Nursing Center at Capitol Hill.

115.   Dental Services Agreement made December 31, 2001 by and between PACIN Healthcare-Hadley Memorial Hospital Corporation and William Vaughan, DDS (with all amendments thereto).

116.   Physician Agreement effective August 31, 2013 between Firew Wubiee, MD and The Specialty Hospital of Washington d/b/a The Specialty Hospital of Washington Hospital and Nursing Center at Capitol Hill.

117.   Program Medical Director Agreement made on April 4, 2007 by and between The Specialty Hospital of Washington-Hadley, LLC and Meersaiid Zonozi, MD.

689855/10/PHOENIX

Exhibit B

DIP Facility Term Sheet

See attached.

Debtor-in-Possession Term Loan/ Lender Sponsored Transaction

Term Sheet

May 18, 2014

| | |
|---|---|
| **Borrowers:** | Specialty Hospitals of America, LLC, SHA Management, LLC, Specialty Hospitals of Washington, LLC (*"SHW"*), Specialty Hospitals of Washington-Nursing Center, LLC, Specialty Hospital of Washington-Hadley, LLC, SHA Holdings, Inc. and SHA Hadley SNF, LLC (collectively, the *"Borrowers"*). |
| **Guarantors:** | None |
| **Lender:** | DCA Acquisitions, LLC or its assigns (the *"Lender"*). |
| **Agent:** | DCA Finance, LLC (the *"Agent"*). |
| *DIP LOAN* | |
| **Type:** | Debtor-in-Possession Term Loan (the *"DIP Loan"*) and potential emergence transaction as part of the Borrowers' voluntary chapter 11 bankruptcy cases filed in the District of Columbia (the *"Cases"*). |
| **Bankruptcy Status:** | A precondition to the funding of the DIP Loan is filing of voluntary chapter 11 cases by each of the Borrowers in the United States Bankruptcy Court for the District of Columbia (the *"DC Court"*) and, as to SHW, consent to entry of an order for relief in the DC Court. The date on which the Cases are filed in the DC Court is the *"Petition Date"*. |
| **Commitment:** | Up to $15 million (the *"Commitment"*), with $10 million available to fund the Approved Budget (as defined below), to be funded on a weekly basis, commencing after entry of the Interim Order (as defined below), and $5 million set aside as a cash reserve. |
| **Interim Disbursement:** | Upon entry of an interim financing order (the *"Interim Order"*) by the Court under Bankruptcy Code § 364(c) and (d) (in form and substance agreeable to the Borrowers, the Lender and the Agent), up to $6.6 million of the Commitment shall be funded by the Lender, on a weekly basis and pursuant to the terms of the Approved Budget (as defined below) (the *"Interim Disbursement"*). <br><br> The Interim Disbursement shall also include the funding of (i) a $450,000 retainer for Pillsbury Winthrop Shaw Pittman, LLP, bankruptcy counsel for the Borrowers and (ii) a $100,000 retainer for Alvarez & Marsal, financial advisor for the Borrower, as part of the Interim Disbursement, which amount shall be reduced dollar for dollar against any amounts that the Court authorizes Pillsbury and Alvarez to roll up from any pre-petition retainer received by such counsel (and satisfy unpaid pre-petition fees and expenses approved by the Court). |
| **Final Disbursement:** | Upon entry of a final financing order (the *"Final Order"*) by the Court under Bankruptcy Code § 364(c) and (d) (in form and substance agreeable to the Borrowers, the Lender and the Agent), the balance of the Commitment shall be made available by the Lender on a weekly basis pursuant to the |

| | terms of the Approved Budget (the **"Final Disbursement"**). |
|---|---|
| **Funding Date:** | Funding under the DIP Loan in accordance with the Approved Budget with respect to the Interim Disbursement shall begin as soon as practicable after the entry of the Interim Order, but no later than two (2) business days after entry of such order (the **"Interim Closing Date"**). |
| | Funding of the DIP Loan in accordance with the Approved Budget with respect to the Final Disbursement shall begin as soon as practicable after the entry of the Final Order, but no later than two (2) business days after entry of such order (the **"Final Closing Date"**). |
| | The DIP Loan shall be governed by the Interim Order and the Final Order (the **"DIP Orders"**), this Term Sheet (which is binding until superseded by the DIP Credit Agreement, as defined herein), a loan agreement between the Lender, the Agent and the Borrowers (with all related documentation, the **"DIP Credit Agreement"**), and such other documents and agreements required by the Lender and the Agent (collectively, the **"Loan Documents"**). |
| **Use of Proceeds:** | Proceeds of the DIP Loan shall be utilized as follows: (i) general working capital and operational expenses; (ii) administration of the Cases (in each case of (i) and (ii), in accordance with a weekly cash flow budget prepared by the Borrowers and approved by the Lender, in form and substance acceptable to the Lender and the Agent on a line-by-line basis (the **"Approved Budget"**); and (iii) costs, expenses, closing payments, and all other payment amounts contemplated herein. |
| | The Approved Budget shall include forecasts of revenues and receipts, expenses (including restructuring expenses and expenses arising on account of the Cases including Professional Fees), statements of cash flows, and applicable assumptions, prepared by the management and/or financial advisors of the Borrowers; such Approved Budget may be updated and revised by the Borrowers from time to time in form and substance satisfactory to the Lender and the Agent, and upon approval of such revised budget, it shall become the Approved Budget. |
| | On the second business day of each week, the Borrowers shall update the Approved Budget on a weekly, rolling basis and shall deliver a variance analysis with respect to the Borrowers' actual revenue, collections and expenses during the prior week measured on a line item basis against the Approved Budget and indicate whether it is in substantial compliance with the Approved Budget and the terms of the DIP Loan, in each case in form and substance satisfactory to the Lender and the Agent. In connection with delivery of the weekly updated Approved Budget, the Borrowers shall clearly identify to the Lender and the Agent any changes made from the prior Approved Budget. |
| **Carveout:** | The liens, security interests, and Superpriority Administrative Expense Claims (as defined below) granted in favor of the Lender and the Agent in connection with the DIP Loan shall be subject to a carveout (the **"Carveout"**) for (i) the payment of U.S. Trustee fees, (ii) the payment of all court-approved fees and expenses of professionals retained by the Borrowers, professionals retained by the official committee of unsecured creditors, once appointed (the **"Committee"**), and any patient care ombudsman appointed in the Cases (collectively, the **"Professional Fees"**) incurred during the Cases in accordance with the Approved Budget prior to the occurrence of an Event of Default (as defined below) under the DIP Loan, but that remain unpaid as of such date, in an amount not to exceed the aggregate amount set forth in the Approved Budget (without regard to any permitted variance under the Approved Budget) for the time period up to the date of an Event of Default and (iii) an amount up to $250,000 for the payment of Professional Fees incurred from and after the occurrence of an Event of Default under the DIP Loan following entry of the |

| | |
|---|---|
| | Final Order. Other than the Carveout, the DIP Loan shall not otherwise be subject to any carveout for Professional Fees. |
| Interest: | LIBOR + 1200 per annum with a 2% floor (the *"Interest"*). Interest shall be due and payable monthly in cash in arrears. |
| Default Interest: | Upon the occurrence of an Event of Default (as defined below) and during the continuation of such default, interest shall accrue on the outstanding amounts at 3% in excess of applicable interest rate (the *"Default Interest"*). |
| DIP Fee: | Two percent (2%) of the Commitment, earned in full at the commencement of the DIP Loan and payable on the earliest of the Due Date (as defined below and without regard to any agreed extension thereof), an Event of Default (as defined below) and the consummation of a Sale. |
| Collateral Monitoring Fee: | One percent (1%) of the Commitment, earned in full at the commencement of the DIP Loan and payable on the earliest of the Due Date (as defined below) (without regard to any agreed extension thereof), an Event of Default (as defined below), and the consummation of a Sale. |
| Call Premium: | A call premium of 3% (at 103) of the Commitment, payable in full upon the Due Date, provided that the call premium shall be waived by Lender upon a closing of the Lender-Sponsored Transaction. |
| Agent Fee: | $40,000, which amount shall be payable in cash to the Agent no later than two (2) business days after entry of the Interim Order and shall be non-refundable. |
| Costs/ Expenses: | The Borrowers shall reimburse the Agent and the Lender for all reasonable costs and expenses incurred in connection with (i) the DIP Loan, (ii) the DIP Loan Obligations (as defined below) and (iii) any expense reimbursement the Borrowers are obligated to pay pursuant to the terms of the APA as part of the Lender Sponsored Transaction (as defined below), including, without limitation, legal fees, advisor fees, consultant fees, costs and expenses, collateral valuations, appraisals, surveys, field examinations, third party diligence, lien searches, filing fees, and all other out-of-pocket costs and expenses in any way related to the DIP Loan, the DIP Loan Obligations and the enforcement and collection thereof (collectively, the *"Costs and Expenses"*). In the event that the DIP Loan is not consummated, the Lender and the Agent shall have the right to seek reimbursement of all reasonable Costs and Expenses incurred with respect thereto as an administrative expense of the Borrowers' bankruptcy estates pursuant to Bankruptcy Code § 503(b), and the Borrowers hereby acknowledge and agree that such amount shall constitute an administrative expense of the Borrowers' bankruptcy estates. |
| Term: | Any and all then current outstanding principal amount of the DIP Loan (the *"DIP Loan Principal"*) plus any unpaid accrued Interest or Default Interest (as the case may be) plus any Costs and Expenses and other amounts due under the DIP Loan, this Term Sheet, the DIP Credit Agreement, the Interim Order and the Final Order (each, a *"DIP Loan Obligation"* and collectively, the *"DIP Loan Obligations"*) shall become due and payable in full in cash upon the earlier of the following (the *"Due Date"*): (i) thirty-five (35) days after the Petition Date; (ii) the substantial consummation (as defined in Bankruptcy Code § 1101 and which for purposes hereof shall be no later than the effective date) of a confirmed plan of reorganization; (iii) conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code; (iv) appointment of a trustee for the Borrowers; (v) dismissal of any of the Cases; (vi) twenty (20) days after the entry of the Interim Order if the Final Order has not been entered prior to the expiration of such twenty (20) day period; (vii) the date on which the Court enters a final order approving a post-petition financing between the Borrowers and another |

| | |
|---|---|
| | lender(s) or investor(s) (as the case may be) (other than the Lender); (viii) consummation of a sale of substantially all of the Borrowers' assets under Bankruptcy Code § 363; (ix) the date on which the Court enters an order approving a sale of any of the Borrowers' assets under Bankruptcy Code § 363 to any party other than the Lender; and (x) five (5) business days after the Agent or the Lender notifies the Borrowers and their counsel in writing of an Event of Default which is not subsequently cured or waived by the end of such notice period; provided, however, that if the Court has entered an order approving the Lender Sponsored Transaction and all conditions to the closing of that Transaction have been satisfied except for the requirement that all regulatory approvals have been received, then the Due Date shall be extended for up to sixty (60) days pursuant to the Approved Budget. The Lender may further extend the Due Date in its sole discretion. In the event that the parties consummate a Lender Sponsored Transaction, as referred to below, the DIP Loan Obligations will be treated in accordance with the terms of such Lender Sponsored Transaction. |
| **DIP Collateral:** | The DIP Loan shall be secured by: (i) a perfected first priority lien on any and all current and future assets of the Borrowers of any nature or type whatsoever, including, without limitation, cash, accounts, accounts receivable (including, without limitation, all cash proceeds from Medicare/Medicaid receivables/reimbursement), goods, instruments, investment property (including, without limitation, ownership interests in corporations, partnerships and limited liability companies), inventory, vehicles, customer lists, trademarks, copyrights, brands, know-how and other intellectual property, minerals, mineral rights, plant and equipment, patents, trade secrets, tax assets, real property and/or leasehold rights, personal property, any causes of action under the Bankruptcy Code or applicable non-bankruptcy law, excluding causes of action and recoveries pursuant to Chapter 5 of the Bankruptcy Code, all other tangible and intangible assets, and any and all proceeds of the foregoing; and (ii) constructive control over the Borrowers' bank accounts in similar form and substance of lockbox and/or control accounts customary for transactions of this nature (including, in the case of those accounts which receive the collected proceeds of Medicare and Medicaid accounts receivable, subject to the special rules and limitations applicable thereto) exercisable upon an Event of Default and stay relief from the Court, or as may be provided in the Interim Order and Final Order, except that duly perfected real property tax liens, if any, shall not be primed (collectively the *"DIP Collateral"*). |
| **Superpriority Administrative Expense Claim and Priming Lien:** | The DIP Loan shall be authorized and approved by the Court pursuant to Bankruptcy Code § 364(c)(1) to be incurred as, and shall constitute, claims with a priority over all administrative expenses of the kind specified in Bankruptcy Code § 503(b) or 507(b) (the *"Superpriority Administrative Expense Claim"*). The security interests and liens in the DIP Collateral securing the DIP Loan shall be authorized and approved by the Court pursuant to Bankruptcy Code § 364(c)(2), (3), and 364(d) to constitute a lien on and in the DIP Collateral ranking prior to all other claims and liens of the Borrowers, except for the Carveout as defined below (the *"Priming Lien")*. The Priming Lien will be senior in priority to security interests and liens securing the indebtedness and other obligations owing under any of the Borrowers' prepetition loan and security agreements and other liens, except duly perfected real property tax liens, if any. The Priming Lien shall not be subject to challenge, but instead shall attach and become valid and perfected without the requirement of any further action by the Agent or the Lender.

A governmental unit (as defined in the Bankruptcy Code), including without limitation the U.S. Department of Health and Human Services, CMS, all applicable State Medicaid and health agencies, and the departments, divisions and agencies thereof (a *"Governmental Entity"*) to collect pre-petition overpayments from the Borrowers shall be governed by the DIP Orders and shall have no right to recoup provider reimbursement |

| | |
|---|---|
| | overpayments that were made to a Borrower from any amounts due to such Borrower other than to recoup such overpayments that arise under the same provider agreement or comparable applicable statutes, regulations, or arrangements, only in accordance with applicable law.

All of the liens described herein, including the Priming Lien, shall be effective and perfected on the date of entry of the Interim Order. |
| Release: | The Borrowers shall release and waive any and all claims, causes of action, counterclaims, set-offs and defenses of any kind or nature whatsoever against the Agent and the Lender relating to any acts, omissions or conduct of the Agent and the Lender arising on or before the Interim Closing Date and the Final Closing Date, as applicable, pursuant to a release set forth in the Interim Order and the Final Order, as applicable, in form and substance acceptable to the Agent and the Lender. |
| Indemnification: | The Borrowers will indemnify and hold harmless the Lender and the Agent and their respective members, officers, directors, employees, affiliates, successors, assigns, agents, counsel and other advisors (collectively, the *"Indemnified Parties"*) from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of, or in connection with the preparation for a defense of, any investigation, litigation or proceeding arising out of, related to or in connection with (a) the DIP Loan, the transactions contemplated thereby, and any use made or proposed to be made with the proceeds thereof or (b) the Cases, whether or not such investigation, litigation or proceeding is brought by the Borrowers, their shareholders or creditors or an Indemnified Party, or an Indemnified Party is otherwise a party thereto, except to the extent such claim, damage, loss, liability or expense is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. |
| Receivable Collection and Billing Procedures: | The Borrowers shall (i) maintain and retain adequate management, staffing and third party consultants, and shall have developed a satisfactory plan to oversee and implement the billing and collection of receivables in a manner reasonably acceptable to the Agent, including obtaining approval by the Agent of any significant "bulk" compromises on receivables; and (ii) consult with the Agent regarding any significant changes to the personnel engaged in the billing, collection and reporting of receivables, outside consultants and advisers and outsource firms.

The Borrowers shall have engaged financial consultants, restructuring advisors and/or other advisors, reasonably acceptable to the Agent, for a scope of services reasonably acceptable to the Agent. |
| Representations and Warranties: | The Borrowers shall make usual and customary representations and warranties for transactions of this nature, including, without limitation, good standing of each of the Borrowers; no consent or approval is required other than the Interim Order and the Final Order; due authorization, execution and delivery of loan documents; no violation of material agreements entered into after the commencement of the Cases; no violation of law as a result of the execution of the DIP Loan Documents; no liens on the assets of the Borrowers except for valid, perfected and non-avoidable liens and security interests in existence as of the commencement of the Cases and certain other liens permitted by the Agent and the Lender; compliance with applicable laws and regulations; no material change in business; no unstayed litigation that is reasonably likely to have a material adverse effect on the operations of the Borrowers taken as a whole; no |

| | information furnished by Borrowers to the Agent or Lender or the Court contains any material misstatement of fact or omitted to state a material fact necessary to make the statements therein not materially misleading; taxes paid to the extent required by law; and material returns filed. |
|---|---|
| **Reporting Requirements:** | Customary reporting requirements for debtor-in-possession financing facilities and as otherwise determined by the Agent, in consultation with the Borrowers. Among other things, (i) Borrowers shall promptly and in no event later than two (2) business days following actual knowledge or receipt thereof provide a complete description, with copies of all relevant documentation, of any material communication to or from any governmental entity; and (ii) Borrowers shall promptly inform the Lender and the Agent of any professional engagements and outsourcing of services. |
| **Covenants:** | The Borrowers shall comply with all of the following covenants: |

1. The Borrowers shall promptly provide the Agent with updates of any material developments in connection with the Borrowers' reorganization efforts under the Cases;

2. The Borrowers shall deliver the Approved Budget as updated on a weekly basis to the Agent (in form and substance reasonably acceptable to the Agent), including, without limitation, forecasts, sales pipeline, accounts receivable and cash flow;

3. The Borrowers shall deliver a semi-monthly payroll report to the Agent (in form and substance reasonably acceptable to the Agent).

4. The Borrowers shall operate their businesses in accordance with the Approved Budget (subject to a permitted variance of: (i) 25% per category in week one; and (ii) 10% per category thereafter as measured on a cumulative basis), and the requirements of the Bankruptcy Code and orders of the Court;

5. Without the prior written consent of the Agent or the Lender, the Borrowers shall not seek or consent to occur any of the following:

   a. Any order which authorizes the assumption or rejection of any leases or contracts of any of the Borrowers without the Agent's prior written consent;

   b. Any modification, stay, vacation or amendment to the Final Order to which the Agent has not consented in writing;

   c. A priority claim or administrative expense or unsecured claim against any of the Borrowers (now existing or hereafter arising of any kind or nature whatsoever, including without limitation, any administrative expense of the kind specified in Bankruptcy Code § 105, 326, 328, 330, 331, 364(c) 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114) equal or superior to the priority claim of the Agent and the Lender in respect of the obligations hereunder, except with respect to the Carveout;

   d. Any lien on any DIP Collateral having a priority equal or superior to the lien securing the obligations hereunder, other than with respect to the Carveout;

   e. Any order which authorizes the payment of any indebtedness incurred prior to the Petition Date other than to employees or vendors, the services or goods of which are essential to continued operations and such payments are in accordance with the Approved Budget and approved by an order of the Court;

   f. Any order seeking authority to take any action that is

| | |
|---|---|
| | prohibited by the terms of this Term Sheet, the DIP Credit Agreement, the Interim Order or the Final Order or refrain from taking any action that is required to be taken by the terms of this Term Sheet, the Interim Order or the Final Order; or<br><br>g    Any other action that would materially adversely affect the Agent or the Lender in any way without the prior written consent of the Agent or the Lender;<br><br>6. The Borrowers shall take, in consultation with the Agent and the Lender, all reasonable actions necessary to pursue and consummate the Lender Sponsored Transaction. |
| **Asset Sales:** | The Borrowers shall not sell any material assets outside the ordinary course of business, except in connection with a sale under § 363 of the Bankruptcy Code, in each case without the consent of the Lender and the Agent. All proceeds of DIP Collateral shall be immediately applied to the DIP Loan, subject to a hold-back reserve in an amount consistent with the Approved Budget and to be agreed upon by the Borrower and the Lender for funding the wind-down of the Borrowers. |
| **Closing Conditions:** | This Term Sheet is subject to, amongst other items, the following:<br><br>1. The filing of all the Cases before the DC Court and, as to SHW, consent to entry of an order for relief in the DC Court;<br><br>2. Entry of the Interim Order and Final Order by the Court, authorizing borrowing pursuant to this Term Sheet and the DIP Credit Agreement;<br><br>3. Prior to the date of the final hearing on the DIP Loan, execution of the DIP Credit Agreement and any other definitive legal documentation with respect to the DIP Loan acceptable to the Agent and Lender in their sole discretion; and<br><br>4. Prior to the date of the final hearing on the DIP Loan, execution of the APA and any related documentation with respect to the Lender-Sponsored Transaction acceptable to the Agent and Lender in their sole discretion. |
| **Event(s) of Default:** | Each of the following shall constitute an **"Event of Default"**, unless otherwise waived by the Agent in its sole discretion:<br><br>1. The Final Order is not entered within 20 days following the entry of the Interim Order;<br><br>2. Borrowers shall fail to pay any DIP Loan Obligation in cash after such payment has become due;<br><br>3. Any governmental unit, including any departments, agencies or fiscal intermediaries thereof, shall seek to recoup or setoff provider reimbursement overpayments that were made to the Borrowers from any amounts due to the Borrowers or to obtain a lien through any means which is equal or senior to the liens of the DIP Lender on the DIP Collateral, to the extent such recoupment or setoff exceeds, as to any Borrower entity, $125,000 in the aggregate, since the Petition Date, or $25,000, as to any single recoupment;<br><br>4. Any report, certificate or other document delivered to the Agent or the Lender pursuant to this Term Sheet, the DIP Credit Agreement, the Interim Order or the Final Order shall have been incorrect in any material respect when made or deemed made;<br><br>5. The failure of Borrowers to comply in all material respects with any covenant, agreement or terms and conditions of the Interim Order, the Final Order, this Term Sheet, and the DIP Credit Agreement; |

6. Any of the Borrowers is enjoined, restrained or in any way prevented by the order of any court or any governmental authority from conducting all or any material part of its business for more than three (3) consecutive days;

7. Any material adverse change in the Borrowers' operations, in the sole discretion of the Lender (including, without limitation, CMS or D.C. Medicaid transferring patients, terminating provider relationships, or withholding or offsetting payments);

8. Any material damage to, or loss, theft or destruction of, any DIP Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty (whether or not insured) which causes, for more than three (3) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Borrowers, if any such event or circumstance could reasonably be expected to have a material adverse effect;

9. The entry of an order in the Cases which stays, modifies (in any manner adverse to the Agent or the Lender), or reverses the Interim Order or Final Order or which otherwise materially adversely affects, as determined by the Agent in its reasonable discretion, the effectiveness of the Interim Order or Final Order without the express written consent of the Agent;

10. The conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code;

11. The appointment of a trustee for any of the Borrowers;

12. The dismissal of any of the Cases; provided that the Agent and the Lender have not consented in writing to such dismissal;

13. The entry of any order which provides relief from the automatic stay otherwise imposed pursuant to Bankruptcy Code § 362 that permits any creditor to (i) realize upon, or to exercise any right or remedy with respect to, any material portion of the DIP Collateral, or (ii) to terminate any license, franchise or similar agreement, wherein either case the exercise of such right or remedy or such realization or termination would be reasonably likely to have a material adverse effect;

14. Subject to the allowance and payment of any amounts due under the Carveout, the filing of any application by Borrowers without the express written consent of the Agent for the approval of a super-priority claim in the Cases which is pari passu with or senior to the priority of the claims of the Agent or the Lender, or there shall arise any such super-priority claim under the Bankruptcy Code;

15. The payment by Borrowers of any prepetition indebtedness without the written consent of the Agent or Lender, other than payment to employees or vendors, the services or goods of which are essential to continued operations, and such payments are in accordance with the Approved Budget and approved by an order of the Court;

16. The filing of any motion by Borrowers seeking, or the entry of any order in the Cases: (a) permitting working capital or other financing (other than ordinary course trade debt, unsecured debt and insurance premium financing) for any of the Borrowers from any person other than the Lender or Agent (unless the proceeds of such financing are to be used to pay in full in cash all obligations arising under this Term Sheet, the DIP Credit Agreement, the Interim Order and the Final Order); (b) granting a lien on, or security interest in, any of the DIP Collateral, other than with respect to this Term Sheet (unless such liens are granted in connection with a financing, the

proceeds of which are to be applied to the payment in full in cash of all obligations arising under this Term Sheet, the DIP Credit Agreement, the Interim Order and the Final Order, and other than liens granted as adequate protection for pre-petition liens on the Borrowers' assets, which adequate protection liens are junior in priority to the Lender's super priority priming liens); (c) except as permitted by this Term Sheet, the DIP Credit Agreement, the Interim Order or the Final Order, permitting the use of any of the DIP Collateral pursuant to Bankruptcy Code § 363(c) without the prior written consent of the Agent, or permitting recovery from any portion of the DIP Collateral any costs or expenses of preserving or disposing of such DIP Collateral under Bankruptcy Code § 506(c); or (d) dismissing the Cases, unless the Agent has sought or consented in writing to such relief by the Court;

17. The filing of a motion or other pleading by the Borrowers seeking the entry of an order confirming a plan of reorganization (and/or approving a disclosure statement related thereto) that does not require payment in full in cash of all obligations under this Term Sheet, the DIP Credit Agreement, the Interim Order and the Final Order on the consummation date of such plan of reorganization, and as to which Lender has not consented in writing;

18. On or before 95 days after the Petition Date, the Lender has not (x) reached agreement with D.C. Medicaid and CMS Medicare for the issuance or transfer of, respectively, the Medicaid and the Medicare operating numbers, (y) reached agreement with CMS, DOJ and DC Medicaid as to the level of assumed liability of the Lender and related caps on recoupment rights, all as acceptable to the Lender, (z) reached agreement with any other governmental entity with regard to the liability of the Lender, all at levels acceptable to the Lender or its assignee;

19. The Lender or the Agent determine in good faith that any of the Regulatory Approvals required as a condition to closing the Sale pursuant to the terms of the APA are not reasonably likely to be obtained;

20. The filing of any pleading by any of the Borrowers challenging the validity, priority, perfection or enforceability of this Term Sheet, the DIP Credit Agreement or the DIP Orders or the obligations hereunder, or any lien granted pursuant to this Term Sheet, the DIP Credit Agreement, the Interim Order or the Final Order is determined to be null and void, invalid or unenforceable by the Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Cases;

21. The Court enters an order approving a sale of any of the Borrowers' assets to any party other than the Lender;

22. Borrowers shall have breached the terms of the APA or any related documentation, including the bid procedures, for the Lender-Sponsored Transaction; or

23. Borrowers shall have failed to satisfy any of the Milestones (set forth below) without prior consent of the Lender.

| | |
|---|---|
| Default Remedies: | Upon five (5) business days' written notice to the Borrowers and their counsel of an Event of Default which is not subsequently cured or waived during such notice period:<br><br>1. The DIP Loan shall mature and any and all DIP Loan Obligations shall become due and payable in full in cash;<br><br>2. The Agent and the Lender shall have standing to move for an order to cause the Borrowers to engage in a process to liquidate |

| | their assets pursuant to Bankruptcy Code § 363; and |
| | 3. The Agent and the Lender shall have the right to an emergency hearing requesting relief from the automatic stay otherwise imposed pursuant to Bankruptcy Code § 362 that permits the Agent and the Lender to realize upon, or to exercise any right or remedy with respect to, any portion of the DIP Collateral. |
| Prepayment(s): | The Borrowers shall have the right (but not the obligation) to prepay the DIP Loan Obligations (in cash) in whole or in part. There shall be no prepayment penalty or premium, except as provided herein. |
| Reservation of Rights: | Nothing in this Term Sheet is intended or shall be construed to waive any of the Agent's or the Lender's rights to object to or otherwise contest the reasonableness of the fees and expenses of the Professionals. Such rights are hereby reserved in their entirety. |
| | The Agent and the Lender shall, as a condition of the DIP Loan, have the right under Bankruptcy Code § 363(k) to credit bid up to the full amount of the DIP Loan Obligations in connection with any sale of the Borrowers' assets whether or not under a plan of reorganization or otherwise (the *"Credit Bid Right"*). The Credit Bid Right shall be approved by the Court pursuant to the Interim Order and the Final Order, and shall be a condition to consummating the DIP Loan. |
| **LENDER SPONSORED TRANSACTION** | |
| Lender Sponsored Transaction: | The Borrowers and the Lender will cooperate to develop and implement a restructuring (the *"Lender Sponsored Transaction"*) through a sale of substantially all of the Borrowers' assets free and clear of all liens, claims, encumbrances and interests pursuant to Bankruptcy Code § 363 (the *"Sale"*). The Lender (or its designee) shall be designated as the "stalking horse" purchaser for the Sale pursuant to the terms and conditions set forth in the APA Term Sheet attached hereto as Exhibit A (the *"Stalking Horse Bid"*). The agreements, instruments and other documents necessary to implement and consummate the Lender Sponsored Transaction (collectively, the *"APA"*) shall be on terms and conditions acceptable to the Agent or the Lender. |
| Milestones: | The Borrowers shall satisfy certain deadlines in the Case as follows (each of which may be extended by an agreement in writing between the Borrower, and the Lender or the Agent): |
| | 1. On the Petition Date, the Borrowers shall have filed a motion (the *"Sale Motion"*) to establish bidding procedures for the Sale and identified the Lender (or its designee) as the "stalking horse" purchaser, and to approve the Sale, which motion shall be in form and substance reasonably acceptable to the Lender and the Agent. |
| | 2. Within nine (9) days of the Petition Date, the Bankruptcy Court shall have entered an order approving bidding procedures for the Sale, which order shall be in form and substance reasonably acceptable to the Lender and the Agent. |
| | 3. Within thirty-five (35) days of the Petition Date, the Bankruptcy Court shall have entered an order approving a Sale, which order shall be in form and substance reasonably acceptable to the Lender and the Agent. |

4.  In the event that the Lender is the successful bidder and all other conditions to closing the Sale have been met except for the required regulatory approvals, and the Court has approved the appointment of management to run Borrowers' operations that is acceptable to Lender, Lender will continue to fund the DIP in accordance with an approved budget (approved by Lender in its sole discretion) for an additional sixty (60) days in order to consummate the Sale.

This Term Sheet is not, and shall not be deemed to be, a binding agreement by the Agent or the Lender to provide the DIP Loan or the Lender Sponsored Transaction described herein. Such agreement will arise only upon the fulfillment, to the satisfaction of the Agent and the Lender, of the conditions precedent required by the Agent and the Lender as set forth herein.

This Term Sheet and the terms set forth herein are confidential until authorized by the Lender to be filed with the Court, and the Borrowers shall not disclose the terms of this Term Sheet, or the fact that negotiations between the Agent, the Lender and the Borrowers are ongoing, to any third party, including, without limitation, any other source of potential financing for the Borrowers.

*Acknowledged, Accepted and Agreed to as of the Date Set Forth Above:*

**Debtors:**

SPECIALTY HOSPITALS OF AMERICA, LLC, a
Delaware limited liability company

By:
Name:    EDWIN D. CIANL
Title:    SVP CFO

SPECIALTY HOSPITAL OF WASHINGTON-
HADLEY, LLC, a Delaware limited liability
company

By:
Name:    EDWIN D CIANL
Title:    SVP CFO

SPECIALTY HOSPITAL OF WASHINGTON-
NURSING CENTER, LLC, a Delaware limited
liability company

By:
Name:    EDWIN D. CIANL
Title:    SVP CFO

- 11 -

SHA HOLDINGS, INC., a Delaware corporation

By: _____
Name: _____EDWIN D CLARK_____
Title: _____SVP CFO_____

SHA MANAGEMENT, LLC, a Delaware limited
liability company

By: _____
Name: _____EDWIN D CLARK_____
Title: _____SVP CFO_____

SPECIALTY HOSPITAL OF WASHINGTON, LLC, a
Delaware limited liability company

By: _____
Name: _____EDWIN D CLARK_____
Title: _____SVP CFO_____

SHA HADLEY SNF, LLC, a Delaware limited
liability company

By: _____
Name: _____EDWIN D CLARK_____
Title: _____SVP CFO_____

- 12 -

Lender:

DCA ACQUISITIONS, LLC, a Delaware limited
liability company

By:
Name: Michael A. Gatto
Title: Authorized Signatory

Agent:

DCA FINANCE, LLC, a Delaware limited liability
company

By:
Name: Michael A. Gatto
Title: Authorized Signatory

# Exhibit E

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re:<br><br>SPECIALTY HOSPITAL OF<br>WASHINGTON, LLC, *et al.*,<br><br>Debtors.[1] | Case No. 14-00279<br><br>Chapter 11<br><br>(Joint Administration Requested) |

**NOTICE OF BID DEADLINE, AUCTION AND SALE**
**HEARING IN CONNECTION WITH THE**
**SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS**
**FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), seek to sell substantially all of their assets (the "**Assets**") free and clear of any and all liens, claims, and encumbrances.

2.      On May 21, 2014, the Debtors filed a motion (the "**Sale Motion**") with the United States Bankruptcy Court for the District of Columbia (the "**Court**") seeking, among other things, entry of an order (the "**Bidding Procedures Order**") (i) approving certain auction and bidding procedures in connection with the sale of substantially all of the Debtors' assets (the "**Bidding Procedures**"), (ii) authorizing the Debtors to enter into a stalking horse purchase agreement, subject to higher or otherwise better offers, (iii) approving procedures relating to the assumption and assignment of executory contracts and unexpired leases ("**Assumption and Assignment Procedures**"), (iv) scheduling an auction (the "**Auction**") and sale approval hearing (the "**Sale Hearing**"), (v) approving the form and manner of sale notice, and (vi) granting related relief.[2]

3.      On [May 30], 2014, the Court entered the Bidding Procedures Order.  All interested parties are invited to make offers to purchase the Acquired Assets in accordance with the Bidding Procedures and the Bidding Procedures Order. Copies of the Bidding Procedures and Bidding Procedures Order may be obtained by:  (a) written request to the Debtors' counsel, Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, D.C. 20037-1122 (Attn: Dania Slim; dania.slim@pillsburylaw.com); (b) accessing the Court's website at

---

[1]      The debtors in these chapter 11 cases and the last four digits of each debtor's federal identification number are:  Specialty Hospital of America, LLC (1347), SHA Holdings, Inc. (1943), SHA Management, LLC (1350), Specialty Hospital of Washington, LLC (1352), Specialty Hospital of Washington Nursing Center, LLC (1348), Specialty Hospital of Washington Hadley, LLC (2586), and SHA Hadley SNF, LLC (1976).

[2]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Sale Motion.

http://www.dcb.uscourts.gov (please note that a PACER password is needed to access documents on the Court's website); or (c) viewing the docket of these cases at the office of the Clerk of the Court, United States Bankruptcy Court for the District of Columbia, 333 Constitution Avenue, NW, Suite 1225, Washington, D.C. 20001. **All interested parties should carefully read the Bidding Procedures.**

4.      The deadline to submit offers to purchase the Acquired Assets is **[June 20, 2014] at 5:00 p.m. (prevailing Eastern Time)** (the "**Bid Deadline**").  Pursuant to the Bidding Procedures and Bidding Procedures Order, if one or more Qualified Bids (as defined in the Bidding Procedures), separate and apart from the bid of the Stalking Horse Purchaser, are received on or before the Bid Deadline, the Debtors will conduct the Auction commencing on **[June 23, 2014] at 10:00 a.m. (prevailing Eastern Time)**, at the offices of Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, D.C. 20037-1122 or such later time or such other place as the Debtors shall designate in a subsequent notice to all Qualified Bidders and Notice Parties (as defined in the Bidding Procedures), to determine the highest or otherwise best bid for the Acquired Assets (the "**Successful Bid**").

5.      Only an entity that has submitted a Qualified Bid (a "**Qualified Bidder**") in accordance with the Bidding Procedures to the following is eligible to participate in the auction: (i) counsel to the Debtors, Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, D.C. 20037-1122 (Attn: Patrick Potter, patrick.potter@pillsburylaw.com) and Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, NY (Attn: Andrew Troop, andrew.troop@pillsburylaw.com); (ii) the Debtors' financial advisor, Alvarez & Marsal Healthcare Industry Group, LLC, 600 Madison Avenue, 8th Floor, New York, NY 10022 (Attn: Ronald Winters, rwinterws@alvarezandmarsal.com); (iii) the Debtors' investment banker, Cain Brothers & Company, LLC, 360 Madison Avenue, New York, NY 10017 (Attn: Gregory J. Hychko, ghychko@cainbrothers.com); and (iv) counsel to any official committee of unsecured creditors appointed in these Cases.

6.      The sale of the Acquired Assets to the Successful Bidder shall be presented for authorization and approval by the Court at the Sale Hearing, which is currently scheduled to be held on **[June 25, 2014] at [2:00 p.m.]** (prevailing Eastern Time) at the United States Bankruptcy Court for the District of Columbia, 333 Constitution Avenue, NW, Courtroom 1, Washington, D.C. 20001 before the Honorable S. Martin Teel, Jr., United States Bankruptcy Judge.  The Sale Hearing may be adjourned or rescheduled without further notice by announcing the adjourned date at the Sale Hearing.

7.      Objections, if any, to approval of the sale of the Acquired Assets to the Successful Bidder shall (i) be in writing, (ii) comply with the Bankruptcy Rules, (iii) set forth the name of the objector, (iv) state with particularity the legal and factual bases for such objection, and (v) be filed with the Clerk of the Court, United States Bankruptcy Court for the District of Columbia, 333 Constitution Avenue, NW, Suite 1225, Washington, D.C. 20001, together with proof of service thereof, and served on the following parties **so as to be actually received no later than 5:00 p.m. (prevailing Eastern Time) on [June 9, 2014]** (the "**Objection Deadline**") to (a) counsel to the Debtors, Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, D.C. 20037-1122 (Attn: Patrick Potter, patrick.potter@pillsburylaw.com) and Pillsbury Winthrop Shaw Pittman. LLP, 1540 Broadway, New York, NY (Attn: Andrew Troop,

andrew.troop@pillsburylaw.com); (b) (ii) counsel for the Stalking Horse Purchaser for noticing purposes, Squire Sanders (US) LLP, One East Washington Street, Suite 2700, Phoenix, AZ 85004 (Attn: Craig D. Hansen, craig.hansen@squiresanders.com); (c) counsel to the Committee; (d) counsel to the Successful Bidder, if not the Stalking Horse Purchaser; and (e) the Office of the United States Trustee for the District of Columbia, 115 S. Union Street, Room 210, Alexandria, VA 22314 (Attn: Bradley Jones, Bradley.D.Jones@usdoj.gov).

8.      Failure of any entity to file an objection on or before the Objection Deadline shall be deemed to constitute consent to the sale of the Acquired Assets to the Successful Bidder and other relief requested in the Sale Motion, and be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Motion, the Auction, the sale of the Acquired Assets, or the Debtors' consummation and performance of the terms of the asset purchase agreement entered into with the Successful Bidder, if authorized by the Court.

9.      After determining the Successful Bid, the Debtors may determine which Qualified Bid is the next best bid (the "**Next Best Bid**").  If the Successful Bidder does not close the sale by the date agreed to by the Debtors and the Successful Bidder, then the Debtors shall be authorized to close with the party that submitted the Next Best Bid (the "**Next Best Bidder**"), without a further court order.  The Next Best Bidder shall be required to close the sale with the Debtors to the extent the Successful Bidder fails to close.

10.      This notice is subject to the full terms and conditions of the Sale Motion, the Bidding Procedures, and the Bidding Procedures Order, and the Debtors encourage any interested parties to review such documents in their entirety.  To the extent that this notice is inconsistent with the Bidding Procedures Order, the terms of the Bidding Procedures Order shall govern.

*[Signature Block on the Next Page]*

3

PILLSBURY WINTHROP SHAW PITTMAN LLP

/s/ *Patrick Potter*
Patrick Potter (426514)
Jerry Hall (976461)
Dania Slim (991689)
2300 N Street, NW
Washington, DC 20037-1122
Telephone:  (202) 663-8000
Facsimile:  (202) 663-8007
patrick.potter@pillsburylaw.com
jerry.hall@pillsburylaw.com
dania.slim@pillsburylaw.com


Andrew M. Troop (admitted *pro hac vice*)
1540 Broadway
New York, NY 10036-4039
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com

*Counsel for the Debtors*

**<u>Exhibit F</u>**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re:<br><br>SPECIALTY HOSPITAL OF WASHINGTON, LLC, *et al.*,<br><br>Debtors.[1] | Case No. 14-00279<br><br>Chapter 11<br><br>(Joint Administration Requested) |

**NOTICE OF POTENTIAL ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION
WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS ASSETS**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.       On [June 9, 2014], 2014, the United States Bankruptcy Court for the District of Columbia (the "**Court**") entered an order (the "**Bidding Procedures Order**") in the chapter 11 cases (the "**Cases**") of the above-captioned debtors and debtors-in-possession (the "**Debtors**") approving, among other things, certain procedures related to the assumption and assignment of executory contracts and unexpired leases (the "**Designated Contracts**") listed on Exhibit 1 annexed to this Notice in connection with the sale of substantially all of the Debtors' assets (the "**Acquired Assets**").  The Debtors may assume and assign the Designated Contracts to the successful bidder for the Acquired Assets (the "**Successful Bidder**") under the bidding procedures (the "**Bidding Procedures**") approved by the Bankruptcy Court in connection with the Bidding Procedures Order.

2.       The Debtors believe that any and all defaults (other than the filing of these Cases) and actual pecuniary losses under the Designated Contracts can be cured by the payment of the cure amounts (the "**Cure Amounts**") listed on Exhibit 1 annexed to this Notice (the "**Assignment Schedule**").  The Debtors reserve the right to delete items from, supplement, and modify the Assignment Schedule at any time, provided that to the extent that the Debtors add a Designated Contract to the Assignment Schedule or modify the Cure Amount, the affected party shall receive separate notice and an opportunity to objection to such addition or modification.

3.       Any objection to the assumption and assignment of any Designated Contract, including, without limitation, any objection to the Cure Amount or the ability of the Successful Bidder to provide adequate assurance of future performance under such Designated Contract, must (i) be in writing, (ii) set forth the basis for the objection as well as any cure amount that the

---

[1]       The debtors in these chapter 11 cases and the last four digits of each debtor's federal identification number are:  Specialty Hospital of America, LLC (1347), SHA Holdings, Inc. (1943), SHA Management, LLC (1350), Specialty Hospital of Washington, LLC (1352), Specialty Hospital of Washington Nursing Center, LLC (1348), Specialty Hospital of Washington Hadley, LLC (2586), and SHA Hadley SNF, LLC (1976).

objector asserts to be due (in all cases with appropriate documentation in support thereof), and (iii) be filed with the Clerk of the Court, United States Bankruptcy Court for the District of Columbia, 333 Constitution Avenue, NW, Suite 1225, Washington, D.C. 20001, and served on (a) counsel to the Debtors, Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, D.C. 20037-1122 (Attn: Patrick Potter, patrick.potter@pillsburylaw.com) and Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, NY (Attn: Andrew Troop, andrew.troop@pillsburylaw.com); (b) (ii) counsel for the Stalking Horse Purchaser for noticing purposes, Squire Sanders (US) LLP, One East Washington Street, Suite 2700, Phoenix, AZ 85004 (Attn: Craig D. Hansen, craig.hansen@squiresanders.com); (c) counsel to the Committee; (d) counsel to the Successful Bidder, if not the Stalking Horse Purchaser; and (e) the Office of the United States Trustee for the District of Columbia, 115 S. Union Street, Room 210, Alexandria, VA 22314 (Attn: Bradley Jones, Bradley.D.Jones@usdoj.gov), **so as to be _actually received_ no later than 5:00 p.m. (prevailing Eastern Time) on the date that is fifteen (15) days after the filing of this Cure Notice** (the "**Assignment and Cure Objection Deadline**").

4.      To the extent that any entity does not timely object as set forth above, such entity shall be (i) forever barred from objecting to the assumption and assignment of its respective Designated Contracts identified on the Assignment Schedule, including, without limitation, asserting any additional cure payments or requesting additional adequate assurance of future performance, (ii) deemed to have consented to the applicable Cure Amount, if any, and to the assumption and assignment of the applicable Designated Contract, (iii) bound to such corresponding Cure Amount, if any, (iv) deemed to have agreed that the Successful Bidder has provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code, (v) deemed to have agreed that all defaults under the applicable Designated Contract arising or continuing prior to the effective date of the assignment have been cured as a result or precondition of the assignment, such that the Successful Bidder or the Debtors shall have no liability or obligation with respect to any default occurring or continuing prior to the assignment, and from and after the date of the assignment the applicable Designated Contract shall remain in full force and effect for the benefit of the Successful Bidder and such entity in accordance with its terms, (vi) deemed to have waived any right to terminate the applicable Designated Contract or designate an early termination date under the applicable Designated Contract as a result of any default that occurred and/or was continuing prior to the assignment date, (vii) deemed to have agreed that the Debtors are not obligated under the Designated Contracts following the effective date of the assumption and assignment, and (viii) deemed to have agreed that the terms of the Sale Order shall apply to the assumption and assignment of the applicable Designated Contract.

5.      If an objection is timely received and such objection cannot otherwise be resolved by the parties, the Court may hear such objection at the Sale Hearing or at a later date set by the Court.  The pendency of a dispute relating to the Cure Amount will not prevent or delay the assumption and assignment of any Designated Contract or the sale of the Acquired Assets to the Successful Bidder.  If an objection is filed only with respect to the cure amount listed on the Cure Notice, the dispute with respect to the cure amount will be resolved consensually, if possible, or, if the parties are unable to resolve their dispute, before the Court.

6.      The Debtors' decision to assume and assign to the Successful Bidder a Designated Contract is subject to Court approval and the sale closing.  Accordingly, absent such approval

2

and closing, any of the Designated Contracts shall not be deemed to be assumed and assigned, and shall in all respects be subject to further administration under the Bankruptcy Code. The inclusion of any document on the Assignment Schedule shall not constitute or be deemed a determination or admission by the Debtors or the Successful Bidder that the document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code (all rights with respect thereto being expressly reserved).

7.      Any anti-assignment provisions contained in, or otherwise purporting to affect, the Designated Contracts shall not restrict, limit or prohibit the assumption, assignment and sale of such Designated Contracts, and such provisions are deemed unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

8.      Copies of the Bidding Procedures Order and other relevant documents may be obtained by: (a) written request to the Debtors' counsel, Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, D.C. 20037-1122 (Attn: Dania Slim; dania.slim@pillsburylaw.com); (b) accessing the Court's website at http://www.dcb.uscourts.gov (please note that a PACER password is needed to access documents on the Court's website); or (c) viewing the docket of these cases at the office of the Clerk of the Court, United States Bankruptcy Court for the District of Columbia, 333 Constitution Avenue, NW, Suite 1225, Washington, D.C. 20001.

*[Signature Block on the Next Page]*

Dated: June ___, 2014

PILLSBURY WINTHROP SHAW PITTMAN LLP

*/s/ Patrick Potter*
Patrick Potter (426514)
Jerry Hall (976461)
Dania Slim (991689)
2300 N Street, NW
Washington, DC 20037-1122
Telephone:  (202) 663-8000
Facsimile:  (202) 663-8007
patrick.potter@pillsburylaw.com
jerry.hall@pillsburylaw.com
dania.slim@pillsburylaw.com


-and-

Andrew M. Troop (admitted *pro hac vice*)
1540 Broadway
New York, NY 10036-4039
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com

*Counsel for Debtors*

**<u>Exhibit 1</u>**

Assignment Schedule