## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re:<br><br>SPECIALTY HOSPITAL OF WASHINGTON, LLC, *et al.*,<br><br>Debtors.[1] | Case No. 14-00279<br><br>Chapter 11<br><br>(Joint Administration Requested) |

## DECLARATION OF EDWIN CLARK, CHIEF FINANCIAL OFFICER OF THE DEBTORS, IN SUPPORT OF FIRST DAY MOTIONS

Pursuant to 28 U.S.C. § 1746 and under penalty of perjury, Edwin Clark hereby declares as follows:

1.      My name is Edwin Clark.  I am over the age of 18 and competent to testify about the matters contained in this Declaration.  The statements contained in this Declaration are true and correct to the best of my knowledge, information and belief, and are based on my personal knowledge.  If called as a witness, I could competently testify to the matters in this Declaration.

2.      I am employed by Special Hospital of America, LLC and serve as the Chief Financial Officer of Specialty Hospital of Washington, LLC ("**SHDC**") and its affiliated debtors (collectively, the "**Debtors**").  I have been employed in this and other capacities by the Debtors since January 2007.  Accordingly, I am familiar with the Debtors' day-to-day operations, businesses, and financial affairs.  I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases, and in support of relief requested by the Debtors in certain motions and applications

---

[1]      The debtors in these chapter 11 cases and the last four digits of each debtor's federal identification number are:  Specialty Hospital of America, LLC (1347), SHA Holdings, Inc. (1943), SHA Management, LLC (1350), Specialty Hospital of Washington, LLC (1352), Specialty Hospital of Washington Nursing Center, LLC (1348), Specialty Hospital of Washington Hadley, LLC (2586), and SHA Hadley SNF, LLC (1976).

(collectively, the "**First Day Motions**") filed with the Court on May 21, 2014 (the "**Petition Date**").

3.    As described in more detail below, the First Day Motions seek various forms of relief, including (i) authority for the Debtors to continue using cash collateral and their existing cash management system, (ii) approval of post-petition financing, and (iii) approval of other administrative procedures to ensure a seamless transition into chapter 11.

4.    I am familiar with the contents of the First Day Motions and believe that the relief requested is necessary to permit an effective transition into chapter 11.  Indeed, the Debtors' estates would suffer immediate and irreparable harm absent obtaining the relief sought in the First Day Motions, because without this relief, the Debtors will not have sufficient liquidity to operate and ensure continuous high quality care to their patients and residents.  Approval of the relief requested in the First Day Motions will not only minimize disruptions to the Debtors' business operations, but is essential to continue operations that will preserve and maximize the value of the Debtors' estates.

5.    Sections A through D of this Declaration provide an overview of the Debtors' corporate structure, businesses, capital structure, and the events giving rise to these chapter 11 cases.  Section E then summarizes the relief requested in certain of the First Day Motions.

A.    **The Debtors' Corporate Structure**

The Debtors are limited liability companies or corporations formed under the laws of Delaware.  Specialty Hospital of America LLC ("**SHA**") wholly owns all of the other Debtors except for Specialty Hospital of Washington Hadley, LLC ("**Hadley Hospital**") and SHA Hadley SNF, LLC ("**Hadley SNF**").  Hadley Hospital is owned 99.99% by SHA and 0.01% by

SHA Holdings, Inc. ("**Holdings**"), which in turn is owned 100% by SHA.  Hadley SNF is owned

100% by Hadley Hospital.  A corporate organization chart is attached as Exhibit A.

### B.    The Debtors' Businesses

6.    The Debtors collectively own and operate two long-term acute care hospitals

("**LTAC**"),[2] each of which has an accompanying skilled nursing facility ("**SNF**").[3]  As described

below, the patients and residents at these facilities are among the sickest in the country.

7.    One of the Debtors' facilities is located at 700 Constitution Avenue, NE,

Washington, D.C. (the "**Capitol Hill Facility**").[4]  The Capitol Hill Facility houses a 60-bed

LTAC and a 117-bed SNF.  The Capitol Hill Facility serves mostly Medicare and Medicaid

patients.

8.    The other facility is located at 4601 Martin Luther King Jr. Avenue, SW,

Washington, D.C. (the "**Hadley Facility**" and together with the Capitol Hill Facility, the "**SHA**

**Facilities**").  The Hadley Facility houses an 82-bed LTAC, a 62-bed SNF,[5] and a surgical suite

primarily for the benefit of the Hadley Facility's patients and residents.

---

[2]    LTACs are specialized hospitals that treat patients with multiple conditions, but who may improve and be able to return home.  They treat people requiring comprehensive rehabilitation, head trauma treatment, respiratory therapy and pain management.  LTAC patients are often resident at a facility for more than twenty-five days, and often are transferred from intensive or critical care units.  These patients receive care coordination, dialysis, wound care, pharmacy and physician services, radiation, and physical therapy, among other services.

[3]    An SNF is commonly referred to as a nursing home.  It provides twenty-four hour care to residents who are sick, disabled or injured.

[4]    The LTAC and SNF at the Capitol Hill Facility are owned and operated by Specialty Hospital of Washington, LLC and Specialty Hospital of Washington Nursing Center, LLC, respectively.

[5]    Hadley owns the real estate and improvements thereon at the Hadley Facility.

9.     Collectively, the SNF beds currently have an occupancy rate of approximately 98 percent, filled mostly by Medicaid patients.  The LTAC beds currently have an occupancy rate of approximately 35 percent, filled by a combination of primarily Medicare and Medicaid patients.

10.     The SHA Facilities contain the only licensed freestanding LTACs between Philadelphia and Richmond, and have the only certificates of need issued in the District of Columbia for LTAC services.  As such, they provide a critical service to the citizens of the District of Columbia metropolitan area, in particular those who rely on Medicare and Medicaid to pay for healthcare services.

11.     The Debtors provide a wide variety of programs and services at the SHA Facilities, including cardio-pulmonary treatment, wound care, infectious disease therapy, and other patient care services.  The Debtors' patients typically are critically ill or have multiple system failures that require extended acute care treatment after discharge from a traditional hospital.  Patients often come to the LTACs directly from an intensive care unit.  Medicare uses a "case mix index" to identify the average acuity level for a group of patients.  The LTAC patients in the SHA Facilities have been assigned a case mix index of 1.329 by Medicare, which means that SHA's LTACs handle the fifth most-acute long term acute care patients from among the LTACs in the United States.

12.     To provide high quality care to their patients and residents, the Debtors currently employ approximately 790 people.  Historically, when occupancy levels at the SHA Facilities were at their peak, the Debtors employed approximately 850 people.

### C.     The Debtors' Capital Structure

13.     As described more fully below, the Debtors' prepetition secured debt consists mainly of: (i) secured facilities with Branch Banking and Trust Company ("**BB&T**") in the

4

approximate amount of $40.1 million; (ii) a secured facility with National Capitol Bank of Washington ("**NCB**") in the approximate amount of $6 million, (iii) tax liens in favor of the Internal Revenue Service and/or other governmental agencies (the "**IRS**") in the approximate amount of $7 million, and (iv) more than $5 million owed (on a senior subordinated secured basis) to JWR Realty, LLC ("**JWR**") by Specialty Hospital of America, LLC.  BB&T, NCB, IRS and JWR are referred to herein as the "**Existing Lienholders**".

*The BB&T Facilities*

14.    The Debtors have outstanding obligations under a secured financing facility with BB&T in the principal amount of approximately $34 million.  Approximately $28 million of these obligations relate to a term facility (the "**BB&T Term Facility**") and the remaining $6 million of these obligations relate to a revolving facility (the "**BB&T Revolving Facility**" and, together with the BB&T Term Facility, the "**BB&T Facilities**").

15.    The BB&T Facilities are evidenced by a *Business Loan and Security Agreement* dated March of 2008 and three secured promissory notes, each dated March 24, 2008: (i) a *Term A Promissory Note* in the amount of $35 million; (ii) a *Term B Promissory Note* in the amount of $6 million, and; (iii) a *Revolving Promissory Note* in the amount of $10.5 million.[6]  The BB&T Term Facility matures on April 1, 2015, and the BB&T Revolving Facility matured on April 1, 2011.  The BB&T Facilities appear to be secured by substantially all of the Debtors' assets (the "**BB&T Collateral**").  The Debtors are in monetary default under the BB&T Facilities.  As of the Petition Date, the total amount outstanding on the BB&T Facilities was approximately $40.1 million.

---

[6]    The original borrowing limit under the BB&T Revolving Facility was $7.5 million, but was increased to $10.5 million through execution of an *Allonge and First Modification to Revolving Promissory Note* dated December of 2009.

*NCB Facility*

16.    SHA also has outstanding obligations under a short-term secured financing arrangement with NCB (the "**NCB Facility**").  The NCB Facility is evidenced by a *Promissory Note* in the amount of $6 million, a *Commercial Security Agreement*, and a *Security Agreement-Pledge*, each dated March 12, 2013, by and between SHA and NCB.  The NCB Facility appears to be secured by all of SHA's personal property and business assets (the "**NCB Collateral**"); albeit subordinate to the Debtors' obligations under the BB&T Facilities and the IRS Tax Liens (as defined below).  SHA is currently in monetary default under the NCB Facility.  As of the Petition Date, the total amount outstanding on the NCB Facility was approximately $6 million.

*IRS Tax Liens*

17.    The Debtors are obligated to the federal government for payment of certain unpaid withholdings and other related tax obligations (the "**Tax Obligations**"), including those arising under the Federal Insurance Contributions Act (FICA).  In order to secure repayment of the Tax Obligations, the IRS has filed liens (the "**IRS Tax Liens**") on the Debtors' accounts receivable and inventory (the "**IRS Collateral**" and together with the BB&T Collateral and the NCB Collateral, the "**Prepetition Collateral**") totaling approximately $7 million.  The IRS Tax Liens appear to be senior to the security interests of both BB&T and NCB with regard to the IRS Collateral.

*JWR Realty Facility*

18.    Specialty Hospital of America, LLC has outstanding obligations to JWR in the amount of at least $5 million (the "**JWRR Debt**") pursuant to, among other instruments, a certain Senior Subordinated Note Agreement dated as of November 28, 2005 (as may have been amended from time to time).  The collateral for the JWRR Debt is described in, among other instruments, the November 28, 2005 Security Agreement (All Personal Property Assets) entered

into by Specialty Hospital of America, LLC and JWR.

**D.      Events Leading Up to the Debtors' Chapter 11 Filings**

19.      The Debtors are operating under severe financial and operational distress that

threatens their ability to maintain operations.  Several factors have contributed to the Debtors'

difficulties.  They have been (and are) parties to numerous legal actions, including actions

brought by the IRS, the U.S. Department of Justice, the Center for Medicaid and Medicare

Services ("**CMS**"), the District of Columbia Department of Healthcare Finance, and the District

of Columbia Department of Health.  Defending these and other lawsuits consumes substantial

financial, personnel, and other resources of the Debtors.  Moreover, the outcome of such lawsuits

has resulted in substantial liabilities to the IRS, CMS and others, totaling over $40 million.

20.      Occupancy levels at the SHA Facilities (particularly at the LTACs) have also

declined.  Since 2012, total occupancy at the Hadley Facility has decreased approximately 31%,

and total occupancy at the Capitol Hill Facility has decreased approximately 74%.  The decline

in total occupancy has been the result of a changing and challenging healthcare environment.

There is uncertainty regarding how Medicare and Medicaid reimbursements will be treated in the

future because of The Patient Protection and Affordable Care Act.  Additionally, referral sources

that historically sent patients to the SHA Facilities and particularly the LTACs, have been

sending patients to SNFs (other than the SNFs at the SHA Facilities) or keeping patients in the

hospital, instead of sending them to the SHA Facilities' LTACs.

21.      As a result of the confluence of these and other, related factors, the Debtors are in

a state of financial crisis.  They are in monetary default under lease and secured debt obligations

and have fallen behind in payment to trade creditors.  Without the infusion of new operating

capital, the SHA Facilities will be unable to meet upcoming payroll and operational obligations.

22.     The SHA Facilities serve a vital need to the community and their closure would result in a healthcare crisis in the District of Columbia metropolitan area.  As mentioned above, the SHA Facilities provide acute medical care and services to a population suffering from serious and life-threatening conditions.  Because the LTACs at the SHA Facilities are the only licensed, freestanding LTACs in the region, and because short-term acute care hospitals are not financially able to care for long-term patients, the continued operation of the SHA Facilities is critical to the well-being of the Debtors' current and future patients, particularly those patients relying on Medicaid and Medicare.  The SHA Facilities serve a high concentration of Medicaid and Medicare patients, many of whom do not have the financial or physical capability to relocate to another area to obtain care.  This potential hardship is particularly true for the Debtors' SNF residents.  There are few other nursing home options in these neighborhoods, and there is a shortage of nursing home beds in the District of Columbia.  Moreover, as freestanding LTACs and SNFs, the SHA Facilities are serving patients with life-threatening illnesses in fragile conditions, and thus the closure of the SHA Facilities could lead to particularly catastrophic consequences.

23.     In addition, because there are no other freestanding LTACs in the District of Columbia, the closure of the SHA Facilities would have a devastating and potentially long-lasting impact on approximately 750 employees.  There are no comparable facilities with employment capacity within the District, making it unlikely that the Debtors' employees would find new jobs quickly within the District.

24.     Confronted with increasing financial difficulties, on the one hand, and existing and future patients in critical need (most of whom have no place else to turn), on the other hand, the Debtors analyzed and pursued initiatives other than closing their doors.  To this end, in

8

August 2013 the Debtors retained Alvarez & Marsal ("**Alvarez**") to provide the Debtors with experienced assistance in addressing their circumstances.

25.    Alvarez initially began to assist the Debtors explore an operational restructuring (including a likely bankruptcy proceeding) that was to be funded in part with the proceeds from a lawsuit or settlement with Department of Health Care Finance (the "**DHCF Lawsuit**") that was hoped to be received in late 2013.  During this time, Alvarez assisted the Debtors in developing financial projections, weekly cash flow forecasts, and benchmarking analyses, and in conducting discussions with the Debtors' primary creditor and regulatory constituencies.  In December 2013, however, an administrative law judge ruled against the Debtors on several significant issues relating to reimbursement claims against the District of Columbia's Healthcare Finance Department.  Having lost these claims for additional payments, the Debtors understood that their available liquidity would be substantially constrained.  As a result, the Debtors determined the best course of action was to pursue a sale through the chapter 11 process.  At that time, Alvarez focused its efforts to those items necessary to complete a sale, including cash flow forecasts, assistance with due diligence efforts, assistance in discussions with creditors, regulators and potential bidders, and bankruptcy preparation.

26.    As discussed in more detail below, after contacting a number of potential buyers for their assets (with the help of Alvarez and other professionals), the Debtors have been able to secure a stalking horse bid for their assets from a financially sound buyer whom the Debtors believe will be able to obtain, in short order, the necessary non-bankruptcy regulatory and other approvals to permit a sale without any interruption in service.

27.    While the Debtors were negotiating the terms of a "stalking horse" bid for their operating assets, on April 23, 2014, an involuntary petition for relief under chapter 11 of the U.S.

Bankruptcy Code (the "**Bankruptcy Code**") was filed against SHDC in the U.S. Bankruptcy

Court for the District of Delware ("**Delaware Court**").  On May 9, 2014, however, the Delaware

Court transferred the case to the U.S. Bankruptcy Court for the District of Columbia upon the

request of various parties, including the petitioning creditors, the District of Columbia, other

federal agencies and SHDC.  On May 21, 2014, SHDC consented to the entry of an order for

relief against it and the other Debtors filed voluntary petitions for relief under chapter 11 of the

Bankruptcy Code in the the U.S. Bankruptcy Court for the District of Columbia.

### E.    The First Day Motions

28.    On the Petition Date, the Debtors filed various First Day Motions, which they

believe are necessary to (a) continue the Debtors' operations in chapter 11 with as little

disruption and loss of productivity as possible, (b) maintain the confidence and support of

patients, employees, suppliers and certain other key constituencies, and (c) establish procedures

for the smooth and efficient administration of these chapter 11 cases.  I have reviewed each of

the First Day Motions and I believe that the relief sought in each is tailored to meet the foregoing

goals, thereby preserving and maximizing the value of the Debtors' estates.

*Motion for Order Directing Joint Administration of Chapter 11 Cases*

29.    The Debtors moved for joint administration of these chapter 11 cases for

procedural purposes only (the "**Joint Administration Motion**").  The Debtors believe that

because many of issues that the Debtors will face in these cases will overlap, virtually all of the

pleadings filed in these chapter 11 cases will relate to relief sought jointly by or against all

Debtors.  The Debtors also anticipate that their chapter 11 cases will proceed on the same

timetable and that most, if not all, of the notices, applications, motions and other pleadings filed

and orders entered in these cases will affect all Debtors.

30.    The joint administration of these chapter 11 cases, to the best of my knowledge, will not give rise to any conflict of interest among the Debtors' estates.  Nor will joint administration adversely affect the Debtors' respective creditors because the Debtors seek only administrative, not substantive, consolidation of the estates.  Intercompany claims among the Debtors also will be preserved and each of the Debtors will maintain separate records of assets and liabilities.  Thus, I believe that individual creditors' rights should not be harmed by the relief requested.  Instead, creditors and parties in interest should benefit from the cost efficiencies associated with the joint administration of these cases.

<u>*Motion for Order Authorizing Debtors to File Consolidated Lists and Matrices*</u>

31.    The Debtors also seek authority to file the lists and matrices required by Rule 1007 of the Federal Rules of Bankruptcy Procedure and Rules 1007-1 and 1007-4 of the Local Rules of the Court (the "**Lists and Matrices**") on a consolidated basis.

32.    Given that the Debtors' businesses are intertwined and the creditor overlap, the Debtors believe that it is appropriate and more efficient for them to file the Lists and Matrices on a consolidated basis.  Instead of filing a list of the largest twenty unsecured creditors for each Debtor, the Debtors propose filing a consolidated list of the thirty-five largest unsecured creditors, excluding insiders.  A single consolidated list of the Debtors' thirty-five largest unsecured creditors is more reflective of the body of unsecured creditors that have the greatest stake in these chapter 11 cases than would be the case with separate lists for each Debtor.

33.    The Debtors seek to file the Lists and Matrices on a consolidated basis to efficiently and effectively manage their chapter 11 cases.  The relief sought is purely procedural and will not prejudice or adversely affect the substantive rights of creditors.  Creditors and other parties in interest will retain any claims or rights they may have against the respective estates.

11

*Motion for Order Authorizing Debtors to Continue Using Cash Management System,*
*Existing Bank Accounts, and Business Forms*

34.    The Debtors moved for entry of an order authorizing the Debtors to continue

using their Cash Management System, Bank Accounts and Business Forms (the "**Cash**

**Management Motion**").  The Debtors also requested that the Court waive certain of the

operating guidelines established by the Office of the U.S. Trustee for the District of Columbia

(the "**U.S. Trustee**").

35.    In order to manage their businesses efficiently and seamlessly, the Debtors

maintain a cash management and disbursement system (the "**Cash Management System**") in the

ordinary course of business to collect funds generated by their operations and to disburse funds

to satisfy their financial obligations.  As part of their Cash Management System, the Debtors

maintain approximately thirteen active bank accounts at BB&T (collectively, the "**Bank**

**Accounts**").[7]  In general, the Debtors have the following types of accounts in their Cash

Management System:

      a.  Payroll accounts;
      b.  Operating accounts; and
      c.  Lockbox accounts.

36.    A chart showing the flow of money through the active BB&T bank accounts is

attached to the Cash Management Motion.  Through the Bank Accounts, the Debtors collect,

transfer and disburse funds generated from operations.  The Debtors routinely deposit, withdraw

and transfer funds to, from and between the Bank Accounts by various methods, including check

and wire transfer.

---

[7]    The Debtors also have seven inactive accounts at BB&T.

37.     The Debtors maintain current and accurate accounting records of daily cash transactions and believe that maintaining their existing Cash Management System will prevent disruption to the Debtors' business operations while protecting the Debtors' cash for the benefit of the estates.

38.     Also in the ordinary course of business, the Debtors use a variety of business forms.  To minimize the expense to the estates and to avoid any confusion with suppliers, patients, and employees, the Debtors seek authority to continue using all business forms, including without limitation, checks, letterhead, patient forms, purchase orders, contracts, and invoices (collectively, the "**Business Forms**"), as such forms were used by the Debtors immediately prior to the Petition Date, without reference to the Debtors' status as debtors in possession.  This will allow the Debtors to avoid the cost and delay of ordering new business forms.  Upon depletion of the current stock of forms and checks, the Debtors will obtain new checks and forms that indicate their debtor in possession status.

39.     If the Debtors cannot continue using their Cash Management System, Bank Accounts or Business Forms, then there will be significant disruptions to the Debtors' operations and unnecessary and immediate constraints on liquidity.  As illustrated by the chart attached to the Cash Management Motion, the Bank Accounts compose an established cash management system that the Debtors need to maintain to ensure smooth collections and disbursements in the ordinary course of business.  Therefore, to avoid delays in payments to administrative creditors, to ensure as smooth a transition into chapter 11 as possible, and to aid in the Debtors' efforts to preserve and maximize the value of their assets, the Debtors seek permission to continue using their existing Bank Accounts, Cash Management System and Business Form, and if necessary, to open new accounts and close existing accounts in the normal course of business operations.

40.     The Debtors' continued use of the Cash Management System, Bank Accounts and Business Forms is essential to avoid immediate and irreparable harm to the Debtors, their estates, and their creditors.  If the Debtors are not permitted to maintain and use the existing Cash Management System, Bank Accounts and Business Forms, the resulting prejudice will include (a) disruption of the ordinary financial affairs and business operations of the Debtors, (b) delay in the administration of the Debtors' estates, and (c) potential disruption of the critical medical services provided to the Debtors' patients.

*Motion for Order Authorizing the Debtors to (I) Continue Prepetition Insurance Policies and (II) Maintain Existing Financing of Insurance Policies*

41.     On the Petition Date, the Debtors moved for entry of an order granting them authority to (a) continue insurance coverage currently in effect under the Policies and (b) pay any prepetition (and, as to financing, post-petition) amounts related thereto, including: premiums, financing costs and deductibles (the **"Insurance Motion"**).

42.     In the ordinary course of the Debtors' business operations, the Debtors maintain various insurance policies through several different insurance providers (the "**Insurance Providers**") providing coverage for, among other things: general liability, excess, physician extended reporting, worker's compensation, property, and directors and officers liability (collectively, the "**Policies**").  The Policies are essential to preserve the value of the Debtors' business, property, and assets.

43.     The Debtors have general liability insurance covering accidents, injuries and negligence, among other things.  Their physician's extended reporting and professional liability/medical malpractice policies covers losses resulting from claims for wrongful acts or omissions committed in the course of providing professional services during the retroactive period applicable to each named insured as provided in the policy.  The Debtors' worker's

14

compensation insurance insures employees who are injured on the job.  Property insurance

protects against damage to the Debtors' property and their directors and officers insurance

protects directors and officers from actions taken related to their roles as directors and officers.

44.    The aggregate annual premiums under the Policies are approximately $1.9

million.  These premiums are paid to the insurance carriers, in some cases annually at renewal

and in other cases monthly because the premiums are financed.  The Debtors will be required to

pay no less than $600,000 (for the first thirteen weeks of the cases) to continue coverage under

the Policies.

45.    In light of the importance of maintaining insurance coverage with respect to their

business activities, the Debtors believe it is in the best interest of their estates to maintain the

Policies and to pay any prepetition premiums, financing costs and deductibles necessary to do so,

as well as to revise, extend, supplement, or change insurance coverage, as necessary, pursuant to

sections 363(b)(l) and 364(c) of the Bankruptcy Code.

46.    If the Policies lapse or if the Insurance Providers cancel the Policies or otherwise

refuse to continue doing business with the Debtors as a result of unpaid obligations before the

Debtors are able to find replacement coverage, then the Debtors' estates could be exposed to

significant potential losses and liabilities.

47.    At a minimum, loss of any insurance coverage would impose considerable

administrative and financial burden on the Debtors, requiring the Debtors' management to

expend significant attention and resources to secure replacement coverage (and risk having gaps

in coverage) at a critical juncture in these chapter 11 cases and could render the Debtors non-

compliant with the U.S. Trustee's requirement that debtors maintain insurance coverage during

their cases.

48.    Maintaining the Policies is critical to preserve the value of the Debtors' estates. The Debtors' businesses, their estates, and their creditors would suffer immediate and irreparable harm if the relief requested in the Insurance Motion is not granted because the Debtors likely would be unable to prevent detrimental changes to their coverage.  Honoring their obligations under the Policies is necessary to ensure continued, uninterrupted coverage.  Indeed, it is imperative that the Debtors be allowed to make the next installment payments on the Policies on or about June 15, 2014 to prevent potentially irreparable damage to the Debtors' operations, value, and ability to implement their chapter 11 strategy.  Additionally, it would be difficult, inefficient, and wasteful for the Debtors to be forced to find replacement insurance on short notice.

*Motion for Interim and Final Orders (I) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Service; (II) Deeming Utility Providers Adequately Assured of Future Performance; and (III) Establishing Procedures for Determining Adequate Assurance of Payment*

49.    In the ordinary course of business, the Debtors have relationships with approximately five utility companies (each a "**Utility Provider**" and collectively, the "**Utility Providers**") for various services, including water, electricity, sanitation services, telephone and similar utility services ("**Utility Services**").  The Utility Providers service the Debtors' long-term acute care facilities and skilled nursing facilities.  The Debtors estimate that the average monthly payments to the Utility Providers will aggregate approximately $276,000.

50.    Based upon the Debtors' current cash flow projections, the Debtors anticipate that they will have adequate cash and sufficient funds with which to pay all post-petition charges for Utility Services.

51.    Uninterrupted utility service is essential to the Debtors' ongoing operations and therefore the success of the Debtors' chapter 11 efforts.  Indeed, any disruption to the Debtors'

16

operations by virtue of the cessation of Utility Services by any Utility Provider would bring the

Debtors' operations to a grinding halt, potentially causing serious health problems for the

Debtors' patients.  As such, on the Petition Date, the Debtors moved for orders (a) prohibiting

the Utility Providers from altering, refusing, or discontinuing services; (b) deeming the Utility

Providers adequately assured of future performance; and (c) establishing procedures for

determining adequate assurance of future payment (the "**Utilities Motion**").

52.     In order to provide the Utility Providers with adequate assurance of payment for

future services, the Debtors propose making one deposit to each Utility Provider equal to 50% of

the Debtors' estimated, combined monthly utility expenses (each, an "**Adequate Assurance**

**Deposit**" and collectively, the "**Adequate Assurance Deposits**").  The aggregate deposits for the

Utility Providers listed on Exhibit A of the Utilities Motion totals approximately $138,000.  The

Debtors propose making an Adequate Assurance Deposit to each Utility Provider within ten days

after entry of an interim order granting the Utilities Motion.  The Debtors believe that the

Adequate Assurance Deposits, any prepetition deposits or advanced payments paid to the Utility

Providers, together with the Debtors' ability to pay for future Utility Services in the ordinary

course of business, constitute sufficient assurances of payment to the Utility Providers.

53.     Uninterrupted utility service is critical to the continued operation of the Debtors'

business and to the Debtors' ability to maximize the value of their assets.  The relief requested in

the Utilities Motion, therefore, is necessary, appropriate and in the best interests of the Debtors'

estates and creditors.

*Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Payment of*
*Prepetition (A) Wages, Salaries, and Other Compensation, (B) Reimbursable Employees*
*Expenses, and (C) Employee Medical and Similar Benefits.*

54.     On the Petition Date, the Debtors moved for authority, but not direction, to

17

(a) pay prepetition wages, salaries, and other compensation, taxes, withholdings, and related

costs, and reimbursable employee expenses; (b) pay and honor obligations relating to employee

medical, insurance, and other benefits programs; and (c) continue their employee medical,

insurance, and other benefits programs on a post-petition basis. In support of this motion (the

"**Wage Motion**").

55.     In the ordinary course of business, the Employees are paid on alternate Fridays,

by check.  The last date that Employees were paid was May 16, 2014 for the period ending May

10, 2014.

56.     On average, the Debtors' gross payroll is approximately $1,317,062.33 per bi-

weekly pay period (including deductions and taxes).  As of the Petition Date, the Debtors

estimate they owe approximately $2,715,833.33 on account of accrued wages, salaries, other

cash compensation, sick leave, paid time off, and vacation pay (but excluding reimbursable

expenses) that was earned prior to the Petition Date (the "**Unpaid Compensation**").

57.     The Debtors obligations to contribute to the Employees' 401(k) plans for wages

paid on May 16, 2014 also remain outstanding.  The total amounts outstanding on account of the

Debtors' 401(k) obligations is estimated at $43,275.28.  No Employee has a claim against the

Debtors in excess of $12,475 for Unpaid Compensation presently due.

58.     The Debtors employ the services of Temporary Employees, including clinical

staff and nurses to handle overflow work.  Temporary Employees are paid solely through their

staffing agencies.

59.     In the ordinary course of business, the Debtors reimburse Employees for

reasonable and customary expenses incurred on behalf of the Debtors in the scope of their

employment, including Travel Expenses, Business Development Expenses, Corporate Credit

18

Cards, and Relocation Expenses (collectively, the "**Reimbursable Expenses**"). The Debtors

have no prepetition Corporate Credit Card or Relocation Expenses.

60.     Although the Debtors request that reimbursement requests be submitted promptly,

not all of the Employees do so.  Thus, the Debtors are unable to provide a detailed listing of

unpaid prepetition Travel and Business Development Expenses at this time because it is likely

that Employees will submit requests for expenses incurred prepetition after the Petition Date.

Based on the expense reimbursement requests outstanding to date, the Debtors estimate they owe

Employees approximately $14,283.64 on account of prepetition Travel and Business

Development Expenses.

61.     In the ordinary course of business, the Debtors maintain various employment

benefit plans and policies, including, without limitation, medical and dental plans, workers'

compensation benefits, the pension plan, the 401(k) plan, life insurance coverage, accidental

death and dismemberment insurance, supplemental life insurance coverage, and short- and long-

term disability insurance (collectively, the "**Employee Benefit Programs**").  As of the Petition

Date, there were approximately 522 Employees and their dependents eligible for the Employee

Benefits Programs.[8]  Temporary Employees are not eligible for Employee Benefit Programs.

62.     The cost of the Medical and Dental Insurance Programs is borne primarily by the

Debtors, but participating Employees also contribute a portion of the cost through payroll

deductions.  The Debtors pay approximately $45,000 per month in premiums under the Medical

and Dental Insurance Programs.

63.     As of the Petition Date, the Debtors have open and unfunded medical claims

---

[8]     The Debtors' Employee Benefits are available to Employees only, subject to any
eligibility requirements described herein.

liability for "incurred but not reported" claims.  The Debtors maintain $230,000 in an unfunded

claims account.  The amounts of assessed claims are deducted from this account and claims are

not paid if the balance falls below the $200,000 threshold.  If the account drops below this

amount, incoming claims are place on hold until a deposit is made such that an account balance

of $230,000 is restored.  Currently, the account balance is approximately $39,339.87 and a

number of claims remain pending.

66.     The Debtors provide workers' compensation insurance for their Employees in

each state in which they operate (the "**Workers' Compensation Program**") through AIG.

Workers' Compensations payments are due upon receipt, though AIG has been allowing the

Debtors thirty days to pay.  On April 7, 2013, AIG invoiced the Debtors for March claim

payments totaling $27,140.98.  This amount has not been paid and is considered past due.  On

May 7, 2014, AIG invoiced the Debtors for April claim payments totaling $53,276.60.

65.     In addition, the Debtors owe outstanding amounts as a result of the 2011-2012

Workers Compensation Audit (the "**WC Audit**").  The WC Audit assessed an additional

premium of $183,005 owed by the Debtors, which amount is payable in monthly installments of

$18,935.48.   The amounts owed under the WC Audit were due to be paid off in March

2014.  To date, $56,806.38 remains outstanding and is considered past due and payable

immediately.

66.     Up to forty hours of accrued Paid Vacation may be taken following completion of

six months of continuous employment.  A maximum of 160 hours of Paid Vacation may be

allowed to carry over each December 31.

67.     An employee with six or more months of eligible tenure upon their termination

will receive pay for accrued vacation hours.  The Debtors estimate that approximately

20

$688,223.44 of earned but unused Paid Vacation has accrued as of the Petition Date.

68.     Eligible Employees are paid for Sick Leave based on the number of hours scheduled for each scheduled work day of absence due to illness.  Except for medical and dental appointments, sick leave will not be paid for periods of less than (2) hours.  Employees may not be paid for Sick Leave in excess of the hours accrued.

69.     Eligible Employees are permitted to participate in the Debtors' 401(k) plan (entitled "**Specialty Hospitals of America 401(k) Plan**"). The Debtors have the discretion to make matching and profit sharing contributions. The Debtors' contributions are vested according a vesting schedule.

70.     By the Wage Motion, the Debtors desire authority, but not direction, in the exercise of their reasonable business judgment, to pay and honor prepetition obligations associated with the Employee Wages and Benefits in an amount not to exceed $1,078,109.97, but not to exceed, for any Employee or Temporary Employee, $12,475.

71.     By the Wage Motion, the Debtors desire authority, but not direction, to continue to honor their obligations, including any prepetition obligations, to Employees and applicable third-parties for Reimbursable Expenses in accordance with the Debtors' stated policies and prepetition practices, but not to exceed $14,283.64 on account of prepetition Reimbursable Expenses.

72.     By the Wage Motion, the Debtors desire authority, but not direction, to honor the Employee Benefit Programs, including, without limitation, (a) the Medical and Dental Insurance Programs, (b) the Workers' Compensation Programs, (c) the 401(k) Plan, (d) the Life, Disability, and AD&D Insurance Coverage, and (e) Vacation Pay, Sick Leave, and Paid Time Off; and to make any necessary contributions to such programs and pay any unpaid premium, claim, or

21

amount owed as of the Petition Date with respect thereto, but not to <u>exceed</u> $500,000 on account

of prepetition obligations of the Employee Benefit Programs.

> *Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain
> Post-petition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting
> Priming Liens and Providing Superpriority Claims, (IV) Granting Adequate Protection,
> (V) Scheduling a Final Hearing, And (VI) Granting Related Relief*

73.     The Debtors have reached an agreement with the Stalking Horse Purchaser on the

principal terms of (a) a stalking horse asset purchase agreement (b) a post-petition financing

facility in the aggregate principal amount of $15,000,000 (the "**DIP Loan**").  The DIP Loan is

the product of arms' length negotiations, and provides for financing of the Debtors in order to

pursue a sale pursuant to section 363 of the Bankruptcy Code, with the Stalking Horse Purchaser.

74.     The Debtors, together with their advisors, have carefully considered the few

realistic options that are currently available.  The Debtors do not possess sufficient liquidity to

continue operating outside of bankruptcy.  The Debtors have been unable to obtain, on an

unsecured general administrative-priority basis, a loan of the magnitude needed cover their

negative cash flow and other costs necessarily incurred through the closing on a section 363 sale.

They require more than $6.5 million in the first four weeks alone, and no one has offered to lend

such sums on an unsecured basis.

75.      The alternative post-petition financing proposals received by the Debtors

required the prospective lenders to receive first liens on all of the Debtors' assets.

76.     Accordingly, the pursuit of a sale transaction funded by the proposed DIP Loan

presents the only real option to (a) continue operations and provide uninterrupted patient care at

the SHA Facilities, and (b) to preserve, and possibly enhance, value for the Debtors' estates.

77.     Ultimately, the Debtors and their advisors concluded, given the critical financial

condition and revenue problems facing the Debtors, that any post-petition lender would require a

priming lien on substantially all of the Debtors' assets and a limitation on the recoupment and

setoff rights of other governmental regulatory agencies as a condition to funding any post-

petition loans.  Indeed, this is the only basis on which the Stalking Horse Purchaser is willing to

advance post-petition financing to the Debtors, and there are no alternative sources of adequate

funding available to the Debtors.  Accordingly, in the sound exercise of their business judgment,

the Debtors and their advisors determined that the DIP Loan would provide the best bridge to a

section 363 sale.

78.    The Debtors and the Stalking Horse Purchaser engaged in extensive, good faith,

arm's length negotiations with respect to the terms and conditions of post-petition financing. The

result of these negotiations is the proposed DIP Loan, including the DIP Term Sheet and

ultimately a credit agreement.

79.    The DIP Loan is needed by the Debtors to maintain their operations and preserve

the value of their estates pending a section 363 sale.  The Debtors suffer from substantial

negative cash flow and do not possess sufficient sources of working capital or cash to fund these

cases and continue operating their business without accessing the DIP Loan and using cash

collateral.  Absent the DIP Loan, the Debtors will be unable to satisfy their legal obligation to

remain current on post-petition obligations.  Further, the Debtors' healthcare operations will

come to a prompt halt, resulting in immediate and irreparable harm to the Debtors and their

estates.  This will quickly force them into administrative insolvency, where they will have no

choice but to cease operations, move patients, close the doors, and convert their cases to

chapter 7.  Closing the Debtors' facilities would also imperil the health, and possibly the lives, of

many patients.

May 21, 2014                         /s/ Edwin Clark
                                     Edwin Clark

23

**<u>Exhibit A</u>**

## Corporate Ownership Structure of Special Hospital of America, LLC and Subsidiaries

