**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| In re: | * | |
| **SPECIALTY HOSPITAL OF WASHINGTON, LLC, et al.,** | * | Case No. 14-00279 |
| | * | Chapter 11 |
| Debtors. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**BRANCH BANKING AND TRUST COMPANY'S OBJECTION TO
DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364
AND 507 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION
FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III)
GRANTING PRIMING LIENS AND PROVIDING SUPERPRIORITY CLAIMS, (IV)
GRANTING ADEQUATE PROTECTION, (V) SCHEDULING A
FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

Branch Banking and Trust Company ("BB&T"), a North Carolina banking corporation, by and through undersigned counsel, objects to the above-referenced motion (Dkt. No. 67) (the "Financing Motion"), and states as follows:

**PRELIMINARY STATEMENT**

1. The Debtors declare that they lack the financial resources (even if allowed to use cash collateral without restriction) to continue operating without immediate access to a priming postpetition DIP facility that is still in the "term sheet" stage, notwithstanding their having continued to operate under similar circumstances for the past two years. While BB&T understands the Debtors' stated wish to keep their facilities operating, BB&T objects to the proposed Priming DIP Facility because the Debtors cannot meet their burden to demonstrate that the immediate loss and displacement of BB&T's prepetition security interest in real property

caused by the priming lien will be adequately protected, as is mandated by the Bankruptcy Code and indeed the Fifth Amendment to the United States Constitution.

2.  The Debtors have not offered any adequate protection to BB&T, much less the Bankruptcy Code-mandated "indubitable equivalent" of at least $27,000,000.00 (namely, the minimum undisputed value of BB&T's collateral security as of the Petition Date). This Court need look no further than the Debtors' proposed Order granting the Financing Motion, which lacks any reference in any of its 25 pages to the amount and adequacy of the adequate protection provided to BB&T, much less a proposed finding that the Debtors have satisfied their burden.

3.  Instead, the Debtors have presented the matter as a binary choice between meeting their statutory burden of adequate protection, on the one hand, and providing care to its patients and the administrative insolvency of this matter, on the other hand. This choice does not exist under the Bankruptcy Code. If this Court cannot find that BB&T is adequately protected under the law, it cannot approve a priming lien over BB&T's objection, much less a priming lien that secures a $550,000.00 loan disbursement to the Debtors' professionals and a $340,000.00 payment to their new DIP Lender not later than this Friday, May 23, 2014. These two expenditures have literally nothing to do with health care.

4.  BB&T has taken significant good-faith steps to enable the Debtors' facilities to remain open, most recently by paying $3.5 million to redeem real property critical to the Debtors' operations from a pending tax sale, by allowing the Debtors to use cash collateral to fund health care operations, and by taking no judicial enforcement action against the Debtors, even though the Debtors have long been in default under BB&T's Prepetition Financing Documents. Only the Debtors or the District of Columbia government, not BB&T and not this Court, can voluntarily decide to cease the Debtors' operations.

5.     Stripped of ornament, the Financing Motion sets in course an expedited "loan to own" scheme for the exclusive economic benefit of the DIP Lender, while BB&T, the United States Government and other creditors receive nothing for their considerable interests, never mind adequate protection. No independent source has been proffered to validate any allegation that there is a health care crisis at the facilities, nor have the facilities' government regulators weighed in.  Even if this Court were able to conclude on independent evidence that operations in the facilities are the best alternatives for the patients currently situated there, framing this matter as a public health crisis is an emotionally poignant, but legally irrelevant, ground to wipe out BB&T's collateral security for the benefit of the DIP Lender. The Financing Motion should be denied.

## BACKGROUND

**I.     Jurisdiction, Venue and Procedural Posture.**

6.     On April 23, 2014, Capitol Hill Group, CMH Inc., JFW Services, LLC, J-Don Enterprise, LLC, Amalgamated Capital Partners, LLP and Metropolitan Medical Group, LLC filed an involuntary petition under Chapter 11 of the Bankruptcy Code against Specialty Hospital of Washington, LLC in the United States Bankruptcy Court for the District of Delaware (Case No. 14-10935 (BLS)) (the "Involuntary Bankruptcy Case"). The United States Bankruptcy Court for the District of Delaware transferred the Involuntary Bankruptcy Case to this Court.

7.     On May 21, 2014 (the "Petition Date"), Specialty Hospitals of America, LLC, SHA Management, LLC, Specialty Hospital of Washington-Nursing Center, LLC, Specialty Hospital of Washington-Hadley, LLC, SHA Holdings, Inc. and SHA Hadley SNF, LLC (together with against Specialty Hospital of Washington, LLC, the "Debtors") filed petitions for relief under Chapter 11 of the Bankruptcy Code, and this Court entered an order for relief under

3

Chapter 11 against Specialty Hospital of Washington, LLC. The Debtors have filed a motion for joint administration of their bankruptcy cases.

8. Pursuant to §§ 1107 and 1108 of the Bankruptcy Code, the Debtors remain in possession of their assets and continue to operate and manage their businesses.

9. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. § 1408.

10. This is a contested matter as to which Bankruptcy Rule 7056 is applicable. *See* Fed. R. Bankr. P. 9014(c). At this juncture, because there is no genuine dispute of material fact, the Financing Motion should be denied as a matter of law. *See id.*; Fed. R. Civ. P. 56. This Court may and should consider evidentiary affidavits, based on personal knowledge, such as those submitted herewith, in so deciding. Fed. R. Civ. P. 56(c)(4).

**II.     The Debtors' Operations.**

11. The Debtors operate four "for-profit" health care facilities located in the District of Columbia. Specialty Hospital of Washington, LLC operates a long-term acute care hospital ("LTACH") at 900 Constitution Avenue, N.E., on Capitol Hill, Washington, D.C. (the "Capitol Hill Real Property"), while Specialty Hospital of Washington-Nursing Center, LLC operates a skilled nursing facility ("SNF") at this location. *See Joinder in the District of Columbia's Motion to Transfer Venue to the United States Bankruptcy Court for the District of Columbia Filed by Specialty Hospital of Washington, LLC* (Dkt. No. 33) ("Joinder") at ¶¶ 1, 9, n.6. The "lead" petitioning creditor, Capitol Hill Group, owns and is the landlord at the Capitol Hill Real Property. *See Petitioning Creditors' Emergency Motion for an Order Directing the Appointment of a Chapter 11 Trustee* (Dkt. No. 11) ("Trustee Motion") at ¶ 15.

4

12. Specialty Hospital of Washington-Hadley, LLC operates an LTACH at 4601 Martin Luther King Jr. Avenue, S.E., Washington, D.C. (the "Hadley Real Property"), while SHA Hadley SNF, LLC operates an SNF at this location. *Joinder* at ¶ 10, n.7. Specialty Hospital of Washington-Hadley, LLC owns the Hadley Real Property. *Id.*

### III. The Prepetition Secured Debt to BB&T.

13. BB&T is the Debtors' primary secured lender, having made available (A) a term loan in the original principal amount of $35,000,000.00 (the "Term Loan") and (B) a line of credit in the maximum principal amount of $10,500,000.00 (the "Line of Credit,") and together with the Line of Credit, the "Loans"). *See Affidavit of Lawrence D. Shields in Support of Objection of Prepetition Secured Lender, BB&T*, **Exhibit P** hereto ("Shields Aff."), at ¶¶ 4, 6. True and correct copies of the promissory notes evidencing the Term Loan and the Line of Credit are **Exhibits A-B** hereto. *Id.* at ¶¶ 5, 7.

14. Collateral security for the repayment of the Loans is provided by substantially all of the Debtors' personal property (collectively, the "Personal Property Collateral"), pursuant to and as more particularly described in a Business Loan and Security Agreement dated March 24, 2008 (as amended, restated, supplemented, or otherwise modified through the date hereof, the "Loan and Security Agreement"). *Id.* at ¶ 8. A true and correct copy of the Loan and Security Agreement Note is **Exhibit C** hereto. *Id.*

15. BB&T duly perfected its liens and security interests in the Prepetition Personal Property Collateral by filing UCC-1 Financing Statements and continuation statements in the

5

appropriate public records (collectively, the "Financing Statements").[1] *Id.* at ¶ 9. True and correct copies of the Financing Statements are **Exhibits D-L** hereto. *Id.*

16.     Collateral security for the repayment of the Loans is also provided by a <u>first priority</u> lien on the Hadley Real Property pursuant to a Deed of Trust, Security Agreement and Fixture Filing dated March 24, 2008 and recorded in the Recorder of Deeds for the District of Columbia as Doc. No. 2008032888 (the "Hadley Deed of Trust"). *Id.* at ¶ 10. A true and correct copy of the Hadley Deed of Trust is **Exhibit M** hereto. *Id.* The aforesaid promissory notes, the Loan and Security Agreement, the Hadley Deed of Trust and all other written agreements, documents and instruments executed in connection with the Loans are collectively referred to below as the "Prepetition Financing Documents." The Personal Property Collateral and the Hadley Real Property are collectively referred to below as the "Collateral."

17.     The Financing Documents are in default for, among other reasons, the Debtors' failures to pay the Line of Credit in full at maturity on December 31, 2011, and to make payments as and when required with respect to the Term Loan. *Id.* at ¶¶ 11-12.

---

[1] The Financing Statements are as follows: (1) UCC-1 Financing Statement filed with the Delaware Secretary of State as File No. 20081199957, identifying Specialty Hospitals of America, LLC as Debtor, as continued pursuant to UCC-3 Financing Statement Amendment filed as File No. 20130820531 (Ex. "D"); (2) UCC-1 Financing Statement filed April 1, 2008 with the Delaware Secretary of State U.C.C. Filing Section as File No. 20081199262, identifying Specialty Hospital of Washington, LLC as Debtor, as continued pursuant to UCC-3 Financing Statement Amendment filed as File No. 20130821588 (Ex. "E"); (3) UCC-1 Financing Statement filed with the Delaware Secretary of State as File No. 20081199668, identifying Specialty Hospital of Washington-Hadley, LLC as Debtor, as continued pursuant to UCC-3 Financing Statement Amendment filed as File No. 20130821968 (Ex. "F"); (4) UCC-1 Financing Statement filed with the Delaware Secretary of State as File No. 20081199999, identifying Specialty Hospital of Washington-Nursing Center, LLC as Debtor, as continued pursuant to UCC-3 Financing Statement Amendment filed as File No. 20130821695 (Ex. "G"); (5) UCC-1 Financing Statement filed with the Delaware Secretary of State as File No. 20081199775, identifying SHA Hadley SNF, LLC as Debtor, as continued pursuant to UCC-3 Financing Statement Amendment filed as File No. 20130822248 (Ex. "H"); (6) UCC-1 Financing Statement filed April 1, 2008 with the Delaware Secretary of State as File No. 20081199700, identifying SHA Holdings, Inc. as Debtor, as continued pursuant to UCC-3 Financing Statement Amendment filed as File No. 20130822099 (Ex. "I"); (7) UCC-1 Financing Statement filed April 1, 2008 with the Delaware Secretary of State as File No. 20081199866, identifying SHA Management, LLC as Debtor, as continued pursuant to UCC-3 Financing Statement Amendment filed as File No. 20130820564 (Ex. "J"); (8) UCC-1 Financing Statement filed in the Washington, D.C. Recorder of Deeds as Doc. No. 2008032893, identifying Specialty Hospital of Washington, LLC as Debtor, and continued pursuant to UCC-3 Financing Statement Amendment filed as Doc. No. 2013025651 (Ex. "K"); and (9) UCC-1 Financing Statement filed in the Washington, D.C. Recorder of Deeds as Doc. No. 2008032892, identifying Specialty Hospital of Washington-Hadley, LLC as Debtor, as continued pursuant to UCC-3 Financing Statement Amendment filed as Doc. No. 2013025650 (Ex. "L").

6

18. Following the above-referenced defaults, among others, BB&T and the Debtors entered into an Amended and Restated Forbearance Agreement dated May 31, 2012, as modified on or about June 29 and July 12, 2012 (as amended, restated, supplemented, or otherwise modified through the date hereof, the "Forbearance Agreement"). *Id.* at ¶ 13. A true and correct copy of the Forbearance Agreement is **Exhibit N** hereto. *Id.*

19. Notwithstanding the aforesaid defaults and expiration of the forbearance period under the Forbearance Agreement, while reserving all of its rights and remedies, BB&T has permitted the Debtors to use BB&T's cash collateral to fund health care operations. *Id.* at ¶ 18. BB&T has also refrained from taking judicial enforcement action against the Debtors. *Id.*

20. On or about February 24, 2014, BB&T paid $3,481,809.74 to the District of Columbia and redeemed the Hadley Real Property from a pending tax sale action in order to stave off an effort by the purchaser of the tax sale certificate to foreclose its interest. *Id.* at ¶ 20. Taxes had not been paid since 2009. *Id.* A true and correct copy of the related Certificate of Redemption is **Exhibit O** hereto. *Id.*

21. As of April 22, 2014, the Debtors were jointly and severally indebted to BB&T under the Financing Documents as follows:

*Term Loan*

| | |
|---|---|
| Principal | $28,127,952.81 |
| Interest | $ 2,296,672.57 |
| Tax Sale Redemption | $ 3,481,809.74 |
| **Subtotal** | **$33,906,435.12** |

*Line of Credit*

| | |
|---|---|
| Principal | $6,029,631.69 |
| Interest | $   677,174.85 |
| **Subtotal** | **$6,706,806.54** |
| *Grand Total* | *$40,613,241.66*[2] |

*Id.* at § 21. The Debtors appear to accept these figures at face value. *See Financing Motion* at ¶ 21.

22.  The Hadley Real Property was the subject of a November 25, 2013 written appraisal which expressed an expert opinion valuing only the raw land and improvements constituting the Hadley Real Property at $27.4 million as of the date thereof. *See Declaration of Gerald Rasmussen, MAI, FRICS*, **Exhibit Q** hereto ("Rasmussen Decl."), at ¶ 22, Ex. 2.[3] While BB&T is an under-secured creditor, it is indisputably a secured creditor with a first lien against the Hadley Real Property. This $27.4 million valuation of the Hadley Real Property is, at a minimum, the basis for which the Debtors must provide adequate protection to BB&T.

**III.    The Proposed Priming DIP Facility.**

23.  The Debtors seek to enter into a debtor in possession financing facility (the "Priming DIP Facility") provided by a newly formed and presumably uncapitalized affiliate of Silver Point Capital, LLC (collectively, the "DIP Lender"), which is described as a Connecticut-based private investment fund. *See Financing Motion* at ¶ 34. Notably, the Priming DIP Facility is evidenced only by a term sheet that, by its express terms, is not and "shall not be deemed to be" a binding agreement between the DIP Lender and the Debtors. *Id.* at p. 67. Stated another

---

[2] Exclusive of attorneys' fees and other expenses.
[3] This valuation is within $300,000.00 of the District of Columbia Tax Assessor's office assessment of market value of $27,712, 270.00. *See Rasmussen Decl.* at Ex. 2, p. 61.

way, its terms are meaningless until the parties sign a final written agreement (the "DIP Credit Agreement"), the terms of which are unknown to this Court and the creditors of these estates.

24. The Priming DIP Facility is effectively conditioned upon the unlikely prospect that certain healthcare-related government agencies will refrain from exercising their statutorily-entitled recoupment rights. *Id.* at p. 63. The Priming DIP Facility also sets certain milestones that wrest control from the Debtors and place it squarely in the hands of the DIP Lender to predetermine the course of these proceedings.

25. Under the Priming DIP Facility, the Debtors represent to the Court that the DIP Lender has promised to provide the Debtors up to $15 million in postpetition financing, secured by a priming lien, with up to $6.6 million to be disbursed presumably upon execution of the currently invisible DIP Credit Agreement.

26. BB&T understands that the DIP Lender intends to submit a "stalking horse" bid consisting only of (A) the value of its priming lien via credit bid[4] and (B) an assumption of the Debtors' provider agreements. As with the Priming DIP Facility, the transaction is presently documented only by a term sheet subject in all respects to the execution of a so-called "Stalking Horse Agreement," which is not defined in the Asset Purchase Agreement Stalking Horse Term Sheet attached to the sale motion (Dkt. No. 68).

27. Stated plainly, the Debtors are seeking approval of a Priming DIP Facility the binding terms of which do not presently exist and may not exist as of the date of the emergency hearing currently scheduled for Friday, May 23, 2014 at 11:00 a.m.

---

[4] BB&T reserves the right to assert that the DIP Lenders' credit bid be modified "for cause" pursuant to § 363(k) prior to any sale proceeding.

**OBJECTION**

I. **The Priming DIP Facility Should Not Be Approved Because the Debtors Cannot Meet Their Burden to Demonstrate that BB&T is Adequately Protected.**

28. The statute mandating BB&T's right to adequate protection is clear and unambiguous, and there is no shortage of cases describing exactly what Congress meant when it required that a prepetition secured lender receive adequate protection before a Court can approve a priming lien. Indeed, "[t]he ability to prime an existing lien is extraordinary." 3 COLLIER ON BANKRUPTCY § 364.05 (16th Ed.).

29. Section 364(d) provides that the Court "may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if . . . there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." *Id.* § 364(d)(1). "Given the fact that superpriority financing displaces liens on which creditors have relied in extending credit, <u>a court . . . must be particularly cautious when assessing whether the creditors so displaced are adequately protected</u>." *In re First South Sav. Ass'n*, 820 F.2d 700, 710 (5th Cir. 1987) (emphasis added).

30. As enunciated by the Supreme Court, the requirement of adequate protection is derived from the Fifth Amendment protection of property interests. *LNC Invs., Inc. v. First Fidelity Bank*, 247 B.R. 38, 44 (S.D.N.Y. 2000) (quoting Historical and Statutory Notes following 11 U.S.C. § 361 (1993) (citing *Wright v. Union Central Life Ins. Co.*, 311 U.S. 273 (1940), and *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935))). *See also United States v. Security Industrial Bank*, 459 U.S. 70, 75 (1982) (holding that the bankruptcy power is subject to the Fifth Amendment).

31. The purpose of adequate protection is to ensure that a prepetition lender receives the security it bargained for pre-bankruptcy. *See, e.g.*, *In re Mosello*, 195 B.R. 277, 292 (Bankr. S.D.N.Y. 1996) (stating that adequate protection must "protect[]…the creditor from diminution in the value of its collateral during the reorganization process.") (citations omitted).

32. "Adequate protection" is not defined in the Bankruptcy Code, but may include periodic cash payments, the imposition of additional or replacement liens, or the "indubitable equivalent" of the secured creditor's interest in such property. 11 U.S.C. § 361. According to Judge Learned Hand in defining "adequate protection" under a predecessor statute,

> It is plain that "adequate protection" must be completely compensatory. . . . [A] creditor who fears the safety of his principal will scarcely be content with [interest]; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most <u>indubitable equivalence</u>.

*Metro. Life Ins. Co. v. Murel Holding Corp. (In re Murel Holding Corp.)*, 75 F.2d 941, 942 (2d Cir. 1935) (emphasis added).

33. The existence of an equity cushion is the preferred test in determining whether priming of a senior lien is appropriate under § 364. *In re Strug-Div., LLC*, 380 B.R. 505, 513 (Bankr. N.D. Ill. 2008); *see Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088-90 (4th Cir. 1986); *In re Dunes Casino Hotel*, 69 B.R. 784, 795-96 (Bankr. D. N.J. 1986); *In re Reading Tube Indus., Inc.*, 72 B.R. 329, 333-34 (Bankr. E.D. Pa. 1987) (holding that, where there is no equity cushion, §364(d)(1)(B) is not satisfied).

34. Here, the indebtedness under the Prepetition Financing Documents exceeds $40 million. BB&T concedes that recorded liens in favor of the United States Government for unpaid withholding taxes severely deplete and may in fact have exhausted BB&T's first-priority security

interest in its Personal Property Collateral.[5] However, the government's lien does <u>not</u> leapfrog BB&T's lien on the Hadley Real Property, which is worth approximately $27,400,000.00 as of the Petition Date. *See Rasmussen Decl.* at ¶ 22, Ex. 2. Thus, while BB&T is "in the money,"[6] and is entitled to the indubitable equivalent of $27,400,000, it is under-secured in respect of its Collateral. Stated another way, there is no equity cushion, at all. On this ground alone, the Financing Motion should be denied.

35. The Debtors know better than to claim that BB&T has an equity cushion. Instead, the Debtors state that the Priming DIP Facility is absolutely necessary to preserve the Debtors' assets and to bring the promised §363 Sale to the DIP Lender to a speedy conclusion. The Debtors' evidence may prove these facts to be true, but they are beside the point. The *only* inquiry must focus on compensating BB&T for the loss of value of its interests caused by the priming lien. *See In re Swedeland Dev. Grp.*, 16 F.3d 552, 564 (3d Cir. 1994).

36. The Debtors have similarly asserted that the Priming DIP Facility might even "bring[] value to the estate and its creditors, *Financing Motion* at ¶ 68, but this contention (even if technically truthful) is just as irrelevant in light of the clear statutory mandate. For example, in

---

[5] Certain Debtors are indebted to the Internal Revenue Service for obligations secured by the following:
  a. Notice of Tax Lien against Specialty Hospital of Washington, LLC in the aggregate amount of $4,486,895.51 dated April 12, 2011 and recorded in the Washington, D.C. Recorder of Deeds as Doc. No. 2011049998;
  b. Notice of Tax Lien against Specialty Hospital of Washington, LLC in the aggregate amount of $1,204,762.23 dated October 23, 2012 and recorded in the Washington, D.C. Recorder of Deeds as Doc. No. 2012118626;
  c. Notice of Tax Lien against Specialty Hospital of Washington, LLC in the aggregate amount of $993,074.32 dated January 24, 2013 and recorded in the Washington, D.C. Recorder of Deeds as Doc. No. 2013015312;
  d. Notice of Tax Lien against Specialty Hospital of Washington-Hadley, LLC in the aggregate amount of $4,342,687.87 dated April 25, 2011 and recorded in the Washington, D.C. Recorder of Deeds as Doc. No. 2011050953; and
  e. Notice of Tax Lien against Specialty Hospital of Washington-Hadley, LLC in the aggregate amount of $1,546,275.94 dated May 9, 2011 and recorded in the Washington, D.C. Recorder of Deeds as Doc. No. 2011062421.

[6] Further evidencing the value of the Hadley Property to BB&T is that it spent $3,481,809.74 to redeem the Hadley Real Property from tax sale less than three months ago. No regulated financial institution in the country would have made a protective advance of this size had it been "out of the money."

*In re Fontainebleau Las Vegas Holdings, LLC*, 434 B.R. 716 (Bankr. S.D. Fla. 2010), the United States District Court for the Southern District of Florida reversed a Bankruptcy Court order grounded only in the "preservation of value" concept. The court stated that:

> When formulating adequate protection in connection with post-petition financing on a priming basis, preserving or enhancing the value of collateral must be viewed side-by-side with the decrease in value of a creditor's interest in the property caused by the priming lien. *See In re Swedeland Dev. Grp.*, 16 F.3d at 566
>
> …
>
> Here, the Debtors and the bankruptcy court focused on preserving the value of the Project for the benefit of all creditors. That goal was worthy and important, and the Court does not question it. <u>But the Debtors did not try to establish, and the bankruptcy court did not find, that the decrease in the value of the Statutory Lienholders' interests therein caused by the priming lien was compensated, replaced, or substituted in any way: to be blunt, the Statutory Lienholders were not adequately protected</u>. The proceedings below failed to account for what a priming lien does. *See In re First S. Sav. Ass'n*, 820 F.2d 700, 710 (5th Cir. 1987) ("Given the fact that super priority financing displaces liens on which creditors have relied in extending credit, a court that is asked to authorize such financing must be particularly cautious when assessing whether the creditors so displaced are adequately protected." (emphasis added)); COLLIER, supra, ¶ 364.05, at 364-21 ("The ability to prime an existing lien is extraordinary, and in addition to the requirement that the trustee be unable to otherwise obtain the credit, the trustee must provide adequate protection for the interest of the holder of the existing lien." (emphasis added)). <u>Not accounting for the decrease caused by the priming lien was fundamentally at odds with the principle of adequate protection, which must "as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights." In re Swedeland Dev. Grp.</u>, 16 F.3d at 564 (internal quotation marks omitted).

*Id*. at 754 (emphasis added). *See also* 3 COLLIER ON BANKRUPTCY, <u>supra</u>, at § 364.05 ("When the effect of the new borrowing with a senior lien is merely to pass the risk of loss to the holder of the existing lien, the request for authorization should be denied absent the lien holder's consent.").

13

37.     In the present case, the Debtors offer <u>nothing of even arguable value</u> to provide BB&T with the value of its bargained-for rights.  Never mind the statutorily-mandated $27.4 million of adequate protection borne out by BB&T's expert opinion of value, the Debtors have offered a junior replacement lien (!) in exchange for BB&T's senior lien that by the Debtors' own reckoning will simply disappear in thirty days. *Financing Motion* at ¶ 70.

38.     The Financing Motion is replete with references to the public interest the Debtors seek to protect by establishing the Priming DIP Facility. For example, there is the stated need to "continue to provide life-saving, high quality[7] medical and related services to their patients and residents," *id.* at ¶ 80, and the "potentially catastrophic consequences if this financing is not obtained," *id.* at ¶ 66, n. 10. The Debtors even suggest that it would be irresponsible for BB&T and the other Existing Lienholders to require the Debtors to sustain their statutory burden to prove that these stakeholders are adequately protected:

> Requiring the Debtors to litigate priming and cash collateral, even if the Debtors prevail, will only add further uncertainty to the fate of the patients, residents and employees of the SHA facilities.

---

[7] According to the federal Centers for Medicare and Medicaid Services Nursing Home Compare website, www.medicare.gov, Capitol Hill SNF has a "2 star" out of 5 rating, *i.e.*, "below average." Of the factors considered, it has a "1 star" rating, *i.e.*, "much below average," for health inspections. The SHW Hadley SNF has a "3 star" overall rating, *i.e.*, "average," which includes a "2 star" rating for health inspections. At this point, the Debtors have offered no independent verification of the "high quality care" claim from any credible source.

Moreover, the Debtors make no argument as to why they should not arrange for the transfer of patients to whom they cannot afford to provide care. According to aforementioned website, there are 96 SNFs within 25 miles of Washington, D.C., which equates to less than one patient transfer per available facility. Similarly, the LTACH patients could be transferred to hospitals or even SNFs with specialized capabilities. *See*, *e.g.*, *United States Department of Health & Human Services' Response in Support of the Motion of the District of Columbia to Change Venue of Bankruptcy Proceedings and Transfer this Case to the U.S. Bankruptcy Court for the District Of Columbia* (Dkt. No. 36) at ¶ 4 ("[P]atients served by long-term acute care hospitals (LTCHs) can also be served by acute care hospitals. . . . Therefore, the closure of an LTCH generally does not cause significant access to care problems."). Contrary to central theme of the Financing Motion, the instant circumstances do not rise to the level of a public health emergency.

Finally, when the Debtors' claim that they are the only licensed freestanding LTACHs between Richmond and Philadelphia, they may be misleading the court. Upon information and belief, most of the LTACHs in this country are hospital-based, not freestanding.  BB&T understands and this Court can inquire of creditor CMS to confirm that there are at least 2 LTACHs in Baltimore alone, and that the National Rehabilitation Hospital in neighboring Arlington, Virginia is an LTACH.

*Id.* Not surprisingly, the Debtors muster not a single case or statute to support the proposition that the public interest is served only by keeping these for-profit ventures open and operating.

39.     BB&T acknowledges the self-evident public interest in well-managed and high quality healthcare services. But, with respect to the applicable legal standard of § 364(d), "Congress intended that the public interest <u>not</u> be considered in the granting of super priority loans . . . ." *Citicorp North America, Inc. v. Murray*, 109 B.R. 308, 314 (N.D. Ill. 1989) (emphasis added), cited with approval in *In re Fontainebleau Las Vegas Holdings, LLC*, 434 B.R. at 749. "By requiring adequate protection before priming loans may be allowed, whether for a railroad or a widget manufacturer, Congress precluded the consideration of the public interest." *Id.* Adequate protection must be "completely compensatory." *Id*. at 313 (citing Judge Learned Hand in *In re Murel Holding Corp.*, 75 F.2d at 942.

40.     As indicated above, the Debtor has operated (albeit on a financial razor's edge and perpetually in default) solely on the receipts of its accounts receivable for almost two years. The undocumented Priming DIP Facility proposed by the Debtors proposes to keep the Debtors' operations running for another thirty days, impermissibly at the direct and irreparable expense of BB&T's and other stakeholders' statutory right to adequate protection, and with no confirmation that the ultimate effort (requiring as it does immense concessions from the U.S. Government) will be successful. *See* 3 COLLIER ON BANKRUPTCY, <u>supra</u>, at § 364.05.

41.     Notwithstanding the sheer mass of the Debtors' first-day filings, the responsibility for any emergency implicating the public interest rests squarely with the Debtors. It should not cause this Court to dispossess BB&T of its bargained-for collateral for the benefit of the investors in a private distressed investment fund.

## II. The Priming DIP Facility Is Not "Fair, Reasonable and Adequate."

42. Although not specifically enumerated in the statutory text, the Debtors must also demonstrate that the terms of the Priming DIP Facility are "fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender." *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (quoting *In re The Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987)). "[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate." *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990). The party seeking to establish good faith bears the burden of proof. *See In re The Colad Grp., Inc.*, 324 B.R. 208, 225 (Bankr. W.D.N.Y. 2005).

43. The Debtors have fiduciary duties that run to all creditors and the Debtors' obligation to satisfy such duties must not be stifled by an overly burdensome DIP credit agreement. *See, e.g., In re Marvel Enter. Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998) ("The debtor in possession is a fiduciary of the creditors and, as a result, has an obligation to refrain from acting in a manner which could damage the estate, or hinder a successful reorganization." (internal quotations omitted)); *In re Tenney Village Co.*, 104 B.R. 562, 569 (Bankr. D. N.H. 1989) (rejecting DIP financing proposal when, among other things, "the execution of the Financing Agreement violates the Debtors' fiduciary obligations to the estate," noting "the general mandate of the Bankruptcy Code is clear. The Debtors' pervading obligation is to the bankruptcy estate and, derivatively, to the creditors who are its principal beneficiaries"). While it is impossible to gainsay whether the DIP Credit Agreement at issue in the present case poses a stifling burden (because it does not yet exist), the proposed DIP Financing Order is abundantly clear— it contemplates the removal of BB&T and other prepetition creditors from the capital

16

stack altogether. This is more than a stifling burden; rather, is the total evisceration of the Debtors' creditors in favor of the DIP Lender.

44. Of particular note is *Norris Square Civic Ass'n v. St. Mary Hosp. (In re St. Mary Hosp.)*, 86 B.R. 393 (Bankr. E.D. Pa. 1988). The debtor-hospital filed a Chapter 11 petition on April 27, 1988. Seven days later, the court held a hearing on the debtor's request to obtain from its parent, Franciscan Health Services, Inc. ("FHS"), $700,000.00 in superpriority financing pursuant to § 363(c) to fund short-term payroll until a closure of the hospital would occur. The court "decline[d] to enter an order which encourage[d] any further deterioration of the position of the unsecured creditors," noting that its decision "may put the doctors and the adversary plaintiffs to the test of supplying cash or seeing the Debtor [immediately] close because of lack of cash to do otherwise." *Id.* at 401.

45. Directly applicable to the litany of the woes plaguing the Debtors in this case, as alleged in the Financing Motion, the court in *Norris Square* further stated:

> FHS should not be permitted to foist off any unavoidable negative economic consequences upon other parties. We consider the bankruptcy filing, at a time when the Debtor's cash resources were depleted due to circumstances within the control of FHS and just before a payday, to be the archetype of a "tailored emergency." *See In re Ellingsen MacLean Oil Co.*, 65 B.R. 358, 364-65 (W.D. Mich.1986); and *Crouse*, *supra*, 71 B.R. at 550.
>
> \* \* \*
>
> We recognize that this Order places pressure on not only the Debtor, but on the doctors and the adversary plaintiffs, to come up with funds from probably some source other than FHS, or the Debtor will shortly be doomed to complete financial collapse. This is, in a sense, a test by fire. If the doctors and the adversary plaintiffs do indeed have a prospect of coming up with funds or a buyer, they must produce such a party immediately. If they cannot, there would be little or no prospect of saving the Debtor in any event.

*Id.* at 401-402.

46. Although referring to the current circumstances as akin to a *Norris Square* "tailored emergency" may be going too far, the public record and the Debtors' own admissions compel the conclusion that caution is warranted before giving any credence to the Debtors' claims that their current circumstances justify doing violence to the statutory rights of creditors like BB&T and foisting the economic consequences of their failure on other parties.

47. BB&T is indeed willing to allow the Debtors to use cash collateral to pay for medical care[8] until the final hearing on the Financing Motion, while the parties attempt to reach a resolution that respects the legal rights of all stakeholders. BB&T is not willing, and strenuously objects to, the Debtors' attempt to displace BB&T's first priority lien on the Hadley Property without providing one whit of protection, much less adequate protection, as the Bankruptcy Code and the cases interpreting it unambiguously require.

48. This Court must find that BB&T's quantifiable decrease in the value of its collateral security interests in the Hadley Property (from $27 million to zero) will be protected before it can approve the Priming DIP Facility. By offering nothing of value, much less the indubitable equivalent, the Debtors make it at best reversible error and at worst impossible for this Court to find that BB&T is adequately protected, as is required by 11 U.S.C. § 364(d). The Financing Motion should be denied.

**RESERVATION OF RIGHTS**

49. BB&T did not receive copies of the Financing Motion or the related term sheet (much less a full-fledged DIP Credit Agreement, which does not yet exist) prior to the Petition Date. In fact, BB&T did not receive copies of anything until after 8:00 p.m. on Wednesday, May

---

[8] And medical care alone, not the legions of presumably unpaid professionals assisting the Debtors, nor to the reimbursement of the proposed DIP Lender's due diligence fees, or advances to pay professionals. BB&T would ask in return for a standard adequate protection package of replacement liens on the Debtors' postpetition accounts receivables thereby permitted to be created.

21, 2014. Accordingly, BB&T expressly reserves the right to amend or supplement this Objection, to supplement the written evidence filed in connection herewith, to make additional argument at any hearing with respect thereto, to introduce supplemental or additional evidence at any hearing with respect thereto, and to file additional and supplemental objections and pleadings.

## NOTICE

50.     Notice of this Objection has been provided to (i) counsel for the petitioning creditors, (ii) counsel for the Debtors, (iii) the Office of the United States Trustee for the District of Columbia (iv) counsel to the DIP Lender, and (v) all parties on the Electronic Mail Notice List for this case.

WHEREFORE, BB&T requests that the Court deny the Financing Motion and grant such other relief as is just, proper and equitable.

Dated: May 22, 2014                                    Respectfully Submitted,

/s/ Nikolaus F. Schandlbauer
Nikolaus F. Schandlbauer (Bar No. 434314)
E. John Steren (Bar No. 429307)
Ober, Kaler, Grimes & Shriver
A Professional Corporation
1401 H Street, N.W., Suite 500
Washington, D.C. 20005
(202) 326-5070
(202) 326-5270 facsimile
nfschandlbauer@ober.com
ejsteren@ober.com

          Jeffrey S. Greenberg
          (admission *pro hac vice* pending)
          Ober, Kaler, Grimes & Shriver
          A Professional Corporation
          100 Light Street
          Baltimore, Maryland 21202
          (410) 347-7387
          (410) 263-7587 facsimile
          jsgreenberg@ober.com

          *Attorneys for Branch Banking and Trust Company*