# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 14-00279 |
|  | ) |  |
| **SPECIALTY HOSPITAL OF** | ) |  |
| **WASHINGTON, LLC,** *et al.*, | ) | **Chapter 11** |
|  | ) |  |
| Debtor.[1] | ) | **(Joint Administration Requested)** |
|  | ) |  |

**OBJECTION OF THE UNITED STATES TO DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) GRANTING PRIMING LIENS AND PROVIDING SUPERPRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

The United States of America, acting on behalf of the Secretary of Health and Human Services (the "Secretary") and her designated component, the Centers for Medicare & Medicaid Services ("CMS"), hereby objects to the *Debtors' Emergency Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Priming Liens and Providing Superpriority Claims, (IV) Granting Adequate Protection, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Motion"). The relief requested by the Motion violates the Bankruptcy Code, applicable federal law, and D.C. Circuit precedent to the extent it seeks to limit the United States' rights to adjust Medicare payments to the Debtors to account for prior overpayments, and to set off, recoup, or use other legal remedies recover overpayments to the Debtors.  In support of its objection, CMS states as follows.

---

[1]     The debtors in these chapter 11 cases and the last four digits of each debtor's federal identification number are: Specialty Hospital of America, LLC (1347), SHA Holdings, Inc. (1943), SHA Management, LLC (1350), Specialty Hospital of Washington, LLC (1352), Specialty Hospital of Washington Nursing Center, LLC (1348), Specialty Hospital of Washington Hadley, LLC (2586), and SHA Hadley SNF, LLC (1976).

Procedural Background

1.       On May 21, 2014 (the "Petition Date"), the court entered an order for relief in the

bankruptcy case of Specialty Hospital of Washington, LLC ("SHW"), and four of SHW's

affiliates filed voluntary petitions for relief.  The above-captioned debtors have moved for joint

administration of the cases and are continuing to operate their businesses and manage their

affairs as debtors-in-possession.  11 U.S.C. §§ 1107(a) and 1108.

2.       As of the Petition Date, certain of the Debtors are parties to Medicare provider

agreements with the Secretary, permitting the Debtors to receive payment for services provided

to Medicare beneficiaries pursuant to the provisions of, and regulations promulgated under, Title

XVIII of the Social Security Act.  42 U.S.C. §§ 1395-1395kkk (the "Medicare Statute").

3.       On the Petition Date, the Debtors filed the Motion (D.I. 67) and proposed interim

order (D.I. 67-1).  The proposed interim order would approve a postpetition loan from Silver

Point Capital, LLC ("Silver Point") of up to $6.6 million, which could increase to $15 million if

a final order is entered.  The loan would be secured, pursuant to Bankruptcy Code sections

364(c)(2), 364(c)(3) and 364(d)(1) with senior priming liens on most of the Debtors' assets,

including Medicare receivables and reimbursements, with priority over all other pre- and post-

petition liens under section 364(d)(1), with the exception of a small carve-out for professional

fees.  D.I. 67-1 at 3, 13.

4.       The proposed interim order would also approve a term sheet ("DIP Term Sheet")

that purports to prohibit CMS or any other United States agency from collecting prepetition

overpayments from the Debtors and provides for the following limitation on governmental

agencies' recoupment rights.

> [the United States] shall have no right to recoup provider
> reimbursement overpayments that were made to a [Debtor] from

> any amounts due to such [Debtor] other than to recoup such
> overpayments that arise under the same provider agreement or
> comparable applicable statutes, regulations, or arrangements, only
> in accordance with applicable law.

D.I. 67 at 86.  The DIP Term Sheet also specifies that any governmental recoupment exceeding

$125,000 in the aggregate after the Petition Date, or $25,000 in any single recoupment would

constitute an event of default by the Debtor under the DIP loan.  D.I. 67 at 63.

     5.     The proposed interim order further provides for use of cash collateral, although it

does not specify the amount of cash collateral pursuant to 11 U.S.C. § 363.  D.I. 67-1 at 11.  The

order states that "adequate protection" in the form of replacement liens on post-petition

receivables will be provided to creditors for the use of cash collateral and the priming of

creditors' liens.  D.I. 67-1 at 16.  The replacements liens, however, would be junior to the

priming liens provided to Silver Point under the proposed DIP loan, and, as a result, have no

value.  *Id.*

     6.     Also on the Petition Date, the Debtors filed a motion (the "Sale Motion") to sell

their assets to Silver Point, seeking court approval for the sale within 30 days.  D.I. 68.  The Sale

Motion seeks approval of Silver Point as stalking horse bidder, with an agreement to sell all of

the Debtors' assets in exchange for:  (1) Silver Point's "credit bid" of the amounts it loans to the

Debtors under the DIP loan; (2) the undetermined value of a lease and assumption of limited but

undesignated liabilities; and (3) $200,000.  D.I. at 14.  The proposed break-up fee and expense

reimbursement for Silver Point under the stalking horse agreement would be $3 million and

$100,000, respectively.  D.I. 68 at 20.  Although the proposed bid procedures state that secured

creditors (two of whom hold alleged secured claims of $40 million and $34 million) could credit

bid, whether any pre-petition secured creditors would be considered to have a "valid lien"

eligible to credit bid after Silver Point were granted a lien that primed the prepetition lien is

unclear.

Regulatory Background

7.      In order for the Debtors to be eligible as a provider of skilled long-term acute care

services or skilled nursing services under the Medicare program, each has a valid agreement with

the Secretary, called a Health Insurance Benefit Agreement (commonly known as a "Provider

Agreement").  42 U.S.C. § 1395cc; 42 C.F.R. § 400.202 (defining "provider").  A Provider

Agreement is defined as an agreement between CMS, acting on behalf of the Secretary, and a

health facility, such as a hospital (including a long term care hospital or a skilled nursing facility,

such as those owned by Debtors), or a hospice.  42 C.F.R. §§ 489.2 and 489.3[2]

8.      The Medicare Statute explicitly defines amounts that should be paid to providers:

> [t]he Secretary shall periodically determine the amount which
> should be paid under this part to each provider of services with
> respect to the services furnished by it, and the provider of services
> shall be paid, at such time or times as the Secretary believes
> appropriate (but not less often than monthly) and prior to audit or
> settlement . . . the amounts so determined, with necessary
> adjustments on account of previously made overpayments or
> underpayments.

42  U.S.C. § 1395g(a).

9.      The Secretary contracts with Medicare Administrative Contractors ("MACs"),

typically private insurance companies, to administer payment to providers for Medicare covered

---

[2] To obtain a Provider Agreement, a new provider must apply for an initial certification.  *See* 42 C.F.R. §§ 488.1,
488.3, 489.2 and 489.10.  The certification process enables HHS to determine, *inter alia*, that the provider is
qualified to provide health care services to patients.  *See* 42 C.F.R. §§ 489.10-.12 (grounds for denying a Provider
Agreement); *see also* 42 C.F.R. Part 4822 (health and safety requirements to qualify as a hospital).  The transfer of a
Provider Agreement is strictly limited.  Provider Agreements may be assigned only if there is a "change of
ownership."  42 C.F.R. § 498.18.  When CMS determines that there has been a valid "change of ownership,", the
existing Provider Agreement is automatically assigned to the new owner.  42 C.F.R. § 489.18(c); *United States v.
Vernon Home Health, Inc.*, 21 F.3d 693, 696 (5th Cir. 1994).  An assigned agreement is subject to all statutory and
regulatory terms under which it originally was issued, including the adjustment of payments to account for
previously made overpayments.  *Vernon*, 21 F.3d at 696 (*citing* 42 C.F.R. § 489.18(a), (d)).

4

services.  MACs make interim payments to providers in accordance with the Medicare Statute

and regulations and perform the day-to-day administration of Medicare, *e.g.*, audit and

reimbursement activities.  42 U.S.C. § 1395kk-1; 42 C.F.R.  §§ 421.400-421.404.

10.     Within five months after the end of each fiscal year, the provider must submit

financial information in the form of a cost report verifying the actual amount of reimbursements

owed to it for the past fiscal year.  42 C.F.R. §§ 412.521-.541, 413.20, 413.350(c); *see* 42 U.S.C.

§§ 1395g and 1395hh (giving the Secretary authority to require submission of cost reports).

Once the cost report has been submitted, the MAC audits the cost report for that year and

determines the provider's actual, rather than estimated, reimbursement amount for the year.

42 U.S.C. §§ 1395g; 1395x(v)(1)(A)(ii); 1395yy; 42 C.F.R. §§ 412.521, 413.335.[3]

11.     The MAC then issues a "Notice of Amount of Medicare Program

Reimbursement" ("NPR"), which determines whether the provider was overpaid or underpaid for

that fiscal year.  42 C.F.R. §§ 413.60, 405.1803.  The NPR determination is final unless it is

revised by the intermediary or appealed to the Provider Reimbursement Review Board.

42 C.F.R. § 405.1807.

12.     If a provider is dissatisfied with the MAC's determination of program

reimbursement and it meets the applicable amount in controversy requirement, it may, within

180 days of the date the NPR is issued, request a hearing before the Provider Reimbursement

Review Board.  42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835.  After that decision is reviewed by

---

[3] From time to time during a provider's fiscal year, a provider submits claims for payment to its MAC.  The MAC makes two types of payments to a skilled nursing facility.  The first is a pre-determined prospective payment rate, which covers most services, 42 U.S.C. § 1395ww(m); 42 C.F.R. § 412.521(a),(b).  The MAC also makes estimated interim payments for other costs not covered by the prospective payment system, 42 U.S.C. § 1395(g)(a); 42 C.F.R. § 413.521(b)(2), including bad debts of Medicare beneficiaries, 42 C.F.R. § 521.521(d)(2).  Debtors' long-term acute care hospitals receive Periodic Interim Payments ("PIP").  PIPs are biweekly payments that the MAC computes in advance to approximate the cost of services that will be furnished by the provider during the upcoming fiscal year.  The MAC adjusts PIPs at any time if it obtains evidence that changed Medicare utilization warrants such adjustments, to assure that total payments approximate, as closely as possible, the reimbursement determined to be due after review and audit of the provider's cost report.  42 C.F.R. § 413.64(h)(6-7).

the Secretary, the provider may seek review in federal district court.  42 U.S.C. § 1395oo(f)(1).

Such review is appellate in nature.

13.    The regulations also permit reopening in order to make corrections on otherwise

final cost report determinations.  42 C.F.R. § 405.1885.  A MAC determination "may be

reopened, for findings on matters at issue" either by motion of the MAC, or at the request of the

provider affected by the determination, provided that the reopening request is made within three

years of the finalization of the specific cost report determination included in the NPR.  *Id.*

Objections

A.  A Motion For Approval of Postpetition Financing Is Inadequate to Obtain An
    Injunction Against the United States' Exercise of Recoupment and Offset Rights.

14.    The proposed interim order is silent as to whether it would affect the recoupment

and offset rights of the United States.  The DIP Term Sheet, however, purports to prevent CMS

from exercising recoupment rights to collect Medicare overpayments.  To prevent the Debtor or

Silver Point from obtaining Court approval through this "fine print" in the approved term sheet

to effectively enjoin the United States' exercise of recoupment rights, the order should be revised

to clarify that recoupment and offset rights provided by law are unaffected.  Clarification of the

proposed interim order is necessary to prevent the order from being interpreted so as to make it

inconsistent with procedural requirements of the Bankruptcy Rules.

15.    The Debtors cannot obtain an injunction against CMS recoupment or offset in a

motion for DIP financing.  Instead, Debtors must file an adversary proceeding.  *Matter of Zale*

*Corp.*, 62 F.3d 746, 762 (5th Cir. 1995) ("Under Rule 7001, an injunction requires an adversary

proceeding."); *In re Lyons*, 995 F.2d 923, 924 (9th Cir. 1993) (explaining that relief falling under

one of the categories listed in Rule 7001 may only be obtained through an adversary

6

proceeding); *In re Henneghan*, Cas No. 11-673, 2012 WL 1999431 (Bankr. D. C. Jun. 4, 2012)

(denying debtor's motion for stay in part because he failed to seek injunctive relief in an

adversary proceeding); *In re Continental Airlines, Inc.*, 236 B.R. 318, 326-27 (Bankr. D. Del.

1999) (noting that proposition that injunctive relief requires an adversary proceeding is

"generally correct").  Debtors have not filed an adversary proceeding, and accordingly, the

Court's approval of the DIP loan should be clarified to state that it should not be interpreted as

affecting CMS' recoupment and offset rights.

      B.  Debtors Cannot Impair the United States' Rights to Collect Pre-Petition
        <u>Overpayments Pursuant to the Medicare Statute.</u>

     16.     Even if Debtors could obtain injunctive relief with a motion for DIP financing, the

Bankruptcy Code provides no power to the Debtors to limit the United States' collection rights.

Well-settled D.C. Circuit case law recognizes that the United States' authority to adjust Medicare

payments is unchanged in bankruptcy.  In *United States v. Consumer Health Servs. of America*,

108 F.3d 390, 394 (D.C. Cir. 1997), the Court stated:

> The Medicare statute provides that the amount due for Medicare services be calculated as
> follows:
>> The Secretary shall periodically determine the amount which *should* be paid
> under this part to each provider of services with respect to the services furnished by it,
> and the provider of services *shall* be paid, at such time or times as the Secretary believes
> appropriate (but not less often than monthly) and prior to audit or settlement . . . the
> amounts so determined, *with necessary adjustments on account of previously made
> overpayments* or underpayments.  42 U.S.C. § 1395g(a) (emphases added).
>> The statute quite clearly says that the government is liable for particular Medicare
> services only in the amount that "shall be paid," and that amount consists of what the
> Secretary has determined "should be paid" for those services, *less adjustments for prior
> overpayments.*

     17.     Accordingly, CMS may reduce its payments to bankrupt debtors on account of

prior overpayments.  *Id.*  Moreover, reduction of payments pursuant to the Medicare Statute is

consistent with the majority of courts, which decided that recoupment of Medicare payments to

collect prior overpayments is permissible because it is done within the same transaction –

provision of Medicare services under the provider agreement.  *In re Holyoke Nursing Home, Inc.*, 372 F.3d 1, 4 (1st Cir. 2004); *Sims v. HHS (In re TLC Hospitals, Inc.)*, 224 F.3d 1008, 1012 (9th Cir. 2000); *Consumer Health Servs.*, 108 F.3d at 394.

18.    Moreover, Section 553 of the Bankruptcy Code preserves the United States' potential rights to setoff under statutes and common law, arising from mutual pre-petition debts and claims.  The United States presently has a claim against Debtor Specialty Hospital of Washington Hadley, LLC, in excess of $2.8 million for past fiscal years, and has a contingent and unliquidated claim against the Debtors for additional prepetition overpayments not yet determined.[4]  The United States also may pay the Debtors, post-petition, for services provided pre-petition.  *See In re Metro. Hosp.*, 110 B.R. 731, 737 (Bankr. E.D. Pa. 1990) (holding that underpayment arose prepetition where "[a]ll the medicare services and the costs attendant … occurred prepetition," even though HHS's "final determination [as to the underpayment] was made postpetition").  And the Debtors concede that they owe the IRS at least $7 million in taxes. D.I. 67 at 11.  The United States has the right to set off its claims against debts from different transactions and occurrences.  11 U.S.C. § 553 (preserving pre-petition offset rights during bankruptcy case).

19.    Debtors seek to strip these collection rights from the United States using a motion for use of cash collateral and for DIP financing.  But nothing in sections 363 or 364 of the Bankruptcy Code – the provisions dealing with cash collateral use and DIP financing – permits the Debtors to limit setoff or recoupment.  Section 364 may permit Debtors to grant superpriority liens and claims, but it does not permit Debtors to affect setoff, recoupment, or related rights. Indeed, with limited exceptions unrelated to a DIP financing motion, the Bankruptcy Code "does

---

[4] The cost report for the most recent fiscal year, and for the current fiscal year, are not yet due from the Debtors.

not affect any right of a creditor to offset a mutual debt." 11 U.S.C. § 553(a).  Moreover, setoff

and recoupment are defenses to payment and cannot be primed.  *Cf. Folger Adam Security, Inc.*

*v. DeMatteis/MacGregor JV*, 209 F.3d 252, 261-62 (3d Cir. 2000); *Lee v. Schweiker*, 739 F.2d

870, 875 (3d Cir. 1984).    Accordingly, the proposed interim order should be clarified to

explicitly preserve the United States' recoupment and offset rights.[5]

Conclusion

For the reasons stated above, the Court should deny the Motion.

Notice

Notice of this Objection has been provided to all parties on the Electronic Mail Notice

List for this case through the ecf filing system.

---

[5] The cash collateral provisions in section 363 do not allow impairment of the United
States' setoff and recoupment rights without adequate protection.  "Setoff … elevates an
unsecured claim to secured status, to the extent that the debtor has a mutual, pre-petition claim
against the creditor." *Lee*, 739 F.2d at 875; 3-362 Collier on Bankruptcy ¶ 362.03[9] ("A
creditor's setoff right is viewed as a secured claim under section 506(a)," and "[f]unds subject to
setoff are cash collateral under section 363(a) and may be used … only as provided in section
363 (c)(2).").  Accordingly, the Debtors must provide the United States with adequate protection
if they propose to impair the United States' interest in any funds subject to setoff or recoupment.
*See* 11 U.S.C. § 363(e); *In re Colonial Center, Inc.*, 156 B.R. 452, 463 (Bankr. E.D. Pa. 1993).
The proposed order's provision of replacement liens that are junior to Silver Point's liens
provides no protection whatsoever to the United States.

Dated: May 22, 2014                              Respectfully submitted,

                                                 **STUART F. DELERY**
                                                 Assistant Attorney General

                                                 **RONALD C. MACHEN, JR.**
                                                 United States Attorney

                                                  /s/ Margaret M. Newell
                                                 **J. CHRISTOPHER KOHN**
                                                 **TRACY J. WHITAKER**
                                                 **SETH B. SHAPIRO**
                                                 **MARGARET M. NEWELL**
                                                 Attorneys, Civil Division
                                                 U.S. Department of Justice
                                                 P.O. Box 875
                                                 Ben Franklin Station
                                                 Washington, D.C. 20044
                                                 (202) 305-7590 (o)
                                                 (202) 307-0494 (f)

                                                 **Attorney for the United States**
                                                 **of America, on behalf of the United**
                                                 **States Department of Health and**
                                                 **Human Services and the Centers for**
                                                 **Medicare & Medicaid Services**