# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re:<br><br>SPECIALTY HOSPITAL OF<br>WASHINGTON, LLC, *et al.*,<br><br>Debtors.[1] | Case No. 14-00279<br><br>Chapter 11<br><br>(Joint Administration Requested) |

## DEBTORS' REPLY IN SUPPORT OF EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) GRANTING PRIMING LIENS AND PROVIDING SUPERPRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

Specialty Hospital of Washington, LLC ("SHDC") and certain of its affiliates (collectively, the "Debtors"),[1] respectfully submit this *Reply in Support of Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Priming Liens and Providing Superpriority Claims, (IV) Granting Adequate Protection, (V) Scheduling a Final Hearing, And (VI) Granting Related Relief* (the "Financing Motion")*,* and state as follows:

### Summary of Argument

1.      Branch Banking and Trust Company ("BB&T") opposes the Debtors' request for postpetition financing, and particularly it opposes the priming lien that will be granted to the postpetition lender making the financing available.  BB&T's opposition rests entirely upon the incorrect premise that BB&T has real property security at the Debtors' Hadley location with a

---

[1] The debtors in these chapter 11 cases and the last four digits of each debtor's federal identification number are:  Specialty Hospital of America, LLC (1347), SHA Holdings, Inc. (1943), SHA Management, LLC (1350), Specialty Hospital of Washington, LLC (1352), Specialty Hospital of Washington Nursing Center, LLC (1348), Specialty Hospital of Washington Hadley, LLC (2586), and SHA Hadley SNF, LLC (1976).

value of $27.4 million.[2]  In truth, however, BB&T's interest in the real property at Hadley is

worth $0.00 because, among other things, the cost and expense of preparing that property for sale

as a going concern, or closing and liquidating that property, exceed its value under any

reasonable valuation method.  Because BB&T's current interest in the Hadley real estate is

valueless, it is entitled to no adequate protection as a matter of law.

2.    Additionally, BB&T's contention that adequate protection should be based on a

fair market going concern value of the Hadley real estate of $27.4 million is misplaced and

unsupported.  The appropriate method of valuing BB&T's collateral position is a liquidation

analysis.  Because of their dire financial condition, the Debtors are unable to conduct an orderly

fair market sale process.  Indeed, without the liquidity provided by the DIP facility, the Debtors

will be forced to shut their doors immediately.  Still, there is no doubt that BB&T's expert opines

that the highest and best use for the facility is that of an operating healthcare facility, nor that his

valuation is that of a profitable, lien free operating enterprise, with, among other things, provider

numbers intact. See Doc 80, Ex. Q at 12 of 172 ("The property has been appraised as a going

concern and assumes a fair sale, which includes the transfer of a valid operating license, an

assembled workforce, and the transfer of all business assets necessary for the operation of a

licensed health care facility").

3.    Further, even if going concern valuation were the correct analysis, $27.4 million

is not even close to the actual realizable value of the real property.  As BB&T's appraisal

reveals, the real property value was derived indirectly and without regard to the actual and

---

[2]  BB&T admits that its security interest in the Debtors' personal property (accounts receivable
and inventory) is valueless as the result of senior interests in that personal property, either by
way of lien or recoupment rights, now held by the US Government.  Consequently, the only
piece of BB&T's collateral at issue for adequate protection purposes is the real property at
Hadley.

necessary expenditures that would be necessary to realize the going concern value ascribed to Hadley by BB&T.

Argument

BB&T Understands that Closure is the Only Alternative Without Postpetition Financing

4.      BB&T does not contest that the Debtors have only two options—obtain postpetition financing on the best available terms (which in all events includes a priming lien) or shut down, lose what going concern value may exist or be created by a stalking horse-led competitive auction, and jeopardize the health and welfare of the Debtors' patients.  The Debtors simply lack the resources to continue operating without the DIP facility, and BB&T's suggestion that someone like the District of Columbia should fund the Debtors' operations for free (or at least on a subordinate basis for BB&T's benefit until BB&T is willing to take over its collateral or make a credit bid in a sale process underwritten by someone else) is not an available or plausible alternative.[3]

5.      Similarly, BB&T appears to understand that, without the liquidity to be provided by the DIP Facility, the Debtors are unable to conduct an orderly going concern sale, and that even with postpetition financing a sale must proceed promptly. See Doc. 80 at ¶35 (acknowledging that "the Priming DIP Facility is necessary to preserve the Debtors' assets and to bring the promised §363 Sale to the DIP Lender to a speedy conclusion").  The Debtors seek to

---

[3] BB&T's offer to allow use of cash collateral solely for health care expenses (Doc. 80 at 47, n.8) does little to alleviate the Debtors' financial straits. Not only is the Debtors' cash position precarious—the Debtors will lose millions of dollars in the next several weeks—but the Debtors' existing access to its cash flow is questionable. Regulators have the ability to exclude the Debtors from the Medicare program without even seeking relief from the automatic stay. See 11 U.S.C. §362(a)(28). Consequently, the DIP facility is not merely a cushion solely or for the benefit of the Debtors' professionals (as BB&T suggests), rather it is essential to the Debtors' operations and their continuation as a going concern.

put in place a process pursuant to which the estates realize the best value under the circumstances (even if that value is zero).

6.      Finally, BB&T acknowledges that "the Priming DIP Facility might even 'bring value to the estate and its creditors'").  Id. at 36.

7.      Yet, notwithstanding these acknowledgments, BB&T opposes the only available means by which the Debtors can get to that sale.  In a sense, BB&T wants to have its cake and eat it too.  BB&T relies upon a going concern business appraisal to support its claim for adequate protection and acknowledges the merit of a sale (and, indeed, must desire a sale), but it wants to deprive the Debtors' attempt to realize or create going concern value.

BB&T's Interest in the Hadley Real Estate Has No Value

*BB&T's Purported Fair Market Analysis Suggesting It Enjoys Collateral Value is Flawed*

8.      BB&T's support for its claim of adequate protection is based on an appraisal that assumes a facility that is operating profitably (which Hadley is not), and a transfer of the businesses and their licenses (including provider numbers) to operate an LTACH and a SNF at Hadley (not just a sale of BB&T's real property collateral) as a going concern.

9.      Achieving the hypothetical going-concern value of $27.4 million for the real estate based on the assumptions contained in BB&T's appraisal, however, necessarily would require the expenditure of significant sums before any going concern sale.[4]  Indeed, as set forth below, these costs greatly exceed the going-concern value of $34.6 million for the LTACH and

---

[4]  One of many illogical positions in BB&T's appraisal is its separate valuations for the components identified as making up Hadley's going concern value:  real estate, business enterprise value and personal property.  Clearly, the going concern value of the businesses operated at Hadley can be realized only if all three of these components are sold together as one package.

SNF at Hadley stated in BB&T's appraisal. Doc. 80, Ex. Q.

10.     This point is easily illustrated by analyzing only the amounts owed by the Hadley

facilities to creditors possessing or asserting statutory recoupment rights and liens, and Hadley's

projected operating losses.  To transfer a licensed health care facility and its real estate under the

assumptions contained in BB&T's appraisal, the Debtors would be required to pay significant

debts to existing and future creditors as a precondition to obtaining the going concern value in

the BB&T appraisal.  The costs and expenses would include:

a.      CMS[5] for approximately $4,200,000;

b.      DOJ for approximately $4,100,000;

c.      False Claims Act damages for approximately $9,546,000;

d.      DCHF for approximately $10,704,000[6];

e.      IRS tax lien filed against the Hadley for approximately $8,976,000;

f.      2014 D.C. real estate taxes for approximately $500,000;

g.      Deferred capital expenditures of approximately $2,754,000; and

g..     Cash losses to break even (Hadley only) of approximately $6,574,000.

11.     These costs total approximately $47,354 million—$12.754 million than BB&T's

asserted going concern value for its collateral.

12.     Because BB&T's appraisal ignores the expenditures that must be incurred to

achieve the value it ascribes to the Hadley real property, the appraisal provides no support for

any claim of adequate protection.  Indeed, the appraisal proves the opposite.  Even if one were to

---

[5] Capitalized terms used but not defined in this Reply have the meaning given such terms in the
DIP Motion.

[6] Satisfaction of items a. through d. would be required as a condition to the assumption, made by
BB&T's appraiser, that the Hadley Facility's provider numbers would be transferred to a
purchaser.

accept (as BB&T appears to want the Court to do) the appraisal's opinion of value, once the costs to be incurred are considered, there is no remaining value with respect to BB&T's interest in the Hadley property for BB&T's benefit. Pursuant to Bankruptcy Code Section 506(a), BB&T is completely under-secured as to the Hadley real estate based on its own appraisal, and therefore not entitled to any adequate protection.

*Even Using Liquidation Value, BB&T's Secured Claim is $0.00*

13.     Because the Debtors have no unencumbered assets, if they, or a trustee, or a receiver appointed under the laws of the District of Columbia were to liquidate the Debtors,[7] each would be entitled to invade BB&T's real property collateral to pay for the effort. On the facts of this case, however, if the Debtors were shut down and liquidated, the associated costs likely would exceed the liquidation value of the Hadley. Thus, not only would these costs and expenses be paid before BB&T were to see any recovery in a liquidation, there would be no recovery for BB&T.

14.     The shut down and liquidation costs to be incurred by Hadley would be substantial and would include the costs of (a) continuing to provide high quality care to the patients at Hadley's LTACH and the residents at its SNF until each patient or resident is transferred, (b) transporting patients and residents, over time, to new facilities as and if space becomes available in as safe a way as possible,[8] and (c) because Hadley is a single-purpose

---

[7]  BB&T has not only refused to provide financing to the Debtors so that they can meet their liquidity needs, it has refused to foreclose on its collateral notwithstanding 2 years of no payments and offers by the Debtors' representatives to "take the keys." Clearly, if Hadley is to be liquidated, BB&T intends for someone else to be responsible for doing so.

[8]  As described in the Financing Motion and the First Day Affidavit, there are inherent risks in transporting LTACH patients. Also, there is a shortage of SNF beds in the District, and unlike LTACH patients, SNF residents can refuse to leave a facility and can be forced to leave only after legal process. Shutting down of the Hadley Facility would take time and be expensive.

building, demolishing that building so that the value of the real estate could be realized.  Of

course, in addition to incurring these wind-down costs, the Debtors would be losing revenue

during this time, meaning that there would be fewer resources to pay increasing administrative

expenses.  Indeed, given the undisputed senior interest of the federal government in Hadley's

receivables, it is quite conceivable that Hadley would realize no revenue from the services

provided as the government exercised set off or recoupment rights, leaving the real property as

the only source for funding the shut down.

15.     The Debtors estimate that the costs and expenses that would be chargeable against

the Hadley real property include:

- $ 465,000 (demolition and removal);

- $6,913,000 (wind down costs); and

- $ 926,539 (paid time off).

16.     These costs total $8,304,539.  In contrast, according to a recent appraisal by

CBRE, attached as Exhibit A, the "as is" value of the land is $5,200,000. The costs of liquidation

for Hadley, therefore, exceed the liquidation value of the land by $3,104,539, so again, BB&T is

left wholly unsecured.

17.     There is no credible dispute that BB&T's real property collateral can be

surcharged for these actual and necessary costs that must be incurred to permit any value to be

received from a sale of Hadley.  Section 506(c) of the Bankruptcy Code clearly provides for this

relief.  Similarly, the District of Columbia receivership statute allows a receiver to charge costs

against the estate.  Specifically, section 44-1002.6 of the D.C. Code provides that "[a] receiver

may petition the court to allow him or her to wholly or partially avoid the terms of a lease,

mortgage, secured transaction, or other contract . . . if performance of the contract would

substantially impede the receiver's ability to carry out the purposes of the receivership." Notably,

the purpose of a receivership of the Debtors would be to safeguard the Debtors' patients.[9]

18.     In valuing BB&T's security position for adequate protection purposes, the Court

must take into account the likelihood that, absent the DIP facility, the Debtors will cease

operating.[10]  The Court should, therefore, also assume that BB&T's secured interest will be

surcharged under the Bankruptcy Code or successfully attacked or avoided under section 44-

1102.6 of the D.C. Code to the extent needed to pay the costs of liquidation.

19.     When the costs of liquidating are considered, BB&T's security interest in its

collateral, once again, has zero value.  The law is clear that a creditor is not entitled to adequate

protection if its interest in an asset is valued at zero.  See, e.g., In re Hubbard Power & Light, 202

B.R. 680, 685 (Bankr. E.D.N.Y. 1996).  Accordingly, because BB&T's security interest has no

value, BB&T is not entitled to adequate protection.

20.     It also should be noted that in a liquidation where the costs of shutting down the

Hadley Facility exceeds the value of its real property collateral, BB&T is in a worse position

than merely having a worthless security interest.

21.     In the case where the assets of the estate are inadequate to cover liquidation

expenses, the deficiency would be taxed to BB&T.  "It is the general rule that where there is no

fund out of which the expenses of a receivership can be paid, or where the fund is insufficient,

---

[9] The purpose of a receivership for health care facilities is to "safeguard the health, safety, and welfare of a facility's residents when seriously endangered, to ensure their continuity of care, to safeguard their rights as recognized by District and federal law, and to protect them from the increased stress and risk of trauma often associated with abrupt or unplanned transfer and discharge."  D.C. Code § 44-1002.01.

[10] Essential to valuation of collateral is a determination on how long the debtor will continue to operate.  Where a debtor is operating and a reorganization seems relatively likely, going concern value may be appropriate, but where the prospects for reorganization are unclear, liquidation valuation may be more appropriate. *See, e.g., In re Phila. Consumer Disc. Co.*, 37 B.R. 946, 949 n.9 (Bankr. E.D. Pa. 1984) (the likelihood of reorganization is a key factor in determining adequate protection).

the party at whose instance the receiver was appointed must provide the payment." Leslie v.

Telephonics Office Techs., 1993 Del. Ch. LEXIS 272, at *41 (Del. Ch. Dec. 30, 1993).[11]

Because liquidation of BB&T's collateral would be compelled if BB&T were to prevail on its

objection to the Financing Motion (which for the reasons stated above should not be the result),

the resulting receivership or liquidation effectively would occur at its "instance."

Conclusion

22.    Under either a going concern or liquidation analysis, the value of BB&T's interest

in the Debtors' property has no value, and thus BB&T has no security interest entitled to

adequate protection.  Moreover, in light of the potential value that the sale process may capture,

and other benefits to the estate from the proposed financing, BB&T's contention that the Court

should ignore the welfare of the Debtors' patients in deciding whether to grant the Debtors'

priming request, should be rejected by the Court.

WHEREFORE, the Debtors respectfully request that the Court overrule BB&T's

opposition and enter an order granting the DIP Motion.

Dated: May 23, 2014                  Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

/s/ Patrick Potter
Patrick Potter (426514)
Jerry Hall (976461)
Dania Slim (991689)
2300 N Street, NW
Washington, DC 20037-1122

---

[11]    Accord Haw. Ventures, LLC v. Otaka, Inc., 114 Haw. 438, 465 (Haw. 2007) ("Generally, the costs and expenses of a receivership incurred in preserving its assets are administrative expenses, chargeable to the assets of the receivership." (quotation marks and citation omitted)); First Nat'l Bank v. Dual, 392 P.2d 463, 465 (Alaska 1964) (bank that requested appointment of a receiver to operate facility until foreclosure sale was held liable for excess when the proceeds of the foreclosure sale were insufficient to pay receivership costs).

Telephone:  (202) 663-8000
Facsimile:  (202) 663-8007
patrick.potter@pillsburylaw.com
jerry.hall@pillsburylaw.com
dania.slim@pillsburylaw.com


Andrew M. Troop (admitted *pro hac vice*)
1540 Broadway
New York, NY 10036-4039
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com

*Counsel for Debtors*

**<u>Exhibit A</u>**

# RESTRICTED APPRAISAL  REPORT

SPECIALTY HOSPITAL  OF WASHINGTON LAND

4601  Martin Luther King Avenue,   SE

Washington, District of Columbia   20032

CBRE, Inc. File No.  14-081DC-0360

*Lin Chen*
*SILVER POINT  CAPITAL Two*
*Greenwich  Plaza Greenwich,*
*Connecticut 06830*

www.cbre.com/valuation

CBRE



VALUATION & ADVISORY SERVICES



1861 International Drive, Suite 300
McLean, VA 22102

T (703) 734-4748
F (703) 734-3012

www.cbre.com

April 15, 2014


Lin Chen
SILVER POINT CAPITAL Two
Greenwich Plaza Greenwich,
Connecticut 06830


RE:    Appraisal of Specialty Hospital of Washington Land
       4601 Martin Luther King Avenue,  SE
       Washington, District of Columbia
       CBRE, Inc. File No.  14-081DC-0360


Dear Mr. Chen:

At your request and authorization, CBRE, Inc. has prepared an appraisal of the market value of
the referenced property.  Our analysis is presented in the following Restricted Appraisal Report.
The reader is hereby advised that the opinions and conclusions contained herein may not be
properly understood without additional information contained in the appraiser's work file.

The subject is a 6.01-acre (261,857 sq. ft.) tract of land that is currently improved with a specialty
hospital that was reportedly built in 1948.   The property is located at 4601  Martin Luther King
Avenue,  SE in Washington, District of Columbia.   Per the client's scope of work, we have valued
the underlying land value and we have not considered the value of the improvements.

Based on  the analysis contained in  the following report,  the market value of the subject is
concluded as follows:

| MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| Appraisal  Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is Land Value | Fee Simple Estate | April 11, 2014 | $5,200,000 |
| Compiled by CBRE | | | |

The report, in its entirety, including all assumptions and limiting conditions, is an integral part of,
and inseparable from, this letter.

The following  appraisal sets forth  the most pertinent data gathered, the techniques employed,
and the reasoning leading to the opinion of value.  The analyses, opinions and conclusions were
developed based on, and this report has been prepared in conformance with, the guidelines and
recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP),

Lin Chen
April 15, 2014
Page 2

the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

The intended use and user of our report are specifically identified in our report as agreed upon in our contract for services and/or reliance language found in the report. No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by any party to non-client, non-intended users does not extend reliance to any other party and CBRE will not be responsible for unauthorized use of the report, its conclusions or contents used partially or in its entirety.

It has been a pleasure to assist you in this assignment. If you have any questions concerning the analysis, or if CBRE can be of further service, please contact us.


Respectfully submitted,

CBRE - VALUATION & ADVISORY SERVICES



James Dorey, MAI
Vice President
District of Columbia#  GA11716

Phone:   703-734-4748
Fax:      703-734-3012
Email:    james.dorey@cbre.com

Jerrold Harvey, MAI, MRICS, CCIM
Managing Director
District of Columbia#  10016

Phone:   703-734-4759
Fax:      703-734-3012
Email:    jerry.harvey@cbre.com



SPECIALTY HOSPITAL OF WASHINGTON LAND

# Certification

We certify to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial and unbiased professional analyses, opinions, and conclusions.

3. We have no present or prospective interest in or bias with respect to the property that is the subject of this report and have no personal interest in or bias with respect to the parties involved with this assignment.

4. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

5. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

6. This appraisal assignment was not based upon a requested minimum valuation, a specific valuation, or the approval of a loan.

7. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice, as well as the requirements of the District of Columbia.

8. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

9. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

10. As of the date of this report, James M. Dorey Jr. and Jerry Harvey have completed the continuing education program for Designated Members of the Appraisal Institute.

11. As of the date of this report, James M. Dorey Jr. has completed the Standards and Ethics Education Requirements for Candidates/Practicing Affiliates of the Appraisal Institute.

12. James M. Dorey Jr. has and Jerry Harvey has not made a personal inspection of the property that is the subject of this report.

13. No one provided significant real property appraisal assistance to the persons signing this report.

14. Valuation & Advisory Services operates as an independent economic entity within CBRE, Inc. Although employees of other CBRE, Inc. divisions may be contacted as a part of our routine market research investigations, absolute client confidentiality and privacy were maintained at all times with regard to this assignment without conflict of interest.

15. James M. Dorey Jr. has not and Jerry Harvey has not provided any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

_____
James Dorey, MAI

_____
Jerrold Harvey, MAI, MRICS, CCIM



# Subject Photographs





**Aerial View**



SPECIALTY HOSPITAL OF WASHINGTON LAND





Photo 1

Photo 2





Photo 3

Photo 4





Photo 5

Photo 6



# Executive Summary

| | |
|---|---|
| **Property Name** | Specialty Hospital of Washington Land |
| **Location** | 4601 Martin Luther King Avenue, SE, Washington, DC  20032 |
| | |
| **Highest and Best Use** | |
|   As If Vacant | |
| **Property Rights Appraised** | Fee Simple Estate |
| **Date of Report** | April 15, 2014 |
| **Date of Inspection** | April 11, 2014 |
| **Zoning** | R-5-A |
| **Estimated Exposure Time** | 12 Months |
| **Estimated Marketing Time** | 12 Months |
| **Land Area** | 6.01 AC                                          261,857 SF |
| **Buyer Profile** | Developer/Land Speculator |

| **VALUATION** | *Total* | *Per SF* |
|---|---|---|
| Land Value | $5,200,000 | $19.86 |

| CONCLUDED MARKET VALUE | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value |
| As Is Land Value | Fee Simple Estate | April 11, 2014 | $5,200,000 |

Compiled by CBRE

## EXTRAORDINARY ASSUMPTIONS

An extraordinary assumption is defined as "an assumption directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property such as market conditions or trends; or about the integrity of data used in an analysis." [1]

- None noted

## HYPOTHETICAL CONDITIONS

A hypothetical condition is defined as "that which is contrary to what exists but is supposed for the purpose of analysis.  Hypothetical conditions assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to

---

[1] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 5th ed. (Chicago: Appraisal Institute, 2010), 73.



the property, such as market conditions or trends; or about the integrity of data used in an analysis." [2]

- We have valued the underlying land value assuming the hospital improvements were not currently in place.  The use of this hypothetical condition may have affected the assignment results.

_____

[2] *Dictionary of Real Estate Appraisal*, 97.



# Table of Contents

Certification  ...................................................................................................................iii

Subject Photographs..................................................................................................... iv

Executive Summary ......................................................................................................vi

Table of Contents ...................................................................................................... viii

Introduction  ................................................................................................................. 1

Land Value.................................................................................................................... 4

Reconciliation of Value .................................................................................................. 6

Assumptions and Limiting Conditions ............................................................................ 7

ADDENDA

A   Qualifications



# Introduction

## OWNERSHIP AND PROPERTY HISTORY

Title to the property is currently vested in the name of Specialty Hospital of Washington-Hadley, LLC, who acquired title to the property in October 2006, as improved for $20,000,000, as recorded on instrument number 146395 of the Washington DC records. We have not had any contact with a representative of the owner to determine of the most recent transaction represented an arm's length transaction. To the best of our knowledge, there have been no other transfers of the subject property in the past three years, nor is the property currently under contract for sale or actively being marketed for sale.

## INTENDED USE OF REPORT

This appraisal is to be used for internal decision making purposes, and no other use is permitted.

## INTENDED USER OF REPORT

This appraisal is to be used by Silver Point Capital, and no other user may rely on our report unless as specifically indicated in the report.

> Intended Users - the intended user is the person (or entity) who the appraiser intends will use the results of the appraisal. The client may provide the appraiser with information about other potential users of the appraisal, but the appraiser ultimately determines who the appropriate users are given the appraisal problem to be solved. Identifying the intended users is necessary so that the appraiser can report the opinions and conclusions developed in the appraisal in a manner that is clear and understandable to the intended users. Parties who receive or might receive a copy of the appraisal are not necessarily intended users. The appraiser's responsibility is to the intended users identified in the report, not to all readers of the appraisal report. [3]

## PURPOSE OF THE APPRAISAL

The purpose of this appraisal is to estimate the market value of the land portion of the subject property.

## DEFINITION OF VALUE

The current economic definition of market value agreed upon by agencies that regulate federal financial institutions in the U.S. (and used herein) is as follows:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this

---

[3] Appraisal Institute, The Appraisal of Real Estate, 14th ed. (Chicago: Appraisal Institute, 2013), 50.



definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated;
2. both parties are well informed or well advised, and acting in what they consider their own best interests;
3. a reasonable time is allowed for exposure in the open market;
4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. [4]

## INTEREST APPRAISED

The value estimated represents the fee simple interest and defined as follows:

*Fee Simple Estate* - Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power and escheat. [5]

## SCOPE OF WORK

This is a Restricted Appraisal Report that is intended to comply with the reporting requirements set forth under Standards Rule 2 of the Uniform Standards of Professional Appraisal Practice for a Restricted Appraisal Report.  As such, it presents limited discussions of the data, reasoning, and analyses that were used in the appraisal process to develop the appraiser's opinion of value. Supporting documentation concerning the data, reasoning, and analyses has been retained in the appraiser's file.  The depth of discussion contained in this report is specific to the needs of the client and for the intended use stated herein.  The reader is hereby advised that the opinions and conclusions contained herein may not be properly understood without additional information contained in the appraiser's work file.    CBRE, Inc. completed the following steps for this assignment:

### Extent to Which the Property is Identified

The property is identified through the following sources:

- postal address
- assessor's records
- legal description

### Extent to Which the Property is Inspected

The extent of the inspection included a drive-by of the property.

---

[4] Interagency Appraisal and Evaluation Guidelines; December 10, 2010, Federal Register, Volume 75 Number 237, Page 77472.

[5] *Dictionary of Real Estate Appraisal*, 78.



## Type and Extent of the Data Researched

CBRE reviewed the following:

- applicable tax data
- zoning requirements
- flood zone status
- demographics
- income and expense data
- comparable data

## Type and Extent of Analysis Applied

CBRE, Inc. analyzed the data gathered through the use of appropriate and accepted appraisal methodology to arrive at a probable value indication via each applicable approach to value. The steps required to complete each approach are discussed in the methodology section.

## Data Resources Utilized in the Analysis

| DATA SOURCES | |
|---|---|
| *Item:* | *Source(s):* |
| **Site Data** | |
| Size | Tax Card |
| Area Breakdown/Use | N/A |
| Parking Spaces | N/A |
| Expense Data: | N/A |
| Compiled by CBRE | |



# Land Value

The following map and table summarize the comparable data used in the valuation of the subject site.



| SUMMARY OF COMPARABLE LAND SALES | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| No. | Property Location | Transaction Type | Date | Proposed Use | Actual Sale Price | Adjusted Sale Price [1] | Size (SF) | Price Per SF |
| 1 | 700 Howard Road, SE, Washington, DC | Sale | Oct-13 | Mixed-use | $8,450,000 | $8,450,000 | 196,530 | $43.00 |
| 2 | 2512-2514 Sheridan Road SE, Washington, DC | Sale | Apr-12 | Residential | $900,000 | $900,000 | 17,424 | $51.65 |
| 3 | 2604-2610 Stanton Road SE, Washington, DC | Sale | Jan-12 | TBD | $370,000 | $370,000 | 16,988 | $21.78 |
| Subject | 4601 Martin Luther King Avenue, SE, Washington, District of Columbia | --- | --- | | --- | --- | 261,857 | --- |

[1] Adjusted sale price for cash equivalency and/or development costs (where applicable)
Compiled by CBRE

## CONCLUSION

There are a very limited number of land sales available in Southeast Washington, DC, east of the Anacostia River.  In speaking with market participants, we discovered the subject would most likely be developed with a townhouse development if the site were available for development in



the current market.  In speaking with a local developer, we determined the appropriate method to determine the number of prospective townhouse lots would be to project that 30% of the lot size would be lost to roads, setbacks and common areas.  The remaining lot size would be divided by 1,800 square feet, the minimum footprint for a townhouse development in the market area.  This would result in 103 townhouse lots on the subject property.

The market area is generally fully built out and there have been no raw townhouse land sales in recent years.  In speaking with two local developers, we determined the market value for raw townhouse land was in the $50,000 to $60,000 per lot range.  Projecting $50,000 times 103 prospective lots equals $5,150,000, or $19.67 per square foot of land area.  This is below the range of the three comparable sales, but still appears reasonable and market oriented.

Comparable Land Sale One represents the Poplar Point development, a proposed mixed-use development containing approximately one million square feet of building area.  This represents a high-density development and the price per square foot reflects a higher density.  Comparable Two represents a site proposed for multi-family development at an FAR of approximately 2.5.  This also represents a higher density development than the subject.  Comparable Three represents a raw piece of land containing 0.39 acres with similar zoning to the subject.  The buyer planned to improve the site with seven to eight single-family townhouses, at a similar density to the subject. The size of this site is substantially smaller than the subject. With that said, Comparable Three is most similar to the subject in terms of zoning and density as well as highest and best use.  We have given this comparable the most weight in our analysis, but at the lower end of the range given the larger size of the subject.

The following table presents the valuation conclusion:

| CONCLUDED LAND VALUE | | | | |
|---|---|---|---|---|
| $ PSF | | Subject SF | | Total |
| $19.00 | x | 261,857 | = | $4,975,283 |
| $21.00 | x | 261,857 | = | $5,498,997 |
| **Indicated Value:** | | | | **$5,200,000** |
| | | (Rounded $ PSF) | | $19.86 |
| Compiled by CBRE | | | | |



# Reconciliation of Value

The value indications from the approaches to value are summarized as follows:

| SUMMARY OF VALUE CONCLUSIONS | |
|---|---|
| Land Value | $5,200,000 |
| Compiled by CBRE | |

In valuing the subject, the Sales Comparison Approach is considered most reliable and has been given sole emphasis.

Based on the foregoing, the market value of the subject has been concluded as follows:

| MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is Land Value | Fee Simple Estate | April 11, 2014 | $5,200,000 |
| Compiled by CBRE | | | |



# Assumptions and Limiting Conditions

1. Unless otherwise specifically noted in the body of the report, it is assumed that title to the property or properties appraised is clear and marketable and that there are no recorded or unrecorded matters or exceptions to title that would adversely affect marketability or value. CBRE, Inc. is not aware of any title defects nor has it been advised of any unless such is specifically noted in the report. CBRE, Inc., however, has not examined title and makes no representations relative to the condition thereof. Documents dealing with liens, encumbrances, easements, deed restrictions, clouds and other conditions that may affect the quality of title have not been reviewed. Insurance against financial loss resulting in claims that may arise out of defects in the subject's title should be sought from a qualified title company that issues or insures title to real property.

2. Unless otherwise specifically noted in the body of this report, it is assumed: that the existing improvements on the property or properties being appraised are structurally sound, seismically safe and code conforming; that all building systems (mechanical/electrical, HVAC, elevator, plumbing, etc.) are in good working order with no major deferred maintenance or repair required; that the roof and exterior are in good condition and free from intrusion by the elements; that the property or properties have been engineered in such a manner that the improvements, as currently constituted, conform to all applicable local, state, and federal building codes and ordinances. CBRE, Inc. professionals are not engineers and are not competent to judge matters of an engineering nature. CBRE, Inc. has not retained independent structural, mechanical, electrical, or civil engineers in connection with this appraisal and, therefore, makes no representations relative to the condition of improvements. Unless otherwise specifically noted in the body of the report: no problems were brought to the attention of CBRE, Inc. by ownership or management; CBRE, Inc. inspected less than 100% of the entire interior and exterior portions of the improvements; and CBRE, Inc. was not furnished any engineering studies by the owners or by the party requesting this appraisal. If questions in these areas are critical to the decision process of the reader, the advice of competent engineering consultants should be obtained and relied upon. It is specifically assumed that any knowledgeable and prudent purchaser would, as a precondition to closing a sale, obtain a satisfactory engineering report relative to the structural integrity of the property and the integrity of building systems. Structural problems and/or building system problems may not be visually detectable. If engineering consultants retained should report negative factors of a material nature, or if such are later discovered, relative to the condition of improvements, such information could have a substantial negative impact on the conclusions reported in this appraisal. Accordingly, if negative findings are reported by engineering consultants, CBRE, Inc. reserves the right to amend the appraisal conclusions reported herein.

3. Unless otherwise stated in this report, the existence of hazardous material, which may or may not be present on the property was not observed by the appraisers. CBRE, Inc. has no knowledge of the existence of such materials on or in the property. CBRE, Inc., however, is not qualified to detect such substances. The presence of substances such as asbestos, urea formaldehyde foam insulation, contaminated groundwater or other potentially hazardous materials may affect the value of the property. The value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them. The client is urged to retain an expert in this field, if desired.

   We have inspected, as thoroughly as possible by observation, the land; however, it was impossible to personally inspect conditions beneath the soil. Therefore, no representation is made as to these matters unless specifically considered in the appraisal.

4. All furnishings, equipment and business operations, except as specifically stated and typically considered as part of real property, have been disregarded with only real property being considered in the report unless otherwise stated. Any existing or proposed improvements, on or off-site, as well as any alterations or repairs considered, are assumed to be completed in a workmanlike manner according to standard practices based upon the information submitted to CBRE, Inc. This report may be subject to amendment upon re-inspection of the subject subsequent to repairs, modifications, alterations and completed new construction. Any estimate of Market Value is as of the date indicated; based upon the information, conditions and projected levels of operation.

5. It is assumed that all factual data furnished by the client, property owner, owner's representative, or persons designated by the client or owner to supply said data are accurate and correct unless otherwise specifically noted in the appraisal report. Unless otherwise specifically noted in the appraisal report, CBRE, Inc. has no reason to believe that any of the data furnished contain any material error. Information and data referred to in this paragraph include, without being limited to, numerical street addresses, lot and block numbers, Assessor's Parcel Numbers, land dimensions, square footage area of the land, dimensions of the improvements, gross building areas, net rentable areas, usable areas, unit count, room count, rent schedules, income data, historical operating expenses, budgets, and related data. Any material error in any of the above data could have a substantial impact



on the conclusions reported.  Thus, CBRE, Inc. reserves the right to amend conclusions reported if made aware of any such error.   Accordingly, the client-addressee should carefully review all assumptions, data, relevant calculations, and conclusions within 30 days after the date of delivery of this report and should immediately notify CBRE, Inc. of any questions or errors.

6.   The date of value to which any of the conclusions and opinions expressed in this report apply, is set forth in the Letter of Transmittal.  Further, that the dollar amount of any value opinion herein rendered is based upon the purchasing power of the American Dollar on that date.  This appraisal is based on market conditions existing as of the date of this appraisal.  Under the terms of the engagement, we will have no obligation to revise this report to reflect events or conditions which occur subsequent to the date of the appraisal.  However, CBRE, Inc. will be available to discuss the necessity for revision resulting from changes in economic or market factors affecting the subject.

7.   CBRE, Inc. assumes no private deed restrictions, limiting the use of the subject in any way.

8.   Unless otherwise noted in the body of the report, it is assumed that there are no mineral deposit or subsurface rights of value involved in this appraisal, whether they be gas, liquid, or solid.  Nor are the rights associated with extraction or exploration of such elements considered unless otherwise stated in this appraisal report.  Unless otherwise stated it is also assumed that there are no air or development rights of value that may be transferred.

9.   CBRE, Inc. is not aware of any contemplated public initiatives, governmental development controls, or rent controls that would significantly affect the value of the subject.

10.  The estimate of Market Value, which may be defined within the body of this report, is subject to change with market fluctuations over time.  Market value is highly related to exposure, time promotion effort, terms, motivation, and conclusions surrounding the offering.   The value estimate(s) consider the productivity and relative attractiveness of the property, both physically and economically, on the open market.

11.  Any cash flows included in the analysis are forecasts of estimated future operating characteristics are predicated on the information and assumptions contained within the report.   Any projections of income, expenses and economic conditions utilized in this report are not predictions of the future.  Rather, they are estimates of current market expectations of future income and expenses. The achievement of the financial projections will be affected by fluctuating economic conditions and is dependent upon other future occurrences that cannot be assured. Actual results may vary from the projections considered herein.  CBRE, Inc. does not warrant these forecasts will occur.  Projections may be affected by circumstances beyond the current realm of knowledge or control of CBRE, Inc.

12.  Unless specifically set forth in the body of the report, nothing contained herein shall be construed to represent any direct or indirect recommendation of CBRE, Inc. to buy, sell, or hold the properties at the value stated.  Such decisions involve substantial investment strategy questions and must be specifically addressed in consultation form.

13.  Also, unless otherwise noted in the body of this report, it is assumed that no changes in the present zoning ordinances or regulations governing use, density, or shape are being considered.  The property is appraised assuming that all required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, nor national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimates contained in this report are based, unless otherwise stated.

14.  This study may not be duplicated in whole or in part without the specific written consent of CBRE, Inc. nor may this report or copies hereof be transmitted to third parties without said consent, which consent CBRE, Inc. reserves the right to deny.   Exempt from this restriction is duplication for the internal use of the client-addressee and/or transmission to attorneys, accountants, or advisors of the client-addressee. Also exempt from this restriction is transmission of the report to any court, governmental authority, or regulatory agency having jurisdiction over the party/parties for whom this appraisal was prepared, provided that this report and/or its contents shall not be published, in whole or in part, in any public document without the express written consent of CBRE, Inc. which consent CBRE, Inc. reserves the right to deny.  Finally, this report shall not be advertised to the public or otherwise used to induce a third party to purchase the property or to make a "sale" or "offer for sale" of any "security", as such terms are defined and used in the Securities Act of 1933, as amended.  Any third party, not covered by the exemptions herein, who may possess this report, is advised that they should rely on their own independently secured advice for any decision in connection with this property.   CBRE, Inc. shall have no accountability or responsibility to any such third party.

15.  Any value estimate provided in the report applies to the entire property, and any pro ration or division of the title into fractional interests will invalidate the value estimate, unless such pro ration or division of interests has been set forth in the report.



16. The distribution of the total valuation in this report between land and improvements applies only under the existing program of utilization. Component values for land and/or buildings are not intended to be used in conjunction with any other property or appraisal and are invalid if so used.

17. The maps, plats, sketches, graphs, photographs and exhibits included in this report are for illustration purposes only and are to be utilized only to assist in visualizing matters discussed within this report. Except as specifically stated, data relative to size or area of the subject and comparable properties has been obtained from sources deemed accurate and reliable. None of the exhibits are to be removed, reproduced, or used apart from this report.

18. No opinion is intended to be expressed on matters which may require legal expertise or specialized investigation or knowledge beyond that customarily employed by real estate appraisers. Values and opinions expressed presume that environmental and other governmental restrictions/conditions by applicable agencies have been met, including but not limited to seismic hazards, flight patterns, decibel levels/noise envelopes, fire hazards, hillside ordinances, density, allowable uses, building codes, permits, licenses, etc. No survey, engineering study or architectural analysis has been made known to CBRE, Inc. unless otherwise stated within the body of this report. If the Consultant has not been supplied with a termite inspection, survey or occupancy permit, no responsibility or representation is assumed or made for any costs associated with obtaining same or for any deficiencies discovered before or after they are obtained. No representation or warranty is made concerning obtaining these items. CBRE, Inc. assumes no responsibility for any costs or consequences arising due to the need, or the lack of need, for flood hazard insurance. An agent for the Federal Flood Insurance Program should be contacted to determine the actual need for Flood Hazard Insurance.

19. Acceptance and/or use of this report constitutes full acceptance of the Contingent and Limiting Conditions and special assumptions set forth in this report. It is the responsibility of the Client, or client's designees, to read in full, comprehend and thus become aware of the aforementioned contingencies and limiting conditions. Neither the Appraiser nor CBRE, Inc. assumes responsibility for any situation arising out of the Client's failure to become familiar with and understand the same. The Client is advised to retain experts in areas that fall outside the scope of the real estate appraisal/consulting profession if so desired.

20. CBRE, Inc. assumes that the subject analyzed herein will be under prudent and competent management and ownership; neither inefficient or super-efficient.

21. It is assumed that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless noncompliance is stated, defined and considered in the appraisal report.

22. No survey of the boundaries of the property was undertaken. All areas and dimensions furnished are presumed to be correct. It is further assumed that no encroachments to the realty exist.

23. The Americans with Disabilities Act (ADA) became effective January 26, 1992. Notwithstanding any discussion of possible readily achievable barrier removal construction items in this report, CBRE, Inc. has not made a specific compliance survey and analysis of this property to determine whether it is in conformance with the various detailed requirements of the ADA. It is possible that a compliance survey of the property together with a detailed analysis of the requirements of the ADA could reveal that the property is not in compliance with one or more of the requirements of the ADA. If so, this fact could have a negative effect on the value estimated herein. Since CBRE, Inc. has no specific information relating to this issue, nor is CBRE, Inc. qualified to make such an assessment, the effect of any possible non-compliance with the requirements of the ADA was not considered in estimating the value of the subject.

24. Client shall not indemnify Appraiser or hold Appraiser harmless unless and only to the extent that the Client misrepresents, distorts, or provides incomplete or inaccurate appraisal results to others, which acts of the Client approximately result in damage to Appraiser. Notwithstanding the foregoing, Appraiser shall have no obligation under this Section with respect to any loss that is caused solely by the active negligence or willful misconduct of a Client and is not contributed to by any act or omission (including any failure to perform any duty imposed by law) by Appraiser. Client shall indemnify and hold Appraiser harmless from any claims, expenses, judgments or other items or costs arising as a result of the Client's failure or the failure of any of the Client's agents to provide a complete copy of the appraisal report to any third party. In the event of any litigation between the parties, the prevailing party to such litigation shall be entitled to recover, from the other, reasonable attorney fees and costs.



ADDENDA



# LAND SALE No. 1

## Poplar Point

### Location Data

| | |
|---|---|
| Location: | **700 Howard Road, SE** |
| | **Washington, DC  20020** |
| County: | **District of Columbia** |
| Parcel No: | **See comments** |
| Atlas Ref: | |

### Physical Data

| | | |
|---|---|---|
| Type: | **Mixed-Use** | |
| Land Area: | **Gross** | **Usable** |
| Acres: | **4.512** | **4.512** |
| Square Feet: | **196,530** | **196,530** |
| Topography: | **Level, At Street Grade** | |
| Shape: | **Irregular** | |
| Utilities: | **Near to site** | |
| Zoning: | **W-3** | |
| Allowable Bldg Area: | | |
| Floor Area Ratio: | | |
| No. of units: | | |
| Max FAR: | **NA** | |
| Frontage: | | |

### Analysis

| | |
|---|---|
| Use At Sale: | **Vacant land** |
| Proposed Use or Dev. | **Mixed-use** |
| Price Per Acre: | **$1,872,908** |
| Price Per SF of Land: | **$43.00** |
| Price Per Unit: | |
| Price Per SF of Bldg: | |

No image to display.

### Financial Data

| | |
|---|---|
| Transaction Type: | **Sale** |
| Date: | **10/2013** |
| Marketing Time: | **NA** |
| Grantor: | **Poplar Point Property, LLC** |
| Grantee: | **Redbrick Partners** |
| Document No.: | **Multiple** |
| Sale Price: | **$8,450,000** |
| Financing: | |
| Cash Eq.Price: | **$8,450,000** |
| Onsite/Offsite Costs: | |
| Adj. Sale Price: | **$8,450,000** |
| Verification: | **Buyer** |

### Comments

The Poplar Point site, containing approximately 4.5 acres, is able to develop approximately one million square feet of mixed use space.  The property wqas purchased from UBS in an all-cash transaction.  The prior owners of the site reportedly considered a range of options including a Walmart and a potential lease with the Deparment of Homeland Security.



# LAND SALE No. 2

## 2512-2514 Sheridan Road SE

### Location Data

| | |
|---|---|
| Location: | **2512-2514 Sheridan Road SE** |
| | **Washington, DC  20020** |
| County: | **District of Columbia** |
| Parcel No: Atlas | |
| Ref: **Physical** | |

*No image to display.*

### Data

| | | |
|---|---|---|
| Type: | **Spec-Holding** | |
| Land Area: | **Gross** | **Usable** |
| Acres: | **0.400** | **0.400** |
| Square Feet: | **17,424** | **17,424** |
| Topography: | **Generally Level** | |
| Shape: | **Irregular** | |
| Utilities: | **All to Site** | |
| Zoning: | **C2A** | |
| Allowable Bldg Area: | | |
| Floor Area Ratio: | | |
| No. of units: | | |
| Max FAR: | **NA** | |
| Frontage: | | |

### Financial Data

| | |
|---|---|
| Transaction Type: | **Sale** |
| Date: | **4/2012** |
| Marketing Time: | **NA** |
| Grantor: | **William H Underdue** |
| Grantee: | **2512 Sheridan Road, LLC** |
| Document No.: | |
| Sale Price: | **$900,000** |
| Financing: | **All Cash** |
| Cash Eq.Price: | **$900,000** |
| Onsite/Offsite Costs: | |
| Adj. Sale Price: | **$900,000** |
| Verification: | **Broker** |

### Analysis

| | |
|---|---|
| Use At Sale: | **Office Building, Vacant** |
| Proposed Use or Dev. | **Residential** |
| Price Per Acre: | **$2,250,000** |
| Price Per SF of Land: | **$51.65** |
| Price Per Unit: | |
| Price Per SF of Bldg: | |

### Comments

This represents the transaction of two parcels of land containing a cumulative lot size of 17,424 square feet.  One of the sites was improved with an office buildng leased to a non-profit on a month-to-month basis.  The remaining site was vacant.  Both sites combined are able to be developed with approximately 45,000 square feet.



## LAND SALE No. 3

### 2604-2610 Stanton Road SE

#### Location Data

| | |
|---|---|
| Location: | **2604-2610 Stanton Road SE** |
| | **Washington, DC  20020** |
| County: | **District of Columbia** |
| Parcel No: Atlas | |

Ref: **Physical**

No image to display.

#### Data

| | | |
|---|---|---|
| Type: | **Spec-Holding** | |
| Land Area: | **Gross** | **Usable** |
| Acres: | **0.390** | **0.390** |
| Square Feet: | **16,988** | **16,988** |
| Topography: | | |
| Shape: | | |
| Utilities: | **All to site** | |
| Zoning: | **R5A** | |
| Allowable Bldg Area: | | |
| Floor Area Ratio: | | |
| No. of units: | | |
| Max FAR: | **NA** | |
| Frontage: | | |

#### Financial Data

| | |
|---|---|
| Transaction Type: | **Sale** |
| Date: | **1/2012** |
| Marketing Time: | **NA** |
| Grantor: | **R&L Giles LLC** |
| Grantee: | **Stanton Road SE, LLC** |
| Document No.: | |
| Sale Price: | **$370,000** |
| Financing: | **All Cash** |
| Cash Eq.Price: | **$370,000** |
| Onsite/Offsite Costs: | |
| Adj. Sale Price: | **$370,000** |
| Verification: | **Buyer** |

#### Analysis

| | |
|---|---|
| Use At Sale: | **Vacant land** |
| Proposed Use or Dev. | **TBD** |
| Price Per Acre: | **$948,718** |
| Price Per SF of Land: | **$21.78** |
| Price Per Unit: | |
| Price Per SF of Bldg: | |

#### Comments

This represents the transaction of a raw parcel of land containing 0.39 acres.  According to the buyer, the land will continue to be raw undeveloped land until the market improved.  The plan is to develop the site with single family townhomes, but the buyer was not definite.



SPECIALTY HOSPITAL OF WASHINGTON LAND Addenda

Addendum  A

# QUALIFICATIONS



**JERROLD HARVEY, MAI,  MRICS, CCIM**
**Managing  Director**

CBRE, Inc. – Valuation & Advisory  Services
1861 International  Drive, Suite 300
McLean, Virginia 22102
Voice (703)-734-4759
Fax (703)-734-3012
E-Mail jerry.harvey@cbre.com

## EDUCATIONAL

Bachelor in Business Administration,  Emory University, Atlanta,  Georgia
Successfully completed  all the necessary courses to qualify for the MAI and CCIM designation.
Graduate  course work  at  various institutions  in  real estate law,  commercial leasing, finance and
investment, construction  cost analysis and valuation of fractional interests.

## PROFESSIONAL

Designated Member,  Appraisal  Institute (MAI) #8935,   Current on Continuing Education
Member,  Royal Institute of Chartered Surveyors
Member, Commercial Investment  Real Estate Institute
President, Washington DC Chapter,  Appraisal Institute, 2013
Vice President, Washington  DC Chapter, Appraisal Institute, 2012
Treasurer, Washington  DC Chapter, Appraisal Institute, 2011
Secretary, Washington  DC Chapter, Appraisal  Institute, 2010
Member, Board of Directors - Washington DC Chapter,  Appraisal Institute, 2008-2009
Former Member,  Local Appraisal Institute Chapter  Admissions Committee.
Former Member,  Regional Appraisal  Institute Ethics and Counseling Panel.
Qualified Expert Witness - Superior Court of the District of Columbia
Qualified Expert Witness - United  States Bankruptcy  Court

## LICENSES/CERTIFICATIONS

Certified  General  Real Estate Appraiser:  District of Columbia (10016, expiration 2/29/16)
Certified  General  Real Estate Appraiser:  State of Maryland (10086, expiration 2/25/16)
Certified  General  RE Appraiser: Commonwealth of Virginia (4001-001321,  exp 1/31/16)
Certified  General  Real Estate Appraiser:  State of West Virginia (268, expiration 9/30/14)

## EXPERIENCE

Thirty (30) years of Real Estate Appraisal,  Consulting  and Brokerage experience throughout  the United
States specializing  in  the Washington DC,  Baltimore, Richmond  and Hampton Roads metropolitan
areas.

| | | |
|---|---|---|
| 1995 - Present | CB Richard Ellis, Inc. - Valuation & Advisory Services | Washington, D.C. |
| 1987 - 1994 | Chase National Corporate  Services - Real Estate | Washington, D.C. |
| 1982 - 1987 | Chase Manhattan Bank, N.A. - Real Estate | New York, New York |
| 1981 - 1982 | KDL Real Estate Company | New York, New York |

Assignments span a wide variety of properties and markets, including office buildings, community retail
centers, regional  malls,  industrial buildings,  residential and  commercial subdivisions,  apartment
buildings and hotels.

**QUALIFICATIONS OF**

**James M. Dorey Jr., MAI**
**Vice President**

CBRE, Inc.
Valuation and Advisory Services
1861 International Drive, Suite 300
McLean, Virginia 22102
Voice (703) 734-4748
Fax (703)-734-3012
E-mail: James.Dorey@cbre.com

**EDUCATIONAL**

Bachelor of Science, Finance, East Carolina University Greenville, NC

**LICENSES/CERTIFICATIONS**

Certified General Real Estate Appraiser: Commonwealth of Virginia 4001 015178, Exp. 10/31/2014
Certified General Real Estate Appraiser: State of Maryland 27498, Exp.8/26/2016
Certified General Real Estate Appraiser: District of Columbia GA11716, Exp 02/28/2016

**PROFESSIONAL**

Appraisal Institute Course: Advanced Income Capitalization
Appraisal Institute Course: Highest and Best Use
Appraisal Institute Course: Advanced Sales Comparison and Cost Approaches
Appraisal Institute Course: Report Writing and Valuation Analysis
Appraisal Institute Course: Advanced Applications
Appraisal Institute: Business Practices and Ethics
Appraisal Institute: 15-Hour National USPAP

**EXPERIENCE**

Ten years of Real Estate Appraisal experience throughout the Eastern United States specializing in the Washington DC, Baltimore and Richmond metropolitan areas.

| | | |
|---|---|---|
| 2010-Present | CBRE, Inc., Valuation & Advisory Services | Washington, D.C. |
| 2005-2010 | Joseph J. Blake & Associates | Washington, DC |
| 2004-2005 | Thorne Consultants | Kensington, MD |

Assignments span a wide variety of properties and markets, including land, suburban and CBD office buildings, community and regional retail centers, warehouse and flex industrial buildings, multi-family apartments, subdivisions and condominium conversions.