IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | * | |
| **SPECIALTY HOSPITAL OF WASHINGTON, LLC, et al.,** | * | Case No. 14-00279 |
| | * | **Chapter 11** |
| Debtors. | | |
| | * | **(Jointly Administered)** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**BRANCH BANKING AND TRUST COMPANY'S OBJECTION TO
DEBTORS' SECOND EMERGENCY MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364
AND 507 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION
FINANCING *ON A MODIFIED BASIS*, (II) AUTHORIZING THE USE OF CASH
COLLATERAL, (III) GRANTING PRIMING LIENS AND PROVIDING
SUPERPRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

Branch Banking and Trust Company ("BB&T"), a North Carolina banking corporation, by and through undersigned counsel, objects to the above-referenced second emergency financing motion (Dkt. No. 100) (the "Second Financing Motion"), and states as follows:

**PRELIMINARY STATEMENT**

1. On Friday, May 23, 2014, after a day-long emergency evidentiary hearing, this Court declined to approve an emergency Priming DIP Facility proposed by the Debtors and their would-be stalking horse purchaser, Silver Point Partners, LLC. Following the recitation of this Court's verbal ruling on the matter, the Debtors requested to sell all of the assets of the Debtors' estates at an auction to occur on Thursday, May 29, 2014, for cash consideration of $4.7 million, the terms of which were to follow.

2. This Court entertained the request and established a deadline of 12:00 Noon E.S.T. on Monday, May 26, 2014, for the Debtors to file a written motion detailing the proposed

terms of sale. Provided the Debtors met this Noon deadline, the Court established a second deadline, 12:00 Noon E.S.T on Tuesday, May 27, 2014, for the filing of any objections thereto.

3. The Debtors failed to file their proposed "emergency sale motion" by the Court's deadline. Instead, the Debtors filed a new, Second Financing Motion on the afternoon of Memorial Day, May 26, 2014, which ignores altogether the request of Friday evening and demands that this Court and all of the creditors in this case swallow a bald misrepresentation of this Court's Friday, May 23, 2014 ruling denying the Debtors' prior motion to approve an emergency Priming DIP Facility.

4. Namely, the Second Financing Motion is premised upon the suggestion that when this Court found that BB&T's first lien on the Hadley Real Property was worth *at least* $4.7 million, this Court instead meant to state that the value of the Hadley Real Property, including the raw land and the approximately 160,000 square feet of the improvements on that property currently in use as a functioning hospital, was *exactly* $4.7 million.

5. The Debtors should not be permitted to twist an illustrative fact (namely, that the Hadley Real Property was worth *at least* $4.7 million) offered by a conscientious Court while enumerating the reasons for denying the Debtors' prior financing motion into a license to sidestep the express requirements of the Bankruptcy Code. The fact remains that BB&T is entitled to adequate protection of its prepetition security interest in the Hadley Real Property, equal to the value of that property as of the May 21, 2014 Petition Date, when it was operating as a functioning hospital.

6. The fact also remains that this Court received into evidence on Friday three opinions of value for the Hadley Real Property: (i) first, a comprehensive 168 page appraisal report prepared by an experienced appraiser at Cushman & Wakefield for BB&T strictly in

adherence to the standards required by FIRREA, reciting a going concern value for the Hadley Real Property (its land <u>and</u> its 160,000 square feet of brick and mortar improvements) of $27,400,000, which was received into evidence as BB&T's Exhibit Q; (ii) second, the Debtors' written appraisal of *the land only* prepared by CBRE for the benefit of Silver Point Capital and received into evidence as Debtors' Exhibit 8, opining that *the raw land only* was worth $5,200,000; and (iii) third, the opinion of the District of Columbia's Office of Tax Assessor, recited in detail on page 61 of Exhibit Q, suggesting that the Hadley Real Property was worth $27,712,200 for the tax assessment year 2013, inclusive of a land value of $3,535,070 and an improvements value of $24,177,200.  Notably, the last opinion of market value is un-burdened by <u>any</u> assumptions or limiting conditions, such as the nature of the Hadley Real Property's current use.

7. While BB&T understands and has for more than two years accommodated the Debtors' desire to keep their facilities operating despite the Debtors' defaults, BB&T objects to this new proposed Priming DIP Facility because the Debtors cannot meet their burden to demonstrate that the immediate loss and displacement of BB&T's prepetition security interest in real property caused by the priming lien will be adequately protected, as is mandated by the Bankruptcy Code and the Fifth Amendment to the United States Constitution.

8. Having unsuccessfully litigated the matter to conclusion once already, the Debtors have renewed the proposition that the instant matter is a binary choice between meeting their statutory burden of adequate protection, on the one hand, and providing care to its patients and the administrative insolvency of this matter, on the other hand.  The Second Financing Motion remains an expedited "loan to own" scheme for the exclusive economic benefit of Silver Point

3

Partners, LLC, severely undermining the Debtors burden to demonstrate that this scheme has been proposed in good faith.

9.  The only modification to the scheme is an offer to BB&T of an adequate protection package equal to the Debtors' proffered liquidation value of the Hadley Real Property's *land only,* <u>less the cost of demolition</u>.  As an aside, for the Debtors to suggest that BB&T would pay to demolish 160,000 square feet of bricks and mortar that as recently as today serves as a functioning hospital facility, prior to any disposition thereof, is bizarre and disingenuous.  Nor does the suggestion bear any relation to <u>any</u> evidence adduced at last Friday's hearing, ignoring the "demonstrative exhibit" neither offered nor received into evidence during the testimony of Alvarez & Marsal's Ronald Winters.

10.  The scheme has not been modified regarding the rights of the United States Government and other creditors:  they are to receive <u>nothing</u> for their considerable interests, never mind adequate protection.  The Second Financing Motion proposes a first and priming lien on all of the Debtors' assets, save the new twist of a first lien on the Hadley Real Property in BB&T's favor capped at $4.7 million.

11.  Nor has any independent source been proffered to validate any allegation that there is a health care crisis at the facilities; nor, as of the time of filing of the instant objection, have the facilities' government regulators weighed in.  Even if it were this Court's duty to determine on independent evidence that operations in the facilities are the best alternatives for the patients currently situated there, which it is not, the scheme fails to offer the adequate protection necessary to clear the way for Silver Point Partners, LLC to own the Debtors' assets.  The Second Financing Motion should be denied.

## BACKGROUND

12. BB&T incorporates by reference herein the background information set forth in BB&T's objection to the original Financing Motion (Dkt. No. 80) (the "<u>First Objection</u>"),[1] and the Exhibits attached to the First Objection, all of which have been received into evidence.

## OBJECTION

**I.   The Priming DIP Facility Should Not Be Approved Because the Debtors Cannot Meet Their Burden to Demonstrate that BB&T is Adequately Protected.**

13. BB&T's First Objection recited at length the nature and extent of BB&T's undeniable right to adequate protection, and BB&T incorporates Section I of the First Objection by reference herein.

14. Just as with their original Financing Motion (Dkt. No. 67), the Debtors cannot meet their statutory burden to prove by <u>clear and convincing evidence</u>[2] that BB&T's interests are adequately protected. *See* 11 U.S.C. § 364(d)(2); *In re Reading Tube Indus.*, 72 B.R. 329, 334 (Bankr. E.D. Pa. 1987) (denying motion for authorization to grant priming lien).

15. The <u>only</u> difference between the original Financing Motion and the Second Financing Motion is that the Debtors have now increased their offer of adequate protection from $0.00[3] to $4.7 million, which is what the Debtors insist is the exact value of the raw dirt after deducting the cost of destroying a three story, 160,000 square foot hospital. The Debtors attempt

---

[1] All capitalized terms not defined herein have the meanings assigned in the First Objection.

[2] In *Grogan v. Garner*, 498 U.S. 279, 286 (1991), the Supreme Court observed that the preponderance of evidence standard is not the appropriate standard of proof if "particularly important individual interests are at stake." The interest and rights at stake in the context of adequate protection are deeply rooted in the Fifth Amendment of the United States Constitution. *See Louisville Joint Stock Land Bank v. Rudford*, 295 U.S. 555, 589 (1935); *Matter of James Wilson Assoc.*, 965 F.2d 160, 167-168 (7th Cir 1992). Indeed, there is perhaps no more important interest or right at stake for a creditor in a bankruptcy case. *See, e.g.*, *Metro. Life Ins. Co. v. Murel Holding Corp. (In re Murel Holding Corp.)*, 75 F.2d 941, 942 (2d Cir. 1935). Thus, the Debtors must prove by clear and convincing evidence that BB&T's interest is being adequately protected. *See id.* at 942 (requiring a "clear showing").

[3] This offer was increased in open court from $0.00 to approximately $9,000.00 per week through the proposed sale date six weeks later, payable by the Debtors from the proceeds of an advance under the Priming DIP Facility, for an aggregate sum of no more than $54,000.00.

5

to cloud the water, however, by insisting that this Court found the value of the Hadley Real Property to be worth *exactly* $4.7 million, which this Court did not.

16.     In explaining its ruling denying the relief requested in the original Financing Motion, this Court recited that the value of the raw land under the hospital was "at least" $4.7 million. The Court recited the fact on the way to the logical conclusion that by failing to offer even the minimal measure suggested by the *Debtor's own appraisal of the raw land only,* the Debtors' unwillingness to offer an adequate protection package of at least that amount doomed the original Financing Motion to fail.

17.     Now the Debtors have seized upon this illustrative fact, and want this Court to convene another full-fledged emergency hearing, on three days' notice, in order to take another bite at the apple. Moreover, the Debtors' *own moving papers* undermine their contention that the bare liquidation value of the raw dirt, after deducting the cost to demolish the hospital that now sits there, is the correct measure of adequate protection.

18.     Specifically, the Debtors contend that "[t]he DIP Loan will enable the Debtors to avoid shutting down and to pursue the sale of their assets as a going concern, bringing value to the estates and its creditors." *Second Financing Motion* at ¶ 72 (emphasis added). *See also id.* at ¶ 72 ("Absent the ability to use Cash Collateral, the Debtors would be deprived of a significant (albeit insufficient), source of liquidity, which would imperil the process and the Debtors' ability to sell their assets as a going-concern."). The Debtors have even requested that the Court make such a finding. *See id.*, Ex. A (copy of proposed order) at "E" ("The purpose of the DIP Loan and the Debtors' use of Prepetition Collateral (including Cash Collateral) will thus be to preserve, maintain and possibly enhance the going concern value of the Debtors . . . .").

6

19. It is incongruous for the Debtors, on one hand, to seek the Court's imprimatur on a sale of their assets as a "going concern" and, on the other hand, to assert that BB&T is entitled to only the liquidation value of the raw land under the existing hospital (after demolition, no less) as adequate protection. It is not surprising at all that the Debtors have failed to muster a single case to support this proposition.

20. In fact, the Debtor's position is contrary to the plain language of the Bankruptcy Code. Section 506(a) provides that "value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property." The Debtors are not proposing to liquidate their assets piecemeal. Rather, the Debtors propose to transfer substantially all of their assets to Silver Point Partners, LLC, which will assume the provider agreements and certain "to be capped" liabilities associated therewith, and operate the facilities.

21. Thus, the proposed disposition of the Debtors' assets is as a going concern and BB&T's interest in those assets should be valued accordingly. *See In re Roe Excavating, Inc.*, 52 B.R. 439, 443 (Bankr. S.D. Ohio 1984) ("Since the Debtor is operating, we hold that the proper standard to be applied in appraising the value of its equipment is fair market value."). *Roe Excavating* is congruent to the case proffered by BB&T at Friday's emergency hearing for the proposition that the only logical measure of adequate protection is the Hadley Real Property's going concern value as of the May 21, 2014 Petition Date.

22. The Debtors' central premise, repeated in every corner of their moving papers, is that the Debtors are worth more as a going concern rather than the alternative. Under the express terms of 11 U.S.C. § 506(a), however, "going concern" is the appropriate valuation standard for determining if the terms of the Priming DIP Facility adequately protect BB&T's interest. Because the Debtors propose to cap BB&T's lien at a value below the value *set forth in the*

7

*Debtor's own appraisal of the raw land only*, BB&T's interest is not adequately protected. This Court does not need to convene another day-long emergency hearing to come to this conclusion.

23.     To the contrary, the evidentiary record already before the this Court requires a determination that BB&T's interest is not adequately protected by the cap on the value of its lien and obviates the need for another emergency hearing.  This Court has Exhibit Q, namely the Cushman & Wakefield appraisal stating a going concern value of the land and improvements of $27.4 million, at its fingertips. In addition, this Court can take judicial notice of and should also consider the D.C. Tax Assessor's Office's appraisal of the Hadley Real Property's market value, which is readily obtainable and independently admissible as a public record (*i.e.*, https://www.taxpayerservicecenter.com) even had BB&T not moved Exhibit Q into the evidentiary record.[4]  Fed. R. Evid. 803(8).

24.     The District of Columbia's appraisal has the benefit of being free of <u>any</u> limiting assumptions or conditions, and it found the market value of the land and improvements constituting the Hadley Real Property (for the 2013 tax year, to be specific) to be $27.7 million, inclusive of $3.5 million in land and $24.2 million in improvements. Exhibit Q, p. 61. Notably, the Debtors failed to challenge the government's valuation despite the availability of a statutory appeal process that, if successful, would have saved the Debtors half a million dollars annually. *See id*.

25.     Nor does this Court need to confine its review to the evidence that BB&T submitted. The Debtors' own appraisal recites a land value component $1.7 million *higher* than

---

[4] Attached hereto as **Exhibit R** and incorporated by reference herein is a true and accurate .pdf copy of the 2015 Tax Year assessment for the Hadley Real Property downloaded from this website. It provides for a market value of $28,405,080 for the Hadley Real Property, inclusive of $3,535,070 for land (identical to that already in the evidentiary record) and $24,870,010 attributable to the improvements, which as suggested above includes a fully functioning 160,000 square foot hospital building. The latter is a significant (*i.e.*, approximately $700,000) increase in value attributable to the hospital since the 2013 tax year.

8

the District of Columbia's breakdown of that particular component of value (*i.e.*, the $5.2 million land value set forth in the Debtors' appraisal versus the $3.5 million recited by the District of Columbia's Tax Assessor's office). Incredibly, the Debtors' proposed $4.7 million adequate protection package fails to meet even the value of its *very own appraisal*, free as the latter is from any opinion of the value of the Hadley Real Property's three stories and 160,000 square feet of brick and mortar improvements currently being operated as a hospital.

26.     If this Court were to entertain the Debtors' suggestion that it use the value of the raw dirt less the cost of demolition as the appropriate measure even though the Debtors propose to sell the facility as a going concern, this Court would have to make a finding of fact, with no support in the record, that the improvements to the Hadley Real Property are worth exactly nothing.

27.     There is no fact in the evidentiary record that suggests that the improvements component of the Hadley Real Property is worth nothing. To the contrary, there are two credible expert opinions that recite the value of the land *including the existing improvements* to be either $27.4 million (the Cushman & Wakefield appraisal received into evidence as BB&T Exhibit Q) or $27.7 million (the 2013 District of Columbia Tax Assessors' 2013 real property tax assessment, received into evidence as an integral component of Exhibit Q).

28.     Against this evidentiary backdrop, this Court cannot conclude that the improvements on the Hadley Real Property are worthless. The Second Financing Motion should be denied.

II.     **The Debtors Cannot Meet Their Burden to Demonstrate that the Priming DIP Facility Is "Fair, Reasonable and Adequate."**

29.     BB&T's First Objection offered cases and legal argument suggesting that the Debtors cannot meet their burden to demonstrate that the terms of the Priming DIP Facility are

9

"fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender." Section II of BB&T's First Objection is incorporated by reference herein.

30. But the circumstances attendant to last Friday's hearing, particularly the energetic in-court arguments made by Mr. David Tatge during the direct examination of Ronald Winters, and the appearance of Mr. Craig Hansen (the two of whom, among others, serve as Silver Point Partners LLC's outside counsel) bolster BB&T's suggestion in its First Objection that these Chapter 11 cases are being run for the benefit of, and at the out-of-pocket expense of, Silver Point Partners, LLC.

31. Facing a less-than-24 hour objection deadline that began after Noon on a federal holiday, BB&T has not had an opportunity for discovery, but reserves its right to gainsay the details of Silver Point Partners, LLC' role in this process in order to determine whether the Debtors are neglecting their fiduciary duty to their estates.

32. The present evidentiary record omits many critical aspects of the role of Silver Point Partners, LLC in the proposed reorganization process, such as the details of Silver Point Partners, LLC's proposed "transition consulting services" payments to the very insiders of the Debtors (namely, $200,000 to James Rappaport, $200,000 to Robert Rummler and $200,000 to Frank Wilich) responsible for engineering and perpetuating the current financial crisis in which the Debtors find themselves. *See 363 Sale Motion* (Dkt. No. 68) (the "Sale Motion") at p. 107. Exactly whom Silver Point has paid or has promised to pay to get its scheme underway is directly relevant to determining whether the Debtors have proposed the DIP Financing Facility in good faith.

33. The Debtors bear the burden of proving that the proposed financing scheme is in good faith. *See In re The Colad Group, Inc.*, 324 B.R. 208, 225 (Bankr. W.D.N.Y. 2005); *In re*

*Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (quoting *In re The Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987)). "[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate." *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990).

34. The concept of good faith is also inextricably linked to the central means by which the Debtors propose to sell their assets— the proposed sale to Silver Point Partners, LLC. Silver Point Partners, LLC will have the right to credit-bid the requested priming lien pursuant to § 363(k),[5] thereby allowing Silver Point Partners, LLC an inside track to acquiring the Debtors' assets "free and clear," subject only to the alleged "adequate protection" package offered to BB&T.

35. Unless the Debtors impermissibly strip secured creditors of their rights, however, the Debtors cannot meet their burden to satisfy that any condition of § 363(f) is satisfied in order for this sale to occur. In this regard, the sale motion (Dkt. No. 68) (the "<u>Sale Motion</u>") only states that:

> The Debtors submit that at the time of the Sale Hearing one or more of the conditions set forth in section 363(f) of the Bankruptcy Code will be satisfied with respect to the sale of the Acquired Assets. Specifically, section 363(f)(2) will be met because each of the Existing Lienholders will consent, or absent any objection to this Motion, will be deemed to have consented, to the sale.

36. In point of fact, none of the conditions of § 363(f) can be satisfied, because: (a) BB&T does not consent to the proposed sale; (b) applicable non-bankruptcy law does not permit the sale free and clear of BB&T's interest because it holds a first-priority lien; (c) the price at which the property is to be sold is less than the aggregate value of the liens on the property, *In re Gonzalez*, Order Approving Sale of Real Property and Approving the Withdrawal of Claim 11-1,

---

[5] BB&T expressly reserves the right to assert that such credit bid be modified "for cause" pursuant to § 363(k) prior to any sale proceeding.

Case No. 07-00466 (Bankr. D.D.C. Mar. 16, 2009) ("The sale cannot be approved under section 363(f)(3) as section 363(f)(3) measures liens by the amount owed on the liens, not the value of the property."), *citing Clear Channel Outdoor, Inc. v. Knupfer*, 391 B.R. 25, 39 (B.A.P. 9th Cir. 2008); (d) BB&T's interest is not in bona fide dispute (*i.e.*, the nature, extent of security therefor and current amount thereof having been entered into evidence in this case without objection, correction or contradiction); and (e) BB&T could not be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest because, among other reasons, the proposed sale price is less than the indebtedness under the Prepetition Financing Documents. *See* § 363(f)(1)-(5).

37. That the Debtors in this case can posit nothing other than the proposed consent of Existing Lienholders like BB&T as the basis for their proposed sale is disconcerting. Without the law on their side, and having failed to meet their evidentiary burden, the Debtors will no doubt allege that the public interest in keeping the facilities open trumps all else, despite the fact that the record is insufficient to make such a determination.

38. The absence of a legal basis for conducting the expedited sale suggests that the Debtors are asking this Court to serve as a "mediating officer" to advance a low-ball "loan to own" scheme by Silver Point Partners, LLC

39. BB&T objects to the Second Financing Motion on this ground as well, and insists that the Debtors satisfy their burden and demonstrate that the Priming DIP Facility has been proposed in good faith.

**III.     Use of Cash Collateral**

40.     In open court last Friday, BB&T echoed the offer contained in its First Objection to allow the Debtors to use cash collateral to pay for medical care[6] until the final hearing on the Second Financing Motion, while the parties attempt to reach a resolution of this matter that respects the legal rights of all stakeholders.  BB&T reiterates the offer, specifically including the "medical care only" limits on that offer, in the instant Objection.

### ADDITIONAL RESERVATION OF RIGHTS

41.     BB&T received the Second Financing Motion when it was electronically filed on 12:13 p.m. on Memorial Day, May 26, 2014.  Out of an abundance of caution, BB&T has interposed this Objection within the 24 hour deadline established by this Court to respond to any *sale* motion filed by the Debtors after Friday night's ruling denying the Original Financing Motion was delivered.

42.     Against this backdrop, BB&T expressly reserves the right to amend or supplement this Objection, to supplement the written evidence filed in connection herewith, to take discovery, expedited if necessary, on the subject of Silver Point's role in the instant proceeding, to make additional argument at any hearing with respect thereto, to introduce supplemental or additional evidence at any hearing with respect thereto, and to file additional and supplemental objections and pleadings.

### NOTICE

43.     Notice of this Objection has been provided to (i) counsel for the Debtors, (ii) counsel for the petitioning creditors, (iii) the Office of the United States Trustee for the District

---

[6] And medical care alone, not the legions of presumably unpaid professionals assisting the Debtors, nor to the reimbursement of the proposed DIP Lender's due diligence fees, or advances to pay professionals.

of Columbia, (iv) counsel to the proposed DIP Lender, and (v) all parties on the Electronic Mail Notice List for this case.

 WHEREFORE, BB&T requests that the Court deny the Second Financing Motion and grant such other relief as is just, proper and equitable.

Dated:  May 27, 2014        Respectfully Submitted,

              /s/ Nikolaus F. Schandlbauer
              Nikolaus F. Schandlbauer (Bar No. 434314)
              E. John Steren (Bar No. 429307)
              Ober, Kaler, Grimes & Shriver
              A Professional Corporation
              1401 H Street, N.W., Suite 500
              Washington, D.C.  20005
              (202) 326-5016
              (202) 326-5270 facsimile
              nfschandlbauer@ober.com
              ejsteren@ober.com

              Walter F. Kirkman (Bar No. 502968)
              Jeffrey S. Greenberg
              (admitted *pro hac vice*)
              Ober, Kaler, Grimes & Shriver
              A Professional Corporation
              100 Light Street
              Baltimore, Maryland 21202
              (410) 347-7387
              (410) 263-7587 facsimile
              jsgreenberg@ober.com

              *Attorneys for Branch Banking and Trust Company*

**CERTIFICATE OF SERVICE**

This is to certify that on May 27, 2014, a copy of the foregoing Objection with proposed form of order was served electronically through the CM/ECF system on all parties on the Electronic Mail Notice List for this case and by first-class mail, postage prepaid on the following:

Patrick J. Potter, Esquire
Dania Slim, Esquire
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, N.W.
Washington, D.C. 20037

Andrew M. Troop, Esquire
Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 10036-4039

Bradford F. Englander, Esquire
Brent C. Strickland, Esquire
Whiteford, Taylor & Preston LLP
3190 Fairview Park Drive, Ste. 300
Falls Church, VA 22042

Joseph A. Guzinski, Esquire
U. S. Trustee's Office
115 South Union St.
Suite 210 Plaza Level
Alexandria, VA 22314

Bradley D. Jones, Esquire
U.S. Trustee's Office
115 South Union St.
Suite 210 Plaza Level
Alexandria, VA 22314

Craig D. Hansen, Esquire
Squire Sanders (US) LLP
One E. Washington Street, Ste. 2700
Phoenix, AZ 85004

Kristin E. Richner, Esquire
Squire Sanders (US) LLP
2000 Huntington Center
41 South High Street
Columbus, OH 43215

David B. Tatge, Esquire
Epstein Becker & Green, P.C.
1227 25th Street, N.W., Ste. 700
Washington, D.C. 20037

Nancy L. Alper, Esquire
Office of the Attorney General
for the District of Columbia
441 – 4th Street, N.W.
Suite 1010 South
Washington, D.C. 20001

Seth B. Shapiro, Esquire
Trial Attorney
U.S. Department of Justice - Civil Division
Commercial Litigation Branch
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044

| | |
|---|---|
| Christopher J. Williamson , Esquire<br>Trial Attorney, Tax Division<br>U.S. Department of Justice<br>P.O. Box 227<br>Washington, D.C. 20044 | Margaret M. Newell, Esquire<br>Attorneys, Civil Division<br>U.S. Department of Justice<br>P.O. Box 875<br>Ben Franklin Station<br>Washington, D.C. 20044 |

/s/ Nikolaus F. Schandlbauer  
Nikolaus F. Schandlbauer

16