## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| In re:<br><br>SPECIALTY HOSPITAL OF<br>WASHINGTON, LLC, *et al.*,<br><br>Debtors.[1] | Case No. 14-00279<br><br>Chapter 11<br><br>(Joint Administration Requested) |

## NOTICE OF DEBTORS' MODIFICATIONS TO

## MOTION OF DEBTORS FOR ENTRY OF ORDERS (I) (A) APPROVING AUCTION AND BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) AUTHORIZING ENTRY INTO A STALKING HORSE AGREEMENT, SUBJECT TO HIGHER OR OTHERWISE BETTER OFFERS, (C) APPROVING PROCEDURES RELATED TO THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) SCHEDULING AUCTION AND SALE HEARING, (E) APPROVING THE FORM AND MANNER OF SALE NOTICE, AND (F) GRANTING RELATED RELIEF, AND (II) (A) AUTHORIZING AND APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), by

and through their proposed undersigned attorneys, hereby file this modification (the

"**Modification**") to their bid procedures and sale motion ("**Motion,**" and as modified the

---

[1] The debtors in these chapter 11 cases and each debtor's federal identification number ("EIN") and chapter 11 case number are: Specialty Hospital of Washington, LLC (EIN: 81-0681352; case number: 14-00279); Specialty Hospital of America, LLC (EIN: 81-0681347; case number 14-00295); SHA Holdings, Inc. (EIN: 20-5741943; case number 14-00296); SHA Management, LLC (EIN: 81-0681350; case number 14-00297); Specialty Hospital of Washington Nursing Center, LLC (EIN: 81-0681348; case number 14-00298), Specialty Hospital of Washington Hadley, LLC (EIN: 20-5752586; case number 14-00299), and SHA Hadley SNF, LLC (EIN: 20-5741976; case number 14-00300).

"**Modified Motion**").[2]   In the Modified Motion, the Debtors, pursuant to sections 105(a), 363,

365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. and Rules 2002,

6004, 6006, and 9006 of the Federal Rules of Bankruptcy Procedure, seek entry of (i) an order,

substantially in the form annexed hereto as <u>Exhibit A-1</u> (the "**Modified Bidding Procedures**

**Order**"), (a) approving certain auction and bidding procedures in connection with the sale of

substantially all of the Debtors' assets, substantially in the form annexed hereto as <u>Exhibit B-1</u>

(the "**Modified Bidding Procedures**"), (b) authorizing the Debtors to enter into a stalking horse

purchase agreement, subject to higher and better offers, (c) approving procedures relating to the

assumption and assignment of executory contracts and unexpired leases, (d) scheduling an

auction and Sale Hearing (as defined below), (e) approving the form and manner of sale notice,

and (f) granting related relief, and (ii) an order, substantially in the form annexed hereto as

<u>Exhibit C-1</u> (the " **Modified Sale Order**"), (a) authorizing and approving the sale of

substantially all of the Debtors' assets free and clear of all liens, claims, encumbrances, and other

interests, (b) authorizing the assumption and assignment of certain executory contracts and

unexpired leases, and (c) granting related relief.  In support of this Motion, the Debtors

respectfully represent as follows:

<u>PRELIMINARY STATEMENT</u>

1.      On May 23, 2014, the Court denied the Debtors' motion for postpetition financing

("**DIP Motion**") because it found that the interests of Branch Banking & Trust Company

("**BB&T**") in certain real property of one of the Debtors – the Hadley real estate – were not

adequately protected. Instead, that interest was to be fully primed under the Debtors' original

DIP Motion.  Although the original DIP Motion was denied, no party contested whether the

---

[2]      All terms not otherwise defined in the Modification have the meanings given them in the
Motion.  <u>See</u> Doc. 68.

Debtors need considerable cash to continue operating, and no party committed to resolve the
Debtors' cash needs despite the Debtors' specific and urgent requests for funding.

2.      Because the DIP Motion was denied, the Debtors lack the resources to continue
operating through an extended sale process. The Debtors worked diligently over the weekend to
preserve their operations and to find a solution to their considerable need for cash.  To avoid
having to close their doors and transfer patients abruptly, the Debtors have arrived at a solution
that addresses the substance of the Court's DIP Motion ruling.

3.      Specifically, the Debtors have negotiated with Silver Point Capital, LLC ("**Silver
Point**") and reached an accommodation that protects the value of BB&T's liens and minimizes
the risk to Silver Point sufficient to enable Silver Point to provide postpetition financing.[3]
Specifically, Silver Point has agreed that its Priming Lien (as defined in the DIP Term Sheet)
shall be subordinate to any lien of Branch Banking and Trust Company ("**BB&T**") on the real
property located at 4601 Martin Luther King Jr. Avenue, SW, Washington, DC (the "**Owned
Real Property**") *but only* to the extent of $4.7 million representing the value of the Owned Real
Property.   Doing so, however, places Silver Point's financing at significantly greater risk.

4.      To mitigate that risk, Silver Point requires a compression of the bid and sale
process timeline and modest changes to the Term Sheet. Those modifications are described in
greater detail below. Shortening the bid and sale process timeline protects Silver Point, which in
turn, enables the Debtors to obtain post-petition financing to protect and preserve operations and
their patients.  Furthermore, in contrast to the sales process outlined to the Court on May 23,
2014, after denial of the DIP Motion, the process described below provides an opportunity for a
competitive, albeit, accelerated auction process.

---

[3]      On May 26, 2014, the Debtors filed motions seeking approval of this agreement regarding modified
postpetition financing (Doc. 100) and asking for a hearing on this new DIP Loan to be held on Thursday May 29,
2014 (Doc. 101).

5.      Accordingly, for the reasons set forth in the Motion and above, the Debtors

request that the Court approve the Modified Motion.  Under the circumstances, it is imperative

that the Debtors sell their assets promptly and the modifications described below are essential to

being able to achieve that result timely.

## MODIFIED RELIEF REQUESTED

6.      By this Modification, the Debtors note the following modifications to the

procedures and orders outlined in and attached to the Motion[4]:

7.      Regarding the Bidding Procedures,[5] the changes are as followed in bold:

(i)     scheduling (a) a deadline to submit bids for the Acquired Assets of **June
4, 2014 at 7:00 p.m.** (prevailing Eastern Time), (b) the date of the Auction
for **June 9, 2014 at 10:00 a.m.** (prevailing Eastern Time), and (c) the date
of the hearing to consider approval of the proposed sale of the Acquired
Assets (the "**Sale Hearing**") for **June 10, 2014 at 9:30 a.m.** (prevailing
Eastern Time), subject to this Court's availability;

(ii)    to be a Qualified Bid, a bid must provide that a signed writing that the
potential qualified bidder's offer is irrevocable until the selection of the
Successful Bidder, provided that if such potential qualified bidder is
selected as (A) the Successful Bidder, its offer shall remain irrevocable
until the earlier of (i) the outside date by which all regulatory approvals
and other conditions to closing shall have been satisfied or waived, (ii) the
date the Sale Order is entered if the sale transaction with such potential
qualified bidder is denied or (iii) the date that is **sixty-five (65)** days after
the Sale Hearing, or (B) the Next Best Bidder (as defined below), its offer
shall remain irrevocable until the earlier of (i) the closing of the sale to the
Successful Bidder, (ii) the date that is thirty (30) days after the earlier of
(I) the outside date by which all regulatory approvals or other conditions
to closing under the Successful Bidder's asset purchase agreement shall
have been satisfied or waived, or (II) the date that is **sixty-five (65)** days
after the Sale Hearing;

(iii)   The bid has value to the Debtors that is greater than or equal to (i) the
Total Transaction Value (as defined in the Motion), <u>plus</u> (ii) 5% of the
Total Transaction Value, estimated to be approximately **$3.25 million** (the

---

[4]      The Debtors do not intend to modify any portion of the Motion not expressly set forth in
the Modification.
[5]      A copy of the Modified Bidding Procedures and a redline against the original Bidding
Procedures are attached, respectively, as <u>Exhibit B-1</u> and <u>B-2</u>.

"**Breakup Fee**"), plus (iii) the Expense Reimbursement, as defined in the Stalking Horse Agreement, plus (iv) $100,000 (the "**Initial Overbid**"); and

(iv)    The Good Faith Deposit of the Next Best Bidder shall be returned within two (2) business days after the consummation of the Transaction with the Successful Bidder, but in no event later than **seventy (70)** days after the Sale Hearing.

8.    The Debtors contemplate non-substantive, conforming changes to the Bidding Procedures Order and the Sale Order, as reflected in Exhibits B-1 and B-2 (Modified Bidding Procedures Order and redline) and Exhibits C-1 and C-2 (Modified Sale Order and redline).

9.    Regarding the APA Term Sheet,[6] the changes are as follows and in bold:

(i)    The purchase price (the "**Purchase Price**") for the purchase, sale, assignment and conveyance of the Debtors' right, title and interest in, to and under the Acquired Assets (as defined below**), free and clear of all interests, claims, liens and encumbrances pursuant to section 363(f) of the Bankruptcy Code, shall consist of: (a) a $15 million DIP loan term facility, with all sums owing thereon to be credit-bid by the Purchaser at closing pursuant to Bankruptcy Code Section 363(k);** plus (b) the value of either a new lease (which, for the avoidance of doubt, includes the net present value of the lease payments to be assumed by SHP) to be entered into between SHP and the Landlord or an amended and restated lease, which will constitute a Designated Contract, with respect to the Leased Real Property, which will be conditioned, in part, on a waiver from the Landlord of certain cure amounts, rent arrearage, HVAC and capital expenditure requirements and otherwise on terms and conditions satisfactory to SHP in its sole discretion; plus (c) the assumption by the Stalking Horse Purchaser of certain liabilities set forth in the Stalking Horse Agreement, including the Regulatory Agreements, and the payment of the Cure Costs (as defined below) relating to the Designated Contracts; plus (d) an amount not to exceed $200,000 (or as otherwise approved by the Stalking Horse Purchaser in its sole discretion), to conduct the orderly wind-down or dismissal of the bankruptcy case(s) following the sale contemplated by the Transaction; **and** plus **(e) a cash payment of $4.7 million, which will be placed into escrow upon the Bankruptcy Court's entry of a sale order and will be released from escrow and payable to BB&T at the closing of the Transaction to satisfy in full**

---

[6]    A copy of the Modified Term Sheet and a redline against the original APA Term Sheet are attached as Exhibits D-1 and D-2. Interested parties should refer to the Modified Term Sheet for the complete changes to the original APA Term Sheet.

**BB&T's first priority lien on the Owned Real Property (the "BB&T Payoff")**.

(ii) Acquired Assets: The Stalking Horse Purchaser shall purchase substantially all of the assets of the Debtors (collectively, the "**Acquired Assets**"), other than the Excluded Assets, **free and clear of all interests, claims, liens and encumbrances pursuant to section 363(f) of the Bankruptcy Code**. The Acquired Assets include all tangible property, accounts, machinery, equipment, inventories, tenant improvements, goodwill, software and computer programs, hardware, intellectual property, prepaid expenses (other than prepaid insurance or prepaid other assets) and deposits, the Designated Contracts, books and records (including all patient charts and records, patient lists and appointment books relating to patients treated by the Debtors to the extent transferable under applicable law), any policies and procedures relating to the Debtors' business, telephone and facsimile numbers, all licenses and permits, including drug and nuclear licenses, to the extent transferable, any federal, state, or local Medicare and Medicaid provider numbers which SHP chooses in its sole discretion to assume and Certificates of Need ("**CON**"), in each case to the extent transferable or otherwise capable of being assumed, sold and assigned, in SHP's sole discretion, the Regulatory Agreements, the Owned Real Property, all benefits, proceeds and other amounts payable under any policy of insurance relating to the Debtors' business, **any rights, claims or causes of action of any Debtor against third parties relating to assets, properties, losses, business or operations of any Debtor (other than those that constitute Excluded Assets)**, and proceeds of all the foregoing assets.

(iii) Excluded Assets: Except to the extent specifically identified above as an Acquired Asset, the following are not included in the Acquired Assets and are not being sold to the Stalking Horse Purchaser (collectively, the "**Excluded Assets**"): (i) cash, (ii) cash equivalents (excluding receivables and the proceeds thereof), (iii) income tax receivables, (iv) deferred tax assets, (v) employee advances, (vi) prepaid insurance including prepaid professional liability insurance, (vii) contracts and leases that are not Designated Contracts, (viii) the Purchase Price and all rights of the Debtors under the Stalking Horse Agreement, (ix) any rights, claims or causes of action under chapter 5 of the Bankruptcy Code, (x) all personnel records and other books, records, and files that the Debtors are required by law to retain in their possession, (xi) any patient records with respect to which the applicable patient(s) has objected to a transfer of such patient records to the Stalking Horse Purchaser, (xii) any claim, right or interest of any Debtor in or to any refund, rebate, abatement or other recovery for taxes, together with any interest due thereon or penalty rebate arising therefrom, (xiii) any other prepaid assets or properties expressly set forth on a Schedule to be attached to the Stalking Horse Agreement, (xiv) any Medicare and Medicaid provider numbers and CON which SHP, in its sole

discretion, chooses not to assume or which are otherwise not capable of being transferred or replaced by SHP, (xv) the BB&T Debt, (xvi) applicable federal, state, and local taxes, and (xvii) any books and records relating to any of the foregoing.

(iv)    A condition to closing shall be that the Stalking Horse Purchaser shall have received any third party consents, the requirements of which have not been negated by an order of the Bankruptcy Court, and governmental approvals, including the Regulatory Agreements **(including, without limitation, a new DCM provider agreement and provider number)**, in form and substance satisfactory to SHP in its sole and absolute discretion, effective as of the closing date (unless otherwise agreed to by the parties to the definitive Regulatory Agreements); provided, however, that if the Court has entered an order approving the Transaction and all conditions to the closing have been satisfied except for the requirement that all Regulatory Agreements have been received, then the period for Debtors to satisfy this closing condition shall be extended for sixty (60) days.

(v)    A condition to closing shall be that any and all liabilities of the Debtors to any of the CMS, DCM, IRS, the DOJ, or the District of Columbia, for either unpaid taxes owed by any Debtor, qui tam liability, overpayments arising under Medicare or Medicaid, or any other obligations or liabilities, in each case arising prior to closing on the Debtors' asset sale to SHP, shall be capped, together with any recoupment and/or setoff rights of each and any of them post-closing, at a mutually acceptable amount **to be not greater than $4 million (unless otherwise agreed to by the SHP)**, agreed to in writing by SHP, as to DCM and in respect of any pre-closing taxes owed to the District of Columbia, collectively, as approved by final Order of the Bankruptcy Court, and SHP shall have negotiated acceptable caps on recoupment with all such persons, as well as with the DOJ and IRS; provided, that, with respect to liabilities accruing prior to closing on the Transaction by any Debtor to SHP of the DOJ, IRS or to the District of Columbia (for unpaid taxes), such condition may be satisfied by a judicial or administrative finding or other agreement acceptable to SHP, final beyond appeal, that the IRS and the DOJ, and the District of Columbia, as to such taxes, each have no post-petition right of recoupment or set-off, post-sale of the Debtors' assets to SHP, arising from liabilities of any Debtor attributable to healthcare services delivered prior to closing, tax liabilities of any Debtor incurred prior to closing on the asset sale, or otherwise attributable to pre-closing operations of any Debtor.

(vi)    **The Breakup Fee and Expense Reimbursement shall constitute administrative expense claims pursuant to section 503(b) of the Bankruptcy Code and shall have priority over all other administrative expense claims.**

(vii)    **Stalking Horse Purchaser will establish an escrow account to hold the BB&T Payoff between the date that a Sale Order is entered and the closing of the Transaction.  The BB&T Payoff shall accrue interest during the holdback period, which will be payable to BB&T in the event the Transaction closes and the BB&T Payoff is paid to BB&T.  If closing does not occur for any reason, the BB&T Payoff (including all interest accrued thereon) will be returned to Stalking Horse Purchaser**.

(viii)    **Two additional Designated Contracts are: (a) Assumption Agreement entered into as of February 1, 2013 by and between MedStar Washington Hospital Center and Specialty Hospital of Washington-Capitol Hill and (b) Patient Transfer Agreement made on May 2, 2014 by and between Specialty Hospital of Washington by and on behalf of its unincorporated divisions of Capitol Hill Campus and Hadley Campus, and Inova Health Care Services.**

10.    Attached, respectively, as Exhibits E-1 and E-2 are the modified Sale Notice (conforming to the modifications set forth in paragraphs 8 and 9, above) and a redline against the original Sale Notice.  Attached, respectively, as Exhibits F-1 and F-2 are the modified Cure Notice (conforming to the modifications set forth in paragraphs 8 and 9, above) and a redline against the original Sale Notice. The Debtors propose no substantive modifications to the Assumption and Assignment Procedures.

**WHEREFORE**, the Debtors respectfully request that the Court grant the relief requested in the Motion as modified by this Modification and grant such other and further relief as this Court deems just and proper.

Dated: May 27, 2014                   Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

/s/ *Patrick Potter*
Patrick Potter (426514)
Jerry Hall (976461)
Dania Slim (991689)
2300 N Street, NW
Washington, DC 20037-1122
Telephone:  (202) 663-8000
Facsimile:  (202) 663-8007
patrick.potter@pillsburylaw.com
jerry.hall@pillsburylaw.com
dania.slim@pillsburylaw.com


Andrew M. Troop (admitted *pro hac vice*)
1540 Broadway
New York, NY 10036-4039
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com

*Counsel for Debtors*

## Exhibit A-1

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re: | Case No. 14-00279 |
| SPECIALTY HOSPITAL OF WASHINGTON, LLC, *et al.*, | Chapter 11 |
| Debtors.[1] | (Joint Administration Requested) |

---

[1] The debtors in these chapter 11 cases and each debtor's federal identification number ("EIN") and chapter 11 case number are: Specialty Hospital of Washington, LLC (EIN: 81-0681352; case number: 14-00279); Specialty Hospital of America, LLC (EIN: 81-0681347; case number 14-00295); SHA Holdings, Inc. (EIN: 20-5741943; case number 14-00296); SHA Management, LLC (EIN: 81-0681350; case number 14-00297); Specialty Hospital of Washington Nursing Center, LLC (EIN: 81-0681348; case number 14-00298), Specialty Hospital of Washington Hadley, LLC (EIN: 20-5752586; case number 14-00299), and SHA Hadley SNF, LLC (EIN: 20-5741976; case number 14-00300).

**ORDER (I) APPROVING AUCTION AND BIDDING PROCEDURES
IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS, (II) AUTHORIZING ENTRY INTO A STALKING
HORSE AGREEMENT, SUBJECT TO HIGHER OR OTHERWISE BETTER
OFFERS, (III) APPROVING PROCEDURES RELATED TO THE ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (IV)
SCHEDULING AUCTION AND SALE HEARING, (V) APPROVING THE
FORM AND MANNER OF SALE NOTICE, AND (VI) GRANTING RELATED RELIEF**

Upon the Debtors' motion for, among other things, entry of an Order (i) Approving

Auction and Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (ii)

Authorizing Entry Into a Stalking Horse Agreement, Subject to Higher or Otherwise Better

Offers, (iii) Approving Procedures for the Assumption and Assignment of Executory Contracts

and Unexpired Leases, (iv) Scheduling the Auction and Sale Hearing; (v) Approving the Form

and Manner of the Sale Notice, and (vi) Granting Related Relief (the "**Motion**"),[2] all as more

fully set forth in the Motion (Doc. 68) as modified (Doc. ___); and the Court having jurisdiction

over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the

relief requested therein being a core proceeding pursuant to 28 U.S.C. §157(b)(2); and venue

being proper before this Court pursuant to 28 U.S.C. §§1408 and 1409, and due and proper

notice of the Motion having been provided to the necessary parties; and it appearing that no other

or further notice need be provided; and a hearing having been held to consider the relief

requested in the Motion (the "**Hearing**"); and the appearances of all interested parties having

been noted in the record of the Hearing; and upon the record of the Hearing; and the Court

having determined that the procedural relief sought in the Motion is in the best interests of the

Debtors, their creditors, and all parties in interest; and the Court having determined that the

---

[2]     The Motion also seeks entry of an order approving and authorizing the Debtors to sell the
Acquired Assets free and clear of claims, liens and other interests, and related relief.  Those
aspects of the Motion are not addressed in this Order, and instead, will be addressed at the Sale
Hearing. All capitalized terms used but not otherwise defined on this Order shall have the
meanings ascribed to them in the Motion.

Debtors have demonstrated a compelling and sound business justification for the relief requested in the Motion, and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefore, it is hereby:

**FOUND AND DETERMINED THAT**

A.      The Debtors have demonstrated a compelling and sound business justification for this Court to grant the relief requested in the Motion, including, without limitation, (i) approval of the Bidding Procedures, (ii) authorization to enter into the Stalking Horse Agreement with the Stalking Horse Purchaser, subject to higher or otherwise better offers, (iii) approval of the Breakup Fee and Expense Reimbursement, as provided in the Bidding Procedures, and (iv) approval of the Assignment and Assumption Procedures, under the circumstances described herein and the Motion.

B.      The Bidding Procedures, attached to the Motion as Exhibit B and incorporated herein by reference as if fully set forth in this Order, are fair, reasonable and appropriate and represent the best method for preserving the Debtor's operations and auctioning its assets.

C.      Authorizing the Debtors to enter into the Stalking Horse Agreement, subject to higher or otherwise better offers, is in the best interests of the Debtors' estates and creditors and will provide a benefit to the Debtors' estates and creditors, among others, by establishing a floor for the value of the Debtors' going concern business.

D.      The Breakup Fee and Expense Reimbursement are fair, reasonable and appropriate and provide a benefit to the Debtors' estates and creditors.

E.      The Initial Overbid and the Overbid Increments are fair, reasonable and appropriate and provide a benefit to the Debtors' estates and creditors.

F.      The Sale Notice, substantially in the form attached to the Motion as <u>Exhibit E</u>, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of the Acquired Assets, the Bidding Procedures, the Auction and the Sale Hearing, and no other or further such notice is required.

G.      The Cure Notice, substantially in the form attached to the Motion as <u>Exhibit F</u>, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of the Designated Contracts in connection with the sale of the Acquired Assets and the related Cure Amount, and no other or further such notice is required.

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED THAT**

1.      The Motion is GRANTED with respect to the relief specifically granted herein.

2.      The Bidding Procedures, attached to the Motion as <u>Exhibit B</u>, including those related to payment of the Breakup Fee and Expense Reimbursement, are hereby approved, are incorporated herein by reference, and shall govern all bids and bid procedures relating to the Auction and Sale of the Acquired Assets. The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

3.      The Debtors are authorized to enter into the Stalking Horse Agreement with the Stalking Horse Purchaser, subject to higher or otherwise better offers.

4.      The Breakup Fee and Expense Reimbursement are hereby approved and allowed as an administrative expense of the Debtors and the Debtors' estates under section 503 of the Bankruptcy Code. In the event that payment of the Breakup Fee and Expense Reimbursement is triggered, under the terms of the Stalking Horse Agreement or otherwise, the

4

Breakup Fee and Expense Reimbursement shall be paid (i) in the event of the Sale of all or any part of the Acquired Assets to any party other than the Stalking Horse Purchaser, from the proceeds of such Sale, and at the earlier of the closing of such Sale, or within 10 days of entry of an order approving such Sale; or (ii) in the case of any other event triggering payment of the Breakup Fee and Expense Reimbursement, from amounts advanced to the Debtors under the DIP Loan.

5.     The Sale Notice attached to the Motion as <u>Exhibit E</u> is hereby approved.

6.     The deadline for submitting a Qualified Bid in accordance with the Bidding Procedures shall be [**June 4**], **2014 at 7:00 p.m. (prevailing Eastern Time)** (the "**Bid Deadline**").

7.     Subject to the provisions of the Bidding Procedures, the Debtors are authorized to solicit, initiate, encourage, facilitate or take any other action designed to facilitate any inquiries or proposals regarding any sale of assets, assumption of liabilities or similar transactions with third parties until the Bid Deadline.

8.     Unless the Debtors receive an additional Qualified Bid, they will not hold an Auction, and the Stalking Horse Purchaser shall be named the Successful Bidder.

9.     If the Debtors receive an additional Qualified Bid (meaning at least one Qualified Bid in addition to the Stalking Horse Purchaser's existing Qualified Bid), the Debtors shall conduct the Auction on [**June 9**], **2014 at 10:00 a.m. (prevailing Eastern Time)** at the offices of Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, DC 20037-1122, or such later time or such other place as the Debtors shall designate in a subsequent notice to all Qualified Bidders.

10.     Only Qualified Bidders may participate in the Auction. Each such Qualified Bidder participating in the Auction may be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale.  The Auction will be videotaped and/or transcribed.

11.     All bidders at the Auction shall be deemed to have consented to the Bidding Procedures and to the core jurisdiction of this Court, waived any right to a jury trial in connection with any disputes relating to the Auction, the sale and the construction and enforcement of the applicable Asset Purchase Agreement, and, except as otherwise provided in this Order and the Bidding Procedures, waived any claim for expense reimbursement or a break-up fee.

12.     Within two (2) business days after entry of this Order, the Debtors shall serve notice of the Bid Deadline and the Auction, substantially in the form attached to the Motion as Exhibit E, by first class mail on the following persons:

    i.      counsel to the Stalking Horse Purchaser;

    ii.     counsel to the Existing Lienholders;

    iii.    all applicable health regulatory agencies and taxing authorities;

    iv.    the Office of the United States Trustee for the District of Columbia;

    v.     the United States Attorney's Office for the District of Columbia;

    vi.    any entity known or reasonably believed to have asserted a security interest in or lien against any of the Acquired Assets;

    vii.   the Debtors' twenty (20) largest creditors on a consolidated basis or counsel for the Committee if one has been appointed;

    viii.  any party that has filed a notice of appearance in these cases;

    ix.    any party who has, within the last twelve months, expressed an interest to the Debtors in purchasing the Acquired Assets;

     x.  any party who the Debtors or their professionals believe would have an interest in purchasing the Acquired Assets.

   13.  As soon as practicable following the determination of the Successful Bid, the Debtors shall file a notice with the Court identifying the Successful Bidder and serve such notice by telecopy, electronic mail transmission, or overnight delivery upon the following entities: (a) the Office of the United States Trustee for the District of Columbia; (b) each of the Debtors' twenty largest unsecured creditors on a consolidated basis, or counsel to the Committee if one has been appointed; (c) counsel to the Stalking Horse Purchaser; (d) all applicable health regulatory agencies and taxing authorities; (e) the United States Attorney's Office for the District of Columbia; (f) all known parties that may be asserting a lien against the Acquired Assets; (g) all Qualified Bidders that have submitted a Qualified Bid; (h) all non-debtor counterparties to the Designated Contracts proposed to be assumed and assigned under the Successful Bid; and (i) all parties that have requested notice pursuant to Bankruptcy Rule 2002.

   14.  The Assumption and Assignment Procedures are hereby approved.

   15.  Within five (5) business days after entry of this Order, the Debtors will file the Cure Notice, substantially in the form attached to the Motion as <u>Exhibit F</u> (the "**Cure Notice**") with the Court and serve such Cure Notice by first-class mail on the non-debtor counterparties to the Designated Contracts.  The Cure Notice substantially in the form attached to the Motion as <u>Exhibit F</u> is hereby approved. The Debtors reserve the right to amend, modify, or supplement the Cure Notice.

   16.  Any objection to the assumption and assignment of any Designated Contract identified on the Cure Notice, including, without limitation, any objection to the Cure Amount set forth on the Cure Notice or to the ability of the Successful Bidder to provide adequate assurance of future performance under such Designated Contract, must (a) be in

writing, (b) set forth the basis for the objection as well as any cure amount that the objector
asserts to be due (in all cases with appropriate documentation in support thereof), and (c) be filed
with the Clerk of the Court, United States Bankruptcy Court for the District of Columbia, 333
Constitution Avenue, NW, Room 1225, Washington, DC 20001, and served on the following:
(i) counsel to the Debtors, Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW,
Washington, DC 20037-1122 (Attn: Patrick Potter, patrick.potter@pillsburylaw.com) and
Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, NY (Attn: Andrew Troop,
andrew.troop@pillsburylaw.com); (ii) counsel for the Stalking Horse Purchaser for noticing
purposes, Squire Sanders (US) LLP, One East Washington Street, Suite 2700, Phoenix, AZ
85004 (Attn: Craig D. Hansen, craig.hansen@ squiresanders.com; (iii) counsel to the Committee;
(iv) counsel to the Successful Bidder, if not the Stalking Horse Purchaser; and (v) the Office of
the United States Trustee for the District of Columbia, 115 S. Union Street, Room 210,
Alexandria, VA 22314 (Attn: Bradley Jones; Bradley.D.Jones@usdoj.gov), **so as to be actually
received no later than 5:00 p.m. (prevailing Eastern Time) on the date that is fifteen (15)
days after the filing of the Cure Notice** (the "**Assignment and Cure Objection Deadline**").

17. To the extent that any entity does not timely object as set forth above, such
entity shall be (a) forever barred from objecting to the assumption and assignment of its
respective Designated Contracts identified on the Cure Notice, including, without limitation,
asserting any additional cure payments or requesting additional adequate assurance of future
performance, (b) deemed to have consented to the applicable Cure Amount, if any, and to the
assumption and assignment of the applicable Designated Contract, (c) bound to such
corresponding Cure Amount, if any, (d) deemed to have agreed that the Successful Bidder has
provided adequate assurance of future performance within the meaning of section 365(b)(1)(C)

of the Bankruptcy Code, (e) deemed to have agreed that all defaults under the applicable Designated Contract arising or continuing prior to the effective date of the assignment have been cured as a result or precondition of the assignment, such that the Successful Bidder or the Debtors shall have no liability or obligation with respect to any default occurring or continuing prior to the assignment, and from and after the date of the assignment the applicable Designated Contract shall remain in full force and effect for the benefit of the Successful Bidder and such entity in accordance with its terms, (f) deemed to have waived any right to terminate the applicable Designated Contract or designate an early termination date under the applicable Designated Contract as a result of any default that occurred and/or was continuing prior to the assignment date, (g) deemed to have agreed that the Debtors are not obligated under the Designated Contracts following the effective date of the assumption and assignment, and (h) deemed to have agreed that the terms of the Sale Order shall apply to the assumption and assignment of the applicable Designated Contract.

18.     If such an objection is received timely and such objection cannot otherwise be resolved by the parties, the Court may hear such objection at the Sale Hearing or at a later date set by the Court. The pendency of a dispute relating to the Cure Amount will not prevent or delay the assumption and assignment of any Designated Contract or the sale of the Acquired Assets to the Successful Bidder. If an objection is filed with respect only to the cure amount listed on the Cure Notice, the dispute with respect to the Cure Amount will be resolved consensually, if possible, or, if the parties are unable to resolve their dispute, before the Court, and subject to the entry of the Sale Order the Debtors may consummate the sale of the Acquired Assets and assumption and assignment of the Designated Contracts and reserve from the cash sale proceeds an amount sufficient to pay the asserted cure amount.

19.    The Sale Hearing shall be held on [**June 10**], 2014 at [**9:30 a.m.**] **(prevailing Eastern Time)** at the United States Bankruptcy Court for the District of Columbia, Courtroom No. 1, 333 Constitution Avenue, NW, Washington, DC 20001. The Sale Hearing may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.

20.    All other objections to approval of the sale of the Acquired Assets to the Successful Bidder shall (a) be in writing, (b) comply with the Bankruptcy Rules and any applicable Local Rules, (c) set forth the name of the objector, (d) state with particularity the legal and factual bases for such objection, and (e) be filed with the Clerk of the Court, United States Bankruptcy Court for the District of Columbia, 333 Constitution Avenue, NW, Room 1225, Washington, DC 20001, together with proof of service thereof, and served on the following parties **so as to be** **actually received** **no later than 5:00 p.m. (prevailing Eastern Time) on** [**June 9**], **2014:** (i) counsel to the Debtors, Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, DC 20037-1122 (Attn: Patrick Potter, patrick.potter@pillsburylaw.com) and Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, NY (Attn: Andrew Troop, andrew.troop@pillsburylaw.com); (ii) counsel for the Stalking Horse Purchaser for noticing purposes, Squire Sanders (US) LLP, One East Washington Street, Suite 2700, Phoenix, AZ 85004 (Attn: Craig D. Hansen, craig.hansen@ squiresanders.com; (iii) counsel to the Committee; (iv) counsel to the Successful Bidder, if not the Stalking Horse Purchaser; and (v) the Office of the United States Trustee for the District of Columbia, 115 S. Union Street, Room 210, Alexandria, VA 22314 (Attn: Bradley Jones; Bradley.D.Jones@usdoj.gov).

21.    All objections to entry of this Order that have not been withdrawn, waived, or settled as announced to the Court at the Hearing or by stipulation filed with the Court, and all reservations of rights included in such objections, are overruled.

22.    In the event there is a conflict between this Order and the Motion or Stalking Horse Agreement, to the extent of such conflict this Order shall control and govern.

23.    This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, enforcement and/or interpretation of this Order.

24.    This Order shall be effective immediately upon entry, and any stay of orders provided for in Bankruptcy Rules 6004 or 6006 or any other provision of the Bankruptcy Code or Bankruptcy Rules is expressly lifted. The Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and except as directed by the Court in this Order, may in their discretion and without further delay take any action and perform any act authorized under this Order.

25.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

cc:

All attorneys who have entered an appearance and who are registered e-filers.

## Exhibit A-2

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re: | Case No. 14-00279 |
| SPECIALTY HOSPITAL OF WASHINGTON, LLC, *et al.*, | Chapter 11 |
| Debtors.[1] | (Joint Administration Requested) |

---

[1]

The debtors in these chapter 11 cases and each debtor's federal identification number ("EIN") and chapter 11 case number are: Specialty Hospital of Washington, LLC (EIN: 81-0681352; case number: 14-00279); Specialty Hospital of America, LLC (EIN: 81-0681347; case number 14-00295); SHA Holdings, Inc. (EIN: 20-5741943; case number 14-00296); SHA Management, LLC (EIN: 81-0681350; case number 14-00297); Specialty Hospital of Washington Nursing Center, LLC (EIN: 81-0681348; case number 14-00298); Specialty Hospital of Washington Hadley, LLC (EIN: 20-5752586; case number 14-00299); and SHA Hadley SNF, LLC (EIN: 20-5741976; case number 14-00300).The debtors in these Chapter 11 cases and the last four digits of each debtor's federal identification number are: Specialty Hospitals of America, LLC (1347), SHA Holdings, Inc. (1943), SHA Management, LLC (1350), Specialty Hospital of Washington, LLC (1352), Specialty Hospital of Washington Nursing Center, LLC (1348), Specialty Hospital of Washington Hadley, LLC (2586), and SHA Hadley SNF, LLC (1976).

**ORDER (I) APPROVING AUCTION AND BIDDING PROCEDURES
IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS, (II) AUTHORIZING ENTRY INTO A STALKING
HORSE AGREEMENT, SUBJECT TO HIGHER OR OTHERWISE BETTER
OFFERS, (III) APPROVING PROCEDURES RELATED TO THE ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (IV)
SCHEDULING AUCTION AND SALE HEARING, (V) APPROVING THE
FORM AND MANNER OF SALE NOTICE, AND (VI) GRANTING RELATED RELIEF**

Upon the Debtors' motion for, among other things, entry of an Order (i) Approving
Auction and Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (ii)
Authorizing Entry Into a Stalking Horse Agreement, Subject to Higher or Otherwise Better
Offers, (iii) Approving Procedures for the Assumption and Assignment of Executory Contracts
and Unexpired Leases, (iv) Scheduling the Auction and Sale Hearing; (v) Approving the Form
and Manner of the Sale Notice, and (vi) Granting Related Relief (the "**Motion**"),[2] all as more
fully set forth in the Motion (Doc. 68) as modified (Doc. ____); and the Court having jurisdiction
over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the
relief requested therein being a core proceeding pursuant to 28 U.S.C. §157(b)(2); and venue
being proper before this Court pursuant to 28 U.S.C. §§1408 and 1409, and due and proper
notice of the Motion having been provided to the necessary parties; and it appearing that no other
or further notice need be provided; and a hearing having been held to consider the relief
requested in the Motion (the "**Hearing**"); and the appearances of all interested parties having
been noted in the record of the Hearing; and upon the record of the Hearing; and the Court
having determined that the procedural relief sought in the Motion is in the best interests of the
Debtors, their creditors, and all parties in interest; and the Court having determined that the

---

[2]     The Motion also seeks entry of an order approving and authorizing the Debtors to sell the
Acquired Assets free and clear of claims, liens and other interests, and related relief.  Those
aspects of the Motion are not addressed in this Order, and instead, will be addressed at the Sale
Hearing. All capitalized terms used but not otherwise defined on this Order shall have the
meanings ascribed to them in the Motion.

Debtors have demonstrated a compelling and sound business justification for the relief requested in the Motion, and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefore, it is hereby:

**FOUND AND DETERMINED THAT**

A.      The Debtors have demonstrated a compelling and sound business justification for this Court to grant the relief requested in the Motion, including, without limitation, (i) approval of the Bidding Procedures, (ii) authorization to enter into the Stalking Horse Agreement with the Stalking Horse Purchaser, subject to higher or otherwise better offers, (iii) approval of the Breakup Fee and Expense Reimbursement, as provided in the Bidding Procedures, and (iv) approval of the Assignment and Assumption Procedures, under the circumstances described herein and the Motion.

B.      The Bidding Procedures, attached to the Motion as <u>Exhibit B</u> and incorporated herein by reference as if fully set forth in this Order, are fair, reasonable and appropriate and represent the best method for preserving the Debtor's operations and auctioning its assets.

C.      Authorizing the Debtors to enter into the Stalking Horse Agreement, subject to higher or otherwise better offers, is in the best interests of the Debtors' estates and creditors and will provide a benefit to the Debtors' estates and creditors, among others, by establishing a floor for the value of the Debtors' going concern business.

D.      The Breakup Fee and Expense Reimbursement are fair, reasonable and appropriate and provide a benefit to the Debtors' estates and creditors.

E.      The Initial Overbid and the Overbid Increments are fair, reasonable and appropriate and provide a benefit to the Debtors' estates and creditors.

3

F.      The Sale Notice, substantially in the form attached to the Motion as <u>Exhibit E</u>, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of the Acquired Assets, the Bidding Procedures, the Auction and the Sale Hearing, and no other or further such notice is required.

G.      The Cure Notice, substantially in the form attached to the Motion as <u>Exhibit F</u>, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of the Designated Contracts in connection with the sale of the Acquired Assets and the related Cure Amount, and no other or further such notice is required.

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED THAT**

1.      The Motion is GRANTED with respect to the relief specifically granted herein.

2.      The Bidding Procedures, attached to the Motion as <u>Exhibit B</u>, including those related to payment of the Breakup Fee and Expense Reimbursement, are hereby approved, are incorporated herein by reference, and shall govern all bids and bid procedures relating to the Auction and Sale of the Acquired Assets. The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

3.      The Debtors are authorized to enter into the Stalking Horse Agreement with the Stalking Horse Purchaser, subject to higher or otherwise better offers.

4.      The Breakup Fee and Expense Reimbursement are hereby approved and allowed as an administrative expense of the Debtors and the Debtors' estates under section 503 of the Bankruptcy Code. In the event that payment of the Breakup Fee and Expense Reimbursement is triggered, under the terms of the Stalking Horse Agreement or otherwise, the

4

Breakup Fee and Expense Reimbursement shall be paid (i) in the event of the Sale of all or any part of the Acquired Assets to any party other than the Stalking Horse Purchaser, from the proceeds of such Sale, and at the earlier of the closing of such Sale, or within 10 days of entry of an order approving such Sale; or (ii) in the case of any other event triggering payment of the Breakup Fee and Expense Reimbursement, from amounts advanced to the Debtors under the DIP Loan.

5.    The Sale Notice attached to the Motion as <u>Exhibit E</u> is hereby approved.

6.    The deadline for submitting a Qualified Bid in accordance with the Bidding Procedures shall be [**June 4~~20~~**], 2014 at **7~~5~~:00 p.m. (prevailing Eastern Time)** (the "**Bid Deadline**").

7.    Subject to the provisions of the Bidding Procedures, the Debtors are authorized to solicit, initiate, encourage, facilitate or take any other action designed to facilitate any inquiries or proposals regarding any sale of assets, assumption of liabilities or similar transactions with third parties until the Bid Deadline.

8.    Unless the Debtors receive an additional Qualified Bid, they will not hold an Auction, and the Stalking Horse Purchaser shall be named the Successful Bidder.

9.    If the Debtors receive an additional Qualified Bid (meaning at least one Qualified Bid in addition to the Stalking Horse Purchaser's existing Qualified Bid), the Debtors shall conduct the Auction on [**June 9~~23~~**], 2014 at 10:00 a.m. (prevailing Eastern Time) at the offices of Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, DC 20037-1122, or such later time or such other place as the Debtors shall designate in a subsequent notice to all Qualified Bidders.

10.     Only Qualified Bidders may participate in the Auction. Each such Qualified Bidder participating in the Auction may be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale.  The Auction will be videotaped and/or transcribed.

11.     All bidders at the Auction shall be deemed to have consented to the Bidding Procedures and to the core jurisdiction of this Court, waived any right to a jury trial in connection with any disputes relating to the Auction, the sale and the construction and enforcement of the applicable Asset Purchase Agreement, and, except as otherwise provided in this Order and the Bidding Procedures, waived any claim for expense reimbursement or a break-up fee.

12.     Within two (2) business days after entry of this Order, the Debtors shall serve notice of the Bid Deadline and the Auction, substantially in the form attached to the Motion as Exhibit E, by first class mail on the following persons:

i.      counsel to the Stalking Horse Purchaser;

ii.     counsel to the Existing Lienholders;

iii.    all applicable health regulatory agencies and taxing authorities;

iv.     the Office of the United States Trustee for the District of Columbia;

v.      the United States Attorney's Office for the District of Columbia;

vi.     any entity known or reasonably believed to have asserted a security interest in or lien against any of the Acquired Assets;

vii.    the Debtors' twenty (20) largest creditors on a consolidated basis or counsel for the Committee if one has been appointed;

viii.   any party that has filed a notice of appearance in these cases;

ix.     any party who has, within the last twelve months, expressed an interest to the Debtors in purchasing the Acquired Assets;

6

x.    any party who the Debtors or their professionals believe would have an interest in purchasing the Acquired Assets.

13.    As soon as practicable following the determination of the Successful Bid, the Debtors shall file a notice with the Court identifying the Successful Bidder and serve such notice by telecopy, electronic mail transmission, or overnight delivery upon the following entities: (a) the Office of the United States Trustee for the District of Columbia; (b) each of the Debtors' twenty largest unsecured creditors on a consolidated basis, or counsel to the Committee if one has been appointed; (c) counsel to the Stalking Horse Purchaser; (d) all applicable health regulatory agencies and taxing authorities; (e) the United States Attorney's Office for the District of Columbia; (f) all known parties that may be asserting a lien against the Acquired Assets; (g) all Qualified Bidders that have submitted a Qualified Bid; (h) all non-debtor counterparties to the Designated Contracts proposed to be assumed and assigned under the Successful Bid; and (i) all parties that have requested notice pursuant to Bankruptcy Rule 2002.

14.    The Assumption and Assignment Procedures are hereby approved.

15.    Within five (5) business days after entry of this Order, the Debtors will file the Cure Notice, substantially in the form attached to the Motion as Exhibit F (the "**Cure Notice**") with the Court and serve such Cure Notice by first-class mail on the non-debtor counterparties to the Designated Contracts. The Cure Notice substantially in the form attached to the Motion as Exhibit F is hereby approved. The Debtors reserve the right to amend, modify, or supplement the Cure Notice.

16.    Any objection to the assumption and assignment of any Designated Contract identified on the Cure Notice, including, without limitation, any objection to the Cure Amount set forth on the Cure Notice or to the ability of the Successful Bidder to provide adequate assurance of future performance under such Designated Contract, must (a) be in

7

writing, (b) set forth the basis for the objection as well as any cure amount that the objector asserts to be due (in all cases with appropriate documentation in support thereof), and (c) be filed with the Clerk of the Court, United States Bankruptcy Court for the District of Columbia, 333 Constitution Avenue, NW, Room 1225, Washington, DC 20001, and served on the following: (i) counsel to the Debtors, Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, DC 20037-1122 (Attn: Patrick Potter, patrick.potter@pillsburylaw.com) and Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, NY (Attn: Andrew Troop, andrew.troop@pillsburylaw.com); (ii) counsel for the Stalking Horse Purchaser for noticing purposes, Squire Sanders (US) LLP, One East Washington Street, Suite 2700, Phoenix, AZ 85004 (Attn: Craig D. Hansen, craig.hansen@ squiresanders.com; (iii) counsel to the Committee; (iv) counsel to the Successful Bidder, if not the Stalking Horse Purchaser; and (v) the Office of the United States Trustee for the District of Columbia, 115 S. Union Street, Room 210, Alexandria, VA 22314 (Attn: Bradley Jones; Bradley.D.Jones@usdoj.gov), **so as to be actually received** no later than 5:00 p.m. (prevailing Eastern Time) on the date that is fifteen (15) days after the filing of the Cure Notice (the "**Assignment and Cure Objection Deadline**").

Field Code Changed

17.    To the extent that any entity does not timely object as set forth above, such entity shall be (a) forever barred from objecting to the assumption and assignment of its respective Designated Contracts identified on the Cure Notice, including, without limitation, asserting any additional cure payments or requesting additional adequate assurance of future performance, (b) deemed to have consented to the applicable Cure Amount, if any, and to the assumption and assignment of the applicable Designated Contract, (c) bound to such corresponding Cure Amount, if any, (d) deemed to have agreed that the Successful Bidder has provided adequate assurance of future performance within the meaning of section 365(b)(1)(C)

8

of the Bankruptcy Code, (e) deemed to have agreed that all defaults under the applicable Designated Contract arising or continuing prior to the effective date of the assignment have been cured as a result or precondition of the assignment, such that the Successful Bidder or the Debtors shall have no liability or obligation with respect to any default occurring or continuing prior to the assignment, and from and after the date of the assignment the applicable Designated Contract shall remain in full force and effect for the benefit of the Successful Bidder and such entity in accordance with its terms, (f) deemed to have waived any right to terminate the applicable Designated Contract or designate an early termination date under the applicable Designated Contract as a result of any default that occurred and/or was continuing prior to the assignment date, (g) deemed to have agreed that the Debtors are not obligated under the Designated Contracts following the effective date of the assumption and assignment, and (h) deemed to have agreed that the terms of the Sale Order shall apply to the assumption and assignment of the applicable Designated Contract.

18.    If such an objection is received timely and such objection cannot otherwise be resolved by the parties, the Court may hear such objection at the Sale Hearing or at a later date set by the Court. The pendency of a dispute relating to the Cure Amount will not prevent or delay the assumption and assignment of any Designated Contract or the sale of the Acquired Assets to the Successful Bidder. If an objection is filed with respect only to the cure amount listed on the Cure Notice, the dispute with respect to the Cure Amount will be resolved consensually, if possible, or, if the parties are unable to resolve their dispute, before the Court, and subject to the entry of the Sale Order the Debtors may consummate the sale of the Acquired Assets and assumption and assignment of the Designated Contracts and reserve from the cash sale proceeds an amount sufficient to pay the asserted cure amount.

9

19.     The Sale Hearing shall be held on [**June 10~~25~~**], 2014 at [**9:30~~2:00~~ a~~p~~.m.**] **(prevailing Eastern Time)** at the United States Bankruptcy Court for the District of Columbia, Courtroom No. 1, 333 Constitution Avenue, NW, Washington, DC 20001. The Sale Hearing may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.

20.     All other objections to approval of the sale of the Acquired Assets to the Successful Bidder shall (a) be in writing, (b) comply with the Bankruptcy Rules and any applicable Local Rules, (c) set forth the name of the objector, (d) state with particularity the legal and factual bases for such objection, and (e) be filed with the Clerk of the Court, United States Bankruptcy Court for the District of Columbia, 333 Constitution Avenue, NW, Room 1225, Washington, DC 20001, together with proof of service thereof, and served on the following parties **so as to be actually received no later than 5:00 p.m. (prevailing Eastern Time) on [June 9], 2014:** (i) counsel to the Debtors, Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, DC 20037-1122 (Attn: Patrick Potter, patrick.potter@pillsburylaw.com) and Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, NY (Attn: Andrew Troop, andrew.troop@pillsburylaw.com); (ii) counsel for the Stalking Horse Purchaser for noticing purposes, Squire Sanders (US) LLP, One East Washington Street, Suite 2700, Phoenix, AZ 85004 (Attn: Craig D. Hansen, craig.hansen@ squiresanders.com; (iii) counsel to the Committee; (iv) counsel to the Successful Bidder, if not the Stalking Horse Purchaser; and (v) the Office of the United States Trustee for the District of Columbia, 115 S. Union Street, Room 210, Alexandria, VA 22314 (Attn: Bradley Jones; Bradley.D.Jones@usdoj.gov).

Field Code Changed

21.     All objections to entry of this Order that have not been withdrawn, waived, or settled as announced to the Court at the Hearing or by stipulation filed with the Court, and all reservations of rights included in such objections, are overruled.

22.     In the event there is a conflict between this Order and the Motion or Stalking Horse Agreement, to the extent of such conflict this Order shall control and govern.

23.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, enforcement and/or interpretation of this Order.

24.     This Order shall be effective immediately upon entry, and any stay of orders provided for in Bankruptcy Rules 6004 or 6006 or any other provision of the Bankruptcy Code or Bankruptcy Rules is expressly lifted. The Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and except as directed by the Court in this Order, may in their discretion and without further delay take any action and perform any act authorized under this Order.

25.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

cc:

All attorneys who have entered an appearance and who are registered e-filers.

## Exhibit B-1

## IN RE SPECIALTY HOSPITAL OF WASHINGTON, LLC, *et al.*
## BIDDING PROCEDURES

Set forth below are the bidding procedures (the "**Bidding Procedures**") to be employed in connection with the sale (the "**Transaction**") of substantially all of the assets (collectively, the "**Acquired Assets**") of Specialty Hospital of America, LLC; SHA Management, LLC; Specialty Hospital of Washington, LLC; Specialty Hospitals of Washington Nursing Center, LLC; Specialty Hospital of Washington Hadley, LLC; SHA Holdings, Inc.; and SHA Hadley SNF, LLC (collectively, the "**Debtors**"), as debtors and debtors-in-possession in these chapter 11 cases (the "**Cases**"), which are currently pending in the United States Bankruptcy Court for the District of Columbia (the "**Bankruptcy Court**"). The Acquired Assets to be sold and the terms and conditions upon which the Debtors contemplate consummating a sale are further described in a term sheet (the "**Stalking Horse Term Sheet**"), which outlines the principle terms of a stalking horse asset purchase agreement (the "**Stalking Horse Agreement**") entered into between the Debtors and SHA Acquisitions, LLC (the "**Stalking Horse Purchaser**"). An executed copy of the Stalking Horse Term Sheet is attached as Exhibit B-1 to the modified motion (the "**Motion**") filed with Bankruptcy Court [DE 68], as modified [DE __], seeking approval of, among other things, these Bidding Procedures. An executed copy of the Stalking Horse Agreement was filed with the Bankruptcy Court on June 2, 2014 [DE __].

The sale of the Acquired Assets is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court pursuant to sections 363 and 365 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure. The Transaction shall also include the assumption and assignment of certain designated executory contracts and unexpired leases (collectively, the "**Designated Contracts**") under sections 363 and 365 of the Bankruptcy Code according to the process outlined below.

From the Petition Date to the date of entry of an order approving these Bidding Procedures (the "**Interim Period**"), the Debtors were not authorized to solicit, initiate, or otherwise participate in any negotiations with any third parties regarding any transaction similar to the Transaction. But the Debtors were authorized to respond to any unsolicited third parties interested in participating in the Auction (as defined below) process in good faith. To the extent any Debtor was approached with a proposal from such an unsolicited third party during the Interim Period, the Debtors were required to immediately notify the Stalking Horse Purchaser of the terms of the proposal and the identity of the offeror. Upon entry of an order of the Bankruptcy Court approving the Bidding Procedures outlined below, such Bidding Procedures will govern any Transaction related to the Acquired Assets.

A.     **MARKETING BY THE DEBTORS**

The Debtors shall (a) coordinate the efforts of potential bidders in conducting their respective due diligence, (b) evaluate bids from potential bidders, (c) negotiate any bid made to acquire the Acquired Assets and assume Designated Contracts, (d) conduct an auction (the "**Auction**") if a Qualified Bid is received other than the Stalking Horse Agreement, and (e) make such other determinations as are provided in these Bidding Procedures. Neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Acquired Assets, or any portion thereof,

to any person who is not, in the Debtors' reasonable judgment, in consultation with their advisors, a potential qualified bidder.

**B.      BID DEADLINE**

A potential bidder that desires to make a bid shall deliver copies of its bid package by email to: (i) counsel to the Debtors, Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, D.C. 20037-1122 (Attn: Patrick Potter, patrick.potter@pillsburylaw.com) and Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, NY (Attn: Andrew Troop, andrew.troop@pillsburylaw.com); (ii) the Debtors' financial advisor, Alvarez & Marsal Healthcare Industry Group, LLC, 600 Madison Avenue, 8th Floor, New York, NY 10022 (Attn: Ronald Winters, rwinterws@alvarezandmarsal.com); (iii) the Debtors' investment banker, Cain Brothers & Company, LLC, 360 Madison Avenue, New York, NY 10017 (Attn: Gregory J. Hychko, ghychko@cainbrothers.com); and (iv) counsel to any official committee of unsecured creditors appointed in these Cases (the "**Committee**"), so as to be actually received on or before **June 4, 2014 at 7:00 p.m. (prevailing Eastern Time)** (the "**Bid Deadline**"), which deadline may be extended by the Debtors.  No bids submitted after the Bid Deadline shall be considered by the Debtors.

**C.      DUE DILIGENCE**

Subject to a potential bidder entering into a confidentiality agreement satisfactory to the Debtors in their business judgment, the Debtors may afford any potential bidder, whom the Debtors, in consultation with their advisors, believe has the wherewithal to close the Transaction, the opportunity to conduct a reasonable due diligence review in the manner determined by the Debtors in their discretion. The Debtors shall not be obligated to, but may, furnish access to any due diligence information of any kind after the Bid Deadline. The Debtors intend to use reasonable efforts to provide to all potential qualified bidders certain information in connection with the proposed sale and assumption and assignment of Designated Contracts, including, among other things, these proposed Bidding Procedures and the Stalking Horse Agreement.  However, the Debtors' failure to deliver any such information to any potential bidders shall not affect the validity, effectiveness or finality of the Auction or the sale process.  All diligence inquiries must be directed to Alvarez & Marsal Healthcare Industry Group, LLC, 600 Madison Avenue, 8th Floor, New York, NY 10022 (Attn: Ronald Winters, rwinterws@alvarezandmarsal.com); or Cain Brothers & Company, LLC, 360 Madison Avenue, New York, NY 10017 (Attn: Gregory J. Hychko, ghychko@cainbrothers.com).

**D.      BID REQUIREMENTS**

A bid submitted will be considered a qualified bid and the potential bidder will be considered a qualified bidder (a "**Qualified Bid**" and "**Qualified Bidder**," respectively), only if the bid is submitted by a bidder that in the Debtors' business judgment, in consultation with their advisor and the Committee if one is appointed, complies with all of the following requirements:

a.      The bid states that the potential qualified bidder offers to purchase, in cash, the Acquired Assets and to assume liabilities and/or contracts (or offers to purchase less than all of the Acquired Assets, including the exclusion of the Debtors' accounts receivable) upon the terms and conditions that the Debtors in their business judgment, in consultation with their advisors, reasonably

determine are no less favorable to the Debtors than those set forth in the Stalking Horse Agreement;

b.   The bid includes a signed writing that the potential qualified bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such potential qualified bidder is selected as (A) the Successful Bidder, its offer shall remain irrevocable until the earlier of (i) the outside date by which all regulatory approvals and other conditions to closing shall have been satisfied or waived, (ii) the date the Sale Order is entered if the sale transaction with such potential qualified bidder is denied or (iii) the date that is sixty-five (65) days after the Sale Hearing, or (B) the Next Best Bidder (as defined below), its offer shall remain irrevocable until the earlier of (i) the closing of the sale to the Successful Bidder, (ii) the date that is thirty (30) days after the earlier of (I) the outside date by which all regulatory approvals or other conditions to closing under the Successful Bidder's asset purchase agreement shall have been satisfied or waived, or (II) the date that is sixty-five (65) days after the Sale Hearing;

c.   There are no conditions precedent to the potential qualified bidder's ability to enter into a definitive enforceable agreement and that all necessary internal and shareholder approvals have been obtained prior to the Bid Deadline; and there are no conditions precedent (due diligence, financing, or otherwise) to the closing of the Transaction, other than conditions precedent consistent with those set forth in the Stalking Horse Agreement;

d.   The bid includes a duly authorized and executed copy of an asset purchase agreement (an "**Asset Purchase Agreement**"), including the purchase price for the Assets (the "**Proposed Purchase Price**"), together with all exhibits and schedules thereto, together with copies marked to show any amendments and modifications to the Stalking Horse Agreement and the proposed order to approve the sale by the Bankruptcy Court;

e.   The Bid includes written evidence of a firm, irrevocable commitment for debt or equity financing, or other evidence of ability to consummate the proposed sale transaction, that will allow the Debtors in their business judgment, in consultation with their advisors, to make a determination as to the bidder's financial, regulatory, and other capabilities to consummate the sale transaction contemplated by the Asset Purchase Agreement;

f.   The bid has value to the Debtors that is greater than or equal to (i) the Total Transaction Value (as defined in the Motion, as modified), plus (ii) 5% of the Total Transaction Value, estimated to be approximately $3.25 million (the "**Breakup Fee**"), plus (iii) the Expense Reimbursement, as defined in the Stalking Horse Agreement, plus (iv) $100,000 (the "**Initial Overbid**");

g.   The bid identifies with particularity which executory contracts and unexpired leases the potential qualified bidder designates to assume, and provides details of the potential qualified bidder's proposal for the payment (or treatment) of related cure costs with respect to the Designated Contracts;

h.     The bid includes an acknowledgement and representation that the potential qualified bidder:  (i) has had an opportunity to conduct any and all required due diligence regarding the Acquired Assets and Designated Contracts prior to making its bid; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets and Designated Contracts in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Acquired Assets and Designated Contracts or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in the Asset Purchase Agreement; and (iv) is not entitled to and waives any right to assert a claim for any expense reimbursement, breakup fee, or similar type of payment in connection with its due diligence and bid;

i.     The bid includes evidence, in form and substance reasonably satisfactory to the Debtors, of authorization and approval from the potential qualified bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Asset Purchase Agreement, and any amendments thereto negotiated or occasioned by its participation in the Auction;

j.     The bid is accompanied by a good faith deposit in the form of a wire transfer (to an escrow agent specified by the Debtors (the "**Escrow Agent**")), certified check or such other form acceptable to the Debtors, payable to the order of the Escrow Agent in an amount equal to ten percent (10%) of the Proposed Purchase Price (the "**Good Faith Deposit**");

k.     The bid contains sufficient information, in the Debtors' business judgment in consultation with its advisors, concerning the potential qualified bidder's ability to provide adequate assurance of performance with respect to executory contracts and unexpired leases;

l.     The bidder commits to supplement the bid with other information reasonably requested by the Debtors before or after the Bid Deadline; and

m.     The bid is received by the relevant parties set forth in the Bidding Procedures prior to the Bid Deadline.

The Debtors, the Committee and their professionals will review each potential qualified bid received from a potential qualified bidder to ensure that both the bid and the bidder meet the requirements set forth above. A potential qualified bid received from a potential qualified bidder that the Debtors, in consultation with the Committee, determine meets the above requirements will be considered a "Qualified Bid" and each potential bidder that submits a Qualified Bid will be considered a "Qualified Bidder."  The Debtors, in their business judgment and in consultation with the Committee, reserve the right to reject any bid, without limitation.

The Stalking Horse Agreement is a Qualified Bid for all purposes and the Stalking Horse Purchaser is a Qualified Bidder for all purposes and requirements pursuant to these Bidding Procedures at all times.

The Debtors may value a Qualified Bid based upon any and all factors that the Debtors deem pertinent, including, among others: (a) the Proposed Purchase Price of the Qualified Bid and the assumption of cure obligations respecting the assumption and assignment of Designated Contracts; (b) the risks and timing associated with consummating the Transaction with the Qualified Bidder, including, without limitation, all necessary regulatory approvals; (c) the risks associated with and extent of any non-cash consideration in any Qualified Bid; (d) any assets, contracts, or leases excluded from the Transaction; (e) the Qualified Bidder's experience and ability in managing healthcare assets, including long term acute care hospitals; and (f) any other factors that the Debtors may deem relevant to the proposed Transaction.

The Good Faith Deposits of all Qualified Bidders shall be held by the Escrow Agent in a separate account for the Debtors' benefit.  If a Successful Bidder fails to consummate an approved Transaction because of a breach or failure to perform on the part of such Successful Bidder, such Successful Bidder's Good Faith Deposit will be forfeited to the Debtors.  Any disputes with respect to the transfer of the Good Faith Deposits shall be resolved by the Bankruptcy Court.

## E.   CREDIT BID

On or before the Bid Deadline, parties holding a valid lien on some or all of the Acquired Assets that secures an allowed secured claim may submit a credit bid for some or all of such Acquired Assets to the fullest extent permitted under section 363(k) of the Bankruptcy Code.

## F.   MODIFICATIONS/RESERVATION OF RIGHTS

The Debtors may (i) determine, in their reasonable discretion, which Qualified Bid or Qualified Bids, if any, to present to the Bankruptcy Court as the highest or otherwise best offer for the Acquired Assets, (ii) reject, at any time before entry of an order of the Bankruptcy Court approving any Qualified Bid as the Successful Bid, any bid that, in the Debtors' reasonable discretion, is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code or these Bidding Procedures, or (c) contrary to the best interests of the Debtors and their bankruptcy estates and creditors; provided, that the Stalking Horse Purchaser's bid and the Stalking Horse Agreement, after approval of these Bidding Procedures, may not be rejected under (a), (b), or (c) of this provision, (iii) withdraw, in their business judgment, the Motion, as modified, if pursuing approval of the Motion, as modified, is determined to be contrary to the best interests of the Debtors and their bankruptcy estates and creditors, and (iv) cancel, in their business judgment, the Auction and pursue an alternative transaction if such alternative transaction is determined to be in the best interests of the Debtors and their bankruptcy estates and creditors.

The Debtors may extend or alter any deadline contained in these Bidding Procedures that will better promote their receipt of higher or otherwise better offers for the Acquired Assets and Designated Contracts.  These Bidding Procedures are solely for the benefit of the Debtors and their bankruptcy estates. The Debtors may waive or modify the provisions in these Bidding Procedures or adopt additional procedures as they see fit in their business judgment.

## G.   AUCTION

If the Debtors do not receive any Qualified Bids other than from the Stalking Horse Purchaser, they will not hold an Auction and the Stalking Horse Purchaser will be named the Successful Bidder, subject to entry of the Sale Order.

If more than one Qualified Bid has been received, the Debtors will conduct an Auction for the sale of the Acquired Assets. Prior to the Auction, the Debtors shall send a copy of all Qualified Bids to all Qualified Bidders. The Auction shall take place on **June 9, 2014 at 10:00 a.m. (prevailing Eastern Time)** at the offices of Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, D.C. 20037-1122, or such later time or such other place as the Debtors shall designate in a subsequent notice to all Qualified Bidders and Notice Parties. The Auction may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Auction. The Debtors reserve the right to cancel the Auction in their reasonable discretion.

Unless otherwise ordered by the Court for cause shown, only the Stalking Horse Purchaser and Qualified Bidders will be eligible to participate at the Auction. Representatives of the following parties-in-interest shall be entitled to attend and observe the Auction: Debtors, Committee, Qualified Bidders, holders of liens encumbering the Acquired Assets, and federal and local regulators. The Debtors, in their discretion, may deny access to the Auction to any other entity or person, including the media.

Each Qualified Bidder may be required to confirm at the commencement of and from time to time during the Auction that it has not engaged in any collusive behavior with respect to the sale of the Acquired Assets, the bidding or the Auction. Bidding at the Auction will be videotaped and/or transcribed.

The bidding shall start at the amount offered in the highest or otherwise best Qualified Bid, as determined and announced by the Debtors, in consultation with their advisors, and will continue in increments of at least $100,000 until the bidding ceases. The Stalking Horse Purchaser will have the right to credit bid all indebtedness that is owed under the DIP Loan as of the Closing Date.

Prior to the conclusion of the Auction, the Debtors, in consultation with their advisors and the Committee, will (a) review the last bid by each of the Qualified Bidders made at the Auction on the basis of financial and contractual terms and such factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale, (b) determine the highest or otherwise best bid or combination of bids for the Acquired Assets and Designated Contracts at the Auction (the "**Successful Bid**"), and (c) notify all Qualified Bidders at the Auction of the name of the Successful Bidder. The Debtors will present the Successful Bid to the Court for approval at the Sale Hearing.

After determining the Successful Bid, the Debtors may, in consultation with their advisors and the Committee, determine which Qualified Bid is the next best bid (the "**Next Best Bid**"). The Debtors will present the Next Best Bid to the Court for Approval at the Sale Hearing. If the Successful Bidder does not close the Transaction by the date set forth in the Successful Bid or otherwise agreed to by the Debtors and the Successful Bidder, then the Debtors shall be authorized to close with the party that submitted the Next Best Bid (the "**Next Best Bidder**"), without a further court order. The party that submits the Next Best Bid shall be required to close the Transaction by the date set forth in the Next Best Bid (excusing the time between the Auction and the date the Next Best Bidder is advised that the Debtors

will seek to close under the Next Best Bid), or otherwise agreed to by the Debtors and the Next Best Bidder.

All bidders at the Auction shall be deemed to have consented to these Bidding Procedures and to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the sale and the construction and enforcement of the applicable Asset Purchase Agreement.

**H.     NO ENTITLEMENT TO FEES FOR POTENTIAL BIDDERS OR QUALIFIED BIDDERS**

The performance of due diligence, the tendering of a bid, the determination that a bid is a Qualified Bid or the participation of a Qualified Bidder at the Auction shall not entitle a potential qualified bidder or Qualified Bidder to any breakup, termination or similar fee or reimbursement of expenses and all potential qualified bidders and Qualified Bidders waive any right to seek a claim for substantial contribution. Notwithstanding the foregoing, the Stalking Horse Purchaser shall be entitled to payment of the Breakup Fee and the Expense Reimbursement as provided in the Stalking Horse Agreement and the order approving these Bidding Procedures.

**I.     RETURN OF THE GOOD FAITH DEPOSIT**

The Good Faith Deposits of Qualified Bidders shall be held in escrow by the Escrow Agent.  The Good Faith Deposits of all potential qualified bidders that are determined not to be Qualified Bidders shall be returned promptly by the Escrow Agent.  The Good Faith Deposits of all Qualified Bidders, other than the Successful Bidder and the Next Best Bidder, shall be returned within two (2) business days after the conclusion of the Sale Hearing (as defined below).

The Good Faith Deposit of the Next Best Bidder shall be returned within two (2) business days after the consummation of the Transaction with the Successful Bidder, but in no event later than seventy (70) days after the Sale Hearing.

**J.     AS IS, WHERE IS**

The Transaction shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their estates, or their agents or representatives.  Except as otherwise expressly provided in these Bidding Procedures, the Stalking Horse Agreement, or any applicable Asset Purchase Agreement, each Qualified Bidder shall be deemed to acknowledge and represent that it (i) has had an opportunity to conduct any and all reasonable due diligence regarding the Acquired Assets and Designated Contracts prior to making its bid, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets and Designated Contracts in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets and Designated Contracts, or the completeness of any information provided in connection therewith.

**K.     SALE HEARING**

The Debtors will seek entry of an order from the Bankruptcy Court at a hearing (the "**Sale Hearing**") to begin on **June [10], 2014 at [9:30 a.m.] (prevailing Eastern Time)** to approve and authorize the Transaction with the Successful Bidder and conditionally approve the Transaction with the Next Best Bidder.   The Sale Hearing may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.

**<u>Exhibit B-2</u>**

**IN RE SPECIALTY HOSPITAL OF WASHINGTON, LLC, *et al.***
**BIDDING PROCEDURES**

Set forth below are the bidding procedures (the "**Bidding Procedures**") to be employed in connection with the sale (the "**Transaction**") of substantially all of the assets (collectively, the "**Acquired Assets**") of Specialty Hospital of America, LLC; SHA Management, LLC; Specialty Hospital of Washington, LLC; Specialty Hospitals of Washington Nursing Center, LLC; Specialty Hospital of Washington Hadley, LLC; SHA Holdings, Inc.; and SHA Hadley SNF, LLC (collectively, the "**Debtors**"), as debtors and debtors-in-possession in these chapter 11 cases (the "**Cases**"), which are currently pending in the United States Bankruptcy Court for the District of Columbia (the "**Bankruptcy Court**"). The Acquired Assets to be sold and the terms and conditions upon which the Debtors contemplate consummating a sale are further described in a term sheet (the "**Stalking Horse Term Sheet**"), which outlines the principle terms of a stalking horse asset purchase agreement (the "**Stalking Horse Agreement**") entered into between the Debtors and SHA Acquisitions, LLC (the "**Stalking Horse Purchaser**"). An executed copy of the Stalking Horse Term Sheet is attached as Exhibit ~~D~~ B-1 to the modified motion (the "**Motion**") filed with Bankruptcy Court [DE 68—], as modified [DE __], seeking approval of, among other things, these Bidding Procedures. An executed copy of the Stalking Horse Agreement was filed ~~by~~with the Bankruptcy Court on ~~May [30]~~June 22, 2014 [DE __].

The sale of the Acquired Assets is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court pursuant to sections 363 and 365 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure. The Transaction shall also include the assumption and assignment of certain designated executory contracts and unexpired leases (collectively, "**Designated Contracts**") under sections 363 and 365 of the Bankruptcy Code according to the process outlined below.

From the Petition Date to the date of entry of an order approving these Bidding Procedures (the "**Interim Period**"), the Debtors were not authorized to solicit, initiate, or otherwise participate in any negotiations with any third parties regarding any transaction similar to the Transaction. But the Debtors were authorized to respond to any unsolicited third parties interested in participating in the Auction (as defined below) process in good faith. To the extent any Debtor was approached with a proposal from such an unsolicited third party during the Interim Period, the Debtors were required to immediately notify the Stalking Horse Purchaser of the terms of the proposal and the identity of the offeror. Upon entry of an order of the Bankruptcy Court approving the Bidding Procedures outlined below, such Bidding Procedures will govern any Transaction related to the Acquired Assets.

**A.     MARKETING BY THE DEBTORS**

The Debtors shall (a) coordinate the efforts of potential bidders in conducting their respective due diligence, (b) evaluate bids from potential bidders, (c) negotiate any bid made to acquire the Acquired Assets and assume Designated Contracts, (d) conduct an auction (the "**Auction**") if a Qualified Bid is received other than the Stalking Horse Agreement, and (e) make such other determinations as are provided in these Bidding Procedures. Neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Acquired Assets, or any portion thereof,

to any person who is not, in the Debtors' reasonable judgment, in consultation with their advisors, a potential qualified bidder.

**B.      BID DEADLINE**

A potential bidder that desires to make a bid shall deliver copies of its bid package by email to: (i) counsel to the Debtors, Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, D.C. 20037-1122 (Attn: Patrick Potter, patrick.potter@pillsburylaw.com) and Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, NY (Attn: Andrew Troop, andrew.troop@pillsburylaw.com); (ii) the Debtors' financial advisor, Alvarez & Marsal Healthcare Industry Group, LLC, 600 Madison Avenue, 8th Floor, New York, NY 10022 (Attn: Ronald Winters, rwinterws@alvarezandmarsal.com); (iii) the Debtors' investment banker, Cain Brothers & Company, LLC, 360 Madison Avenue, New York, NY 10017 (Attn: Gregory J. Hychko, ghychko@cainbrothers.com); and (iv) counsel to any official committee of unsecured creditors appointed in these Cases (the "**Committee**"), so as to be actually received on or before [,June ~~20],4,~~ 2014 at ~~5~~7:00 p.m. (prevailing Eastern Time) (the "**Bid Deadline**"), which deadline may be extended by the Debtors.  No bids submitted after the Bid Deadline shall be considered by the Debtors.

**C.      DUE DILIGENCE**

Subject to a potential bidder entering into a confidentiality agreement satisfactory to the Debtors in their business judgment, the Debtors may afford any potential bidder, whom the Debtors, in consultation with their advisors, believe has the wherewithal to close the Transaction, the opportunity to conduct a reasonable due diligence review in the manner determined by the Debtors in their discretion. The Debtors shall not be obligated to, but may, furnish access to any due diligence information of any kind after the Bid Deadline. The Debtors intend to use reasonable efforts to provide to all potential qualified bidders certain information in connection with the proposed sale and assumption and assignment of Designated Contracts, including, among other things, these proposed Bidding Procedures and the Stalking Horse Agreement.  However, the Debtors' failure to deliver any such information to any potential bidders shall not affect the validity, effectiveness or finality of the Auction or the sale process.  All diligence inquiries must be directed to Alvarez & Marsal Healthcare Industry Group, LLC, 600 Madison Avenue, 8th Floor, New York, NY 10022 (Attn: Ronald Winters, rwinterws@alvarezandmarsal.com); or Cain Brothers & Company, LLC, 360 Madison Avenue, New York, NY 10017 (Attn: Gregory J. Hychko, ghychko@cainbrothers.com).

**D.      BID REQUIREMENTS**

A bid submitted will be considered a qualified bid and the potential bidder will be considered a qualified bidder (a "**Qualified Bid**" and "**Qualified Bidder**," respectively), only if the bid is submitted by a bidder that in the Debtors' business judgment, in consultation with their advisor and the Committee if one is appointed, complies with all of the following requirements:

a.      The bid states that the potential qualified bidder offers to purchase, in cash, the Acquired Assets and to assume liabilities and/or contracts (or offers to purchase less than all of the Acquired Assets, including the exclusion of the Debtors' accounts receivable) upon the terms and conditions that the Debtors in their business judgment, in consultation with their advisors, reasonably

determine are no less favorable to the Debtors than those set forth in the Stalking Horse Agreement;

b.    The bid includes a signed writing that the potential qualified bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such potential qualified bidder is selected as (A) the Successful Bidder, its offer shall remain irrevocable until the earlier of (i) the outside date by which all regulatory approvals and other conditions to closing shall have been satisfied or waived, (ii) the date the Sale Order is entered if the sale transaction with such potential qualified bidder is denied or (iii) the date that is sixty (60) five (65) days after the Sale Hearing, or (B) the Next Best Bidder (as defined below), its offer shall remain irrevocable until the earlier of (i) the closing of the sale to the Successful Bidder, (ii) the date that is thirty (30) days after the earlier of (I) the outside date by which all regulatory approvals or other conditions to closing under the Successful Bidder's asset purchase agreement shall have been satisfied or waived, or (II) the date that is sixty (60) five (65) days after the Sale Hearing;

c.    There are no conditions precedent to the potential qualified bidder's ability to enter into a definitive enforceable agreement and that all necessary internal and shareholder approvals have been obtained prior to the Bid Deadline; and there are no conditions precedent (due diligence, financing, or otherwise) to the closing of the Transaction, other than conditions precedent consistent with those set forth in the Stalking Horse Agreement;

d.    The bid includes a duly authorized and executed copy of an asset purchase agreement (an "**Asset Purchase Agreement**"), including the purchase price for the Assets (the "**Proposed Purchase Price**"), together with all exhibits and schedules thereto, together with copies marked to show any amendments and modifications to the Stalking Horse Agreement and the proposed order to approve the sale by the Bankruptcy Court;

e.    The Bid includes written evidence of a firm, irrevocable commitment for debt or equity financing, or other evidence of ability to consummate the proposed sale transaction, that will allow the Debtors in their business judgment, in consultation with their advisors, to make a determination as to the bidder's financial, regulatory, and other capabilities to consummate the sale transaction contemplated by the Asset Purchase Agreement;

f.    The bid has value to the Debtors that is greater than or equal to (i) the Total Transaction Value, (as defined in the Modified Motion, as modified), plus (ii) 5% of the Total Transaction Value, estimated to be approximately $3.25 million (the "**Breakup Fee**"), plus (iii) the Expense Reimbursement, as defined in the Stalking Horse Agreement, plus (iv) $100,000 (the "**Initial Overbid**");

g.    The bid identifies with particularity which executory contracts and unexpired leases the potential qualified bidder designates to assume, and provides details of the potential qualified bidder's proposal for the payment (or treatment) of related cure costs with respect to the Designated Contracts;

h.     The bid includes an acknowledgement and representation that the potential qualified bidder:  (i) has had an opportunity to conduct any and all required due diligence regarding the Acquired Assets and Designated Contracts prior to making its bid; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets and Designated Contracts in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Acquired Assets and Designated Contracts or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in the Asset Purchase Agreement; and (iv) is not entitled to and waives any right to assert a claim for any expense reimbursement, breakup fee, or similar type of payment in connection with its due diligence and bid;

i.     The bid includes evidence, in form and substance reasonably satisfactory to the Debtors, of authorization and approval from the potential qualified bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Asset Purchase Agreement, and any amendments thereto negotiated or occasioned by its participation in the Auction;

j.     The bid is accompanied by a good faith deposit in the form of a wire transfer (to an escrow agent specified by the Debtors (the "**Escrow Agent**")), certified check or such other form acceptable to the Debtors, payable to the order of the Escrow Agent in an amount equal to ten percent (10%) of the Proposed Purchase Price (the "**Good Faith Deposit**");

k.     The bid contains sufficient information, in the Debtors' business judgment in consultation with its advisors, concerning the potential qualified bidder's ability to provide adequate assurance of performance with respect to executory contracts and unexpired leases;

l.     The bidder commits to supplement the bid with other information reasonably requested by the Debtors before or after the Bid Deadline; and

m.     The bid is received by the relevant parties set forth in the Bidding Procedures prior to the Bid Deadline.

The Debtors, the Committee and their professionals will review each potential qualified bid received from a potential qualified bidder to ensure that both the bid and the bidder meet the requirements set forth above. A potential qualified bid received from a potential qualified bidder that the Debtors, in consultation with the Committee, determine meets the above requirements will be considered a "Qualified Bid" and each potential bidder that submits a Qualified Bid will be considered a "Qualified Bidder."  The Debtors, in their business judgment and in consultation with the Committee, reserve the right to reject any bid, without limitation.

The Stalking Horse Agreement is a Qualified Bid for all purposes and the Stalking Horse Purchaser is a Qualified Bidder for all purposes and requirements pursuant to these Bidding Procedures at all times.

910756/1/COLUMBUS

The Debtors may value a Qualified Bid based upon any and all factors that the Debtors deem pertinent, including, among others: (a) the Proposed Purchase Price of the Qualified Bid and the assumption of cure obligations respecting the assumption and assignment of Designated Contracts; (b) the risks and timing associated with consummating the Transaction with the Qualified Bidder, including, without limitation, all necessary regulatory approvals; (c) the risks associated with and extent of any non-cash consideration in any Qualified Bid; (d) any assets, contracts, or leases excluded from the Transaction; (e) the Qualified Bidder's experience and ability in managing healthcare assets, including long term acute care hospitals; and (f) any other factors that the Debtors may deem relevant to the proposed Transaction.

The Good Faith Deposits of all Qualified Bidders shall be held by the Escrow Agent in a separate account for the Debtors' benefit.  If a Successful Bidder fails to consummate an approved Transaction because of a breach or failure to perform on the part of such Successful Bidder, such Successful Bidder's Good Faith Deposit will be forfeited to the Debtors.  Any disputes with respect to the transfer of the Good Faith Deposits shall be resolved by the Bankruptcy Court.

**E.     CREDIT BID**

On or before the Bid Deadline, parties holding a valid lien on some or all of the Acquired Assets that secures an allowed secured claim may submit a credit bid for some or all of such Acquired Assets to the fullest extent permitted under section 363(k) of the Bankruptcy Code.

**F.     MODIFICATIONS/RESERVATION OF RIGHTS**

The Debtors may (i) determine, in their reasonable discretion, which Qualified Bid or Qualified Bids, if any, to present to the Bankruptcy Court as the highest or otherwise best offer for the Acquired Assets, (ii) reject, at any time before entry of an order of the Bankruptcy Court approving any Qualified Bid as the Successful Bid, any bid that, in the Debtors' reasonable discretion, is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code or these Bidding Procedures, or (c) contrary to the best interests of the Debtors and their bankruptcy estates and creditors; provided, that the Stalking Horse Purchaser's bid and the Stalking Horse Agreement, after approval of these Bidding Procedures, may not be rejected under (a), (b), or (c) of this provision, (iii) withdraw, in their business judgment, the Motion, as modified, if pursuing approval of the Motion, as modified, is determined to be contrary to the best interests of the Debtors and their bankruptcy estates and creditors, and (iv) cancel, in their business judgment, the Auction and pursue an alternative transaction if such alternative transaction is determined to be in the best interests of the Debtors and their bankruptcy estates and creditors.

The Debtors may extend or alter any deadline contained in these Bidding Procedures that will better promote their receipt of higher or otherwise better offers for the Acquired Assets and Designated Contracts.  These Bidding Procedures are solely for the benefit of the Debtors and their bankruptcy estates. The Debtors may waive or modify the provisions in these Bidding Procedures or adopt additional procedures as they see fit in their business judgment.

**G.     AUCTION**

If the Debtors do not receive any Qualified Bids other than from the Stalking Horse Purchaser, they will not hold an Auction and the Stalking Horse Purchaser will be named the Successful Bidder, subject to entry of the Sale Order.

If more than one Qualified Bid has been received, the Debtors will conduct an Auction for the sale of the Acquired Assets.  Prior to the Auction, the Debtors shall send a copy of all Qualified Bids to all Qualified Bidders.  The Auction shall take place on [**June 23**9, 2014] **at 10:00 a.m. (prevailing Eastern Time)** at the offices of Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, D.C. 20037-1122, or such later time or such other place as the Debtors shall designate in a subsequent notice to all Qualified Bidders and Notice Parties. The Auction may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Auction. The Debtors reserve the right to cancel the Auction in their reasonable discretion.

Unless otherwise ordered by the Court for cause shown, only the Stalking Horse Purchaser and Qualified Bidders will be eligible to participate at the Auction. Representatives of the following parties-in-interest shall be entitled to attend and observe the Auction:  Debtors, Committee, Qualified Bidders, holders of liens encumbering the Acquired Assets, and federal and local regulators.  The Debtors, in their discretion, may deny access to the Auction to any other entity or person, including the media.

Each Qualified Bidder may be required to confirm at the commencement of and from time to time during the Auction that it has not engaged in any collusive behavior with respect to the sale of the Acquired Assets, the bidding or the Auction. Bidding at the Auction will be videotaped and/or transcribed.

The bidding shall start at the amount offered in the highest or otherwise best Qualified Bid, as determined and announced by the Debtors, in consultation with their advisors, and will continue in increments of at least $100,000 until the bidding ceases. The Stalking Horse Purchaser will have the right to credit bid all indebtedness that is owed under the DIP Loan as of the Closing Date.

Prior to the conclusion of the Auction, the Debtors, in consultation with their advisors and the Committee, will (a) review the last bid by each of the Qualified Bidders made at the Auction on the basis of financial and contractual terms and such factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale, (b) determine the highest or otherwise best bid or combination of bids for the Acquired Assets and Designated Contracts at the Auction (the "**Successful Bid**"), and (c) notify all Qualified Bidders at the Auction of the name of the Successful Bidder.  The Debtors will present the Successful Bid to the Court for approval at the Sale Hearing.

After determining the Successful Bid, the Debtors may, in consultation with their advisors and the Committee, determine which Qualified Bid is the next best bid (the "**Next Best Bid**").  The Debtors will present the Next Best Bid to the Court for Approval at the Sale Hearing.  If the Successful Bidder does not close the Transaction by the date set forth in the Successful Bid or otherwise agreed to by the Debtors and the Successful Bidder, then the Debtors shall be authorized to close with the party that submitted the Next Best Bid (the "**Next Best Bidder**"), without a further court order.  The party that submits the Next Best Bid shall be required to close the Transaction by the date set forth in the Next Best Bid (excusing the time between the Auction and the date the Next Best Bidder is advised that the Debtors

will seek to close under the Next Best Bid), or otherwise agreed to by the Debtors and the Next Best Bidder.

All bidders at the Auction shall be deemed to have consented to these Bidding Procedures and to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the sale and the construction and enforcement of the applicable Asset Purchase Agreement.

**H.    NO ENTITLEMENT TO FEES FOR POTENTIAL BIDDERS OR QUALIFIED BIDDERS**

The performance of due diligence, the tendering of a bid, the determination that a bid is a Qualified Bid or the participation of a Qualified Bidder at the Auction shall not entitle a potential qualified bidder or Qualified Bidder to any breakup, termination or similar fee or reimbursement of expenses and all potential qualified bidders and Qualified Bidders waive any right to seek a claim for substantial contribution. Notwithstanding the foregoing, the Stalking Horse Purchaser shall be entitled to payment of the Breakup Fee and the Expense Reimbursement as provided in the Stalking Horse Agreement and the order approving these Bidding Procedures.

**I.    RETURN OF THE GOOD FAITH DEPOSIT**

The Good Faith Deposits of Qualified Bidders shall be held in escrow by the Escrow Agent. The Good Faith Deposits of all potential qualified bidders that are determined not to be Qualified Bidders shall be returned promptly by the Escrow Agent. The Good Faith Deposits of all Qualified Bidders, other than the Successful Bidder and the Next Best Bidder, shall be returned within two (2) business days after the conclusion of the Sale Hearing (as defined below).

The Good Faith Deposit of the Next Best Bidder shall be returned within two (2) business days after the consummation of the Transaction with the Successful Bidder, but in no event later than ~~sixty (60~~seventy (70)~~ days after the Sale Hearing.

**J.    AS IS, WHERE IS**

The Transaction shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their estates, or their agents or representatives. Except as otherwise expressly provided in these Bidding Procedures, the Stalking Horse Agreement, or any applicable Asset Purchase Agreement, each Qualified Bidder shall be deemed to acknowledge and represent that it (i) has had an opportunity to conduct any and all reasonable due diligence regarding the Acquired Assets and Designated Contracts prior to making its bid, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets and Designated Contracts in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets and Designated Contracts, or the completeness of any information provided in connection therewith.

**K.    SALE HEARING**

The Debtors will seek entry of an order from the Bankruptcy Court at a hearing (the "**Sale Hearing**") to begin on [**June 25, [10], 2014**] at [**2:00 p9:30 a.m.**] (**prevailing Eastern Time**) to approve and authorize the Transaction with the Successful Bidder and conditionally approve the Transaction with the Next Best Bidder.  The Sale Hearing may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.

**Formatted:** Font: 12 pt, Not Expanded by /
Condensed by , Not Highlight

**Formatted:** Font: 12 pt, Not Expanded by /
Condensed by , Not Highlight

**Formatted:** Font: 12 pt, Not Expanded by /
Condensed by

**Formatted:** Not Highlight

**Formatted:** Not Highlight

# **Exhibit C-1**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re: | Case No. 14-00279 |
| SPECIALTY HOSPITAL OF WASHINGTON, LLC, *et al.*, | Chapter 11 |
| Debtors.[1] | (Joint Administration Requested) |

**ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND INTERESTS, (II) AUTHORIZING THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES, AND (III) GRANTING CERTAIN RELATED RELIEF**

---

[1]

The debtors in these chapter 11 cases and each debtor's federal identification number ("EIN") and chapter 11 case number are: Specialty Hospital of Washington, LLC (EIN: 81-0681352; case number: 14-00279); Specialty Hospital of America, LLC (EIN: 81-0681347; case number 14-00295); SHA Holdings, Inc. (EIN: 20-5741943; case number 14-00296); SHA Management, LLC (EIN: 81-0681350; case number 14-00297); Specialty Hospital of Washington Nursing Center, LLC (EIN: 81-0681348; case number 14-00298), Specialty Hospital of Washington Hadley, LLC (EIN: 20-5752586; case number 14-00299), and SHA Hadley SNF, LLC (EIN: 20-5741976; case number 14-00300).

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtors and debtors-in-possession (the "**Debtors**") for, among other things, entry of an order (the "**Order**") pursuant to sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "**Bankruptcy Code**"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), (i) authorizing and approving the sale (the "**Sale Transaction**") of substantially all of the Debtors' assets (the "**Acquired Assets**") free and clear of all liens, claims, encumbrances, setoff rights and others interests (the "**Encumbrances**"), including, without limitation, all Encumbrances of or asserted by CMS, DOJ, IRS, DC Medicaid, the Washington, D.C. Office of Tax and Revenue and any other federal, state or local regulatory or taxing agency (each an "**Agency**," and, collectively, the "**Agencies**"), (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases (the "**Designated Contracts**"), identified by the Debtors and more fully described in the Asset Purchase Agreement dated as of May [29], 2014 (attached hereto as **Exhibit A**) by and between the Debtors and SHA Acquisition, LLC (the "**Purchaser**" or "**Stalking Horse Purchaser**") for the purchase of the Acquired Assets and the assumption of the Designated Contracts, and (iii) granting certain related relief, and the Court having held a hearing on June [10], 2014 (the "**Sale Hearing**") to approve the Sale Transaction; and the Court having reviewed and considered the Motion, the objections to the Motion, if any, and the arguments of counsel made, and the evidence proffered or adduced at the Sale Hearing; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates and creditors and other parties in interest; and upon the record of the Sale Hearing and these chapter 11 cases (the "**Cases**"); and after due deliberation thereon; and good cause appearing therefore, it is hereby

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Asset Purchase Agreement (as defined herein), as applicable.

**FOUND AND DETERMINED THAT**[3]

A.     **Jurisdiction and Venue**.  The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of these Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.     **Statutory Predicates**.  The statutory predicates for the relief sought in the Motion are sections 105, 363 and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, and 6006.

C.     **Petition Date**.  On May 21, 2014, the Debtors, other than Specialty Hospital of Washington LLC, LLC ("**SHDC**"), commenced these Cases by each filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  An involuntary chapter 11 petition for relief under chapter 11 of the Bankruptcy Code was filed against SHDC on April 23, 2014, and on May 21, this Court entered an Order for Relief with respect to SHDC.

D.     **Entry of Bidding Procedures Order**.  On <mark>May [30], 2014</mark>, this Court entered an order (the "**Bidding Procedures Order**") (i) approving bidding and auction procedures (the "**Bidding Procedures**"), (ii) authorizing the Debtors to enter into a Stalking Horse Agreement, (iii) authorizing and approving the Assumption and Assignment Procedures, including the notice of proposed cure amounts (the "**Cure Amount**"), (iv) approving the form and manner of notice of all procedures, schedules, and agreements, and (v) scheduling the Sale Hearing.

E.     **Compliance with Bidding Procedures Order**.  As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing, and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtors have marketed the Acquired Assets and conducted the sale process in compliance with the Bidding Procedures

---

[3]     Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Bankruptcy Rule 7052.

3

Order, and the Auction was duly noticed and conducted in a non-collusive, fair and good faith manner.  The Debtors and their professionals have actively marketed the Acquired Assets and conducted the sale process in compliance with the Bidding Procedures Order, and have afforded potential purchasers a full and fair opportunity to make higher and better offers.  The Purchaser, the Landlord and Existing Lienholders acted in compliance with the terms of the Bidding Procedures.  In accordance with the Bidding Procedures, the Debtors determined that the bid submitted by the Purchaser and memorialized by the Asset Purchase Agreement is the Successful Bid (as defined in the Bidding Procedures).

F.      **Notice**.  As evidenced by the affidavits of service and publication previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing, the Sale Transaction, the Assumption and Assignment Procedures (including the objection deadline with respect to any Cure Amount) and the assumption and assignment of the Designated Contracts and the Cure Amount has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 and in compliance with the Bidding Procedures Order, (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the Motion, the Sale Hearing, the Sale Transaction, or the assumption and assignment of the Designated Contracts or the Cure Amount is or shall be required.

G.      **Corporate Authority**.  Each Debtor (i) has full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale of the Acquired Assets by the Debtors has been duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) has all of the corporate power and authority

4

necessary to consummate the transactions contemplated by the Asset Purchase Agreement, (iii) has taken all corporate action and formalities necessary to authorize and approve the Asset Purchase Agreement and the consummation by the Debtors of the transactions contemplated thereby, including, without limitation, as required by their respective organizational documents and (iv) no government, regulatory or other consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, are required for the Debtors to enter into the Asset Purchase Agreement and consummate the Sale Transaction.

H.     **Opportunity to Object**.  A fair and reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including the following entities:

    i.     counsel to the Stalking Horse Purchaser for noticing purposes;

    ii.     counsel to the Landlord;

    iii.     counsel to the Existing Lienholders;

    iv.     all applicable health regulatory agencies and taxing authorities;

    v.     the Office of the United States Trustee for the District of Columbia;

    vi.     the United States Attorney's Office for the District of Columbia;

    vii.     any entity known or reasonably believed to have asserted a security interest in or lien against any of the Acquired Assets;

    viii.     the Debtors' twenty (20) largest creditors on a consolidated basis or counsel for the Committee if one has been appointed;

    ix.     any party that has filed a notice of appearance in these Cases; and

    x.     any party who has expressed an interest in purchasing the Acquired Assets and who the Debtors reasonably believe could consummate a transaction, or who the Debtors or their professionals believe would have such an interest.

I. **Sale in Best Interest**. Consummation of the sale of the Acquired Assets at this time is in the best interests of the Debtors, their creditors, their estates and other parties in interest.

J. **Business Justification**. Sound business reasons exist for the Sale Transaction. Entry into the Asset Purchase Agreement, and the consummation of the transactions contemplated thereby, including the Sale Transaction and the assumption and assignment of the Designated Contracts, constitutes each Debtor's exercise of sound business judgment and such acts are in the best interests of each Debtor, its estate, and all parties in interest. The Court finds that each Debtor has articulated good and sufficient business reasons justifying the Sale Transaction. Such business reasons include, but are not limited to, the following: (i) the Asset Purchase Agreement constitutes the highest and best offer for the Acquired Assets; (ii) the Asset Purchase Agreement and the closing thereon will present the best opportunity to realize the value of the Acquired Assets on a going-concern basis and avoid decline and devaluation of the Acquired Assets; (iii) unless the Sale Transaction and all of the other transactions contemplated by the Asset Purchase Agreement are concluded expeditiously, as provided for in the Motion and pursuant to the Asset Purchase Agreement, recoveries to creditors may be diminished; (iv) the Asset Purchase Agreement and the closing thereon will promote the public interest; and (v) any plan likely would not have yielded as favorable an economic result. The terms and conditions of the Asset Purchase Agreement, including, without limitation, the consideration to be realized by the Debtors, are fair and reasonable. Approval of the Motion, the Asset Purchase Agreement, and the transactions contemplated thereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Designated Contracts, is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

K.    **Arm's Length Sale**.  The Asset Purchase Agreement was negotiated, proposed and entered into by the Debtors and the Purchaser without collusion, in good faith, and from arm's length bargaining positions.  Neither the Debtors nor the Purchaser has engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under 11 U.S.C. § 363(n).  Specifically, the Purchaser has not acted in a collusive manner with any person and the purchase price was not controlled by any agreement among bidders.  The Purchaser is not an "insider" of the Debtors as defined in Bankruptcy Code section 101(31).

L.    **Good Faith Purchaser**.  The Purchaser is a good faith purchaser for value and, as such, is entitled to all of the protections afforded under 11 U.S.C. § 363(m) and any other applicable or similar bankruptcy and non-bankruptcy law.  Specifically, (i) the Purchaser recognized that the Debtors were free to deal with any other party interested in purchasing the Acquired Assets, (ii) the Purchaser complied in all respects with the provisions in the Bidding Procedures Order, (iii) the Purchaser agreed to subject its bid to the competitive bid procedures set forth in the Bidding Procedures Order, (iv) all payments to be made by the Purchaser in connection with the Sale Transaction have been disclosed, (v) no common identity of directors, officers or controlling stockholders exists among the Purchaser and the Debtors, (vi) the negotiation and execution of the Asset Purchase Agreement was at arm's length and in good faith, and at all times each of the Purchaser and the Debtors were represented by competent counsel of their choosing, (vii) the Purchaser did not in any way induce or cause the chapter 11 filing of the Debtors, and (viii) the Purchaser has not acted in a collusive manner with any person.  The Purchaser will be acting in good faith within the meaning of 11 U.S.C. § 363(m) in closing the transactions contemplated by the Asset Purchase Agreement.

M.   **Free and Clear**.  The Debtors may sell the Acquired Assets free and clear of all obligations, liabilities and the Encumbrances, and free and clear of all set-off rights, because, with respect to each creditor asserting a lien, claim, encumbrance, or interest, one or more of the standards set forth in Bankruptcy Code § 363(f)(l)-(5) has been satisfied.   Those holders of Encumbrances, who did not object or withdrew objections to the Sale Transaction, are deemed to have consented to the Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Encumbrances, who did object, fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

N.   The Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated hereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Designated Contracts, (i) if the transfer of the Acquired Assets were not free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any taxes or successor or transferee liability, and all liens, claims, encumbrances, setoff rights or other interests of or asserted by any Agency or Agencies, or (ii) if the Purchaser would, or in the future could, be liable for any such liens, claims, encumbrances, and other interests, including, without limitation, rights or claims based on any taxes or successor or transferee liability.   The Purchaser will not consummate the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Designated Contracts, unless this Court expressly orders that none of the Purchaser, its affiliates, its present or contemplated members or shareholders, or the Acquired Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any liens,

claims, encumbrances, and other interests, including, without limitation, rights or claims based on any taxes, successor or transferee liability, and all liens, claims, encumbrances, setoff rights or other interests of or asserted by any Agency or Agencies.

O.      Not transferring the Acquired Assets free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever including, without limitation, rights or claims based on any taxes, successor or transferee liability, and all liens, claims, encumbrances, setoff rights or other interests of or asserted by any Agency or Agencies (other than recoupment rights, which are retained to the extent such rights exist under applicable law), would adversely impact the Debtors' efforts to maximize the value of their estates, and the transfer of the Acquired Assets other than pursuant to a transfer that is free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever would be of substantially less benefit to the Debtors' estates.

P.      Without limiting the generality of the foregoing, none of the Purchaser, its respective affiliates, their respective present or contemplated members or shareholders, or the Acquired Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any liens, claims, encumbrances, and other interests relating to any U.S. federal, state or local income tax liabilities, that the Debtors incur in connection with the consummation of the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Designated Contracts.

Q.      **Assumption of Executory Contracts and Unexpired Leases**.  The (i) transfer of the Acquired Assets to the Purchaser and (ii) assignment to the Purchaser of the Designated Contracts, will not subject the Purchaser to any liability whatsoever prior to the Closing or by

reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust, successor or transferee liability.  The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Designated Contracts to the Purchaser in connection with the consummation of the Sale Transaction, and the assumption and assignment of the Designated Contracts is the best interests of the Debtors, their estates, and their creditors.  The Designated Contracts being assigned to the Purchaser are an integral part of the Acquired Assets being purchased by the Purchaser and, accordingly, such assumption and assignment of Designated Contracts is reasonable, enhances the value of the Debtors' estates, and does not constitute unfair discrimination.

R.    **Cure/Adequate Assurance**.  The Purchaser has (i) cured, or has provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Designated Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the Closing under any of the Designated Contracts within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.  The Purchaser has provided or will provide adequate assurance of future performance of and under the Designated Contracts within the meaning of section 365(b)(1)(C) of the Bankruptcy Code.

S.    **Prompt Consummation**.  The sale of the Acquired Assets must be approved and consummated promptly to preserve the value of the Acquired Assets.  Therefore, time is of the essence in consummating the Sale Transaction, and the Debtors and the Purchaser intend to close

10

the Sale Transaction as soon as reasonably practicable, subject to appropriate regulatory approvals.

T.      **Business Judgment**. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the transaction contemplated by the Asset Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Designated Contracts, prior to, and outside of, a chapter 11 plan of reorganization.

U.      **No Fraudulent Transfer**.  The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia. The Purchaser is not a mere continuation, and is not holding itself out as a mere continuation, of any of the Debtors or their respective estates and there is no continuity between the Purchaser and the Debtors.  The Sale Transaction does not amount to a consolidation, merger or _de facto_ merger of the Purchaser and any of the Debtors.

V.      The consideration provided by the Purchaser for the Acquired Assets pursuant to the Asset Purchase Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia (including, without limitation, the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act).

W.      **Purchaser Not an Insider and No Successor Liability**.  The Purchaser is not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no

common identity of incorporators, directors or stockholders existed between the Purchaser and the Debtors. The transfer of the Acquired Assets and the assumption of the Assumed Liabilities (including any individual elements of the Sale Transaction) to the Purchaser, except as otherwise set forth in the Asset Purchase Agreement, does not, and will not, subject the Purchaser to any liability whatsoever, with respect to the Debtors' operation of their businesses prior to the closing of the Sale Transaction or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee or vicarious liability. Pursuant to the Asset Purchase Agreement, the Purchaser is not purchasing all of the Debtors' assets in that the Purchaser is not purchasing any of the Excluded Assets or assuming the Excluded Liabilities, and the Purchaser is not holding itself out to the public as a continuation of the Debtors. The Sale does not amount to a consolidation, merger or de facto merger of the Purchaser and the Debtors and/or the Debtors' estates. There is not substantial continuity between the Purchaser and the Debtors, and there is no continuity of enterprise between the Debtors and the Purchaser. The Purchaser is not a mere continuation of the Debtors or the Debtors' estates, and the Purchaser does not constitute a successor to the Debtors or the Debtors' estates.

X.     **Legal, Valid Transfer**. The transfer of the Acquired Assets to the Purchaser will be a legal, valid, and effective transfer of the Acquired Assets, and will vest the Purchaser with all right, title, and interest of the Debtors to the Acquired Assets free and clear of all Encumbrances, as set forth in the Asset Purchase Agreement. The Acquired Assets constitute property of the Debtors' estates and good title is vested in the Debtors' estates within the

meaning of section 541(a) of the Bankruptcy Code.  The Debtors are the sole and rightful owners of the Acquired Assets, and no other person has any ownership right, title, or interests therein.

Y.      **Asset Purchase Agreement Not Modified**.  The terms of the Asset Purchase Agreement, including any amendments, supplements, and modifications thereto, are fair and reasonable in all respects and the terms of the Order shall not modify the terms of the Asset Purchase Agreement.

Z.      **Not a Sub Rosa Plan**.  The Sale does not constitute a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford. The Sale neither impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates a liquidating plan of reorganization for the Debtors.

AA.     **Legal and Factual Bases**.  The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

**It is therefore ORDERED, ADJUDGED, AND DECREED THAT**

**General Provisions**

1.      The Motion is GRANTED and APPROVED in all respects.

2.      All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits and denied with prejudice.

**Approval of the Sale of the Acquired Assets**

3.      The Asset Purchase Agreement, including any amendments, supplements and modifications thereto, and all of the terms and conditions therein, is hereby approved,

4.      Pursuant to section 363(b) of the Bankruptcy Code, the sale of the Acquired Assets to the Purchaser, and the transactions contemplated thereby, are approved in all respects, and are free and clear of all obligations, liabilities and Encumbrances, including, without

limitation, all obligations, liabilities, and Encumbrances of or asserted by any Agency or

Agencies, and free and clear of all set-off rights of such persons (but not of recoupment rights,

which are retained to the extent such rights exist under applicable law).

**Sale and Transfer of Acquired Assets**

5.       Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are hereby

authorized and directed to sell the Acquired Assets to the Purchaser and consummate the Sale

Transaction in accordance with, and subject to the terms and conditions of, the Asset Purchase

Agreement, and to transfer and assign all right, title and interest (including common law rights)

to all property, licenses and rights to be conveyed in accordance with and subject to the terms

and conditions of the Asset Purchase Agreement, and are further authorized and directed to

execute and deliver, and are empowered to perform under, consummate and implement, the

Asset Purchase Agreement, together with all additional instruments and documents that may be

reasonably necessary or desirable to implement the Asset Purchase Agreement, including,

without limitation, the related documents, exhibits and schedules, and to take all further actions

as may be reasonably requested by the Purchaser for the purposes of assigning, transferring,

granting, conveying and conferring to the Purchaser or reducing to possession, the Acquired

Assets, or as may be necessary or appropriate to the performance of the Debtors' obligations as

contemplated by the Asset Purchase Agreement.

6.       Pursuant to sections 363 (b) and (f) of the Bankruptcy Code, the Acquired Assets

shall be transferred to the Purchaser upon consummation of the Asset Purchase Agreement at the

Closing free and clear of all obligations, liabilities and Encumbrances of any kind or nature

whatsoever, including without limitation, rights or claims (for purposes of this Order, the term

"claim" shall have the meaning ascribed to such term in section 101(5) of the Bankruptcy Code)

based on any taxes or successor or transferee liability, including, without limitation all claims

arising in any way in connection with any agreements, acts, or failures to act, of any of the Debtors or any of the Debtors' predecessors or affiliates, whether known or unknown, contingent or otherwise, whether arising before or subsequent to the commencement of these Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including, without limitation, claims otherwise arising under federal or state tax laws or doctrines of successor or transferee liability.

7.      Following the Closing, the Debtors or the Purchaser are authorized and directed to execute and file a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all obligations, liabilities and Encumbrances in the Acquired Assets of any kind or nature whatsoever.  On the Closing, this Order will be construed, and constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired Assets to the Purchaser.  On the Closing, this Order also shall be construed, and constitute for any and all purposes, a complete and general assignment of all right, title and interest of the Debtors and each bankruptcy estate to the Purchaser in the Designated Contracts.   Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

8.      All entities which are presently, or on the Closing may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Purchaser on the Closing.

9.      All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to the

Purchaser in accordance with the Asset Purchase Agreement and this Order; provided, however, that the foregoing restriction shall not prevent any party from appealing this Order in accordance with applicable law or opposing any appeal of this Order.

10.     Except as expressly permitted by the Asset Purchase Agreement or this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants, and other creditors, holding liens, claims encumbrances, and other interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any taxes or successor or transferee liability, against or in a Debtor or the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets or the operation of the Acquired Assets before the Closing, or the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Designated Contracts, are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its respective successors and assigns, their respective property and the Acquired Assets, such persons' or entities' liens, claims, encumbrances, or other interests, including, without limitation, rights or claims based on any taxes or successor or transferee liability.

11.     On the Closing of the Sale Transaction, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Encumbrances on the Acquired Assets, if any, as such Encumbrances may have been recorded or otherwise exist.

12.     To the extent provided by section 525 of the Bankruptcy Code, no governmental

unit may deny, revoke, suspend, or refuse to renew any permit, license or similar grant relating to

the operation of the Acquired Assets on account of the filing or pendency of these Cases or the

consummation of the transactions contemplated by the Asset Purchase Agreement, including,

without limitation, the Sale Transaction and the assumption and assignment of the Designated

Contracts, provided, however, that this sale is subject to (1) the Debtors and the Centers for

Medicare and Medicaid Services (CMS) reaching an agreement approved by the Court and

acceptable to the Purchaser, within sixty-two (62) days of the date hereof, prior to closing under

the asset purchase agreement, calling for the Debtors assumption and assignment of their

Medicare provider agreements to the Purchaser, subject to caps on recoupment which may be

exercised by CMS post-closing on the Asset Purchase Agreement not to exceed Four Million

Dollars (4,000,000) and (2) DC Medicaid having entered into new Provider Agreements with the

Purchaser, on terms acceptable to the Purchaser, within such sixty (60) day period, conditioned

and effective on closing under the Asset Purchase Agreement timely occurring.

13.     Subject to the terms and conditions of this Order, the transfer of the Acquired

Assets to the Purchaser pursuant to the Asset Purchase Agreement constitutes a legal, valid, and

effective transfer of the Acquired Assets, and shall vest the Purchaser with all right, title, and

interest of the Debtors in and to the Acquired Assets free and clear of all Encumbrances of any

kind or nature whatsoever.

**No Successor Liability**

14.     The Purchaser is not a "successor" to the Debtors or their estates by reason of any

theory of law or equity, and the Purchaser shall not assume, or be deemed to assume, or in any

way be responsible for any liability or obligation of any of the Debtors and/or their estates, other

than the Assumed Liabilities, with respect to the Acquired Assets or otherwise, including, but not

limited to, under any bulk sales law, doctrine or theory of successor liability, or similar theory or basis of liability except for the assumption of the Asset Purchase Agreement and any documents related thereto.  Except to the extent the Purchaser assumes Assumed Liabilities and is ultimately permitted to assume the Designated Contracts pursuant to the Asset Purchase Agreement, neither the purchase of the Acquired Assets by the Purchaser nor the fact that the Purchaser is using any of the Acquired Assets previously operated by the Debtors will cause the Purchaser to be deemed a successor in any respect to the Debtors' businesses or incur any liability derived therefrom within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

15.     The Purchaser has given substantial consideration under the Asset Purchase Agreement, which consideration shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Purchaser and which shall be deemed to have been given in favor of the Purchaser by all holders of Encumbrances and liabilities in or against the Debtors, or the Acquired Assets.  Upon consummation of the Sale Transaction, the Purchaser shall not be deemed to (a) be the successor to the Debtors, (b) have, *de facto* or otherwise, merged with or into the Debtors, or (c) be a mere continuation, alter ego or substantial continuation of the Debtors.

16.     Except to the extent the Purchaser or otherwise specifically agreed in the Asset Purchase Agreement or this Order, the Purchaser shall not have any liability, responsibility or obligation for any claims, liabilities or other obligations of the Debtors or their estates, including without limitation, any claims, liabilities or other obligations related to the Acquired Assets prior

18

to Closing.  Under no circumstances shall the Purchaser be deemed a successor of or to the

Debtors for any Encumbrances and liabilities against, in or to the Debtors or the Acquired

Assets.  For the purposes of paragraphs 14 through 16 of this Order, all references to the

Purchaser shall include the Purchaser's affiliates, subsidiaries and shareholders.

17.    Without limiting paragraph 16 immediately above, or any other provisions of this

Order, and notwithstanding any agreement entered into between the Purchaser and any Agency

or Agencies, in no event shall Purchaser's total liability or obligation to any Agency or Agencies

exceed $[_____] for any reason, including, without limitation, for any liability or

obligation asserted against Purchaser on account of any Encumbrances, recoupment rights or any

other rights of or asserted by such Agency or Agencies.

**Good Faith**

18.    The transactions contemplated by the Asset Purchase Agreement are undertaken

by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code,

and accordingly, the reversal or modification on appeal of the authorization provided herein by

this Order to consummate the Sale Transaction shall not affect the validity of the sale of the

Acquired Assets to the Purchaser.  The Purchaser is a purchaser in good faith of the Acquired

Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy

Code.

19.    As a good faith purchaser of the Acquired Assets, the Purchaser has not entered

into an agreement with any other potential bidders at the Auction, and has not colluded with any

of the other bidders, potential bidders or any other parties interested in the Acquired Assets, and,

therefore, neither the Debtors nor any successor in interest to the Debtors' estates shall be

entitled to bring an action against the Purchaser, and the Sale Transaction may not be avoided

pursuant to section 363(n) of the Bankruptcy Code.

19

**Assumption and Assignment of Designated Contracts**

20.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Sale Transaction, the Debtors' assumption and assignment to the Purchaser, and the Purchaser's assumption on the terms set forth in the Asset Purchase Agreement, of the Designated Contracts is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

21.     The Debtors are hereby authorized and directed in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, effective upon the Closing of the Sale Transaction, the Designated Contracts free and clear of all Encumbrances of any kind or nature whatsoever and (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Designated Contracts to the Purchaser.

22.     The Designated Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to 11 U.S.C. § 365(k), the Debtors shall be relieved from any further liability with respect to the Designated Contracts after such assignment to and assumption by the Purchaser, except as provided in the Asset Purchase Agreement.

23.     All defaults or other obligations of the Debtors under the Designated Contracts arising or accruing prior to the date of this Order (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by the Purchaser at the Closing or as soon thereafter as reasonably practicable, and the Purchaser shall have no liability or obligation arising or accruing prior to the

20

Closing, except as otherwise expressly provided in the Asset Purchase Agreement.   The

Purchaser may elect to take an assignment of certain contracts and leases previously omitted

from [Schedules 4.8 and 4.19] of the Asset Purchase Agreement (the "**Previously Omitted**

**Contracts**") after the Closing and prior to the conversion or dismissal of their chapter 11 cases.

Upon designation of such Previously Omitted Contracts as "Assumed" by the Purchaser, the

Debtors shall serve a notice on the counterparties to such Previously Omitted Contracts that

identifies the Purchaser of the Acquired Assets and provides notice that the Debtors are assuming

and assigning the Previously Omitted Contract to the Purchaser.   The counterparties will have

fifteen (15) Business Days (as defined in the Asset Purchase Agreement) to object to the Cure

Amount or the assumption.   If the counterparties, the Debtors and the Purchaser are unable to

reach a consensual resolution with respect to an objection to the Cure Amount or assumption of a

Previously Omitted Contract, the Debtors will seek an expedited hearing before Bankruptcy

Court to determine the Cure Costs and approve the assumption; provided, however, that all costs,

including legal fees, shall be paid for by the Purchaser.   If there is no objection, then the Debtors

will obtain an order of this Court fixing the Cure Amount and approving the assumption of the

Previously Omitted Contract.

24.   Each non-Debtor party to an Assigned Contract hereby is forever barred,

estopped, and permanently enjoined from raising or asserting against the Debtors or the

Purchaser, or the property of either of them, any assignment fee, default, breach or claim of

pecuniary loss, or condition to assignment, arising under or related to the Designated Contracts,

existing as of the date of the Sale Hearing, or arising by reason of the consummation of

transactions contemplated by the Asset Purchase Agreement, including, without limitation, the

Sale Transaction and the assumption and assignment of the Designated Contracts.   Any party

that may have had the right to consent to the assignment of an Assigned Contract is deemed to have consented to such assignment for purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code and otherwise if such party failed to object to the assumption and assignment of such Assigned Contract.

25.     To the extent a counterparty to an Assigned Contract failed to object timely to a Cure Amount, such Cure Amount shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to or denying the validity and finality of the Cure Amount at any time, and such Cure Amount, when paid, shall completely revive any Assigned Contract to which it relates.

**Additional Provisions**

26.     The consideration provided by the Purchaser for the Acquired Assets under the Asset Purchase Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

27.     Each and every federal, state, and local governmental agency, court or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.  On the Closing, the Debtors and the Purchaser are authorized to take such actions as may be necessary to obtain a release of any and all obligations, liabilities and Encumbrances in the Acquired Assets, if any, and to the extent contemplated hereby and by the Asset Purchase Agreement.  This Order (a) shall be effective as a determination that, on the Closing, all Encumbrances of any kind or nature whatsoever existing as to the Acquired Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities

22

including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets. Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement. The Purchaser and the Debtors shall take such further steps and execute such further documents, assignments, instruments and papers as shall be reasonably requested by the other to implement and effectuate the transactions contemplated in this paragraph. All interests of record as of the date of this Order shall be forthwith deemed removed and stricken as against the Acquired Assets. All entities described in this paragraph are authorized and specifically directed to strike all such recorded liens, claims, rights, interests and encumbrances against the Acquired Assets from their records, official and otherwise.

28.     If any person or entity that has filed statements or other documents or agreements evidencing claims, liens, encumbrances, or interests in any of the Acquired Assets does not deliver to the Debtors or the Purchaser prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all interests and other interests that the person or entity has or may assert with respect to any of the Acquired Assets, the Debtors and/or the Purchaser are hereby authorized to execute

23

and file such statements, instruments, releases and other documents on behalf of such persons or entity with respect to any of the Acquired Assets.

29.     The Debtors will cooperate with the Purchaser and the Purchaser will cooperate with the Debtors, in each case to ensure that the transaction contemplated in the Asset Purchase Agreement is consummated, and the Debtors will make such modifications or supplements to any bill of sale or other document executed in connection with the closing to facilitate such consummation as contemplated by the Asset Purchase Agreement (including, without limitation, adding, pursuant to the terms of the Asset Purchase Agreement, such specific assets to such documents as may be reasonably requested by the Purchaser).

30.     The Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Acquired Assets other than for the Assumed Liabilities.  Without limiting the generality of the foregoing, and except as otherwise specifically provided in the Asset Purchase Agreement, the Purchaser shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character whether known or unknown as of the Closing, now existing or hereinafter arising, whether fixed or contingent, with respect to the Debtors, the Acquired Assets or any obligations of the Debtors arising prior to the Closing, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, or in connection with, or in any way relating to the operation of the business prior to the Closing.

31.     Under no circumstances shall the Purchaser be deemed a successor of or to the Debtors for any Encumbrance against or in the Debtors or the Acquired Assets of any kind or nature whatsoever.  The sale, transfer, assignment and delivery of the Acquired Assets and the

Designated Contracts shall not be subject to any Encumbrance and Encumbrances of any kind or nature whatsoever shall remain with, and continue to be obligations of, the Debtors.  All persons holding Encumbrances against, on, or in the Debtors or the Acquired Assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Encumbrances of any kind or nature whatsoever against the Purchaser, its officers, directors, shareholders and professionals, its property, its successors and assigns, or the Acquired Assets with respect to any Encumbrance of any kind or nature whatsoever such person or entity had, has, or may have against or in the Debtors, their estates, officers, directors, shareholders, or the Acquired Assets.  Following the Closing, no holder of an Encumbrance in the Debtors shall interfere with the Purchaser's title to or use and enjoyment of the Acquired Assets and the Designated Contracts based on or related to such Encumbrance, or any actions that the Debtors may take in their Cases.

32.    The terms and provisions of the Asset Purchase Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors and their respective affiliates, successors and assigns, their estates, and their creditors, the Purchaser, and its respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting Encumbrances on the Acquired Assets to be sold to the Purchaser pursuant to the Asset Purchase Agreement, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

33.    The failure specifically to include any particular provisions of the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being

the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety.

34.     The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.  To the extent that any provision of the Asset Purchase Agreement conflicts with or is, in any way, inconsistent with any provision of this Order, this Order shall govern and control.

35.     Nothing contained in any plan of reorganization or liquidation confirmed in these Cases or any order of this Court confirming such plans or in any other order in these Cases, including any order entered after any conversion of these Cases to a case under chapter 7 of the Bankruptcy Code, shall alter, conflict with, or derogate from, the provisions of the Asset Purchase Agreement or the terms of this Order.  The provisions of this Order and the Asset Purchase Agreement and any actions taken pursuant hereto or thereto shall survive entry of any order which may be entered confirming or consummating any plan of reorganization of the Debtors, or which may be entered converting these Cases from chapter 11 to chapter 7 of the Bankruptcy Code, and the terms and provisions of the Asset Purchase Agreement as well as the rights and interests granted pursuant to this Order and the Asset Purchase Agreement shall continue in these Cases or any superseding case and shall be specifically performable and enforceable against and binding upon the Debtors, their estates and the Purchaser and their respective successors and permitted assigns, including any trustee, responsible officer or other

fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

36.     The provisions of this Order are nonseverable and mutually dependent.

37.     To the extent applicable, the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court (a) to allow the Purchaser to give the Debtors any notice provided for in the Asset Purchase Agreement, and (b) to allow the Purchaser to take any and all actions permitted by the Asset Purchase Agreement.

38.     There are no brokers involved in consummating the Sale Transaction and no brokers' commissions are due.

39.     Compliance with the legal requirements relating to bulk sales and transfers is not necessary or appropriate under the circumstances.

40.     The Debtors and each other person having duties or responsibilities under the Asset Purchase Agreement or this Order, and their respective agents, representatives, and attorneys, are authorized and empowered to carry out all of the provisions of the Asset Purchase Agreement, to issue, execute, deliver, file and record, as appropriate, the Asset Purchase Agreement, and any related agreements, and to take any action contemplated by the Asset Purchase Agreement or this Order, and to issue, execute, deliver, file and record, as appropriate, such other contracts, instruments, releases, deeds, bills of sale, assignments, or other agreements, and to perform such other acts as are consistent with, and necessary or appropriate to, implement, effectuate and consummate the Asset Purchase Agreement and this Order and the transactions contemplated thereby and hereby, all without further application to, or order of, the Court. Without limiting the generality of the foregoing, this Order shall constitute all approvals and

27

consents, if any, including any applicable regulatory approvals, required by applicable business

corporation, trust and other laws of applicable governmental units with respect to the

implementation and consummation of the Asset Purchase Agreement and this Order and the

transactions contemplated thereby and hereby.

41.     This Court shall retain exclusive jurisdiction to enforce and implement the terms

and provisions of the Asset Purchase Agreement, all amendments thereto, any waivers and

consents thereunder, and of each of the agreements executed in connections therewith in all

respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the

Acquired Assets to the Purchaser free and clear of Encumbrances, or compel the performance of

other obligations owed by the Debtors, (b) compel delivery of the purchase price or performance

of other obligations owed to the Debtors, (c) resolve any disputes arising under or related to the

Asset Purchase Agreement, except as otherwise provided therein, (d) interpret, implement, and

enforce the provisions of this Order, and (e) protect the Purchaser against (i) any claims of

successor or vicarious liability related to the Acquired Assets or Designated Contracts, or (ii) any

claims of Encumbrances asserted on or in the Debtors or the Acquired Assets, of any kind or

nature whatsoever.

42.     To the extent that any provision of this Order conflicts with the Asset Purchase

Agreement, this Order shall control.

43.     Notwithstanding anything to the contrary contained herein, the purchase by

Purchaser of the Acquired Assets is subject to the Assumed Liabilities and Purchaser shall

remain liable for the Assumed Liabilities, all as set forth in the Asset Purchase Agreement.

cc:

All attorneys who have entered an appearance and who are registered e-filers.

# Exhibit C-2

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re: | Case No. 14-00279 |
| SPECIALTY HOSPITAL OF WASHINGTON, LLC, *et al.*, | Chapter 11 |
| Debtors.[1] | (Joint Administration Requested) |

## ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING CERTAIN RELATED RELIEF

---

[1] The debtors in these chapter 11 cases and each debtor's federal identification number ("EIN") and chapter 11 case number are: Specialty Hospital of Washington, LLC (EIN: 81-0681352; case number: 14-00279); Specialty Hospital of America, LLC (EIN: 81-0681347; case number 14-00295); SHA Holdings, Inc. (EIN: 20-5741943; case number 14-00296); SHA Management, LLC (EIN: 81-0681350; case number 14-00297); Specialty Hospital of Washington Nursing Center, LLC (EIN: 81-0681348; case number 14-00298), Specialty Hospital of Washington Hadley, LLC (EIN: 20-5752586; case number 14-00299), and SHA Hadley SNF, LLC (EIN: 20-5741976; case number 14-00300).

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtors and debtors-in-possession (the "**Debtors**") for, among other things, entry of an order (the "**Order**") pursuant to sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "**Bankruptcy Code**"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), (i) authorizing and approving the sale (the "**Sale Transaction**") of substantially all of the Debtors' assets (the "**Acquired Assets**") free and clear of all liens, claims, encumbrances, setoff rights and others interests (the "**Encumbrances**"), including, without limitation, all Encumbrances of or asserted by CMS, DOJ, IRS, DC Medicaid, the Washington, D.C. Office of Tax and Revenue and any other federal, state or local regulatory or taxing agency (each an "**Agency**," and, collectively, the "**Agencies**"), (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases (the "**Designated Contracts**"), identified by the Debtors and more fully described in the Asset Purchase Agreement dated as of May [29], 2014 (attached hereto as **Exhibit A**) by and between the Debtors and SHA Acquisition, LLC (the "**Purchaser**" or "**Stalking Horse Purchaser**") for the purchase of the Acquired Assets and the assumption of the Designated Contracts, and (iii) granting certain related relief, and the Court having held a hearing on June [10], 2014 (the "**Sale Hearing**") to approve the Sale Transaction; and the Court having reviewed and considered the Motion, the objections to the Motion, if any, and the arguments of counsel made, and the evidence proffered or adduced at the Sale Hearing; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates and creditors and other parties in interest; and upon the record of the Sale Hearing and these chapter 11 cases (the "**Cases**"); and after due deliberation thereon; and good cause appearing therefore, it is hereby

---

[2]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Asset Purchase Agreement (as defined herein), as applicable.

**FOUND AND DETERMINED THAT**[3]

A.    <u>**Jurisdiction and Venue**</u>.  The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of these Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    <u>**Statutory Predicates**</u>.  The statutory predicates for the relief sought in the Motion are sections 105, 363 and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, and 6006.

C.    <u>**Petition Date**</u>.  On May 21, 2014, the Debtors, other than Specialty Hospital of Washington LLC, LLC ("**SHDC**"), commenced these Cases by each filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  An involuntary chapter 11 petition for relief under chapter 11 of the Bankruptcy Code was filed against SHDC on April 23, 2014, and on May 21, this Court entered an Order for Relief with respect to SHDC.

D.    <u>**Entry of Bidding Procedures Order**</u>.  On ==May [30], 2014==, this Court entered an order (the "**Bidding Procedures Order**") (i) approving bidding and auction procedures (the "**Bidding Procedures**"), (ii) authorizing the Debtors to enter into a Stalking Horse Agreement, (iii) authorizing and approving the Assumption and Assignment Procedures, including the notice of proposed cure amounts (the "**Cure Amount**"), (iv) approving the form and manner of notice of all procedures, schedules, and agreements, and (v) scheduling the Sale Hearing.

E.    <u>**Compliance with Bidding Procedures Order**</u>.  As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing, and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtors have marketed the Acquired Assets and conducted the sale process in compliance with the Bidding Procedures

---

[3]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  <u>See</u> Bankruptcy Rule 7052.

3

Order, and the Auction was duly noticed and conducted in a non-collusive, fair and good faith manner.  The Debtors and their professionals have actively marketed the Acquired Assets and conducted the sale process in compliance with the Bidding Procedures Order, and have afforded potential purchasers a full and fair opportunity to make higher and better offers.  The Purchaser, the Landlord and Existing Lienholders acted in compliance with the terms of the Bidding Procedures.  In accordance with the Bidding Procedures, the Debtors determined that the bid submitted by the Purchaser and memorialized by the Asset Purchase Agreement is the Successful Bid (as defined in the Bidding Procedures).

F.   **Notice**.  As evidenced by the affidavits of service and publication previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing, the Sale Transaction, the Assumption and Assignment Procedures (including the objection deadline with respect to any Cure Amount) and the assumption and assignment of the Designated Contracts and the Cure Amount has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 and in compliance with the Bidding Procedures Order, (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the Motion, the Sale Hearing, the Sale Transaction, or the assumption and assignment of the Designated Contracts or the Cure Amount is or shall be required.

G.   **Corporate Authority**.  Each Debtor (i) has full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale of the Acquired Assets by the Debtors has been duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) has all of the corporate power and authority

4

necessary to consummate the transactions contemplated by the Asset Purchase Agreement, (iii) has taken all corporate action and formalities necessary to authorize and approve the Asset Purchase Agreement and the consummation by the Debtors of the transactions contemplated thereby, including, without limitation, as required by their respective organizational documents and (iv) no government, regulatory or other consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, are required for the Debtors to enter into the Asset Purchase Agreement and consummate the Sale Transaction.

H.     **<u>Opportunity to Object</u>**.  A fair and reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including the following entities:

    i.      counsel to the Stalking Horse Purchaser for noticing purposes;

    ii.     counsel to the Landlord;

    iii.    counsel to the Existing Lienholders;

    iv.    all applicable health regulatory agencies and taxing authorities;

    v.     the Office of the United States Trustee for the District of Columbia;

    vi.    the United States Attorney's Office for the District of Columbia;

    vii.   any entity known or reasonably believed to have asserted a security interest in or lien against any of the Acquired Assets;

    viii.  the Debtors' twenty (20) largest creditors on a consolidated basis or counsel for the Committee if one has been appointed;

    ix.    any party that has filed a notice of appearance in these Cases; and

    x.     any party who has expressed an interest in purchasing the Acquired Assets and who the Debtors reasonably believe could consummate a transaction, or who the Debtors or their professionals believe would have such an interest.

I.      **Sale in Best Interest**.  Consummation of the sale of the Acquired Assets at this time is in the best interests of the Debtors, their creditors, their estates and other parties in interest.

J.      **Business Justification**.  Sound business reasons exist for the Sale Transaction. Entry into the Asset Purchase Agreement, and the consummation of the transactions contemplated thereby, including the Sale Transaction and the assumption and assignment of the Designated Contracts, constitutes each Debtor's exercise of sound business judgment and such acts are in the best interests of each Debtor, its estate, and all parties in interest.  The Court finds that each Debtor has articulated good and sufficient business reasons justifying the Sale Transaction.  Such business reasons include, but are not limited to, the following:  (i) the Asset Purchase Agreement constitutes the highest and best offer for the Acquired Assets; (ii) the Asset Purchase Agreement and the closing thereon will present the best opportunity to realize the value of the Acquired Assets on a going-concern basis and avoid decline and devaluation of the Acquired Assets; (iii) unless the Sale Transaction and all of the other transactions contemplated by the Asset Purchase Agreement are concluded expeditiously, as provided for in the Motion and pursuant to the Asset Purchase Agreement, recoveries to creditors may be diminished; (iv) the Asset Purchase Agreement and the closing thereon will promote the public interest; and (iv) any plan likely would not have yielded as favorable an economic result.  The terms and conditions of the Asset Purchase Agreement, including, without limitation, the consideration to be realized by the Debtors, are fair and reasonable.  Approval of the Motion, the Asset Purchase Agreement, and the transactions contemplated thereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Designated Contracts, is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

K.      **Arm's Length Sale**.  The Asset Purchase Agreement was negotiated, proposed and entered into by the Debtors and the Purchaser without collusion, in good faith, and from arm's length bargaining positions.  Neither the Debtors nor the Purchaser has engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under 11 U.S.C. § 363(n).  Specifically, the Purchaser has not acted in a collusive manner with any person and the purchase price was not controlled by any agreement among bidders.  The Purchaser is not an "insider" of the Debtors as defined in Bankruptcy Code section 101(31).

L.      **Good Faith Purchaser**.  The Purchaser is a good faith purchaser for value and, as such, is entitled to all of the protections afforded under 11 U.S.C. § 363(m) and any other applicable or similar bankruptcy and non-bankruptcy law.   Specifically, (i) the Purchaser recognized that the Debtors were free to deal with any other party interested in purchasing the Acquired Assets, (ii) the Purchaser complied in all respects with the provisions in the Bidding Procedures Order, (iii) the Purchaser agreed to subject its bid to the competitive bid procedures set forth in the Bidding Procedures Order, (iv) all payments to be made by the Purchaser in connection with the Sale Transaction have been disclosed, (v) no common identity of directors, officers or controlling stockholders exists among the Purchaser and the Debtors, (vi) the negotiation and execution of the Asset Purchase Agreement was at arm's length and in good faith, and at all times each of the Purchaser and the Debtors were represented by competent counsel of their choosing, (vii) the Purchaser did not in any way induce or cause the chapter 11 filing of the Debtors, and (viii) the Purchaser has not acted in a collusive manner with any person.  The Purchaser will be acting in good faith within the meaning of 11 U.S.C. § 363(m) in closing the transactions contemplated by the Asset Purchase Agreement.

M.    **Free and Clear**.  The Debtors may sell the Acquired Assets free and clear of all obligations, liabilities and the Encumbrances, and free and clear of all set-off rights, because, with respect to each creditor asserting a lien, claim, encumbrance, or interest, one or more of the standards set forth in Bankruptcy Code § 363(f)(l)-(5) has been satisfied.  Those holders of Encumbrances, who did not object or withdrew objections to the Sale Transaction, are deemed to have consented to the Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Encumbrances, who did object, fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

N.    The Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated hereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Designated Contracts, (i) if the transfer of the Acquired Assets were not free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any taxes or successor or transferee liability, and all liens, claims, encumbrances, setoff rights or other interests of or asserted by any Agency or Agencies, or (ii) if the Purchaser would, or in the future could, be liable for any such liens, claims, encumbrances, and other interests, including, without limitation, rights or claims based on any taxes or successor or transferee liability.  The Purchaser will not consummate the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Designated Contracts, unless this Court expressly orders that none of the Purchaser, its affiliates, its present or contemplated members or shareholders, or the Acquired Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any liens,

claims, encumbrances, and other interests, including, without limitation, rights or claims based on any taxes, successor or transferee liability, and all liens, claims, encumbrances, setoff rights or other interests of or asserted by any Agency or Agencies.

O.    Not transferring the Acquired Assets free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever including, without limitation, rights or claims based on any taxes, successor or transferee liability, and all liens, claims, encumbrances, setoff rights or other interests of or asserted by any Agency or Agencies (other than recoupment rights, which are retained to the extent such rights exist under applicable law), would adversely impact the Debtors' efforts to maximize the value of their estates, and the transfer of the Acquired Assets other than pursuant to a transfer that is free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever would be of substantially less benefit to the Debtors' estates.

P.    Without limiting the generality of the foregoing, none of the Purchaser, its respective affiliates, their respective present or contemplated members or shareholders, or the Acquired Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any liens, claims, encumbrances, and other interests relating to any U.S. federal, state or local income tax liabilities, that the Debtors incur in connection with the consummation of the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Designated Contracts.

Q.    **Assumption of Executory Contracts and Unexpired Leases**.  The (i) transfer of the Acquired Assets to the Purchaser and (ii) assignment to the Purchaser of the Designated Contracts, will not subject the Purchaser to any liability whatsoever prior to the Closing or by

9

reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust, successor or transferee liability.  The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Designated Contracts to the Purchaser in connection with the consummation of the Sale Transaction, and the assumption and assignment of the Designated Contracts is the best interests of the Debtors, their estates, and their creditors.  The Designated Contracts being assigned to the Purchaser are an integral part of the Acquired Assets being purchased by the Purchaser and, accordingly, such assumption and assignment of Designated Contracts is reasonable, enhances the value of the Debtors' estates, and does not constitute unfair discrimination.

R.      **Cure/Adequate Assurance**.   The Purchaser has (i) cured, or has provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Designated Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the Closing under any of the Designated Contracts within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.  The Purchaser has provided or will provide adequate assurance of future performance of and under the Designated Contracts within the meaning of section 365(b)(1)(C) of the Bankruptcy Code.

S.      **Prompt Consummation**.  The sale of the Acquired Assets must be approved and consummated promptly to preserve the value of the Acquired Assets.  Therefore, time is of the essence in consummating the Sale Transaction, and the Debtors and the Purchaser intend to close

10

the Sale Transaction as soon as reasonably practicable, subject to appropriate regulatory approvals.

T.    **Business Judgment**. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the transaction contemplated by the Asset Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Designated Contracts, prior to, and outside of, a chapter 11 plan of reorganization.

U.    **No Fraudulent Transfer**.  The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia. The Purchaser is not a mere continuation, and is not holding itself out as a mere continuation, of any of the Debtors or their respective estates and there is no continuity between the Purchaser and the Debtors.  The Sale Transaction does not amount to a consolidation, merger or de facto merger of the Purchaser and any of the Debtors.

V.    The consideration provided by the Purchaser for the Acquired Assets pursuant to the Asset Purchase Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia (including, without limitation, the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act).

W.    **Purchaser Not an Insider and No Successor Liability**.  The Purchaser is not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no

common identity of incorporators, directors or stockholders existed between the Purchaser and the Debtors. The transfer of the Acquired Assets and the assumption of the Assumed Liabilities (including any individual elements of the Sale Transaction) to the Purchaser, except as otherwise set forth in the Asset Purchase Agreement, does not, and will not, subject the Purchaser to any liability whatsoever, with respect to the Debtors' operation of their businesses prior to the closing of the Sale Transaction or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee or vicarious liability. Pursuant to the Asset Purchase Agreement, the Purchaser is not purchasing all of the Debtors' assets in that the Purchaser is not purchasing any of the Excluded Assets or assuming the Excluded Liabilities, and the Purchaser is not holding itself out to the public as a continuation of the Debtors. The Sale does not amount to a consolidation, merger or de facto merger of the Purchaser and the Debtors and/or the Debtors' estates. There is not substantial continuity between the Purchaser and the Debtors, and there is no continuity of enterprise between the Debtors and the Purchaser. The Purchaser is not a mere continuation of the Debtors or the Debtors' estates, and the Purchaser does not constitute a successor to the Debtors or the Debtors' estates.

X.      **Legal, Valid Transfer**. The transfer of the Acquired Assets to the Purchaser will be a legal, valid, and effective transfer of the Acquired Assets, and will vest the Purchaser with all right, title, and interest of the Debtors to the Acquired Assets free and clear of all Encumbrances, as set forth in the Asset Purchase Agreement. The Acquired Assets constitute property of the Debtors' estates and good title is vested in the Debtors' estates within the

meaning of section 541(a) of the Bankruptcy Code.  The Debtors are the sole and rightful owners of the Acquired Assets, and no other person has any ownership right, title, or interests therein.

Y.    **Asset Purchase Agreement Not Modified**.   The terms of the Asset Purchase Agreement, including any amendments, supplements, and modifications thereto, are fair and reasonable in all respects and the terms of the Order shall not modify the terms of the Asset Purchase Agreement.

Z.    **Not a Sub Rosa Plan**.  The Sale does not constitute a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford. The Sale neither impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates a liquidating plan of reorganization for the Debtors.

AA.    **Legal and Factual Bases**.  The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

**It is therefore ORDERED, ADJUDGED, AND DECREED THAT**

**General Provisions**

1.    The Motion is GRANTED and APPROVED in all respects.

2.    All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits and denied with prejudice.

**Approval of the Sale of the Acquired Assets**

3.    The Asset Purchase Agreement, including any amendments, supplements and modifications thereto, and all of the terms and conditions therein, is hereby approved,

4.    Pursuant to section 363(b) of the Bankruptcy Code, the sale of the Acquired Assets to the Purchaser, and the transactions contemplated thereby, are approved in all respects, and are free and clear of all obligations, liabilities and Encumbrances, including, without

limitation, all obligations, liabilities, and Encumbrances of or asserted by any Agency or Agencies, and free and clear of all set-off rights of such persons (but not of recoupment rights, which are retained to the extent such rights exist under applicable law).

**Sale and Transfer of Acquired Assets**

5.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are hereby authorized and directed to sell the Acquired Assets to the Purchaser and consummate the Sale Transaction in accordance with, and subject to the terms and conditions of, the Asset Purchase Agreement, and to transfer and assign all right, title and interest (including common law rights) to all property, licenses and rights to be conveyed in accordance with and subject to the terms and conditions of the Asset Purchase Agreement, and are further authorized and directed to execute and deliver, and are empowered to perform under, consummate and implement, the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement, including, without limitation, the related documents, exhibits and schedules, and to take all further actions as may be reasonably requested by the Purchaser for the purposes of assigning, transferring, granting, conveying and conferring to the Purchaser or reducing to possession, the Acquired Assets, or as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Asset Purchase Agreement.

6.      Pursuant to sections 363 (b) and (f) of the Bankruptcy Code, the Acquired Assets shall be transferred to the Purchaser upon consummation of the Asset Purchase Agreement at the Closing free and clear of all obligations, liabilities and Encumbrances of any kind or nature whatsoever, including without limitation, rights or claims (for purposes of this Order, the term "claim" shall have the meaning ascribed to such term in section 101(5) of the Bankruptcy Code) based on any taxes or successor or transferee liability, including, without limitation all claims

arising in any way in connection with any agreements, acts, or failures to act, of any of the Debtors or any of the Debtors' predecessors or affiliates, whether known or unknown, contingent or otherwise, whether arising before or subsequent to the commencement of these Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including, without limitation, claims otherwise arising under federal or state tax laws or doctrines of successor or transferee liability.

7.      Following the Closing, the Debtors or the Purchaser are authorized and directed to execute and file a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all obligations, liabilities and Encumbrances in the Acquired Assets of any kind or nature whatsoever.  On the Closing, this Order will be construed, and constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired Assets to the Purchaser.  On the Closing, this Order also shall be construed, and constitute for any and all purposes, a complete and general assignment of all right, title and interest of the Debtors and each bankruptcy estate to the Purchaser in the Designated Contracts.   Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

8.      All entities which are presently, or on the Closing may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Purchaser on the Closing.

9.      All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to the

Purchaser in accordance with the Asset Purchase Agreement and this Order; provided, however, that the foregoing restriction shall not prevent any party from appealing this Order in accordance with applicable law or opposing any appeal of this Order.

10.    Except as expressly permitted by the Asset Purchase Agreement or this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants, and other creditors, holding liens, claims encumbrances, and other interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any taxes or successor or transferee liability, against or in a Debtor or the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets or the operation of the Acquired Assets before the Closing, or the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Designated Contracts, are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its respective successors and assigns, their respective property and the Acquired Assets, such persons' or entities' liens, claims, encumbrances, or other interests, including, without limitation, rights or claims based on any taxes or successor or transferee liability.

11.    On the Closing of the Sale Transaction, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Encumbrances on the Acquired Assets, if any, as such Encumbrances may have been recorded or otherwise exist.

16

12.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license or similar grant relating to the operation of the Acquired Assets on account of the filing or pendency of these Cases or the consummation of the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Designated Contracts, provided, however, that this sale is subject to (1) the Debtors and the Centers for Medicare and Medicaid Services (CMS) reaching an agreement approved by the Court and acceptable to the Purchaser, within sixty-two (62) days of the date hereof, prior to closing under the asset purchase agreement, calling for the Debtors assumption and assignment of their Medicare provider agreements to the Purchaser, subject to caps on recoupment which may be exercised by CMS post-closing on the Asset Purchase Agreement not to exceed Four Million Dollars (4,000,000) and (2) DC Medicaid having entered into new Provider Agreements with the Purchaser, on terms acceptable to the Purchaser, within such sixty (60) day period, conditioned and effective on closing under the Asset Purchase Agreement timely occurring.

13.     Subject to the terms and conditions of this Order, the transfer of the Acquired Assets to the Purchaser pursuant to the Asset Purchase Agreement constitutes a legal, valid, and effective transfer of the Acquired Assets, and shall vest the Purchaser with all right, title, and interest of the Debtors in and to the Acquired Assets free and clear of all Encumbrances of any kind or nature whatsoever.

**No Successor Liability**

14.     The Purchaser is not a "successor" to the Debtors or their estates by reason of any theory of law or equity, and the Purchaser shall not assume, or be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates, other than the Assumed Liabilities, with respect to the Acquired Assets or otherwise, including, but not

17

limited to, under any bulk sales law, doctrine or theory of successor liability, or similar theory or basis of liability except for the assumption of the Asset Purchase Agreement and any documents related thereto.  Except to the extent the Purchaser assumes Assumed Liabilities and is ultimately permitted to assume the Designated Contracts pursuant to the Asset Purchase Agreement, neither the purchase of the Acquired Assets by the Purchaser nor the fact that the Purchaser is using any of the Acquired Assets previously operated by the Debtors will cause the Purchaser to be deemed a successor in any respect to the Debtors' businesses or incur any liability derived therefrom within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

15.     The Purchaser has given substantial consideration under the Asset Purchase Agreement, which consideration shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Purchaser and which shall be deemed to have been given in favor of the Purchaser by all holders of Encumbrances and liabilities in or against the Debtors, or the Acquired Assets.  Upon consummation of the Sale Transaction, the Purchaser shall not be deemed to (a) be the successor to the Debtors, (b) have, *de facto* or otherwise, merged with or into the Debtors, or (c) be a mere continuation, alter ego or substantial continuation of the Debtors.

16.     Except to the extent the Purchaser or otherwise specifically agreed in the Asset Purchase Agreement or this Order, the Purchaser shall not have any liability, responsibility or obligation for any claims, liabilities or other obligations of the Debtors or their estates, including without limitation, any claims, liabilities or other obligations related to the Acquired Assets prior

18

to Closing.  Under no circumstances shall the Purchaser be deemed a successor of or to the Debtors for any Encumbrances and liabilities against, in or to the Debtors or the Acquired Assets.  For the purposes of paragraphs 14 through 16 of this Order, all references to the Purchaser shall include the Purchaser's affiliates, subsidiaries and shareholders.

17.    Without limiting paragraph 16 immediately above, or any other provisions of this Order, and notwithstanding any agreement entered into between the Purchaser and any Agency or Agencies, in no event shall Purchaser's total liability or obligation to any Agency or Agencies exceed $[_____] for any reason, including, without limitation, for any liability or obligation asserted against Purchaser on account of any Encumbrances, recoupment rights or any other rights of or asserted by such Agency or Agencies.

**Good Faith**

18.    The transactions contemplated by the Asset Purchase Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein by this Order to consummate the Sale Transaction shall not affect the validity of the sale of the Acquired Assets to the Purchaser.  The Purchaser is a purchaser in good faith of the Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

19.    As a good faith purchaser of the Acquired Assets, the Purchaser has not entered into an agreement with any other potential bidders at the Auction, and has not colluded with any of the other bidders, potential bidders or any other parties interested in the Acquired Assets, and, therefore, neither the Debtors nor any successor in interest to the Debtors' estates shall be entitled to bring an action against the Purchaser, and the Sale Transaction may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

19

**Assumption and Assignment of Designated Contracts**

20.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Sale Transaction, the Debtors' assumption and assignment to the Purchaser, and the Purchaser's assumption on the terms set forth in the Asset Purchase Agreement, of the Designated Contracts is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

21.     The Debtors are hereby authorized and directed in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, effective upon the Closing of the Sale Transaction, the Designated Contracts free and clear of all Encumbrances of any kind or nature whatsoever and (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Designated Contracts to the Purchaser.

22.     The Designated Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to 11 U.S.C. § 365(k), the Debtors shall be relieved from any further liability with respect to the Designated Contracts after such assignment to and assumption by the Purchaser, except as provided in the Asset Purchase Agreement.

23.     All defaults or other obligations of the Debtors under the Designated Contracts arising or accruing prior to the date of this Order (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by the Purchaser at the Closing or as soon thereafter as reasonably practicable, and the Purchaser shall have no liability or obligation arising or accruing prior to the

Closing, except as otherwise expressly provided in the Asset Purchase Agreement.   The

Purchaser may elect to take an assignment of certain contracts and leases previously omitted

from [Schedules 4.8 and 4.19] of the Asset Purchase Agreement (the "**Previously Omitted**

**Contracts**") after the Closing and prior to the conversion or dismissal of their chapter 11 cases.

Upon designation of such Previously Omitted Contracts as "Assumed" by the Purchaser, the

Debtors shall serve a notice on the counterparties to such Previously Omitted Contracts that

identifies the Purchaser of the Acquired Assets and provides notice that the Debtors are assuming

and assigning the Previously Omitted Contract to the Purchaser.   The counterparties will have

fifteen (15) Business Days (as defined in the Asset Purchase Agreement) to object to the Cure

Amount or the assumption.   If the counterparties, the Debtors and the Purchaser are unable to

reach a consensual resolution with respect to an objection to the Cure Amount or assumption of a

Previously Omitted Contract, the Debtors will seek an expedited hearing before Bankruptcy

Court to determine the Cure Costs and approve the assumption; provided, however, that all costs,

including legal fees, shall be paid for by the Purchaser.   If there is no objection, then the Debtors

will obtain an order of this Court fixing the Cure Amount and approving the assumption of the

Previously Omitted Contract.

      24.   Each non-Debtor party to an Assigned Contract hereby is forever barred,

estopped, and permanently enjoined from raising or asserting against the Debtors or the

Purchaser, or the property of either of them, any assignment fee, default, breach or claim of

pecuniary loss, or condition to assignment, arising under or related to the Designated Contracts,

existing as of the date of the Sale Hearing, or arising by reason of the consummation of

transactions contemplated by the Asset Purchase Agreement, including, without limitation, the

Sale Transaction and the assumption and assignment of the Designated Contracts.   Any party

that may have had the right to consent to the assignment of an Assigned Contract is deemed to have consented to such assignment for purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code and otherwise if such party failed to object to the assumption and assignment of such Assigned Contract.

25.     To the extent a counterparty to an Assigned Contract failed to object timely to a Cure Amount, such Cure Amount shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to or denying the validity and finality of the Cure Amount at any time, and such Cure Amount, when paid, shall completely revive any Assigned Contract to which it relates.

**Additional Provisions**

26.     The consideration provided by the Purchaser for the Acquired Assets under the Asset Purchase Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

27.     Each and every federal, state, and local governmental agency, court or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.  On the Closing, the Debtors and the Purchaser are authorized to take such actions as may be necessary to obtain a release of any and all obligations, liabilities and Encumbrances in the Acquired Assets, if any, and to the extent contemplated hereby and by the Asset Purchase Agreement.  This Order (a) shall be effective as a determination that, on the Closing, all Encumbrances of any kind or nature whatsoever existing as to the Acquired Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities

including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets.  Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.  The Purchaser and the Debtors shall take such further steps and execute such further documents, assignments, instruments and papers as shall be reasonably requested by the other to implement and effectuate the transactions contemplated in this paragraph.  All interests of record as of the date of this Order shall be forthwith deemed removed and stricken as against the Acquired Assets.  All entities described in this paragraph are authorized and specifically directed to strike all such recorded liens, claims, rights, interests and encumbrances against the Acquired Assets from their records, official and otherwise.

28.    If any person or entity that has filed statements or other documents or agreements evidencing claims, liens, encumbrances, or interests in any of the Acquired Assets does not deliver to the Debtors or the Purchaser prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all interests and other interests that the person or entity has or may assert with respect to any of the Acquired Assets, the Debtors and/or the Purchaser are hereby authorized to execute

23

and file such statements, instruments, releases and other documents on behalf of such persons or entity with respect to any of the Acquired Assets.

29.      The Debtors will cooperate with the Purchaser and the Purchaser will cooperate with the Debtors, in each case to ensure that the transaction contemplated in the Asset Purchase Agreement is consummated, and the Debtors will make such modifications or supplements to any bill of sale or other document executed in connection with the closing to facilitate such consummation as contemplated by the Asset Purchase Agreement (including, without limitation, adding, pursuant to the terms of the Asset Purchase Agreement, such specific assets to such documents as may be reasonably requested by the Purchaser).

30.      The Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Acquired Assets other than for the Assumed Liabilities.  Without limiting the generality of the foregoing, and except as otherwise specifically provided in the Asset Purchase Agreement, the Purchaser shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character whether known or unknown as of the Closing, now existing or hereinafter arising, whether fixed or contingent, with respect to the Debtors, the Acquired Assets or any obligations of the Debtors arising prior to the Closing, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, or in connection with, or in any way relating to the operation of the business prior to the Closing.

31.      Under no circumstances shall the Purchaser be deemed a successor of or to the Debtors for any Encumbrance against or in the Debtors or the Acquired Assets of any kind or nature whatsoever.  The sale, transfer, assignment and delivery of the Acquired Assets and the

Designated Contracts shall not be subject to any Encumbrance and Encumbrances of any kind or nature whatsoever shall remain with, and continue to be obligations of, the Debtors.  All persons holding Encumbrances against, on, or in the Debtors or the Acquired Assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Encumbrances of any kind or nature whatsoever against the Purchaser, its officers, directors, shareholders and professionals, its property, its successors and assigns, or the Acquired Assets with respect to any Encumbrance of any kind or nature whatsoever such person or entity had, has, or may have against or in the Debtors, their estates, officers, directors, shareholders, or the Acquired Assets.  Following the Closing, no holder of an Encumbrance in the Debtors shall interfere with the Purchaser's title to or use and enjoyment of the Acquired Assets and the Designated Contracts based on or related to such Encumbrance, or any actions that the Debtors may take in their Cases.

32.   The terms and provisions of the Asset Purchase Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors and their respective affiliates, successors and assigns, their estates, and their creditors, the Purchaser, and its respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting Encumbrances on the Acquired Assets to be sold to the Purchaser pursuant to the Asset Purchase Agreement, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

33.   The failure specifically to include any particular provisions of the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being

the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety.

34.     The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.  To the extent that any provision of the Asset Purchase Agreement conflicts with or is, in any way, inconsistent with any provision of this Order, this Order shall govern and control.

35.     Nothing contained in any plan of reorganization or liquidation confirmed in these Cases or any order of this Court confirming such plans or in any other order in these Cases, including any order entered after any conversion of these Cases to a case under chapter 7 of the Bankruptcy Code, shall alter, conflict with, or derogate from, the provisions of the Asset Purchase Agreement or the terms of this Order.  The provisions of this Order and the Asset Purchase Agreement and any actions taken pursuant hereto or thereto shall survive entry of any order which may be entered confirming or consummating any plan of reorganization of the Debtors, or which may be entered converting these Cases from chapter 11 to chapter 7 of the Bankruptcy Code, and the terms and provisions of the Asset Purchase Agreement as well as the rights and interests granted pursuant to this Order and the Asset Purchase Agreement shall continue in these Cases or any superseding case and shall be specifically performable and enforceable against and binding upon the Debtors, their estates and the Purchaser and their respective successors and permitted assigns, including any trustee, responsible officer or other

fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

36.     The provisions of this Order are nonseverable and mutually dependent.

37.     To the extent applicable, the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court (a) to allow the Purchaser to give the Debtors any notice provided for in the Asset Purchase Agreement, and (b) to allow the Purchaser to take any and all actions permitted by the Asset Purchase Agreement.

38.     There are no brokers involved in consummating the Sale Transaction and no brokers' commissions are due.

39.     Compliance with the legal requirements relating to bulk sales and transfers is not necessary or appropriate under the circumstances.

40.     The Debtors and each other person having duties or responsibilities under the Asset Purchase Agreement or this Order, and their respective agents, representatives, and attorneys, are authorized and empowered to carry out all of the provisions of the Asset Purchase Agreement, to issue, execute, deliver, file and record, as appropriate, the Asset Purchase Agreement, and any related agreements, and to take any action contemplated by the Asset Purchase Agreement or this Order, and to issue, execute, deliver, file and record, as appropriate, such other contracts, instruments, releases, deeds, bills of sale, assignments, or other agreements, and to perform such other acts as are consistent with, and necessary or appropriate to, implement, effectuate and consummate the Asset Purchase Agreement and this Order and the transactions contemplated thereby and hereby, all without further application to, or order of, the Court. Without limiting the generality of the foregoing, this Order shall constitute all approvals and

consents, if any, including any applicable regulatory approvals, required by applicable business corporation, trust and other laws of applicable governmental units with respect to the implementation and consummation of the Asset Purchase Agreement and this Order and the transactions contemplated thereby and hereby.

41.     This Court shall retain exclusive jurisdiction to enforce and implement the terms and provisions of the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connections therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets to the Purchaser free and clear of Encumbrances, or compel the performance of other obligations owed by the Debtors, (b) compel delivery of the purchase price or performance of other obligations owed to the Debtors, (c) resolve any disputes arising under or related to the Asset Purchase Agreement, except as otherwise provided therein, (d) interpret, implement, and enforce the provisions of this Order, and (e) protect the Purchaser against (i) any claims of successor or vicarious liability related to the Acquired Assets or Designated Contracts, or (ii) any claims of Encumbrances asserted on or in the Debtors or the Acquired Assets, of any kind or nature whatsoever.

42.     To the extent that any provision of this Order conflicts with the Asset Purchase Agreement, this Order shall control.

43.     Notwithstanding anything to the contrary contained herein, the purchase by Purchaser of the Acquired Assets is subject to the Assumed Liabilities and Purchaser shall remain liable for the Assumed Liabilities, all as set forth in the Asset Purchase Agreement.

cc:

All attorneys who have entered an appearance and who are registered e-filers.

**<u>Exhibit D-1</u>**

Execution Version

**Silver Point Capital, LLC**

**Asset Purchase Agreement Stalking Horse Term Sheet**

This Asset Purchase Agreement Stalking Horse Term Sheet (the "**Term Sheet**"), is being entered into as of the 25th day of May, 2014, by and among the Debtors (defined below), and DCA Acquisitions, LLC, a Delaware limited liability company (the "**Stalking Horse Purchaser**" or "**SHP**"). This Term Sheet contains a description of certain principal terms of a Stalking Horse Agreement to be entered into among the parties for the Section 363 sale by Debtors, and purchase by SHP, of certain of the assets of the Debtors free and clear of all interests, claims, liens and encumbrances pursuant to section 363(f) of the Bankruptcy Code (collectively, the "**Transaction**"). To the extent that there are inconsistent terms between the Stalking Horse Agreement and this Term Sheet, the terms of the Stalking Horse Agreement shall prevail.

| *Certain Defined Terms* | "**BB&T Debt**" means the amount of debt owing to Branch Banking and Trust Company ("**BB&T**") pursuant to the Business Loan and Security Agreement between BB&T and the Debtors, dated March 2008, in the approximate amount of $40.1 million. |
| --- | --- |
| | "**Debtors**" means, collectively, Specialty Hospitals of America, LLC ("**SHA**"), SHA Management, LLC, Specialty Hospitals of Washington, LLC ("**SPW**"), Specialty Hospitals of Washington-Nursing Center, LLC, Specialty Hospital of Washington-Hadley, LLC, SHA Holdings, Inc., and SHA Hadley SNF, LLC. |
| | "**Designated Contracts**" means those executory contracts and unexpired leases to be assumed by and assigned to the Stalking Horse Purchaser at the closing of the Transaction, which are set forth on <u>Exhibit A</u> hereto. |
| | "**DIP Facility**" means that Debtor-in-Possession term loan funded by SHP to the Debtors in contemplation of the Transaction as part of the Debtors' bankruptcy cases filed in the District of Columbia, on substantially the terms and conditions set forth in <u>Exhibit B</u> hereto. |
| | "**Landlord**" means Capitol Hill Group, a California non-profit mutual benefit corporation. |
| | "**Leased Real Property**" means the Capitol Hill facility located at 700 Constitution Avenue, N.E., Washington, D.C. |
| | "**Owned Real Property**" means the Hadley facility located at 4601 Martin Luther King Jr. Avenue, S.W., Washington, D.C. |
| | "**Regulatory Agreements**" means the approvals and agreements, in form and substance satisfactory to the Stalking Horse Purchaser in its sole discretion, with each of the Department of Justice ("**DOJ**") (and to the extent that the Stalking Horse Purchaser elects to acquire them), D.C. Medicaid ("**DCM**"), and the Centers for Medicare and Medicaid Services ("**CMS**"), including, without limitation, the obtainment of new provider |

**Execution Version**

| | |
|---|---|
| | numbers issued or authorized by any of the foregoing. |
| *Amount and Form of Consideration* | The purchase price (the "**Purchase Price**") for the purchase, sale, assignment and conveyance of the Debtors' right, title and interest in, to and under the Acquired Assets (as defined below), free and clear of all interests, claims, liens and encumbrances pursuant to section 363(f) of the Bankruptcy Code, shall consist of: (a) a $15 million DIP loan term facility, with all sums owing thereon to be credit-bid by the Purchaser at closing pursuant to Bankruptcy Code Section 363(k); <u>plus</u> (b) the value of either a new lease (which, for the avoidance of doubt, includes the net present value of the lease payments to be assumed by SHP) to be entered into between SHP and the Landlord or an amended and restated lease, which will constitute a Designated Contract, with respect to the Leased Real Property, which will be conditioned, in part, on a waiver from the Landlord of certain cure amounts, rent arrearage, HVAC and capital expenditure requirements and otherwise on terms and conditions satisfactory to SHP in its sole discretion; <u>plus</u> (c) the assumption by the Stalking Horse Purchaser of certain liabilities set forth in the Stalking Horse Agreement, including the Regulatory Agreements, and the payment of the Cure Costs (as defined below) relating to the Designated Contracts; <u>plus</u> (d) an amount not to exceed $200,000 (or as otherwise approved by the Stalking Horse Purchaser in its sole discretion), to conduct the orderly wind-down or dismissal of the bankruptcy case(s) following the sale contemplated by the Transaction; and <u>plus</u> (e) a cash payment of $4.7 million, which will be placed into escrow upon the Bankruptcy Court's entry of a sale order and will be released from escrow and payable to BB&T at the closing of the Transaction to satisfy BB&T's first priority lien on the Owned Real Property (the "**BB&T Amount**").<br><br>The parties will agree on a tax allocation of the Purchase Price which addresses the Debtors' obligations to the Internal Revenue Service ("**IRS**"). |
| *Acquired Assets* | The Stalking Horse Purchaser shall purchase substantially all of the assets of the Debtors (collectively, the "**Acquired Assets**"), other than the Excluded Assets, free and clear of all interests, claims, liens and encumbrances pursuant to section 363(f) of the Bankruptcy Code.   The Acquired Assets include all tangible property, accounts, machinery, equipment, inventories, tenant improvements, goodwill, software and computer programs, hardware, intellectual property, prepaid expenses (other than prepaid insurance or prepaid other assets) and deposits, the Designated Contracts, books and records (including all patient charts and records, patient lists and appointment books relating to patients treated by the Debtors to the extent transferable under applicable law), any policies and procedures relating to the Debtors' business, telephone and facsimile numbers, all licenses and permits, including drug and nuclear licenses, to the extent transferable, any federal, state, or local Medicare and Medicaid provider numbers which SHP chooses in its sole discretion to assume and Certificates of Need ("**CON**"), in each case to the extent |

2

**Execution Version**

| | |
|---|---|
| | transferable or otherwise capable of being assumed, sold and assigned, in SHP's sole discretion, the Regulatory Agreements, the Owned Real Property, all benefits, proceeds and other amounts payable under any policy of insurance relating to the Debtors' business, any rights, claims or causes of action of any Debtor against third parties relating to assets, properties, losses, business or operations of any Debtor (other than those that constitute Excluded Assets), and proceeds of all the foregoing assets. |
| *Excluded Assets* | Except to the extent specifically identified above as an Acquired Asset, the following are not included in the Acquired Assets and are not being sold to the Stalking Horse Purchaser (collectively, the "**Excluded Assets**"):  (i) cash, (ii) cash equivalents (excluding receivables and the proceeds thereof), (iii) income tax receivables, (iv) deferred tax assets, (v) employee advances, (vi) prepaid insurance including prepaid professional liability insurance, (vii) contracts and leases that are not Designated Contracts, (viii) the Purchase Price and all rights of the Debtors under the Stalking Horse Agreement, (ix) any rights, claims or causes of action under chapter 5 of the Bankruptcy Code, (x) all personnel records and other books, records, and files that the Debtors are required by law to retain in their possession, (xi) any patient records with respect to which the applicable patient(s) has objected to a transfer of such patient records to the Stalking Horse Purchaser, (xii) any claim, right or interest of any Debtor in or to any refund, rebate, abatement or other recovery for taxes, together with any interest due thereon or penalty rebate arising therefrom, (xiii) any other prepaid assets or properties expressly set forth on a Schedule to be attached to the Stalking Horse Agreement, (xiv) any Medicare and Medicaid provider numbers and CON which SHP, in its sole discretion, chooses not to assume or which are otherwise not capable of being transferred or replaced by SHP, (xv) the BB&T Debt, (xvi) applicable federal, state, and local taxes, and (xvii) any books and records relating to any of the foregoing. |
| *Assumed Liabilities* | The Stalking Horse Purchaser shall, effective as of the closing date, assume those liabilities and obligations (i) under the DIP Facility and (ii) arising from events occurring on or after the closing date under any Designated Contracts, including the Regulatory Agreements, subject to applicable caps on assumed liabilities, as mutually acceptable to SHP and the regulators. The Stalking Horse Purchaser also shall be responsible for payment of Cure Costs (as defined below). |
| *Excluded Liabilities* | The Stalking Horse Purchaser shall not assume or be deemed to have assumed any liabilities of the Debtors other than the Assumed Liabilities, including, without limitation, any liabilities associated with the Excluded Assets and specifically including, without limitation, the BB&T Debt, any other existing indebtedness, any federal, state, or local tax liabilities, and any obligations pursuant to Collective Bargaining Agreements and other employee-related liabilities, in each case to be assumed in SHP's sole |

3

**Execution Version**

| | |
|---|---|
| | discretion. |
| *Assumption and Assignment of Contracts and Leases; Hiring of Personnel* | At the closing, the Debtors shall assign to the Stalking Horse Purchaser each of the Designated Contracts and, to the extent not directly negotiated with the applicable regulatory entities, the Regulatory Agreements. In connection with the assumption and assignment of the Designated Contracts, the Stalking Horse Purchaser shall pay cure costs which the Bankruptcy Court, pursuant to a Final Order, orders to be paid in connection with the Debtors' assignment to Stalking Horse Purchaser of such Designated Contracts in accordance with section 365 of the Bankruptcy Code, up to a maximum aggregate amount to be agreed on by SHP in its sole discretion (the "**Cure Costs**").  SHP shall also initiate, in SHP's discretion, the process of hiring personnel appropriate for the continued operation of Debtors' health care facilities. |
| *Representations, Warranties, and Covenants* | The Stalking Horse Agreement will contain usual and customary representations, warranties, and covenants for similar bankruptcy section 363(f) sale transactions, including representations and warranties by the Stalking Horse Purchaser that it has the requisite authority and has obtained the necessary consents to consummate the Transaction. |
| *Regulatory Approvals* | In addition to negotiating the Regulatory Agreements on substantially the same terms, both operationally and economically as are currently in effect, the Stalking Horse Purchaser and the Debtors will have obtained all necessary regulatory approvals for the Transaction, including but not limited to, any required approvals by the DOJ, DCM, CMS, and any federal, state, or local healthcare or other agency or entity whose regulatory approval is required in order to consummate the Transaction. If any governmental approval is determined to be necessary and cannot be timely obtained, the parties agree to work in good faith to modify the terms of the Transaction as necessary to ensure compliance with all federal, state, or other governmental laws, rules, and regulations while providing the same economic result to the Stalking Horse Purchaser. |
| *Conditions to Closing* | The material conditions and contingencies for the Stalking Horse Purchaser's obligations to close include: |
| | (a)  The Debtors shall have performed, satisfied and complied in all material respects with all obligations and covenants required by the Stalking Horse Agreement to be performed or complied with by them on or prior to the closing date. |
| | (b)  The Debtors shall have executed and delivered to the Stalking Horse Purchaser the Assignment and Assumption and Bill of Sale, dated and effective as of the closing date. |
| | (c)  The Debtors shall have delivered to the Stalking Horse Purchaser all other documents required to be delivered by them under the |

694091/4/PHOENIX

Stalking Horse Agreement and all such documents shall have been properly executed by each of them.

(d)     The Stalking Horse Purchaser shall have received any third party consents, the requirements of which have not been negated by an order of the Bankruptcy Court, and governmental approvals, including the Regulatory Agreements (including, without limitation, a new DCM provider agreement and provider number), in form and substance satisfactory to SHP in its sole and absolute discretion, effective as of the closing date (unless otherwise agreed to by the parties to the definitive Regulatory Agreements); provided, however, that if the Court has entered an order approving the Transaction and all conditions to the closing have been satisfied except for the requirement that all Regulatory Agreements have been received, then the period for Debtors to satisfy this closing condition shall be extended for sixty (60) days.

(e)     The Stalking Horse Purchaser shall have entered into new or modified contracts, acceptable to SHP in its sole discretion, effective as of closing, with all persons identified by SHP prior to the closing, including critical vendors and suppliers and applicable labor unions.

(f)     There shall not have occurred any Event of Default (as described in Exhibit B hereto) which has not been waived by SHP.

(g)     The Debtors shall have delivered all schedules and exhibits attached to or otherwise required by the Stalking Horse Agreement.

(h)     The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become final and non-appealable.

(i)     All of the Designated Contracts shall have been validly assumed and assigned to the Stalking Horse Purchaser under section 365 of the Bankruptcy Code pursuant to the Sale Order.

(j)     The Sale Order shall provide that the sale of the Acquired Assets is (w) pursuant to section 363(f) of the Bankruptcy Code free and clear of all liens, claims, encumbrances, interests, and rights of set-off, including, without limitation, those of BB&T, the DOJ and IRS and any state or local taxing authority, whether known or unknown, disputed, contingent, actual, or otherwise, arising prior to closing, (x) to a good faith purchaser, (y) to occur on condition that SHP has negotiated agreements with CMS and DCM satisfactory to SHP in its sole discretion, and (z) to SHP with no successor liability.  The Sale Order shall also provide that SHP may credit bid under Section 363(k) of the Bankruptcy Code, at face

**Execution Version**

value, the DIP Facility and any other existing secured debt that SHP may acquire prior to the closing of the Transaction.

(k)    Any and all liabilities of the Debtors to any of the CMS, DCM, IRS, the DOJ, or the District of Columbia, for either unpaid taxes owed by any Debtor, qui tam liability, overpayments arising under Medicare or Medicaid, or any other obligations or liabilities, in each case arising prior to closing on the Debtors' asset sale to SHP, shall be capped, together with any recoupment and/or setoff rights of each and any of them post-closing, at a mutually acceptable amount to be not greater than $4 million (unless otherwise agreed to by the SHP), agreed to in writing by SHP, as to DCM and in respect of any pre-closing taxes owed to the District of Columbia, collectively, as approved by final Order of the Bankruptcy Court, and SHP shall have negotiated acceptable caps on recoupment with all such persons, as well as with the DOJ and IRS; provided, that, with respect to liabilities accruing prior to closing on the Transaction by any Debtor to SHP of the DOJ, IRS or to the District of Columbia (for unpaid taxes), such condition may be satisfied by a judicial or administrative finding or other agreement acceptable to SHP, final beyond appeal, that the IRS and the DOJ, and the District of Columbia, as to such taxes, each have no post-petition right of recoupment or set-off, post-sale of the Debtors' assets to SHP, arising from liabilities of any Debtor attributable to healthcare services delivered prior to closing, tax liabilities of any Debtor incurred prior to closing on the asset sale, or otherwise attributable to pre-closing operations of any Debtor.

(l)    SHP shall not have received any notice pursuant to the applicable section of the Stalking Horse Agreement that, individually or in the aggregate, could be reasonably expected to be materially adverse to the condition (financial or otherwise), properties, assets, liabilities, businesses, operations, results of operations or prospects of the business or the Acquired Assets.

(m)    No event shall have occurred that, individually or in the aggregate, could be reasonably expected to result in a material adverse change in the condition (financial or otherwise), properties, assets, liabilities, businesses, operations, results of operations or prospects of the business or the Acquired Assets (including, by way of example, CMS or D.C. Medicaid transferring patients, terminating provider relationships, or withholding or offsetting payments).

(n)    As of the closing, the Landlord shall be in full compliance with the terms of a lockup agreement to be negotiated with SHP, including having addressed any deficiencies with respect to the Leased Real Property which have resulted in, or are reasonably likely to result

6

<table>
<tr><td></td><td>

in, a material adverse change in the conditions, liabilities, or operations of the Leased Real Property.

(o)   As of the closing, a new or amended and restated lease satisfactory to SHP will be in effect with respect to the Leased Real Property.

(p)   SHP shall have received all consents and contract modifications which SHP may require, with all Bankruptcy Court approvals required for the same, including, without limitation, leases of key medical equipment, beds, food service contracts, and utility contracts.

If, following the entry of the Sale Order, all conditions to closing have been satisfied except for the requirement that all Regulatory Agreements have been received, and if the period for the Debtors to satisfy this closing condition is extended for the sixty (60) day period contemplated in subsection (d) above, then SHP will agree to fund such amounts as may be called for under the DIP Term Sheet during the 60 day extension period <u>except that</u>, if SHP determines in good faith that either (i) the required Regulatory Approvals or (ii) the required new or amended and restated lease to be negotiated with the Landlord with respect to the Leased Real Property, are not reasonably likely to be obtained, SHP may deem the applicable closing conditions not capable of being satisfied and may declare an Event of Default under the DIP Term Sheet and any further obligation to fund additional advances shall immediately cease and be of no further force or effect.

</td></tr>
<tr><td>

***As Is, Where Is***

</td><td>

The Stalking Horse Purchaser is acquiring the Acquired Assets at the closing "as is, where is" and, except as otherwise expressly provided in the Stalking Horse Agreement, the Debtors are making no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Acquired Assets.  Notwithstanding the foregoing, for the avoidance of doubt, SHP is buying the Acquired Assets free and clear of all CMS, DOJ, IRS (and any state or local taxing authority), and DCM liabilities, whatsoever, and also free and clear of set-off rights, except to the extent that under applicable law any of these persons retains recoupment rights, and subject, as to such persons, to mutually acceptable "caps" on recoupment rights attributable to the delivery of healthcare services by the Debtors prior to closing, as set forth in agreements between such persons and the Stalking Horse Purchaser.

</td></tr>
<tr><td>

***Break-Up Fee; Expense Reimbursement***

</td><td>

In consideration of the significant costs and efforts to be expended and risks assumed by SHP in negotiating the Transaction described in this Term Sheet, the Stalking Horse Agreement will provide for a break-up fee payable by SHA to SHP in the amount of 5% of the total transaction value (the "**Breakup Fee**"), <u>plus</u> reimbursement of all reasonable expenses incurred in connection with SHP's efforts to negotiate and consummate

</td></tr>
</table>

7

**Execution Version**

| | the Transaction ("**Expense Reimbursement**") in the event the Stalking Horse Agreement is terminated as a result of either (i) an Event of Default by a Debtor under the DIP Loan, or (ii) a breach by a Debtor of a material term of, or failure to timely satisfy a condition to closing that is a Debtor's obligation under, the Stalking Horse Agreement; provided that, if SHP, in its sole discretion, elects to seek specific performance of the Stalking Horse Agreement, then SHP shall not be entitled to the Breakup Fee or Expense Reimbursement.   The Breakup Fee and Expense Reimbursement shall constitute administrative expense claims pursuant to section 503(b) of the Bankruptcy Code and shall have priority over all other administrative expense claims.<br><br>If the Stalking Horse Agreement is terminated because of a superior bid, then the Breakup Fee and Expense Reimbursement shall be payable from the proceeds of a replacement DIP financing or from the proceeds of an alternative transaction whereby the assets contemplated to be sold to SHP are, instead, sold to a third party. |
|---|---|
| *Specific Performance* | Because the exact nature and extent of damages resulting from a breach of the Stalking Horse Agreement are uncertain at the time of entering into the Stalking Horse Agreement, and because such a breach would result in damages that would be difficult to determine with certainty, it is understood that money damages would not be a sufficient remedy and the parties shall each be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach. |
| *Release* | In connection with the closing, Debtors shall execute a release in favor of SHP (and its affiliates, agents, attorneys, and employees), releasing SHP from all causes of action and claims that the Debtors have or may have against SHP, in each case as of the closing. |
| *Non-Competition and Transition Consulting Services Agreements* | On the date the Bankruptcy Court enters the Sale Order, SHP will enter into Non-Competition and Transition Consulting Services Agreements with each of James Rappaport, Robert Rummler, and Frank Wilich, each in the amount of $200,000. |
| *Escrow* | Stalking Horse Purchaser will establish an escrow account to hold the BB&T Amount between the date that a Sale Order is entered and the closing of the Transaction.   The BB&T Amount shall accrue interest during the holdback period, which will be payable to BB&T in the event the Transaction closes and the BB&T Amount is paid to BB&T.  If closing does not occur for any reason, the BB&T Amount (including all interest accrued thereon) will be returned to Stalking Horse Purchaser. |

694091/4/PHOENIX

IN WITNESS WHEREOF, this Term Sheet is executed and delivered as of the date first above-written.

**Debtors:**

SPECIALTY HOSPITALS OF AMERICA, LLC, a
Delaware limited liability company

By: _____
Name: _____
Title: _____

SPECIALTY HOSPITAL OF WASHINGTON-HADLEY,
LLC, a Delaware limited liability company

By: _____
Name: _____
Title: _____

SPECIALTY HOSPITAL OF WASHINGTON-NURSING
CENTER, LLC, a Delaware limited liability company

By: _____
Name: _____
Title: _____

SHA HOLDINGS, INC., a Delaware corporation

By: _____
Name: _____
Title: _____

SHA MANAGEMENT, LLC, a Delaware limited
liability company

By: _____
Name: _____
Title: _____

SPECIALTY HOSPITAL OF WASHINGTON, LLC, a
Delaware limited liability company

By: _____
Name: _____

[Signature Page to APA Term Sheet]

Title: _____

SHA HADLEY SNF, LLC, a Delaware limited liability
company

By: _____
Name: _____
Title: _____

[Signature Page to APA Term Sheet]

**<u>Stalking Horse Purchaser</u>:**

DCA ACQUISITIONS, LLC, a Delaware limited
liability company

By: _____
Name:    Michael Gatto
Title:     Authorized Signatory

[Signature Page to APA Term Sheet]

**Exhibit A**[1]

**Designated Contracts**

1.      Agreement for Dictations and Transcription Services between MDI – Medical Dictation Services, Inc. and The Specialty Hospital of Washington/Capitol Hill entered into June 3, 2008 (with First Amendment thereto).

2.      Pharmacy Service Agreement entered into and effective November 15, 2009 by and between The Specialty Hospital of Washington, LLC.

3.      Maintenance Management Program Agreement entered into and effective October 1, 2011 by and between Cohr, Inc. d/b/a Masterplan and The Specialty Hospitals of Washington.

4.      Service Agreement by and between McGraw Communications, Inc. and Specialty Hospital of Washington-Hadley dated November 22, 2011.

5.      Agreement by and between Morrison Management Specialists, Inc. and The Specialty Hospital of Washington LLC effective April 1, 2007 (with all amendments thereto).

6.      Engagement Letter between Specialty Hospitals of America, LLC and Cherry, Bekaert & Holland, L.L.P. dated November 6, 2009.

7.      Payroll Account Acknowledgement between Aflac and Specialty Hospital of Washington effective April 17, 2009.

8.      Supplemental Staffing Agreement between The Specialty Hospital of Washington-Hadley and Favorite Healthcare Staffing, Inc. dated April 1, 2009 (with all amendments thereto).

9.      Insurance Services Agreement between Computer Programs & Systems, Inc. and The Specialty Hospital of Washington dated April 15, 2010.

10.     Contract for Hospitalist/Intensivist Services effective as of May 1, 2014 by and between Specialty Hospital of Washington and Anacostia Medical Associates, PLLC.

11.     Biomedical Services Agreement by and between Yousaf Esmaili and Specialty Hospital of Washington-Hadley effective as of (not executed).

12.     Agreement for Hospitalist and Intensivist Services entered into April 18, 2012, to be effective May 1, 2012, by and between Specialty Hospital of Washington-Hadley and Hospitalist Medicine Physicians of D.C., P.C.

---

[1] Exhibit A remains subject to SHP's continued review and revision in all respects in connection with SHP's continuing diligence review and investigation.

694091/4/PHOENIX

13.     Rehabilitative Services Agreement entered into July 1, 2012 by and between Ergo Rehab Management Group, LLC and Specialty Hospital of Washington, LLC and Specialty Hospital of Washington-Nursing Center, LLC.

14.     Committed Portfolio Participation Agreement between The Broadlane Group, Inc., MedAssets Supply Chain Systems, LLC, and Specialty Hospitals of America dated July 1, 2011.

15.     Diagnostic Laboratory Services Agreement entered into by and between Washington Hospital Center d/b/a Medstar Diagnostic Laboratories and The Specialty Hospital of Washington (not executed).

16.     Diagnostic Laboratory Services Agreement entered into by and between Washington Hospital Center d/b/a MedStar Diagnostic Laboratories and The Specialty Hospital of Washington-Hadley (not executed).

17.     Pharmacy Consultant Agreement dated as of December 20, 2005 between NeighborCare – Annapolis Junction and PACIN Healthcare-Hadley Memorial Hospital Corporation.

18.     Hospitalist and Back-Up Call Coverage Agreement made and entered into on March 9, 2012 between The Specialty Hospital of Washington, LLC d/b/a The Specialty Hospital of Washington-Capital Hill and Metropolitan Medical Group, LLC.

19.     Primary Care Hospitalist Coverage Agreement made and entered into March 9, 2012 between The Specialty Hospital of Washington, LLC d/b/a The Specialty Hospital of Washington-Capital Hill and Metropolitan Medical Group, LLC.

20.     Radiology Services Agreement effective as of April 1, 2012 by and between Metropolitan Radiology Management, LLC and Specialty Hospital of Washington, LLC.

21.     Biomedical Services Agreement by and between Yousaf Esmaili and Specialty Hospital of Washington-Capitol Hill (not executed).

22.     Service Agreement made effective as of December 15, 2008 by and between The Specialty Hospital of Washington, LLC d/b/a the Specialty Hospital of Washington-Capitol Hill and Vascular Access Professionals, Inc.

23.     Shredding Service Agreement by and between The Specialty Hospital of Washington, LLC and Cintas Corporation No. 2 d/b/a Cintas Document Management dated September 9, 2011.

24.     Purchased Services Agreement entered into as of June 3, 2010 by and between FRD Services Corporation of Virginia d/b/a FDR Services Corporation and Specialty Hospitals of Washington, LLC.

25.     Pest Management Program Agreement by and between The Specialty Hospitals of Washington Hadley and Regional Pest Management, dated September 9, 2011.

26.     Services Agreement by and between Stericycle, Inc. and Specialty Hospital of Washington-Capital effective August 1, 2010.

Exhibit A

27.     Services Agreement by and between Stericycle, Inc. and Specialty Hospital of Washington-Hadley entered into June 19, 2010.

28.     Patient Transfer Agreement entered into May 2, 2014 by and between Specialty Hospital of Washington by and on behalf of its unincorporated divisions of Capitol Hill Campus and Hadley Campus and Inova Health Care Services.

29.     Agreement dated August 20, 2007 between LifeStar Response of Maryland, Inc. and The Specialty Hospital of Washington, Capitol Hill.

30.     Software License Agreement a/k/a the Software License and Services Agreement dated April 1, 2008 between 3M Company and Specialty Hospital of Washington (with all amendments thereto).

31.     Agreement between Omnicare and Specialty Hospital of Washington-Hadley dated December 1, 2009.

32.     Supply Agreement by and between Fresenius USA Marketing, Inc. and The Specialty Hospital of Washington-Capitol Hill, LLC dated October 15, 2009, with an Effective Date of October 21, 2009 (with all amendments thereto).

33.     Product Agreement by and between Pacin Healthcare – Hadley Memorial Hospital Corporation and The BOC Group, Inc. dated May 11, 1998.

34.     Supply Agreement by and between Fresenius USA Marketing, Inc. and The Specialty Hospital of Washington-Hadley, LLC dated October 15, 2009, with an Effective Date of October 21, 2009 (with all amendments thereto).

35.     Pharmacy Services Provider Agreement dated as of December 20, 2005 between NeighborCare – Annapolis Junction and PACIN Healthcare-Hadley Memorial Hospital Corporation.

36.     Primary Vendor Agreement made and entered as of March 25, 2011 by and between H. D. Smith Wholesale Drug Co. and Specialty Hospital of Washington.

37.     Corporate Program Agreement between Medline Industries Inc. and Specialty Hospitals of Washington, LLC effective September 1, 2011.

38.     Agreement between Freedom Medical and the Specialty Hospital System dated September 21, 2011.

39.     Reagent Rental Agreement by and between Instrumentation Laboratory and Specialty Hospital of Washington-Hadley effective January 20, 2009.

40.     Vendor Agreement dated February 6, 2012 between Therapy Systems, Inc. and The Specialty Hospital of Washington (Capitol Hill) and Capitol Hill Healthcare Group d/b/a Capitol Hill Nursing Center.

41.     Vendor Agreement dated February 6, 2012 between Therapy Systems, Inc. and The Specialty Hospital of Washington-Hadley, LLC.

Exhibit A

42.     Customer Service Agreement by and between UniFirst Corporation and Specialty Hospital of Washington Material Management dated January 17, 2007.

43.     Customer Service Agreement by and between UniFirst Corporation and Specialty Hospital of Washington dated March 19, 2008.

44.     Customer Service Agreement by and between UniFirst Corporation and Capitol Hill Community Hospital d/b/a Medlink Hospital dated February 24, 2005.

45.     Customer Service Agreement by and between UniFirst Corporation and Specialty Hospital of Washington dated April 3, 2006.

46.     Ancillary Services Agreement between Connecticut General Life Insurance Company and The Specialty Hospital of Washington effective July 15, 2012.

47.     Ancillary Services Agreement between Connective General Life Insurance Company and Capitol Hill Nursing Center Effective July 15, 2012.

48.     Employment Practices Liability Insurance Policy by and between AIG and Specialty Hospitals of America, LLC dated June 15, 2013.

49.     Excess Healthcare Professional Liability Policy by and between Lexington Insurance Company and Specialty Hospitals of America, LLC dated March 12, 2013.

50.     Healthcare Professional Liability Policy by and between Lexington Insurance Company and Specialty Hospitals of America, LLC dated March 12, 2013.

51.     Physicians Professional Liability Retroactive Coverage Policy by and between Specialty Hospital of Washington, L.L.C. Hadley Location Physicians dated June 6, 2013.

52.     Storage Tank Third Party Liability, Corrective Action, and Cleanup Costs Policy by and between Specialty Hospital of Washington Hadley, LLC and Commerce and Industry Insurance Company dated December 10, 2013.

53.     Workers Compensation and Employers Liability Policy by and between New Hampshire Insurance Company and Specialty Hospitals of America, LLC dated November 09, 2013.

54.     Dental Preferred Provider Insurance by and between CIGNA and Specialty Hospital of Washington effective August 1, 2012.

55.     Open Access Plus Medical Benefits Health Reimbursement Arrangement by and between CIGNA and Specialty Hospital of Washington effective August 1, 2012.

56.     Open Access Plus In-Network Medical Benefits Plan by and Between CIGNA and Specialty Hospital of Washington effective August 1, 2012.

57.     Contract for Services made as of May 1, 2014 by and between Specialty Hospital of Washington and Anacostia Medical Associates PLLC.

Exhibit A

58.    Rehabilitative Services Agreement entered into on the 1st day of July, 2012, by and between Ergo Rehab Management Group, LLC and Specialty Hospital of Washington, LLC, and Specialty Hospital of Washington-Nursing Center, LLC.

59.    Hospitalist and Back-Up Call Coverage Agreement entered into on the 9th Day of March 2012 between The Specialty Hospital of Washington, LLC (d/b/a Specialty Hospital of Washington – Capitol Hill) and Metropolitan Medical Group, LLC.

60.    Primary Care Hospitalist Coverage Agreement made as of the 9th Day of March, 2012 between Specialty Hospital of Washington (d/b/a The Specialty Hospital of Washington – Capitol Hill) and Metropolitan Medical Group, LLC.

61.    Agreement made effective as of April 1, 2008 between Specialty Hospital of Washington, LLC and Morrison Management Specialists, Inc. (with all amendments thereto).

62.    Equipment Lease Agreement dated September 24, 2012 between Med One Capital Funding, LLC and Specialty Hospital of Washington.

63.    Lease Agreement dated December 12, 2012 between Specialty Hospital of Washington-Capitol Hill, LLC and XEROX Corporation.

64.    Hospital Services Agreement dated August 1, 2006 by and between Aetna Health Inc. and The Specialty Hospital of Washington.

65.    Skilled Nursing Facility Services Agreement effective January 1, 2014 by and between AmeriHealth District of Columbia, Inc. and Capitol Hill Nursing Center.

66.    Hospital Provider Agreement effective November 1, 2013 by and between AmeriHealth District of Columbia, Inc. and Specialty Hospital of Washington.

67.    Hospital Provider Agreement effective November 1, 2013 by and between AmeriHealth District of Columbia, Inc. and Specialty Hospital of Washington Hadley.

68.    DC Chartered Healthcare Plan, Inc. Hospital Services Agreement with Capitol Community Hospital d/b/a MedLink Hospital and Capitol Hill Nursing Center effective March 15, 2007

69.    Ancillary Services Agreement between Connective General Life Insurance Company and Capitol Hill Nursing Center Effective July 15, 2012.

70.    Ancillary Services Agreement between Connecticut General Life Insurance Company and The Specialty Hospital of Washington effective July 15, 2012.

71.    Ancillary Services Agreement between Connecticut General Life Insurance Company and The Specialty Hospital of Washington effective July 15, 2012.

72.    Participating Provider Agreement between Southern Health Services, Inc. and SHA-Hadley SNF, LLC effective August 1, 2008.

Exhibit A

73.     Participating Provider Agreement between Southern Health Services, Inc. and The Specialty Hospital of Washington-Hadley effective August 1, 2008.

74.     Participating Provider Agreement between Southern Health Services, Inc. and The Specialty Hospital of Washington effective August 1, 2008.

75.     Participating Provider Agreement between Southern Health Services, Inc. and The Specialty Hospital of Washington effective August 1, 2008.

76.     Participating Provider Agreement between Southern Health Services, Inc. and Capitol Hill Healthcare Group effective August 1, 2008.

77.     Facility Provider Agreement between Health Net Federal Services and The Specialty Hospital of Washington –Hadley effective February 1, 2007.

78.     Hospital Services Agreement between Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. and The Specialty Hospital of Washington effective November 1, 2013.

79.     Hospital Services Agreement between Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. and The Specialty Hospital of Washington –Hadley effective November 1, 2013.

80.     Medicaid Amendment to Hospital Services Agreement between  Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. and The Specialty Hospital of Washington –Hadley effective July 1, 2013.

81.     Ancillary Provider Participation Agreement between MedStar Family Choice, Inc. and The Specialty Hospital of Washington effective October 10, 2013.

82.     Plan/Referral Hospital Participation Agreement between Thrive Health Plans, Inc. and Specialty Hospital of Washington effective July 1, 2013.

83.     Plan/Referral Hospital Participation Agreement between Thrive Health Plans, Inc. and Specialty Hospital of Washington effective July 1, 2013.

84.     Network Participation Agreement between Unison Administrative Services, LLC and Capitol Hill Healthcare Group dba Capitol Hill Nursing Center effective July 31, 2008.

85.     Network Participation Agreement between Unison Administrative Services, LLC and The Specialty Hospital of Washington dba The Specialty Hospital of Washington -Capitol Hill effective July 31, 2008.

86.     Facility Participation Agreement between UnitedHealthcare of the Mid-Atlantic, Inc. and The Specialty Hospital of Washington dba The Specialty Hospital of Washington -Capitol Hill effective August 1, 2008.

87.     Facility Participation Agreement between UnitedHealthcare of the Mid-Atlantic, Inc. and The Specialty Hospital of Washington-Hadley effective August 1, 2008.

Exhibit A

88.    Agreement for Consultation Services between Specialty Hospital of Washington, LLC and Charge
        Capture Services, Inc. dated February 24, 2010.

89.    Independent Contractor Agreement between Specialty Hospital of Washington and Jerome
        Perry effective February 1, 2014.

90.    Agreement for Consultation Services between Specialty Hospital of Washington, LLC and
        Leonard Smith dated May 10, 2009.

91.    Transcription Services Agreement by and between Perry Johnson & Associated Incorporated and
        Specialty Hospital of Washington Hadley effective May 1, 2014.

92.    Engagement Agreement between Reed Smith LLP and Specialty Hospitals of America, LLC dated
        July 14, 2010.

93.    Retainer Agreement between Rosenau & Rosenau and Specialty Hospital of Washington dated
        August 9, 2010.

94.    Agreement for Consultative Services between Specialty Hospital of Washington Capitol Hill, LLC
        and Sandra Swann dated March 25, 2011.

95.    Program Medical Director Agreement made April 4, 2007 by and between The Specialty Hospital
        of Washington-Hadley, LLC and Khosrow Davachi, M.D.

96.    Program Medical Director Agreement made May 13, 2008 by and between The Specialty
        Hospital of Washington-Hadley, LLC and Khosrow Davachi, M.D.

97.    Program Medical Director Agreement made on June 18, 2007 by and between the Specialty
        Hospital of Washington-Hadley, LLC and Capitol Care Medical Associates, PLLC.

98.    Medical Director Agreement made October 28, 2010 by and between The Specialty Hospital of
        Washington, LLC and Krishna Dass, MD.

99.    Physician Agreement effective February 2, 2013 between Jonathan Drysdale, MD and The
        Specialty Hospital of Washington.

100.   Professional Services Agreement effective December 1, 2005 by and between Specialty
        Hospitals of America, LLC and Eric F. Rieseberg.

101.   Physician Agreement effective November 1, 2007 between Mohammad Hoque, MD and The
        Specialty Hospital of Washington.

102.   Physician Agreement, effective April 29, 2013 between Laura Kharsa, MD and The Specialty
        Hospital of Washington.

103.   Pulmonary Program Medical Director Agreement dated March 14, 2014 by and between The
        Nursing Center of Specialty Hospital of Washington, LLC and Leslie Kingslow, MD.

Exhibit A

104.    Physician Agreement effective November 1, 2010 between Homayoon Mahjoob, MD and The Specialty Hospital of Washington d/b/a The Specialty Hospital and Nursing Center at Capitol Hill.

105.    Service Purchase Agreement entered into April/July 1, 2010 by and between Dr. Massoud Nemati and The Specialty Hospital of Washington-Hadley LLC.

106.    Program Medical Director Agreement made February 1, 2008 by and between The Specialty Hospital of Washington-Hadley. LLC and Massoud Nemati, MD.

107.    Physician Agreement effective July 23, 2012 between Shahin Oveisi, MD and The Specialty Hospital of Washington.

108.    Physician Agreement between Faullin Paletsky, MD and The Specialty Hospital of Washington d/b/a The Specialty Hospital of Washington Hospital and Nursing Center at Capitol Hill.

109.    Medical Director Agreement made January 1, 2007 by and between SHA Hadley SNF LLC and Edgar Potter, MD.

110.    Medical Director Agreement made on May 1, 2007 by and between The Specialty Hospital of Washington, LLC and Manisha Singal, MD.

111.    Medical Director Agreement by and between Capitol Hill Health Care Group d/b/a Specialty Hospital of Washington-Capitol Hill Nursing Center and Manisha Singal effective August 1, 2009.

112.    Physician Agreement effective November 6, 2009 between Kathryn Sowerine, MD and The Specialty Hospital of Washington d/b/a The Specialty Hospital of Washington Hospital and Nursing Center at Capitol Hill.

113.    Physician Agreement effective December 1, 2013 between Mestawet Teka, MD and The Specialty Hospital of Washington d/b/a The Specialty Hospital of Washington Hospital and Nursing Center at Capitol Hill.

114.    Physician Agreement effective June 11, 2009 between Heshem Vababzadeh-Monshie, MD and The Specialty Hospital of Washington d/b/a The Specialty Hospital of Washington Hospital and Nursing Center at Capitol Hill.

115.    Dental Services Agreement made December 31, 2001 by and between PACIN Healthcare-Hadley Memorial Hospital Corporation and William Vaughan, DDS (with all amendments thereto).

116.    Physician Agreement effective August 31, 2013 between Firew Wubiee, MD and The Specialty Hospital of Washington d/b/a The Specialty Hospital of Washington Hospital and Nursing Center at Capitol Hill.

117.    Program Medical Director Agreement made on April 4, 2007 by and between The Specialty Hospital of Washington-Hadley, LLC and Meersaiid Zonozi, MD.

118.    Assumption Agreement entered into as of February 1, 2013 by and between MedStar Washington Hospital Center and Specialty Hospital of Washington-Capitol Hill.

Exhibit A

119.    Patient Transfer Agreement made on May 2, 2014 by and between Specialty Hospital of
        Washington by and on behalf of its unincorporated divisions of Capitol Hill Campus and Hadley
        Campus, and Inova Health Care Services.

**Exhibit B**

**DIP Facility Term Sheet**

See attached.

**Exhibit D-2**

Execution Version

### Silver Point Capital, LLC
### Asset Purchase Agreement Stalking Horse Term Sheet

This Asset Purchase Agreement Stalking Horse Term Sheet (the "**Term Sheet**"), is being entered into as of the ~~18th~~25th day of May, 2014, by and among the Debtors (defined below), and DCA Acquisitions, LLC, a Delaware limited liability company (the "**Stalking Horse Purchaser**" or "**SHP**").  This Term Sheet contains a description of certain principal terms of a Stalking Horse Agreement to be entered into among the parties for the Section 363 sale by Debtors, and purchase by SHP, of certain of the assets of the Debtors free and clear of all interests, claims, liens and encumbrances pursuant to section 363(f) of the Bankruptcy Code (collectively, the "**Transaction**").  To the extent that there are inconsistent terms between the Stalking Horse Agreement and this Term Sheet, the terms of the Stalking Horse Agreement shall prevail.

| *Certain Defined Terms* | "**BB&T Debt**" means the amount of debt owing to Branch Banking and Trust Company ("**BB&T**") pursuant to the Business Loan and Security Agreement between BB&T and the Debtors, dated March 2008, in the approximate amount of $40.1 million. |
|---|---|
| | "**Debtors**" means, collectively, Specialty Hospitals of America, LLC ("**SHA**"), SHA Management, LLC, Specialty Hospitals of Washington, LLC ("**SPW**"), Specialty Hospitals of Washington-Nursing Center, LLC, Specialty Hospital of Washington-Hadley, LLC, SHA Holdings, Inc., and SHA Hadley SNF, LLC. |
| | "**Designated Contracts**" means those executory contracts and unexpired leases to be assumed by and assigned to the Stalking Horse Purchaser at the closing of the Transaction, which are set forth on Exhibit A hereto. |
| | "**DIP Facility**" means that Debtor-in-Possession term loan funded by SHP to the Debtors in contemplation of the Transaction as part of the Debtors' bankruptcy cases ~~to be~~ filed in the District of Columbia, on substantially the terms and conditions set forth in Exhibit B hereto. |
| | "**Landlord**" means Capitol Hill Group, a California non-profit mutual benefit corporation. |
| | "**Leased Real Property**" means the Capitol Hill facility located at 700 Constitution Avenue, N.E., Washington, D.C. |
| | "**Owned Real Property**" means the Hadley ~~Facility~~facility located at 4601 Martin Luther King Jr. Avenue, S.W., Washington, D.C. |
| | "**Regulatory Agreements**" means the approvals and agreements, in form and substance satisfactory to the Stalking Horse Purchaser in its sole discretion, with each of the Department of Justice ("**DOJ**") (and to the extent that the Stalking Horse Purchaser elects to acquire them), D.C. Medicaid ("**DCM**"), and the Centers for Medicare and Medicaid Services ("**CMS**"). |

1

**Style Definition:** Normal: Font: Calibri
**Style Definition:** Body Text: Font: Calibri
**Style Definition:** Body Ind .5: Font: Calibri
**Style Definition:** Body FI 1: Font: Calibri
**Style Definition:** Body FI .5: Font: Calibri
**Style Definition:** Body Ind 1: Font: Calibri
**Style Definition:** Block .5: Font: Calibri
**Style Definition:** Block 1: Font: Calibri
**Style Definition:** Right Flush: Font: Calibri
**Style Definition:** Signature: Font: Calibri
**Style Definition:** List Bullet 2,LB2: Font: Calibri
**Style Definition:** List Bullet 3,LB3: Font: Calibri
**Style Definition:** List Bullet 4,LB4: Font: Calibri
**Style Definition:** List Bullet 5,LB5: Font: Calibri
**Style Definition:** List Bullet,LB1: Font: Calibri
**Style Definition:** List Number 2,LN2: Font: Calibri
**Style Definition:** List Number 3,LN3: Font: Calibri
**Style Definition:** List Number 4,LN4: Font: Calibri
**Style Definition:** List Number 5,LN5: Font: Calibri
**Style Definition:** List Number,LN1: Font: Calibri
**Style Definition:** Header: Font: Calibri
**Style Definition:** Footer: Font: Calibri
**Style Definition:** List Paragraph: Font: Calibri
**Style Definition:** Footnote Text: Font: Calibri
**Style Definition:** Comment Text: Font: Calibri
**Style Definition:** Comment Subject: Font: Calibri

Execution Version

| | ") , including, without limitation, the obtainment of new provider numbers issued or authorized by any of the foregoing. |
|---|---|
| *Amount and Form of Consideration* | The purchase price (the **"Purchase Price"**) for the purchase, sale, assignment and conveyance of the Debtors' right, title and interest in, to and under the Acquired Assets (as defined below) shall consist of: (a) $15,000,000, in the form of a term DIP Facility provided by SHP;), free and clear of all interests, claims, liens and encumbrances pursuant to section 363(f) of the Bankruptcy Code, shall consist of: (a) a $15 million DIP loan term facility, with all sums owing thereon to be credit-bid by the Purchaser at closing pursuant to Bankruptcy Code Section 363(k); plus (b) the value of either a new lease (which, for the avoidance of doubt, includes the net present value of the lease payments to be assumed by SHP) to be entered into between SHP and the Landlord or an amended and restated lease, which will constitute a Designated Contract, with respect to the Leased Real Property, which will be conditioned, in part, on a waiver from the Landlord of certain cure amounts, rent arrearage, HVAC and capital expenditure requirements and otherwise on terms and conditions satisfactory to SHP in its sole discretion; plus (c) the assumption by the Stalking Horse Purchaser of certain liabilities set forth in the Stalking Horse Agreement, including the Regulatory Agreements, and the payment of the Cure Costs (as defined below) relating to the Designated Contracts; and plus (d) an amount not to exceed $200,000 (or as otherwise approved by the Stalking Horse Purchaser in its sole discretion), to conduct the orderly wind-down or dismissal of the bankruptcy case(s) following the sale contemplated by the Transaction.; and plus (e) a cash payment of $4.7 million, which will be placed into escrow upon the Bankruptcy Court's entry of a sale order and will be released from escrow and payable to BB&T at the closing of the Transaction to satisfy BB&T's first priority lien on the Owned Real Property (the **"BB&T Amount"**).

The parties will agree on a tax allocation of the Purchase Price which addresses the Debtors' obligations to the Internal Revenue Service (**"IRS"**). |
| *Acquired Assets* | The Stalking Horse Purchaser shall purchase substantially all of the operating assets of the Debtors (collectively, the **"Acquired Assets"**), other than the Excluded Assets, free and clear of all interests, claims, liens and encumbrances pursuant to section 363(f) of the Bankruptcy Code.  The Acquired Assets include all tangible property, accounts, machinery, equipment, inventories, tenant improvements, goodwill, software and computer programs, hardware, intellectual property, prepaid expenses (other than prepaid insurance or prepaid other assets) and deposits, the Designated Contracts, books and records (including all patient charts and records, patient lists and appointment books relating to patients treated by the Debtors to the extent transferable under applicable law), any policies and procedures relating to the Debtors' business, telephone and facsimile numbers, all licenses and permits, including drug and nuclear licenses, to the extent transferable, any federal, state, or local Medicare |

2

Execution Version

| | |
|---|---|
| | and Medicaid provider numbers which SHP chooses in its sole discretion to assume and Certificates of Need ("**CON**"), in each case to the extent transferable or otherwise capable of being assumed, sold and assigned, in SHP's sole discretion, the Regulatory Agreements, the Owned Real Property, ~~and~~ all benefits, proceeds and other amounts payable under any policy of insurance relating to the Debtors' business, any rights, claims or causes of action of any Debtor against third parties relating to assets, properties, losses, business or operations of any Debtor (other than those that constitute Excluded Assets), and proceeds of all the foregoing assets. |
| *Excluded Assets* | Except to the extent specifically identified above as an Acquired Asset, the following are not included in the Acquired Assets and are not being sold to the Stalking Horse Purchaser (collectively, the "**Excluded Assets**"):  (i) cash, (ii) cash equivalents (excluding receivables and the proceeds thereof), (iii) income tax receivables, (iv) deferred tax assets, (v) employee advances, (vi) prepaid insurance including prepaid professional liability insurance, (vii) contracts and leases that are not Designated Contracts, (viii) the Purchase Price and all rights of the Debtors under the Stalking Horse Agreement, (ix) any rights, claims or causes of action ~~of any Debtor against third parties relating to assets, properties, losses, business or operations of any Debtor, including any actions~~ under chapter 5 of the Bankruptcy Code, (x) all personnel records and other books, records, and files that the Debtors are required by law to retain in their possession, (xi) any patient records with respect to which the applicable patient(s) has objected to a transfer of such patient records to the Stalking Horse Purchaser, (xii) any claim, right or interest of any Debtor in or to any refund, rebate, abatement or other recovery for taxes, together with any interest due thereon or penalty rebate arising therefrom, (xiii) any other prepaid assets or properties expressly set forth on a Schedule to be attached to the Stalking Horse Agreement, (xiv) any Medicare and Medicaid provider numbers and CON which SHP, in its sole discretion, chooses not to assume or which are otherwise not capable of being transferred or replaced by SHP, (xv) the BB&T Debt, (xvi) applicable federal, state, and local taxes, and (xvii) any books and records relating to any of the foregoing. |
| *Assumed Liabilities* | The Stalking Horse Purchaser shall, effective as of the closing date, assume those liabilities and obligations (i) under the DIP Facility and (ii) arising from events occurring on or after the closing date under any Designated Contracts, including the Regulatory Agreements, subject to applicable caps on assumed liabilities, as mutually acceptable to SHP and the regulators. The Stalking Horse Purchaser also shall be responsible for payment of Cure Costs (as defined below). |
| *Excluded Liabilities* | The Stalking Horse Purchaser shall not assume or be deemed to have assumed any liabilities of the Debtors other than the Assumed Liabilities, including, without limitation, any liabilities associated with the Excluded Assets and specifically including, without limitation, the BB&T Debt, any other existing indebtedness, any federal, state, or local tax liabilities, and |

3

Execution Version

| | |
|---|---|
| | any obligations pursuant to Collective Bargaining Agreements and other employee-related liabilities, in each case to be assumed in SHP's sole discretion. |
| ***Assumption and Assignment of Contracts and Leases; Hiring of Personnel*** | At the closing, the Debtors shall assign to the Stalking Horse Purchaser each of the Designated Contracts and, to the extent not directly negotiated with the applicable regulatory entities, the Regulatory Agreements. In connection with the assumption and assignment of the Designated Contracts, the Stalking Horse Purchaser shall pay cure costs which the Bankruptcy Court, pursuant to a Final Order, orders to be paid in connection with the Debtors' assignment to Stalking Horse Purchaser of such Designated Contracts in accordance with section 365 of the Bankruptcy Code, up to a maximum aggregate amount to be agreed on by SHP in its sole discretion (the "**Cure Costs**").  SHP shall also initiate, in SHP's discretion, the process of hiring personnel appropriate for the continued operation of Debtors' health care facilities. |
| ***Representations, Warranties, and Covenants*** | The Stalking Horse Agreement will contain usual and customary representations, warranties, and covenants for similar bankruptcy section 363(f) sale transactions, including representations and warranties by the Stalking Horse Purchaser that it has the requisite authority and has obtained the necessary consents to consummate the Transaction. |
| ***Regulatory Approvals*** | In addition to negotiating the Regulatory Agreements on substantially the same terms, both operationally and economically as are currently in effect, the Stalking Horse Purchaser and the Debtors will have obtained all necessary regulatory approvals for the Transaction, including but not limited to, any required approvals by the DOJ, DCM, CMS, and any federal, state, or local healthcare or other agency or entity whose regulatory approval is required in order to consummate the Transaction. If any governmental approval is determined to be necessary and cannot be timely obtained, the parties agree to work in good faith to modify the terms of the Transaction as necessary to ensure compliance with all federal, state, or other governmental laws, rules, and regulations while providing the same economic result to the Stalking Horse Purchaser. |
| ***Conditions to Closing*** | The material conditions and contingencies for the Stalking Horse Purchaser's obligations to close include:<br><br>(a)      The Debtors shall have performed, satisfied and complied in all material respects with all obligations and covenants required by the Stalking Horse Agreement to be performed or complied with by them on or prior to the closing date.<br><br>(b)      The Debtors shall have executed and delivered to the Stalking Horse Purchaser the Assignment and Assumption and Bill of Sale, dated and effective as of the closing date. |

4

Execution Version

(c)    The Debtors shall have delivered to the Stalking Horse Purchaser all other documents required to be delivered by them under the Stalking Horse Agreement and all such documents shall have been properly executed by each of them.

(d)    The Stalking Horse Purchaser shall have received any third party consents, the requirements of which have not been negated by an order of the Bankruptcy Court, and governmental approvals, including the Regulatory Agreements, (including, without limitation, a new DCM provider agreement and provider number), in form and substance satisfactory to itSHP in its sole and absolute discretion, effective as of the closing date (unless otherwise agreed to by the parties to the definitive Regulatory Agreements); provided, however, that if the Court has entered an order approving the Transaction and all conditions to the closing have been satisfied except for the requirement that all Regulatory Agreements have been received, then the period for Debtors to satisfy this closing condition shall be extended for sixty (60) days.

(e)    The Stalking Horse Purchaser shall have entered into new or modified contracts, acceptable to SHP in its sole discretion, effective as of closing, with all persons identified by SHP prior to the closing, including critical vendors and suppliers and applicable labor unions.

(f)    There shall not have occurred any Event of Default (as described in Exhibit B hereto) which has not been waived by SHP.

(g)    The Debtors shall have delivered all schedules and exhibits attached to or otherwise required by the Stalking Horse Agreement.

(h)    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become final and non-appealable.

(i)    All of the Designated Contracts shall have been validly assumed and assigned to the Stalking Horse Purchaser under section 365 of the Bankruptcy Code pursuant to the Sale Order.

(j)    The Sale Order shall provide that the sale of the Acquired Assets is (w) pursuant to section 363(f) of the Bankruptcy Code free and clear of all liens, claims, encumbrances and, interests, and rights of set-off, including, without limitation, those of BB&T, the DOJ and IRS and any state or local taxing authority, whether known or unknown, disputed, contingent, actual, or otherwise, arising prior to closing, (x) to a good faith purchaser, (y) to occur on condition that SHP has negotiated agreements with CMS and DCM satisfactory to SHP in its sole discretion, and (z) to SHP with no

5

**Execution Version**

successor liability.  The Sale Order shall also provide that SHP may credit bid under Section 363(k) of the Bankruptcy Code, at face value, the DIP Facility and any other existing secured debt that SHP may acquire prior to the closing of the Transaction.

(k)    Any and all liabilities of the Debtors to any of the CMS, DCM, IRS, the DOJ, or the District of Columbia, for either unpaid taxes owed by any Debtor, qui tam liability, overpayments arising under Medicare or Medicaid, or any other obligations or liabilities, in each case arising prior to closing on the Debtors' asset sale to SHP, shall be capped, together with any recoupment and/or setoff rights of each and any of them post-closing, at a mutually acceptable amount, to be not greater than $4 million (unless otherwise agreed to by the SHP), agreed to in writing by SHP, as to DCM and in respect of any pre-closing taxes owed to the District of Columbia, collectively, as approved by final Order of the Bankruptcy Court, and SHP shall have negotiated acceptable caps on recoupment with all such persons, as well as with the DOJ and IRS; provided, that, with respect to liabilities accruing prior to closing on the Transaction by any Debtor to SHP of the DOJ, IRS or to the District of Columbia (for unpaid taxes), such condition may be satisfied by a judicial or administrative finding or other agreement acceptable to SHP, final beyond appeal, that the IRS and the DOJ, and the District of Columbia, as to such taxes, each have no post-petition right of recoupment or set-off, post-sale of the Debtors' assets to SHP, arising from liabilities of any Debtor attributable to healthcare services delivered prior to closing, tax liabilities of any Debtor incurred prior to closing on the asset sale, or otherwise attributable to pre-closing operations of any Debtor.

(l)    SHP shall not have received any notice pursuant to the applicable section of the Stalking Horse Agreement that, individually or in the aggregate, could be reasonably expected to be materially adverse to the condition (financial or otherwise), properties, assets, liabilities, businesses, operations, results of operations or prospects of the business or the Acquired Assets.

(m)    No event shall have occurred that, individually or in the aggregate, could be reasonably expected to result in a material adverse change in the condition (financial or otherwise), properties, assets, liabilities, businesses, operations, results of operations or prospects of the business or the Acquired Assets (including, by way of example, CMS or D.C. Medicaid transferring patients, terminating provider relationships, or withholding or offsetting payments).

(n)    As of the closing, the Landlord shall be in full compliance with the terms of a lockup agreement to be negotiated with SHP, including

6

689855/10694091/4/PHOENIX

**Execution Version**

| | having addressed any deficiencies with respect to the Leased Real Property which have resulted in, or are reasonably likely to result in, a material adverse change in the conditions, liabilities, or operations of the Leased Real Property. |
|---|---|
| | (o)   As of the closing, a new or amended and restated lease satisfactory to SHP will be in effect with respect to the Leased Real Property. |
| | (p)   SHP shall have received all consents and contract modifications which SHP may require, with all Bankruptcy Court approvals required for the same, including, without limitation, leases of key medical equipment, beds, food service contracts, and utility contracts. |
| | If, following the entry of the Sale Order, all conditions to closing have been satisfied except for the requirement that all Regulatory Agreements have been received, and if the period for the Debtors to satisfy this closing condition is extended for the sixty (60) day period contemplated in subsection (d) above, then SHP will agree to fund such amounts as may be called for under the DIP Term Sheet during the 60 day extension period <u>except that</u>, if SHP determines in good faith that either (i) the required Regulatory Approvals or (ii) the required new or amended and restated lease to be negotiated with the Landlord with respect to the Leased Real Property, are not reasonably likely to be obtained, SHP may deem the applicable closing conditions not capable of being satisfied and may declare an Event of Default under the DIP Term Sheet and any further obligation to fund additional advances shall immediately cease and be of no further force or effect. |
| ***As Is, Where Is*** | The Stalking Horse Purchaser is acquiring the Acquired Assets at the closing "as is, where is" and, except as otherwise expressly provided in the Stalking Horse Agreement, the Debtors are making no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Acquired Assets.  Notwithstanding the foregoing, for the avoidance of doubt, SHP is buying the Acquired Assets free and clear of all CMS, DOJ, IRS (and any state or local taxing authority), and DCM liabilities, whatsoever, and also free and clear of set-off rights, except to the extent that under applicable law any of these persons retains recoupment rights, and subject, as to such persons, to mutually acceptable "caps" on recoupment rights attributable to the delivery of healthcare services by the Debtors prior to closing, as set forth in agreements between such persons and the Stalking Horse Purchaser. |
| ***Break-Up Fee; Expense Reimbursement*** | In consideration of the significant costs and efforts to be expended and risks assumed by SHP in negotiating the Transaction described in this Term Sheet, the Stalking Horse Agreement will provide for a break-up fee payable by SHA to SHP in the amount of 5% of the total transaction value |

7

689855/10694091/4/PHOENIX

Execution Version

| | |
|---|---|
| | (the "**Breakup Fee**"), plus reimbursement of all reasonable expenses incurred in connection with SHP's efforts to negotiate and consummate the Transaction ("**Expense Reimbursement**") in the event the Stalking Horse Agreement is terminated as a result of either (i) an Event of Default by a Debtor under the DIP Loan, or (ii) a breach by a Debtor of a material term of, or failure to timely satisfy a condition to closing that is a Debtor's obligation under, the Stalking Horse Agreement; provided that, if SHP, in its sole discretion, elects to seek specific performance of the Stalking Horse Agreement, then SHP shall not be entitled to the Breakup Fee or Expense Reimbursement.  The Breakup Fee and Expense Reimbursement shall constitute administrative expense claims pursuant to section 503(b) of the Bankruptcy Code and shall have priority over all other administrative expense claims. |
| | If the Stalking Horse Agreement is terminated because of a superior bid, then the Breakup Fee and Expense Reimbursement shall be payable from the proceeds of a replacement DIP financing or from the proceeds of an alternative transaction whereby the assets contemplated to be sold to SHP are, instead, sold to a third party. |
| *Specific Performance* | Because the exact nature and extent of damages resulting from a breach of the Stalking Horse Agreement are uncertain at the time of entering into the Stalking Horse Agreement, and because such a breach would result in damages that would be difficult to determine with certainty, it is understood that money damages would not be a sufficient remedy and the parties shall each be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach. |
| *Release* | In connection with the closing, Debtors shall execute a release in favor of SHP (and its affiliates, agents, attorneys, and employees), releasing SHP from all causes of action and claims that the Debtors have or may have against SHP, in each case as of the closing. |
| *Non-Competition and Transition Consulting Services Agreements* | On the date the Bankruptcy Court enters the Sale Order, SHP will enter into Non-Competition and Transition Consulting Services Agreements with each of James Rappaport, Robert Rummler, and Frank Wilich, each in the amount of $200,000. |
| *Escrow* | Stalking Horse Purchaser will establish an escrow account to hold the BB&T Amount between the date that a Sale Order is entered and the closing of the Transaction.  The BB&T Amount shall accrue interest during the holdback period, which will be payable to BB&T in the event the Transaction closes and the BB&T Amount is paid to BB&T.  If closing does not occur for any reason, the BB&T Amount (including all interest accrued thereon) will be returned to Stalking Horse Purchaser. |

8

689855/10694091/4/PHOENIX

IN WITNESS WHEREOF, this Term Sheet is executed and delivered as of the date first above-written.

**<u>Debtors</u>:**

SPECIALTY HOSPITALS OF AMERICA, LLC, a
Delaware limited liability company

By: _____
Name: _____
Title: _____

SPECIALTY HOSPITAL OF WASHINGTON-HADLEY,
LLC, a Delaware limited liability company

By: _____
Name: _____
Title: _____

SPECIALTY HOSPITAL OF WASHINGTON-NURSING
CENTER, LLC, a Delaware limited liability company

By: _____
Name: _____
Title: _____

SHA HOLDINGS, INC., a Delaware corporation

By: _____
Name: _____
Title: _____

SHA MANAGEMENT, LLC, a Delaware limited
liability company

By: _____
Name: _____
Title: _____

SPECIALTY HOSPITAL OF WASHINGTON, LLC, a
Delaware limited liability company

By: _____
Name: _____

[Signature Page to APA Term Sheet]

689855/10694091/4/PHOENIX

Title: _____

SHA HADLEY SNF, LLC, a Delaware limited liability company

By: _____
Name: _____
Title: _____

[Signature Page to APA Term Sheet]

**<u>Stalking Horse Purchaser</u>:**

DCA ACQUISITIONS, LLC, a Delaware limited
liability company

By:    _____
Name:    Michael Gatto
Title:    Authorized Signatory

[Signature Page to APA Term Sheet]

**Exhibit A**[1]

**Designated Contracts**

1.      Agreement for Dictations and Transcription Services between MDI – Medical Dictation Services, Inc. and The Specialty Hospital of Washington/Capitol Hill entered into June 3, 2008 (with First Amendment thereto).

2.      Pharmacy Service Agreement entered into and effective November 15, 2009 by and between The Specialty Hospital of Washington, LLC.

3.      Maintenance Management Program Agreement entered into and effective October 1, 2011 by and between Cohr, Inc. d/b/a Masterplan and The Specialty Hospitals of Washington.

4.      Service Agreement by and between McGraw Communications, Inc. and Specialty Hospital of Washington-Hadley dated November 22, 2011.

5.      Agreement by and between Morrison Management Specialists, Inc. and The Specialty Hospital of Washington LLC effective April 1, 2007 (with all amendments thereto).

6.      Engagement Letter between Specialty Hospitals of America, LLC and Cherry, Bekaert & Holland, L.L.P. dated November 6, 2009.

7.      Payroll Account Acknowledgement between Aflac and Specialty Hospital of Washington effective April 17, 2009.

8.      Supplemental Staffing Agreement between The Specialty Hospital of Washington-Hadley and Favorite Healthcare Staffing, Inc. dated April 1, 2009 (with all amendments thereto).

9.      Insurance Services Agreement between Computer Programs & Systems, Inc. and The Specialty Hospital of Washington dated April 15, 2010.

10.     Contract for Hospitalist/Intensivist Services effective as of May 1, 2014 by and between Specialty Hospital of Washington and Anacostia Medical Associates, PLLC.

11.     Biomedical Services Agreement by and between Yousaf Esmaili and Specialty Hospital of Washington-Hadley effective as of (not executed).

12.     Agreement for Hospitalist and Intensivist Services entered into April 18, 2012, to be effective May 1, 2012, by and between Specialty Hospital of Washington-Hadley and Hospitalist Medicine Physicians of D.C., P.C.

---

[1] Exhibit A remains subject to SHP's continued review and revision in all respects in connection with SHP's continuing diligence review and investigation.

13.     Rehabilitative Services Agreement entered into July 1, 2012 by and between Ergo Rehab Management Group, LLC and Specialty Hospital of Washington, LLC and Specialty Hospital of Washington-Nursing Center, LLC.

14.     Committed Portfolio Participation Agreement between The Broadlane Group, Inc., MedAssets Supply Chain Systems, LLC, and Specialty Hospitals of America dated July 1, 2011.

15.     Diagnostic Laboratory Services Agreement entered into by and between Washington Hospital Center d/b/a Medstar Diagnostic Laboratories and The Specialty Hospital of Washington (not executed).

16.     Diagnostic Laboratory Services Agreement entered into by and between Washington Hospital Center d/b/a MedStar Diagnostic Laboratories and The Specialty Hospital of Washington-Hadley (not executed).

17.     Pharmacy Consultant Agreement dated as of December 20, 2005 between NeighborCare – Annapolis Junction and PACIN Healthcare-Hadley Memorial Hospital Corporation.

18.     Hospitalist and Back-Up Call Coverage Agreement made and entered into on March 9, 2012 between The Specialty Hospital of Washington, LLC d/b/a The Specialty Hospital of Washington-Capital Hill and Metropolitan Medical Group, LLC.

19.     Primary Care Hospitalist Coverage Agreement made and entered into March 9, 2012 between The Specialty Hospital of Washington, LLC d/b/a The Specialty Hospital of Washington-Capital Hill and Metropolitan Medical Group, LLC.

20.     Radiology Services Agreement effective as of April 1, 2012 by and between Metropolitan Radiology Management, LLC and Specialty Hospital of Washington, LLC.

21.     Biomedical Services Agreement by and between Yousaf Esmaili and Specialty Hospital of Washington-Capitol Hill (not executed).

22.     Service Agreement made effective as of December 15, 2008 by and between The Specialty Hospital of Washington, LLC d/b/a the Specialty Hospital of Washington-Capitol Hill and Vascular Access Professionals, Inc.

23.     Shredding Service Agreement by and between The Specialty Hospital of Washington, LLC and Cintas Corporation No. 2 d/b/a Cintas Document Management dated September 9, 2011.

24.     Purchased Services Agreement entered into as of June 3, 2010 by and between FRD Services Corporation of Virginia d/b/a FDR Services Corporation and Specialty Hospitals of Washington, LLC.

25.     Pest Management Program Agreement by and between The Specialty Hospitals of Washington Hadley and Regional Pest Management, dated September 9, 2011.

26.     Services Agreement by and between Stericycle, Inc. and Specialty Hospital of Washington-Capital effective August 1, 2010.

27.    Services Agreement by and between Stericycle, Inc. and Specialty Hospital of Washington-Hadley entered into June 19, 2010.

28.    Patient Transfer Agreement entered into May 2, 2014 by and between Specialty Hospital of Washington by and on behalf of its unincorporated divisions of Capitol Hill Campus and Hadley Campus and Inova Health Care Services.

29.    Agreement dated August 20, 2007 between LifeStar Response of Maryland, Inc. and The Specialty Hospital of Washington, Capitol Hill.

30.    Software License Agreement a/k/a the Software License and Services Agreement dated April 1, 2008 between 3M Company and Specialty Hospital of Washington (with all amendments thereto).

31.    Agreement between Omnicare and Specialty Hospital of Washington-Hadley dated December 1, 2009.

32.    Supply Agreement by and between Fresenius USA Marketing, Inc. and The Specialty Hospital of Washington-Capitol Hill, LLC dated October 15, 2009, with an Effective Date of October 21, 2009 (with all amendments thereto).

33.    Product Agreement by and between Pacin Healthcare – Hadley Memorial Hospital Corporation and The BOC Group, Inc. dated May 11, 1998.

34.    Supply Agreement by and between Fresenius USA Marketing, Inc. and The Specialty Hospital of Washington-Hadley, LLC dated October 15, 2009, with an Effective Date of October 21, 2009 (with all amendments thereto).

35.    Pharmacy Services Provider Agreement dated as of December 20, 2005 between NeighborCare – Annapolis Junction and PACIN Healthcare-Hadley Memorial Hospital Corporation.

36.    Primary Vendor Agreement made and entered as of March 25, 2011 by and between H. D. Smith Wholesale Drug Co. and Specialty Hospital of Washington.

37.    Corporate Program Agreement between Medline Industries Inc. and Specialty Hospitals of Washington, LLC effective September 1, 2011.

38.    Agreement between Freedom Medical and the Specialty Hospital System dated September 21, 2011.

39.    Reagent Rental Agreement by and between Instrumentation Laboratory and Specialty Hospital of Washington-Hadley effective January 20, 2009.

40.    Vendor Agreement dated February 6, 2012 between Therapy Systems, Inc. and The Specialty Hospital of Washington (Capitol Hill) and Capitol Hill Healthcare Group d/b/a Capitol Hill Nursing Center.

41.    Vendor Agreement dated February 6, 2012 between Therapy Systems, Inc. and The Specialty Hospital of Washington-Hadley, LLC.

Exhibit A

42.     Customer Service Agreement by and between UniFirst Corporation and Specialty Hospital of Washington Material Management dated January 17, 2007.

43.     Customer Service Agreement by and between UniFirst Corporation and Specialty Hospital of Washington dated March 19, 2008.

44.     Customer Service Agreement by and between UniFirst Corporation and Capitol Hill Community Hospital d/b/a Medlink Hospital dated February 24, 2005.

45.     Customer Service Agreement by and between UniFirst Corporation and Specialty Hospital of Washington dated April 3, 2006.

46.     Ancillary Services Agreement between Connecticut General Life Insurance Company and The Specialty Hospital of Washington effective July 15, 2012.

47.     Ancillary Services Agreement between Connective General Life Insurance Company and Capitol Hill Nursing Center Effective July 15, 2012.

48.     Employment Practices Liability Insurance Policy by and between AIG and Specialty Hospitals of America, LLC dated June 15, 2013.

49.     Excess Healthcare Professional Liability Policy by and between Lexington Insurance Company and Specialty Hospitals of America, LLC dated March 12, 2013.

50.     Healthcare Professional Liability Policy by and between Lexington Insurance Company and Specialty Hospitals of America, LLC dated March 12, 2013.

51.     Physicians Professional Liability Retroactive Coverage Policy by and between Specialty Hospital of Washington, L.L.C. Hadley Location Physicians dated June 6, 2013.

52.     Storage Tank Third Party Liability, Corrective Action, and Cleanup Costs Policy by and between Specialty Hospital of Washington Hadley, LLC and Commerce and Industry Insurance Company dated December 10, 2013.

53.     Workers Compensation and Employers Liability Policy by and between New Hampshire Insurance Company and Specialty Hospitals of America, LLC dated November 09, 2013.

54.     Dental Preferred Provider Insurance by and between CIGNA and Specialty Hospital of Washington effective August 1, 2012.

55.     Open Access Plus Medical Benefits Health Reimbursement Arrangement by and between CIGNA and Specialty Hospital of Washington effective August 1, 2012.

56.     Open Access Plus In-Network Medical Benefits Plan by and Between CIGNA and Specialty Hospital of Washington effective August 1, 2012.

57.     Contract for Services made as of May 1, 2014 by and between Specialty Hospital of Washington and Anacostia Medical Associates PLLC.

Exhibit A

58.      Rehabilitative Services Agreement entered into on the 1st day of July, 2012, by and between Ergo Rehab Management Group, LLC and Specialty Hospital of Washington, LLC, and Specialty Hospital of Washington-Nursing Center, LLC.

59.      Hospitalist and Back-Up Call Coverage Agreement entered into on the 9th Day of March 2012 between The Specialty Hospital of Washington, LLC (d/b/a Specialty Hospital of Washington – Capitol Hill) and Metropolitan Medical Group, LLC.

60.      Primary Care Hospitalist Coverage Agreement made as of the 9th Day of March, 2012 between Specialty Hospital of Washington (d/b/a The Specialty Hospital of Washington – Capitol Hill) and Metropolitan Medical Group, LLC.

61.      Agreement made effective as of April 1, 2008 between Specialty Hospital of Washington, LLC and Morrison Management Specialists, Inc. (with all amendments thereto).

62.      Equipment Lease Agreement dated September 24, 2012 between Med One Capital Funding, LLC and Specialty Hospital of Washington.

63.      Lease Agreement dated December 12, 2012 between Specialty Hospital of Washington-Capitol Hill, LLC and XEROX Corporation.

64.      Hospital Services Agreement dated August 1, 2006 by and between Aetna Health Inc. and The Specialty Hospital of Washington.

65.      Skilled Nursing Facility Services Agreement effective January 1, 2014 by and between AmeriHealth District of Columbia, Inc. and Capitol Hill Nursing Center.

66.      Hospital Provider Agreement effective November 1, 2013 by and between AmeriHealth District of Columbia, Inc. and Specialty Hospital of Washington.

67.      Hospital Provider Agreement effective November 1, 2013 by and between AmeriHealth District of Columbia, Inc. and Specialty Hospital of Washington Hadley.

68.      DC Chartered Healthcare Plan, Inc. Hospital Services Agreement with Capitol Community Hospital d/b/a MedLink Hospital and Capitol Hill Nursing Center effective March 15, 2007

69.      Ancillary Services Agreement between Connective General Life Insurance Company and Capitol Hill Nursing Center Effective July 15, 2012.

70.      Ancillary Services Agreement between Connecticut General Life Insurance Company and The Specialty Hospital of Washington effective July 15, 2012.

71.      Ancillary Services Agreement between Connecticut General Life Insurance Company and The Specialty Hospital of Washington effective July 15, 2012.

72.      Participating Provider Agreement between Southern Health Services, Inc. and SHA-Hadley SNF, LLC effective August 1, 2008.

Exhibit A

689855/10694091/4/PHOENIX

73.    Participating Provider Agreement between Southern Health Services, Inc. and The Specialty Hospital of Washington-Hadley effective August 1, 2008.

74.    Participating Provider Agreement between Southern Health Services, Inc. and The Specialty Hospital of Washington effective August 1, 2008.

75.    Participating Provider Agreement between Southern Health Services, Inc. and The Specialty Hospital of Washington effective August 1, 2008.

76.    Participating Provider Agreement between Southern Health Services, Inc. and Capitol Hill Healthcare Group effective August 1, 2008.

77.    Facility Provider Agreement between Health Net Federal Services and The Specialty Hospital of Washington –Hadley effective February 1, 2007.

78.    Hospital Services Agreement between Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. and The Specialty Hospital of Washington effective November 1, 2013.

79.    Hospital Services Agreement between Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. and The Specialty Hospital of Washington –Hadley effective November 1, 2013.

80.    Medicaid Amendment to Hospital Services Agreement between  Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. and The Specialty Hospital of Washington –Hadley effective July 1, 2013.

81.    Ancillary Provider Participation Agreement between MedStar Family Choice, Inc. and The Specialty Hospital of Washington effective October 10, 2013.

82.    Plan/Referral Hospital Participation Agreement between Thrive Health Plans, Inc. and Specialty Hospital of Washington effective July 1, 2013.

83.    Plan/Referral Hospital Participation Agreement between Thrive Health Plans, Inc. and Specialty Hospital of Washington effective July 1, 2013.

84.    Network Participation Agreement between Unison Administrative Services, LLC and Capitol Hill Healthcare Group dba Capitol Hill Nursing Center effective July 31, 2008.

85.    Network Participation Agreement between Unison Administrative Services, LLC and The Specialty Hospital of Washington dba The Specialty Hospital of Washington -Capitol Hill effective July 31, 2008.

86.    Facility Participation Agreement between UnitedHealthcare of the Mid-Atlantic, Inc. and The Specialty Hospital of Washington dba The Specialty Hospital of Washington -Capitol Hill effective August 1, 2008.

87.    Facility Participation Agreement between UnitedHealthcare of the Mid-Atlantic, Inc. and The Specialty Hospital of Washington-Hadley effective August 1, 2008.

Exhibit A

88.  Agreement for Consultation Services between Specialty Hospital of Washington, LLC and Charge Capture Services, Inc. dated February 24, 2010.

89.  Independent Contractor Agreement between Specialty Hospital of Washington and Jerome Perry effective February 1, 2014.

90.  Agreement for Consultation Services between Specialty Hospital of Washington, LLC and Leonard Smith dated May 10, 2009.

91.  Transcription Services Agreement by and between Perry Johnson & Associated Incorporated and Specialty Hospital of Washington Hadley effective May 1, 2014.

92.  Engagement Agreement between Reed Smith LLP and Specialty Hospitals of America, LLC dated July 14, 2010.

93.  Retainer Agreement between Rosenau & Rosenau and Specialty Hospital of Washington dated August 9, 2010.

94.  Agreement for Consultative Services between Specialty Hospital of Washington Capitol Hill, LLC and Sandra Swann dated March 25, 2011.

95.  Program Medical Director Agreement made April 4, 2007 by and between The Specialty Hospital of Washington-Hadley, LLC and Khosrow Davachi, M.D.

96.  Program Medical Director Agreement made May 13, 2008 by and between The Specialty Hospital of Washington-Hadley, LLC and Khosrow Davachi, M.D.

97.  Program Medical Director Agreement made on June 18, 2007 by and between the Specialty Hospital of Washington-Hadley, LLC and Capitol Care Medical Associates, PLLC.

98.  Medical Director Agreement made October 28, 2010 by and between The Specialty Hospital of Washington, LLC and Krishna Dass, MD.

99.  Physician Agreement effective February 2, 2013 between Jonathan Drysdale, MD and The Specialty Hospital of Washington.

100.  Professional Services Agreement effective December 1, 2005 by and between Specialty Hospitals of America, LLC and Eric F. Rieseberg.

101.  Physician Agreement effective November 1, 2007 between Mohammad Hoque, MD and The Specialty Hospital of Washington.

102.  Physician Agreement, effective April 29, 2013 between Laura Kharsa, MD and The Specialty Hospital of Washington.

103.  Pulmonary Program Medical Director Agreement dated March 14, 2014 by and between The Nursing Center of Specialty Hospital of Washington, LLC and Leslie Kingslow, MD.

689855/106 690091/4 /PHOENIX

104.    Physician Agreement effective November 1, 2010 between Homayoon Mahjoob, MD and The
Specialty Hospital of Washington d/b/a The Specialty Hospital and Nursing Center at Capitol Hill.

105.    Service Purchase Agreement entered into April/July 1, 2010 by and between Dr. Massoud
Nemati and The Specialty Hospital of Washington-Hadley LLC.

106.    Program Medical Director Agreement made February 1, 2008 by and between The Specialty
Hospital of Washington-Hadley. LLC and Massoud Nemati, MD.

107.    Physician Agreement effective July 23, 2012 between Shahin Oveisi, MD and The Specialty
Hospital of Washington.

108.    Physician Agreement between Faullin Paletsky, MD and The Specialty Hospital of Washington
d/b/a The Specialty Hospital of Washington Hospital and Nursing Center at Capitol Hill.

109.    Medical Director Agreement made January 1, 2007 by and between SHA Hadley SNF LLC and
Edgar Potter, MD.

110.    Medical Director Agreement made on May 1, 2007 by and between The Specialty Hospital of
Washington, LLC and Manisha Singal, MD.

111.    Medical Director Agreement by and between Capitol Hill Health Care Group d/b/a Specialty
Hospital of Washington-Capitol Hill Nursing Center and Manisha Singal effective August 1, 2009.

112.    Physician Agreement effective November 6, 2009 between Kathryn Sowerine, MD and The
Specialty Hospital of Washington d/b/a The Specialty Hospital of Washington Hospital and
Nursing Center at Capitol Hill.

113.    Physician Agreement effective December 1, 2013 between Mestawet Teka, MD and The
Specialty Hospital of Washington d/b/a The Specialty Hospital of Washington Hospital and
Nursing Center at Capitol Hill.

114.    Physician Agreement effective June 11, 2009 between Heshem Vababzadeh-Monshie, MD and
The Specialty Hospital of Washington d/b/a The Specialty Hospital of Washington Hospital and
Nursing Center at Capitol Hill.

115.    Dental Services Agreement made December 31, 2001 by and between PACIN Healthcare-Hadley
Memorial Hospital Corporation and William Vaughan, DDS (with all amendments thereto).

116.    Physician Agreement effective August 31, 2013 between Firew Wubiee, MD and The Specialty
Hospital of Washington d/b/a The Specialty Hospital of Washington Hospital and Nursing Center
at Capitol Hill.

117.    Program Medical Director Agreement made on April 4, 2007 by and between The Specialty
Hospital of Washington-Hadley, LLC and Meersaiid Zonozi, MD.

| | **Formatted:** Justified |

118.    Assumption Agreement entered into as of February 1, 2013 by and between MedStar
Washington Hospital Center and Specialty Hospital of Washington-Capitol Hill.

Exhibit A

119.    Patient Transfer Agreement made on May 2, 2014 by and between Specialty Hospital of Washington by and on behalf of its unincorporated divisions of Capitol Hill Campus and Hadley Campus, and Inova Health Care Services.

Exhibit A

**Exhibit B**

**DIP Facility Term Sheet**

See attached.

## Exhibit E-1

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

In re:

SPECIALTY HOSPITAL OF
WASHINGTON, LLC, *et al.*,

Debtors.[1]

Case No. 14-00279

Chapter 11

(Joint Administration Requested)

## NOTICE OF BID DEADLINE, AUCTION AND SALE
## HEARING IN CONNECTION WITH THE
## SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS
## FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      The above-captioned debtors and debtors-in-possession (collectively, the
"**Debtors**"), seek to sell substantially all of their assets (the "**Assets**") free and clear of any and
all liens, claims, and encumbrances.

2.      On May 21, 2014, the Debtors filed a motion (the "**Sale Motion**") with the United
States Bankruptcy Court for the District of Columbia (the "**Court**") seeking, among other things,
entry of an order (the "**Bidding Procedures Order**") (i) approving certain auction and bidding
procedures in connection with the sale of substantially all of the Debtors' assets (the "**Bidding
Procedures**"), (ii) authorizing the Debtors to enter into a stalking horse purchase agreement,
subject to higher or otherwise better offers, (iii) approving procedures relating to the assumption
and assignment of executory contracts and unexpired leases ("**Assumption and Assignment
Procedures**"), (iv) scheduling an auction (the "**Auction**") and sale approval hearing (the "**Sale
Hearing**"), (v) approving the form and manner of sale notice, and (vi) granting related relief.[2]

---

[1]

The debtors in these chapter 11 cases and each debtor's federal identification number
("EIN") and chapter 11 case number are: Specialty Hospital of Washington, LLC (EIN: 81-
0681352; case number: 14-00279); Specialty Hospital of America, LLC (EIN: 81-0681347; case
number 14-00295); SHA Holdings, Inc. (EIN: 20-5741943; case number 14-00296); SHA
Management, LLC (EIN: 81-0681350; case number 14-00297); Specialty Hospital of
Washington Nursing Center, LLC (EIN: 81-0681348; case number 14-00298), Specialty
Hospital of Washington Hadley, LLC (EIN: 20-5752586; case number 14-00299), and SHA
Hadley SNF, LLC (EIN: 20-5741976; case number 14-00300).

[2]      On May 27, 2014, the Debtors filed certain modifications to the Sale Motion.  Docket No.
___.  As used herein, the Sale Motion means the Sale Motion as modified by the filing on May
27, 2014.  Capitalized terms used but not defined herein shall have the meanings ascribed to
them in the Sale Motion.

3.      On [May 30], 2014, the Court entered the Bidding Procedures Order.   All interested parties are invited to make offers to purchase the Acquired Assets in accordance with the Bidding Procedures and the Bidding Procedures Order. Copies of the Bidding Procedures and Bidding Procedures Order may be obtained by:  (a) written request to the Debtors' counsel, Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, D.C. 20037-1122 (Attn: Dania Slim; dania.slim@pillsburylaw.com); (b) accessing the Court's website at http://www.dcb.uscourts.gov (please note that a PACER password is needed to access documents on the Court's website); or (c) viewing the docket of these cases at the office of the Clerk of the Court, United States Bankruptcy Court for the District of Columbia, 333 Constitution Avenue, NW, Suite 1225, Washington, D.C. 20001. **All interested parties should carefully read the Bidding Procedures.**

4.      The deadline to submit offers to purchase the Acquired Assets is **[June 4, 2014] at 7:00 p.m. (prevailing Eastern Time)** (the "**Bid Deadline**").   Pursuant to the Bidding Procedures and Bidding Procedures Order, if one or more Qualified Bids (as defined in the Bidding Procedures), separate and apart from the bid of the Stalking Horse Purchaser, are received on or before the Bid Deadline, the Debtors will conduct the Auction commencing on **[June 9, 2014] at 10:00 a.m. (prevailing Eastern Time)**, at the offices of Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, D.C. 20037-1122 or such later time or such other place as the Debtors shall designate in a subsequent notice to all Qualified Bidders and Notice Parties (as defined in the Bidding Procedures), to determine the highest or otherwise best bid for the Acquired Assets (the "**Successful Bid**").

5.      Only an entity that has submitted a Qualified Bid (a "**Qualified Bidder**") in accordance with the Bidding Procedures to the following is eligible to participate in the auction: (i) counsel to the Debtors, Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, D.C. 20037-1122 (Attn: Patrick Potter, patrick.potter@pillsburylaw.com) and Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, NY (Attn: Andrew Troop, andrew.troop@pillsburylaw.com); (ii) the Debtors' financial advisor, Alvarez & Marsal Healthcare Industry Group, LLC, 600 Madison Avenue, 8th Floor, New York, NY 10022 (Attn: Ronald Winters, rwinterws@alvarezandmarsal.com); (iii) the Debtors' investment banker, Cain Brothers & Company, LLC, 360 Madison Avenue, New York, NY 10017 (Attn: Gregory J. Hychko, ghychko@cainbrothers.com); and (iv) counsel to any official committee of unsecured creditors appointed in these Cases.

6.      The sale of the Acquired Assets to the Successful Bidder shall be presented for authorization and approval by the Court at the Sale Hearing, which is currently scheduled to be held on **[June 10, 2014] at [9:30 a.m.]** (prevailing Eastern Time) at the United States Bankruptcy Court for the District of Columbia, 333 Constitution Avenue, NW, Courtroom 1, Washington, D.C. 20001 before the Honorable S. Martin Teel, Jr., United States Bankruptcy Judge.  The Sale Hearing may be adjourned or rescheduled without further notice by announcing the adjourned date at the Sale Hearing.

7.      Objections, if any, to approval of the sale of the Acquired Assets to the Successful Bidder shall (i) be in writing, (ii) comply with the Bankruptcy Rules, (iii) set forth the name of the objector, (iv) state with particularity the legal and factual bases for such objection, and (v) be filed with the Clerk of the Court, United States Bankruptcy Court for the District of Columbia,

2

333 Constitution Avenue, NW, Suite 1225, Washington, D.C. 20001, together with proof of service thereof, and served on the following parties **so as to be <u>actually received</u> no later than 5:00 p.m. (prevailing Eastern Time) on <mark>[June 9, 2014]</mark>** (the "**Objection Deadline**") to (a) counsel to the Debtors, Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, D.C. 20037-1122 (Attn: Patrick Potter, patrick.potter@pillsburylaw.com) and Pillsbury Winthrop Shaw Pittman. LLP, 1540 Broadway, New York, NY (Attn: Andrew Troop, andrew.troop@pillsburylaw.com); (b) (ii) counsel for the Stalking Horse Purchaser for noticing purposes, Squire Sanders (US) LLP, One East Washington Street, Suite 2700, Phoenix, AZ 85004 (Attn: Craig D. Hansen, craig.hansen@squiresanders.com); (c) counsel to the Committee; (d) counsel to the Successful Bidder, if not the Stalking Horse Purchaser; and (e) the Office of the United States Trustee for the District of Columbia, 115 S. Union Street, Room 210, Alexandria, VA 22314 (Attn: Bradley Jones, Bradley.D.Jones@usdoj.gov).

8.      Failure of any entity to file an objection on or before the Objection Deadline shall be deemed to constitute consent to the sale of the Acquired Assets to the Successful Bidder and other relief requested in the Sale Motion, and be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Motion, the Auction, the sale of the Acquired Assets, or the Debtors' consummation and performance of the terms of the asset purchase agreement entered into with the Successful Bidder, if authorized by the Court.

9.      After determining the Successful Bid, the Debtors may determine which Qualified Bid is the next best bid (the "**Next Best Bid**"). If the Successful Bidder does not close the sale by the date agreed to by the Debtors and the Successful Bidder, then the Debtors shall be authorized to close with the party that submitted the Next Best Bid (the "**Next Best Bidder**"), without a further court order. The Next Best Bidder shall be required to close the sale with the Debtors to the extent the Successful Bidder fails to close.

10.     This notice is subject to the full terms and conditions of the Sale Motion, the Bidding Procedures, and the Bidding Procedures Order, and the Debtors encourage any interested parties to review such documents in their entirety. To the extent that this notice is inconsistent with the Bidding Procedures Order, the terms of the Bidding Procedures Order shall govern.

*[Signature Block on the Next Page]*

3

PILLSBURY WINTHROP SHAW PITTMAN LLP

/s/ *Patrick Potter*

Patrick Potter (426514)
Jerry Hall (976461)
Dania Slim (991689)
2300 N Street, NW
Washington, DC 20037-1122
Telephone:  (202) 663-8000
Facsimile:  (202) 663-8007
patrick.potter@pillsburylaw.com
jerry.hall@pillsburylaw.com
dania.slim@pillsburylaw.com


Andrew M. Troop (admitted *pro hac vice*)
1540 Broadway
New York, NY 10036-4039
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com

*Counsel for the Debtors*

**<u>Exhibit E-2</u>**

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re: | Case No. 14-00279 |
| SPECIALTY HOSPITAL OF WASHINGTON, LLC, *et al.*, | Chapter 11 |
| Debtors.[1] | (Joint Administration Requested) |

**NOTICE OF BID DEADLINE, AUCTION AND SALE
HEARING IN CONNECTION WITH THE
SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS
FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.     The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), seek to sell substantially all of their assets (the "**Assets**") free and clear of any and all liens, claims, and encumbrances.

2.     On May 21, 2014, the Debtors filed a motion (the "**Sale Motion**") with the United States Bankruptcy Court for the District of Columbia (the "**Court**") seeking, among other things, entry of an order (the "**Bidding Procedures Order**") (i) approving certain auction and bidding procedures in connection with the sale of substantially all of the Debtors' assets (the "**Bidding Procedures**"), (ii) authorizing the Debtors to enter into a stalking horse purchase agreement, subject to higher or otherwise better offers, (iii) approving procedures relating to the assumption and assignment of executory contracts and unexpired leases ("**Assumption and Assignment**

---

[1]    The debtors in these chapter 11 cases and each debtor's federal identification number ("EIN") and chapter 11 case number are: Specialty Hospital of Washington, LLC (EIN: 81-0681352; case number: 14-00279); Specialty Hospital of America, LLC (EIN: 81-0681347; case number 14-00295); SHA Holdings, Inc. (EIN: 20-5741943; case number 14-00296); SHA Management, LLC (EIN: 81-0681350; case number 14-00297); Specialty Hospital of Washington Nursing Center, LLC (EIN: 81-0681348; case number 14-00298); Specialty Hospital of Washington Hadley, LLC (EIN: 20-5752586; case number 14-00299), and SHA Hadley SNF, LLC (EIN: 20-5741976; case number 14-00300). The debtors in these chapter 11 cases and the last four digits of each debtor's federal identification number are: Specialty Hospital of America, LLC (1347), SHA Holdings, Inc. (1943), SHA Management, LLC (1350), Specialty Hospital of Washington, LLC (1352), Specialty Hospital of Washington Nursing Center, LLC (1348), Specialty Hospital of Washington Hadley, LLC (2586), and SHA Hadley SNF, LLC (1976).

Procedures"), (iv) scheduling an auction (the "**Auction**") and sale approval hearing (the "**Sale Hearing**"), (v) approving the form and manner of sale notice, and (vi) granting related relief.[2]

3.     On **[May 30]**, 2014, the Court entered the Bidding Procedures Order.   All interested parties are invited to make offers to purchase the Acquired Assets in accordance with the Bidding Procedures and the Bidding Procedures Order. Copies of the Bidding Procedures and Bidding Procedures Order may be obtained by:  (a) written request to the Debtors' counsel, Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, D.C. 20037-1122 (Attn: Dania Slim; dania.slim@pillsburylaw.com); (b) accessing the Court's website at http://www.dcb.uscourts.gov (please note that a PACER password is needed to access documents on the Court's website); or (c) viewing the docket of these cases at the office of the Clerk of the Court, United States Bankruptcy Court for the District of Columbia, 333 Constitution Avenue, NW, Suite 1225, Washington, D.C. 20001. **All interested parties should carefully read the Bidding Procedures.**

4.     The deadline to submit offers to purchase the Acquired Assets is **[June 4~~20~~, 2014]** at **7~~5~~:00 p.m. (prevailing Eastern Time)** (the "**Bid Deadline**").  Pursuant to the Bidding Procedures and Bidding Procedures Order, if one or more Qualified Bids (as defined in the Bidding Procedures), separate and apart from the bid of the Stalking Horse Purchaser, are received on or before the Bid Deadline, the Debtors will conduct the Auction commencing on **[June 9~~23~~, 2014]** at **10:00 a.m. (prevailing Eastern Time)**, at the offices of Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, D.C. 20037-1122 or such later time or such other place as the Debtors shall designate in a subsequent notice to all Qualified Bidders and Notice Parties (as defined in the Bidding Procedures), to determine the highest or otherwise best bid for the Acquired Assets (the "**Successful Bid**").

5.     Only an entity that has submitted a Qualified Bid (a "**Qualified Bidder**") in accordance with the Bidding Procedures to the following is eligible to participate in the auction: (i) counsel to the Debtors, Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, D.C. 20037-1122 (Attn: Patrick Potter, patrick.potter@pillsburylaw.com) and Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, NY (Attn: Andrew Troop, andrew.troop@pillsburylaw.com); (ii) the Debtors' financial advisor, Alvarez & Marsal Healthcare Industry Group, LLC, 600 Madison Avenue, 8th Floor, New York, NY 10022 (Attn: Ronald Winters, rwinterws@alvarezandmarsal.com); (iii) the Debtors' investment banker, Cain Brothers & Company, LLC, 360 Madison Avenue, New York, NY 10017 (Attn: Gregory J. Hychko, ghychko@cainbrothers.com); and (iv) counsel to any official committee of unsecured creditors appointed in these Cases.

6.     The sale of the Acquired Assets to the Successful Bidder shall be presented for authorization and approval by the Court at the Sale Hearing, which is currently scheduled to be held on **[June 10~~25~~, 2014]** at **~~[2:00 p]~~[9:30 a.m.]** **(prevailing Eastern Time)** at the United States Bankruptcy Court for the District of Columbia, 333 Constitution Avenue, NW, Courtroom 1,

---

[2]     On May 27, 2014, the Debtors filed certain modifications to the Sale Motion.  Docket No. ___.  As used herein, the Sale Motion means the Sale Motion as modified by the filing on May 27, 2014.  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Sale Motion.

2

Washington, D.C. 20001 before the Honorable S. Martin Teel, Jr., United States Bankruptcy
Judge. The Sale Hearing may be adjourned or rescheduled without further notice by announcing
the adjourned date at the Sale Hearing.

7.      Objections, if any, to approval of the sale of the Acquired Assets to the Successful
Bidder shall (i) be in writing, (ii) comply with the Bankruptcy Rules, (iii) set forth the name of
the objector, (iv) state with particularity the legal and factual bases for such objection, and (v) be
filed with the Clerk of the Court, United States Bankruptcy Court for the District of Columbia,
333 Constitution Avenue, NW, Suite 1225, Washington, D.C. 20001, together with proof of
service thereof, and served on the following parties **so as to be <u>actually received</u> no later than
5:00 p.m. (prevailing Eastern Time) on <mark>[June 9, 2014]</mark>** (the "**Objection Deadline**") to (a)
counsel to the Debtors, Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington,
D.C. 20037-1122 (Attn: Patrick Potter, patrick.potter@pillsburylaw.com) and Pillsbury
Winthrop Shaw Pittman. LLP, 1540 Broadway, New York, NY (Attn: Andrew Troop,
andrew.troop@pillsburylaw.com); (b) (ii) counsel for the Stalking Horse Purchaser for noticing
purposes, Squire Sanders (US) LLP, One East Washington Street, Suite 2700, Phoenix, AZ
85004 (Attn: Craig D. Hansen, craig.hansen@squiresanders.com); (c) counsel to the Committee;
(d) counsel to the Successful Bidder, if not the Stalking Horse Purchaser; and (e) the Office of
the United States Trustee for the District of Columbia, 115 S. Union Street, Room 210,
Alexandria, VA 22314 (Attn: Bradley Jones, Bradley.D.Jones@usdoj.gov).

8.      Failure of any entity to file an objection on or before the Objection Deadline shall
be deemed to constitute consent to the sale of the Acquired Assets to the Successful Bidder and
other relief requested in the Sale Motion, and be a bar to the assertion, at the Sale Hearing or
thereafter, of any objection to the Sale Motion, the Auction, the sale of the Acquired Assets, or
the Debtors' consummation and performance of the terms of the asset purchase agreement
entered into with the Successful Bidder, if authorized by the Court.

9.      After determining the Successful Bid, the Debtors may determine which Qualified
Bid is the next best bid (the "**Next Best Bid**"). If the Successful Bidder does not close the sale
by the date agreed to by the Debtors and the Successful Bidder, then the Debtors shall be
authorized to close with the party that submitted the Next Best Bid (the "**Next Best Bidder**"),
without a further court order. The Next Best Bidder shall be required to close the sale with the
Debtors to the extent the Successful Bidder fails to close.

10.     This notice is subject to the full terms and conditions of the Sale Motion, the
Bidding Procedures, and the Bidding Procedures Order, and the Debtors encourage any
interested parties to review such documents in their entirety. To the extent that this notice is
inconsistent with the Bidding Procedures Order, the terms of the Bidding Procedures Order shall
govern.

Field Code Changed

3

*[Signature Block on the Next Page]*

PILLSBURY WINTHROP SHAW PITTMAN LLP

/s/ *Patrick Potter*
Patrick Potter (426514)
Jerry Hall (976461)
Dania Slim (991689)
2300 N Street, NW
Washington, DC 20037-1122
Telephone:  (202) 663-8000
Facsimile:  (202) 663-8007
patrick.potter@pillsburylaw.com
jerry.hall@pillsburylaw.com
dania.slim@pillsburylaw.com

Andrew M. Troop (admitted *pro hac vice*)
1540 Broadway
New York, NY 10036-4039
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com

*Counsel for the Debtors*

4

## Exhibit F-1

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re: | Case No. 14-00279 |
| SPECIALTY HOSPITAL OF WASHINGTON, LLC, *et al.*, | Chapter 11 |
| Debtors.[1] | (Joint Administration Requested) |

**NOTICE OF POTENTIAL ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION
WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS ASSETS**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      On [May 30, 2014], 2014, the United States Bankruptcy Court for the District of Columbia (the "**Court**") entered an order (the "**Bidding Procedures Order**") in the chapter 11 cases (the "**Cases**") of the above-captioned debtors and debtors-in-possession (the "**Debtors**") approving, among other things, certain procedures related to the assumption and assignment of executory contracts and unexpired leases (the "**Designated Contracts**") listed on Exhibit 1 annexed to this Notice in connection with the sale of substantially all of the Debtors' assets (the "**Acquired Assets**").  The Debtors may assume and assign the Designated Contracts to the successful bidder for the Acquired Assets (the "**Successful Bidder**") under the bidding procedures (the "**Bidding Procedures**") approved by the Bankruptcy Court in connection with the Bidding Procedures Order.

2.      The Debtors believe that any and all defaults (other than the filing of these Cases) and actual pecuniary losses under the Designated Contracts can be cured by the payment of the cure amounts (the "**Cure Amounts**") listed on Exhibit 1 annexed to this Notice (the "**Assignment Schedule**").  The Debtors reserve the right to delete items from, supplement, and modify the Assignment Schedule at any time, provided that to the extent that the Debtors add a Designated Contract to the Assignment Schedule or modify the Cure Amount, the affected party shall receive separate notice and an opportunity to objection to such addition or modification.

---

[1] The debtors in these chapter 11 cases and each debtor's federal identification number ("EIN") and chapter 11 case number are: Specialty Hospital of Washington, LLC (EIN: 81-0681352; case number: 14-00279); Specialty Hospital of America, LLC (EIN: 81-0681347; case number 14-00295); SHA Holdings, Inc. (EIN: 20-5741943; case number 14-00296); SHA Management, LLC (EIN: 81-0681350; case number 14-00297); Specialty Hospital of Washington Nursing Center, LLC (EIN: 81-0681348; case number 14-00298), Specialty Hospital of Washington Hadley, LLC (EIN: 20-5752586; case number 14-00299), and SHA Hadley SNF, LLC (EIN: 20-5741976; case number 14-00300).

3.      Any objection to the assumption and assignment of any Designated Contract, including, without limitation, any objection to the Cure Amount or the ability of the Successful Bidder to provide adequate assurance of future performance under such Designated Contract, must (i) be in writing, (ii) set forth the basis for the objection as well as any cure amount that the objector asserts to be due (in all cases with appropriate documentation in support thereof), and (iii) be filed with the Clerk of the Court, United States Bankruptcy Court for the District of Columbia, 333 Constitution Avenue, NW, Suite 1225, Washington, D.C. 20001, and served on (a) counsel to the Debtors, Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, D.C. 20037-1122 (Attn: Patrick Potter, patrick.potter@pillsburylaw.com) and Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, NY (Attn: Andrew Troop, andrew.troop@pillsburylaw.com); (b) (ii) counsel for the Stalking Horse Purchaser for noticing purposes, Squire Sanders (US) LLP, One East Washington Street, Suite 2700, Phoenix, AZ 85004 (Attn: Craig D. Hansen, craig.hansen@squiresanders.com); (c) counsel to the Committee; (d) counsel to the Successful Bidder, if not the Stalking Horse Purchaser; and (e) the Office of the United States Trustee for the District of Columbia, 115 S. Union Street, Room 210, Alexandria, VA 22314 (Attn: Bradley Jones, Bradley.D.Jones@usdoj.gov), **so as to be actually received no later than 5:00 p.m. (prevailing Eastern Time) on the date that is fifteen (15) days after the filing of this Cure Notice** (the "**Assignment and Cure Objection Deadline**").

4.      To the extent that any entity does not timely object as set forth above, such entity shall be (i) forever barred from objecting to the assumption and assignment of its respective Designated Contracts identified on the Assignment Schedule, including, without limitation, asserting any additional cure payments or requesting additional adequate assurance of future performance, (ii) deemed to have consented to the applicable Cure Amount, if any, and to the assumption and assignment of the applicable Designated Contract, (iii) bound to such corresponding Cure Amount, if any, (iv) deemed to have agreed that the Successful Bidder has provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code, (v) deemed to have agreed that all defaults under the applicable Designated Contract arising or continuing prior to the effective date of the assignment have been cured as a result or precondition of the assignment, such that the Successful Bidder or the Debtors shall have no liability or obligation with respect to any default occurring or continuing prior to the assignment, and from and after the date of the assignment the applicable Designated Contract shall remain in full force and effect for the benefit of the Successful Bidder and such entity in accordance with its terms, (vi) deemed to have waived any right to terminate the applicable Designated Contract or designate an early termination date under the applicable Designated Contract as a result of any default that occurred and/or was continuing prior to the assignment date, (vii) deemed to have agreed that the Debtors are not obligated under the Designated Contracts following the effective date of the assumption and assignment, and (viii) deemed to have agreed that the terms of the Sale Order shall apply to the assumption and assignment of the applicable Designated Contract.

5.      If an objection is timely received and such objection cannot otherwise be resolved by the parties, the Court may hear such objection at the Sale Hearing or at a later date set by the Court.  The pendency of a dispute relating to the Cure Amount will not prevent or delay the assumption and assignment of any Designated Contract or the sale of the Acquired Assets to the Successful Bidder.  If an objection is filed only with respect to the cure amount listed on the

Cure Notice, the dispute with respect to the cure amount will be resolved consensually, if possible, or, if the parties are unable to resolve their dispute, before the Court.

6.      The Debtors' decision to assume and assign to the Successful Bidder a Designated Contract is subject to Court approval and the sale closing.  Accordingly, absent such approval and closing, any of the Designated Contracts shall not be deemed to be assumed and assigned, and shall in all respects be subject to further administration under the Bankruptcy Code.  The inclusion of any document on the Assignment Schedule shall not constitute or be deemed a determination or admission by the Debtors or the Successful Bidder that the document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code (all rights with respect thereto being expressly reserved).

7.      Any anti-assignment provisions contained in, or otherwise purporting to affect, the Designated Contracts shall not restrict, limit or prohibit the assumption, assignment and sale of such Designated Contracts, and such provisions are deemed unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

8.      Copies of the Bidding Procedures Order and other relevant documents may be obtained by: (a) written request to the Debtors' counsel, Pillsbury Winthrop Shaw Pittman LLP, 2300   N   Street,   NW,   Washington,   D.C.   20037-1122   (Attn:   Dania   Slim; dania.slim@pillsburylaw.com); (b) accessing the Court's website at http://www.dcb.uscourts.gov (please note that a PACER password is needed to access documents on the Court's website); or (c) viewing the docket of these cases at the office of the Clerk of the Court, United States Bankruptcy Court for the District of Columbia, 333 Constitution Avenue, NW, Suite 1225, Washington, D.C. 20001.

*[Signature Block on the Next Page]*

Dated: June ___, 2014

PILLSBURY WINTHROP SHAW PITTMAN LLP

/s/ *Patrick Potter*
Patrick Potter (426514)
Jerry Hall (976461)
Dania Slim (991689)
2300 N Street, NW
Washington, DC 20037-1122
Telephone:  (202) 663-8000
Facsimile:  (202) 663-8007
patrick.potter@pillsburylaw.com
jerry.hall@pillsburylaw.com
dania.slim@pillsburylaw.com


-and-

Andrew M. Troop (admitted *pro hac vice*)
1540 Broadway
New York, NY 10036-4039
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com

*Counsel for Debtors*

**<u>Exhibit 1</u>**

Assignment Schedule

# **Exhibit F-2**

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re: | |
| SPECIALTY HOSPITAL OF WASHINGTON, LLC, *et al.*, | Case No. 14-00279 |
| | Chapter 11 |
| Debtors.[1] | (Joint Administration Requested) |

### NOTICE OF POTENTIAL ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS ASSETS

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      On [May 30June 9, 2014], 2014, the United States Bankruptcy Court for the District of Columbia (the "**Court**") entered an order (the "**Bidding Procedures Order**") in the chapter 11 cases (the "**Cases**") of the above-captioned debtors and debtors-in-possession (the "**Debtors**") approving, among other things, certain procedures related to the assumption and assignment of executory contracts and unexpired leases (the "**Designated Contracts**") listed on Exhibit 1 annexed to this Notice in connection with the sale of substantially all of the Debtors' assets (the "**Acquired Assets**").  The Debtors may assume and assign the Designated Contracts to the successful bidder for the Acquired Assets (the "**Successful Bidder**") under the bidding procedures (the "**Bidding Procedures**") approved by the Bankruptcy Court in connection with the Bidding Procedures Order.

2.      The Debtors believe that any and all defaults (other than the filing of these Cases) and actual pecuniary losses under the Designated Contracts can be cured by the payment of the cure amounts (the "**Cure Amounts**") listed on Exhibit 1 annexed to this Notice (the

---

[1]  The debtors in these chapter 11 cases and each debtor's federal identification number ("EIN") and chapter 11 case number are: Specialty Hospital of Washington, LLC (EIN: 81-0681352; case number: 14-00279); Specialty Hospital of America, LLC (EIN: 81-0681347; case number 14-00295); SHA Holdings, Inc. (EIN: 20-5741943; case number 14-00296); SHA Management, LLC (EIN: 81-0681350; case number 14-00297); Specialty Hospital of Washington Nursing Center, LLC (EIN: 81-0681348; case number 14-00298); Specialty Hospital of Washington Hadley, LLC (EIN: 20-5752586; case number 14-00299), and SHA Hadley SNF, LLC (EIN: 20-5741976; case number 14-00300).The debtors in these chapter 11 cases and the last four digits of each debtor's federal identification number are:  Specialty Hospital of America, LLC (1347), SHA Holdings, Inc. (1943), SHA Management, LLC (1350), Specialty Hospital of Washington, LLC (1352), Specialty Hospital of Washington Nursing Center, LLC (1348), Specialty Hospital of Washington Hadley, LLC (2586), and SHA Hadley SNF, LLC (1976).

"**Assignment Schedule**").  The Debtors reserve the right to delete items from, supplement, and modify the Assignment Schedule at any time, provided that to the extent that the Debtors add a Designated Contract to the Assignment Schedule or modify the Cure Amount, the affected party shall receive separate notice and an opportunity to objection to such addition or modification.

3.        Any objection to the assumption and assignment of any Designated Contract, including, without limitation, any objection to the Cure Amount or the ability of the Successful Bidder to provide adequate assurance of future performance under such Designated Contract, must (i) be in writing, (ii) set forth the basis for the objection as well as any cure amount that the objector asserts to be due (in all cases with appropriate documentation in support thereof), and (iii) be filed with the Clerk of the Court, United States Bankruptcy Court for the District of Columbia, 333 Constitution Avenue, NW, Suite 1225, Washington, D.C. 20001, and served on (a) counsel to the Debtors, Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, NW, Washington, D.C. 20037-1122 (Attn: Patrick Potter, patrick.potter@pillsburylaw.com) and Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, NY (Attn: Andrew Troop, andrew.troop@pillsburylaw.com); (b) (ii) counsel for the Stalking Horse Purchaser for noticing purposes, Squire Sanders (US) LLP, One East Washington Street, Suite 2700, Phoenix, AZ 85004 (Attn: Craig D. Hansen, craig.hansen@squiresanders.com); (c) counsel to the Committee; (d) counsel to the Successful Bidder, if not the Stalking Horse Purchaser; and (e) the Office of the United States Trustee for the District of Columbia, 115 S. Union Street, Room 210, Alexandria, VA 22314 (Attn: Bradley Jones, Bradley.D.Jones@usdoj.gov), **so as to be <u>actually received</u> no later than 5:00 p.m. (prevailing Eastern Time) on the date that is fifteen (15) days after the filing of this Cure Notice** (the "**Assignment and Cure Objection Deadline**").

4.        To the extent that any entity does not timely object as set forth above, such entity shall be (i) forever barred from objecting to the assumption and assignment of its respective Designated Contracts identified on the Assignment Schedule, including, without limitation, asserting any additional cure payments or requesting additional adequate assurance of future performance, (ii) deemed to have consented to the applicable Cure Amount, if any, and to the assumption and assignment of the applicable Designated Contract, (iii) bound to such corresponding Cure Amount, if any, (iv) deemed to have agreed that the Successful Bidder has provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code, (v) deemed to have agreed that all defaults under the applicable Designated Contract arising or continuing prior to the effective date of the assignment have been cured as a result or precondition of the assignment, such that the Successful Bidder or the Debtors shall have no liability or obligation with respect to any default occurring or continuing prior to the assignment, and from and after the date of the assignment the applicable Designated Contract shall remain in full force and effect for the benefit of the Successful Bidder and such entity in accordance with its terms, (vi) deemed to have waived any right to terminate the applicable Designated Contract or designate an early termination date under the applicable Designated Contract as a result of any default that occurred and/or was continuing prior to the assignment date, (vii) deemed to have agreed that the Debtors are not obligated under the Designated Contracts following the effective date of the assumption and assignment, and (viii) deemed to have agreed that the terms of the Sale Order shall apply to the assumption and assignment of the applicable Designated Contract.

2

5.      If an objection is timely received and such objection cannot otherwise be resolved by the parties, the Court may hear such objection at the Sale Hearing or at a later date set by the Court.  The pendency of a dispute relating to the Cure Amount will not prevent or delay the assumption and assignment of any Designated Contract or the sale of the Acquired Assets to the Successful Bidder.  If an objection is filed only with respect to the cure amount listed on the Cure Notice, the dispute with respect to the cure amount will be resolved consensually, if possible, or, if the parties are unable to resolve their dispute, before the Court.

6.      The Debtors' decision to assume and assign to the Successful Bidder a Designated Contract is subject to Court approval and the sale closing.  Accordingly, absent such approval and closing, any of the Designated Contracts shall not be deemed to be assumed and assigned, and shall in all respects be subject to further administration under the Bankruptcy Code.  The inclusion of any document on the Assignment Schedule shall not constitute or be deemed a determination or admission by the Debtors or the Successful Bidder that the document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code (all rights with respect thereto being expressly reserved).

7.      Any anti-assignment provisions contained in, or otherwise purporting to affect, the Designated Contracts shall not restrict, limit or prohibit the assumption, assignment and sale of such Designated Contracts, and such provisions are deemed unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

8.      Copies of the Bidding Procedures Order and other relevant documents may be obtained by: (a) written request to the Debtors' counsel, Pillsbury Winthrop Shaw Pittman LLP, 2300   N   Street,   NW,   Washington,   D.C.   20037-1122   (Attn:   Dania   Slim; dania.slim@pillsburylaw.com); (b) accessing the Court's website at http://www.dcb.uscourts.gov (please note that a PACER password is needed to access documents on the Court's website); or (c) viewing the docket of these cases at the office of the Clerk of the Court, United States Bankruptcy Court for the District of Columbia, 333 Constitution Avenue, NW, Suite 1225, Washington, D.C. 20001.

*[Signature Block on the Next Page]*

3

Dated: June ___, 2014

PILLSBURY WINTHROP SHAW PITTMAN LLP

/s/ *Patrick Potter*
Patrick Potter (426514)
Jerry Hall (976461)
Dania Slim (991689)
2300 N Street, NW
Washington, DC 20037-1122
Telephone:  (202) 663-8000
Facsimile:  (202) 663-8007
patrick.potter@pillsburylaw.com
jerry.hall@pillsburylaw.com
dania.slim@pillsburylaw.com

-and-

Andrew M. Troop (admitted *pro hac vice*)
1540 Broadway
New York, NY 10036-4039
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com

*Counsel for Debtors*

4

**Exhibit 1**

Assignment Schedule

5